IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | Civil Action No. 19-0519 |
| | : | |
| SAFEHOUSE, a Pennsylvania nonprofit corporation; | : | |
| | : | |
| JOSE BENITEZ, as President and Treasurer of Safehouse, | : | |
| | : | |
| *Defendants.* | : | |
| ———————————————————— | : | |
| | : | |
| SAFEHOUSE, a Pennsylvania nonprofit corporation, | : | |
| | : | |
| *Counterclaim Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Counterclaim Defendant,* | : | |
| | : | |
| and | : | |
| | : | |
| U.S. DEPARTMENT OF JUSTICE; WILLIAM P. BARR, in his official capacity as Attorney General of the United States; and WILLIAM M. McSWAIN, in his official capacity as U.S. Attorney for the Eastern District of Pennsylvania, | : | |
| | : | |
| *Third-Party Defendants.* | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2019, upon consideration

of the Motion for Judgment on the Pleadings filed by Plaintiff/Counterclaim Defendant United

States of America and Third-Party Defendants United States Department of Justice, United

States Attorney General William P. Barr, and United States Attorney for the Eastern District of

Pennsylvania William M. McSwain, and any response thereto, it is ORDERED that:

      1.      The motion is GRANTED;

      2.      Judgment is ENTERED in favor of the United States of America, U.S.

Department of Justice, United States Attorney General William P. Barr, and United States

Attorney for the Eastern District of Pennsylvania William M. McSwain, and against Safehouse

and Jose A. Benitez;

      3.      It is DECLARED that the establishment and operation of a "Consumption

Room," in which Defendants knowingly and intentionally provide a place for drug users to use

illegal controlled substances, including heroin and fentanyl, violates 21 U.S.C. § 856(a)(2); and

      4.      The clerk is directed to CLOSE this case.

IT IS SO ORDERED.

BY THE COURT:

_____
GERALD A. McHUGH
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | Civil Action No. 19-0519 |
| | : | |
| SAFEHOUSE, a Pennsylvania nonprofit corporation; | : | |
| | : | |
| JOSE BENITEZ, as President and Treasurer of Safehouse, | : | |
| | : | |
| *Defendants*. | : | |
| _____ | : | |
| | : | |
| SAFEHOUSE, a Pennsylvania nonprofit corporation, | : | |
| | : | |
| *Counterclaim Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Counterclaim Defendant*, | : | |
| | : | |
| and | : | |
| | : | |
| U.S. DEPARTMENT OF JUSTICE; WILLIAM P. BARR, in his official capacity as Attorney General of the United States; and WILLIAM M. McSWAIN, in his official capacity as U.S. Attorney for the Eastern District of Pennsylvania, | : | |
| | : | |
| *Third-Party Defendants*. | : | |

## **MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiff/Counterclaim Defendant United States of America and Third-Party Defendants

United States Department of Justice, United States Attorney General William P. Barr, and United

States Attorney for the Eastern District of Pennsylvania William M. McSwain (collectively, "the United States") move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons set forth in the attached memorandum of law, which is incorporated herein by reference, *see* Local Rule 7.1(c), the United States requests that its motion be granted, and that judgment be entered in its favor and against Defendants/Counterclaim Plaintiffs Safehouse and Jose A. Benitez.

Dated: June 11, 2019

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

GUSTAV W. EYLER
Branch Director
Consumer Protection Branch

JAMES J. GILLIGAN
Acting Director
Federal Programs Branch

ANDREW E. CLARK
Assistant Director
Consumer Protection Branch

JACQUELINE COLEMAN SNEAD
Assistant Director
Federal Programs Branch

DANIEL K. CRANE-HIRSCH
Trial Attorney
Consumer Protection Branch

TAMRA T. MOORE
Senior Counsel
Federal Programs Branch

*Co-Counsel for the United States*

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney

GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

JOHN T. CRUTCHLOW
ERIC D. GILL
BRYAN C. HUGHES
ERIN E. LINDGREN
Assistant United States Attorneys
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476
TEL: (215) 861-8200
FAX: (215) 861-8618

*Counsel for the United States*

**I**N THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | Civil Action No. 19-0519 |
| | : | |
| SAFEHOUSE, a Pennsylvania nonprofit corporation; | : | |
| | : | |
| JOSE BENITEZ, as President and Treasurer of Safehouse, | : | |
| | : | |
| *Defendants*. | : | |
| ————————————————————— | : | |
| | : | |
| SAFEHOUSE, a Pennsylvania nonprofit corporation, | : | |
| | : | |
| *Counterclaim Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Counterclaim Defendant*, | : | |
| | : | |
| and | : | |
| | : | |
| U.S. DEPARTMENT OF JUSTICE; WILLIAM P. BARR, in his official capacity as Attorney General of the United States; and WILLIAM M. McSWAIN, in his official capacity as U.S. Attorney for the Eastern District of Pennsylvania, | : | |
| | : | |
| *Third-Party Defendants*. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES'
MOTION FOR JUDGMENT ON THE PLEADINGS**

## **Table of Contents**

I.      Procedural and Factual Background .............................................................................2

II.     Argument .......................................................................................................................4

        A.      Safehouse's Proposed Consumption Rooms Plainly Violate
                21 U.S.C. § 856(a)(2)........................................................................................4

        B.      Contrary to Safehouse's Contention, the Phrases "for the purpose of,"
                "except as authorized by this subchapter," and "illegal…use" are
                Not Ambiguous....................................................................................................8

                1.      "For the purpose of":  Defendants' Purportedly Beneficent
                        Purposes Do Not Exempt Them from § 856(a)(2) Because
                        *the Drug User's* Purpose is at Issue...................................................8

                2.      The Phrase "Except as authorized by this subchapter":
                        Nothing in Subchapter I of the CSA Authorizes Consumption
                        Rooms ...................................................................................................13

                3.      The Phrase "illegal…use": § 856(a)(2) Squarely Applies to
                        Safehouse Because People Would Use Illegal Drugs In Its
                        Consumption Rooms..............................................................................16

        C.      None of Safehouse's Affirmative Defenses Has Merit....................................18

                1.      Contrary to Safehouse's Contention, "Medical Necessity" Does
                        Not Excuse a Violation of the CSA .....................................................18

                2.      Safehouse's Affirmative Defense that the CSA is Unconstitutional
                        as Applied is Foreclosed by *Gonzales v. Raich* ...................................20

                3.      Safehouse's Claim that the Religious Freedom Restoration Act
                        Protects Its Religious Expression Fails as a Matter of Law.................22

                        a.      Application of § 856(a) to Safehouse Does Not Substantially
                                Burden Defendants' Claimed Religious Belief........................24

                        b.      Safehouse Admits that It Seeks to Engage in Activity
                                that is Motivated by Socio-Political or Philosophical
                                Reasons, Not Religious Ones....................................................29

III.    Conclusion ..................................................................................................................36

## Table of Authorities

**Cases**                                                                 **Page(s)**

*Adams v. Commissioner of Internal Revenue*,
170 F.3d 173 (3d Cir. 1999).................................................................... 29

*Adkins v. Kaspar*,
393 F.3d 559 (5th Cir. 2004)................................................................ 25

*Africa v. Pennslyvania*,
662 F.2d 1025 (3d Cir. 1981)............................................................ 32, 33

*Allah v. Stachelek*,
1998 U.S. Dist. LEXIS 7972 (E.D. Pa. 1998)...………………………………………….27

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ............................................................................ 23

*Callahan v. Woods*,
658 F.2d 679 (9th Cir. 1981)............................................................... 30

*Cash v. IRS*,
2019 U.S. Dist. LEXIS 11603 (M.D. Pa. 2019)…………………………………..… 27

*Caviezel v. Great Neck Public Schools*,
701 F. Supp. 2d 414 (E.D.N.Y. 2010)................................................... 30

*Check v. New York City Department of Education*,
2013 U.S. Dist. LEXIS 71124 (E.D.N.Y. 2013)………………………………...............31

*Cheffer v. Reno*,
55 F.3d 1517 (11th Cir. 1995)........................................................ 26, 29

*Curto v. A Country Place Condominium Association, Inc.*,
921 F.3d 405 (3d. Cir. 2019)............................................................... 23

*Cutter v. Wilkinson*,
544 U.S. 709 (2005) ........................................................................... 30

*Delaware County, Pennsylvania v. Federal Housing Finance Agency*,
747 F.3d 215 (3d Cir. 2014)............................................................... 20

*Fallon v. Mercy Catholic Medical Center*,
877 F.3d 487 (3d Cir. 2017)........................................................... 32, 33

*General Brown Central School District*,
  851 F.2d 47 (2d Cir. 1988) ......................................................................................... 30

*Geneva College v. Secretary United States Department of Health & Human Services*,
  778 F.3d 422 (3d Cir. 2015) ....................................................................................... 24

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ............................................................................................. 15, 16

*Gonzales v. Raich*,
  545 U.S. 1 (2005) ....................................................................................... 14, 20, 21, 22

*Goodall v. Stafford County School Board*,
  60 F.3d 168 (4th Cir. 1995) ....................................................................................... 25

*Gozlon-Peretz v. United States*,
  498 U.S. 395 (1991) ................................................................................................... 18

*Henderson v. Kennedy*,
  253 F.3d 12 (D.C. Cir. 2001) ............................................................................... 26, 28

*Huddleston v. United States*,
  415 U.S. 814 (1974) ................................................................................................... 18

*Kaemmerling v. Lappin*,
  553 F.3d 669 (D.C. Cir. 2008) ................................................................................... 24

*Little Sisters of the Poor Home for the Aged v. Burwell*,
  794 F.3d 1151 (10th Cir. 2015) ................................................................................. 24

*Lyng v. Northwest Indian Cemetery Protective Associaiton*,
  485 U.S. 439 (1988) ............................................................................................. 24, 25

*Mack v. Warden Loretto FCI*,
  839 F.3d 286 (3d Cir. 2016) ....................................................................................... 25

*Mahoney v. Doe*,
  642 F.3d 1112 (D.C. Cir. 2011) ................................................................................. 26

*Patel v. U.S. Bureau of Prisons*,
  515 F.3d 807 (8th Cir. 2008) ..................................................................................... 27

*Planned Parenthood Association v. Walton*,
  949 F. Supp. 290 (E.D. Pa. 1996) ............................................................................. 26

*Pomper v. Thompson*,
   836 F.2d 131 (3d Cir. 1987) ......................................................................... 10

*Real Alternatives, Inc. v. Secretary Department of Health & Human Services*,
   867 F.3d 338 (3d Cir. 2017) ........................................................... 24, 25, 31

*Reno v. Koray*,
   515 U.S. 50 (1995) ........................................................................................ 18

*Robinson v. Shell Oil Co.*,
   519 U.S. 337 (1997) ........................................................................................ 5

*Rose v. Bartle*,
   871 F.2d 331 (3d Cir. 1989) ........................................................................... 4

*Smith v. Kyler*,
   295 F. App'x 479 (3d Cir. 2008) .................................................................. 25

*Sutton v. Rasheed*,
   323 F.3d 236 (3d Cir. 2003) ......................................................................... 30

*Tavarez v. Klingensmith*,
   372 F.3d 188 (3d Cir. 2004) ......................................................................... 18

*Turbe v. Government of Virgin Islands*,
   938 F.2d 427 (3d Cir. 1991) ........................................................................... 4

*United States v. Akinyoyenu*,
   199 F. Supp. 3d 106 (D.D.C. 2016) ............................................................. 14

*United States v. Banks*,
   987 F.2d 463 (7th Cir. 1993) ........................................................................ 12

*United States v. Blake*,
   Crim. No. 2006-0030, 2009 WL 1124957 (D.V.I. Apr. 24, 2009) ............... 9

*United States v. Butler*,
   Crim. Nos. 02-300-01, 02-300-02, 2004 WL 2577631 (E.D. Pa. Oct. 6, 2004) ........................ 9

*United States v. Cannabis Cultivator Club*,
   5 F. Supp. 2d 1086 (N.D. Cal. 1998) ........................................................... 19

*United States v. Chen*,
   913 F.2d 183 (5th Cir. 1990) ........................................................... 5, 8, 11, 12

*United States v. Cole,*
  558 F. App'x 173 (3d Cir. 2014)........................................................................ 9

*United States v. Epstein,*
  91 F. Supp. 3d 573 (D.N.J. 2015) ............................................................... 27, 28

*United States v. Flemming,*
  617 F.3d 252 (3d Cir. 2010)........................................................................ 18

*United States v. Ford,*
  371 F.3d 550 (9th Cir. 2004)....................................................................... 11

*United States v. Goldstein,*
  902 F.3d 411 (3d Cir. 2018)…………………………………………………………23

*United States v. Harrison,*
  133 F.3d 1084 (8th Cir. 1998).................................................................... 5, 8

*United States v. Hodge,*
  321 F.3d 429 (3d Cir. 2003)......................................................................... 5

*United States v. Meyers,*
  95 F.3d 1475 (10th Cir. 1996)..................................................................... 31

*United States v. Oakland Cannabis Buyers' Cooperative,*
  532 U.S. 483 (2001) ................................................................... 7, 8, 18, 19

*United States v. Pollen,*
  978 F.2d 78 (3d Cir. 1992) ......................................................................... 18

*United States v. Ramsey,*
  406 F.3d 426 (7th Cir. 2005).................................................................. 5, 9, 12

*United States v. Stimler,*
  864 F.3d 253 (3d Cir. 2017)........................................... 23, 26, 27, 28, 29, 30

*United States v. Tamez,*
  941 F.2d 770 (9th Cir. 1991).................................................... 5, 8, 9, 10, 11, 12

*United States v. Tebeau,*
  713 F.3d 955 (8th Cir. 2013).................................................... 5, 9, 12, 13, 16

*United States v. Wallace,*
  532 F.3d 126 (2d Cir. 2008)....................................................................... 17

*United States v. Wilson*,
  503 F.3d 195 (2d Cir. 2007) ......................................................................... 5, 8, 12

*Washington v. Klem*,
  497 F.3d 272 (3d Cir. 2007) ................................................................................. 25

*Watkins v. Shabazz*,
  180 F. App'x 773 (9th Cir. 2006) .......................................................................... 27

*Wiggins v. Sargent*,
  753 F.2d 663 (8th Cir. 1985) ................................................................................. 30

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ............................................................................................... 31

**Statutes**

21 U.S.C. § 801(1)-(2) ............................................................................................ 17
21 U.S.C. § 801(3)(A) ............................................................................................ 21
21 U.S.C. § 812(b)(1)(B) .................................................................................... 6, 19
21 U.S.C. § 812(b)(1)(C) .......................................................................................... 6
21 U.S.C. § 822 ...................................................................................................... 29
21 U.S.C. § 823(g) .................................................................................................. 15
21 U.S.C. § 844 ........................................................................................... 6, 17, 34
21 U.S.C. § 856(a) ................................................................................................ 4, 5
21 U.S.C. § 856(a)(1) ........................................................................................ 10, 11
21 U.S.C. § 856(a)(2) ....................................................................................... *passim*
42 U.S.C. § 2000bb ................................................................................................ 23
114 P.L. No. 113 ....................................................................................................... 7

**Rules**

Federal Rule of Civil Procedure 12(c) ................................................................. 4, 8

**Regulations**

21 C.F.R. § 1301.12 ............................................................................................... 29
21 C.F.R. § 1306.04 ......................................................................................... 14, 16

**Other Authorities**

76 Fed. Reg. 10038 (Feb. 23, 2011) ...................................................................... 7

## <u>INTRODUCTION</u>

What Safehouse proposes is illegal under federal law. This is not a difficult question or a close call. Even Safehouse's chief spokesperson, former District Attorney and Governor Ed Rendell – somebody with a reputation for plain speaking – has candidly admitted in public that injection sites would violate federal law.[1] So, the relevant question in this case is not whether the sites would be illegal – but whether the rule of law will be vindicated in the face of pressure from well-intentioned (but ultimately misguided) injection site proponents.

Safehouse proposes to operate a place called a "Consumption Room" where people can inject heroin and other illegal drugs. This would plainly violate the Controlled Substances Act ("CSA"), which makes it unlawful to manage any place where people use such drugs, regardless of compensation or the property owner's motive. Rather than seek a change in the law through the democratic process, Safehouse asks this Court to change it for them, by seeking to close a supposed "gap in care at the time of drug consumption" by declaring Consumption Rooms legal.

But there is no "gap" in the law; the CSA prohibits Consumption Rooms. Consistent with that prohibition, no doctor can prescribe heroin; there is no currently accepted medical use for it; and no one can legally possess it or another drug that was not dispensed via a valid prescription (like street fentanyl). These facts repudiate the very concept of a "safe" injection site. Even if there were a "gap," it would be incumbent upon Congress – and not the Court – to fill it.

Safehouse's legal arguments in favor of Consumption Rooms find no support in the law. In substantially similar cases, the U.S. Supreme Court has squarely rejected two of Safehouse's defenses – "medical necessity" and its challenge under the Commerce Clause. And while

---

[1] "[T]he Prevention Point people came to me . . . and said we want to set up new non-profit for safe injection," at approximately 48:50, "and I knew it was against the law," at approximately 51:05. Cato Institute panel on "Safe Syringe Programs/Safe Consumption Facilities" held on March 21, 2019 (video available at https://www.cato.org/events/harm-reduction-shifting-war-drugs-war-drug-related-deaths).

Safehouse falls back on a half-hearted argument that the CSA's prohibition would substantially burden Safehouse's founders' expression of religious freedom ("that's not our strongest argument," Ed Rendell said to a crowd's laughter[2]), the law requires consideration of alternative forms of expression before it will recognize a claim under the Religious Freedom Restoration Act ("RFRA"). Given the multitude of potentially lifesaving options such as medication-assisted treatment that do not involve inviting thousands of people onto Safehouse's property to use illegal drugs, enforcement of the CSA presents no substantial burden on Safehouse as a matter of law.

Without question, our nation presently faces a crisis of the first order in the illegal use and abuse of opioids, which has reached epidemic proportions and caused an intolerable number of deaths and misery throughout the United States. The undersigned are dedicated to using all lawful means to address this problem. But all actions undertaken to address the issue must comply with the law, and the law applicable to consumption sites is clear at this time. The remedy for those who disagree with this law lies in the legislative arena, not in the U.S. Attorney's Office or in the courts.

In short, Safehouse's proposed operation of Consumption Rooms is illegal under current law, with no relevant exceptions. This Court should declare it so and strike a blow for the rule of law – something that is sorely needed and that the Court is uniquely qualified to deliver.

## I.     PROCEDURAL AND FACTUAL BACKGROUND

The United States commenced this action on February 5, 2019, by filing a Complaint for Declaratory Judgment against Safehouse, a Pennsylvania nonprofit corporation ("Safehouse"),

---

[2] Cato Institute panel on "Safe Syringe Programs/Safe Consumption Facilities" held on March 21, 2019, starting at approximately 56:06 (video available at https://www.cato.org/events/harm-reduction-shifting-war-drugs-war-drug-related-deaths).

and Jeanette Bowles, as Safehouse's Executive Director ("Bowles"). (ECF No. 1). The day after the United States filed suit, Safehouse informed Jeanette Bowles she would no longer serve as its Executive Director. (ECF No. 29 at 4). Then, on April 10, 2019, Bowles' employment by Safehouse ceased in its entirety. *Id*. Accordingly, on May 23, 2019, the parties stipulated to Bowles' dismissal without prejudice, and the United States amended its complaint, naming Jose Benitez, Safehouse's president and treasurer, in Bowles' place. (ECF No. 35). Defendants subsequently answered the Amended Complaint on June 7, 2019. (ECF No. 45).

In its Amended Complaint, the government alleges that "Safehouse seeks to establish and operate one or more sites in Philadelphia where, among other things, intravenous drug users will be permitted to use illegal controlled substances (primarily, heroin and fentanyl) in 'consumption rooms' under medical supervision[.]" (ECF No. 35 at ¶ 6). The Amended Complaint's core contention is that Consumption Rooms violate § 856(a)(2). That section, in relevant part, makes it a felony for persons to "manage or control any place" that they "knowingly and intentionally . . . make available for use, with or without compensation . . . for the purpose of unlawfully . . . using a controlled substance." (*Id*. at ¶¶ 14, 15). Asserting that Safehouse's "operation of Consumption Rooms would do exactly that" (*id*. at ¶ 15), the United States seeks a declaratory judgment that Safehouse's "establishment and operation of any Consumption Room . . . will violate 21 U.S.C. § 856(a)(2)." (*Id*. at 8).

In its Answer, Safehouse describes its planned operation as follows:

> Upon arrival at Safehouse, all participants must register and provide demographic information. A physical and behavioral health assessment will be conducted and a range of overdose prevention services offered. Participants will be directed to the medically supervised observation room, where they will be offered on-site initiation of Medication Assisted Treatment (MAT), wound care, and referrals to primary care, social services, and housing opportunities. Or participants may seek supervised consumption, in which case they will be directed to the medically supervised consumption room and provided sterile consumption equipment and

> fentanyl test strips. [After injecting illegal controlled substances, such as heroin and fentanyl,] [p]articipants will safely dispose of used consumption equipment before leaving the supervised consumption area. . . . From the consumption area, participants will be directed to the medically supervised observation room and again offered opportunities for drug treatment, medical care, and social services.

(ECF No. 45 at ¶ 10) (internal marks and footnotes omitted). Accordingly, Safehouse intends to invite people possessing illegal drugs to inject those drugs within its facility under observation.

The government now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[3]

## II.   ARGUMENT

### A.  Safehouse's Proposed Consumption Rooms Plainly Violate 21 U.S.C. § 856(a)(2).

Defendants' proposed Consumption Rooms would violate 21 U.S.C. § 856(a), which generally makes it a crime and an offense subject to civil remedies to either:

> (1) knowingly open . . . or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance; [or]

> (2) manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

21 U.S.C. § 856(a). Safehouse's proposed operation of a place in which people would be invited to use illegal drugs falls within the plain prohibition of § 856(a)(2).

---

[3] On June 10, 2019, the United States filed its Answer to Safehouse's Counterclaims/Third-Party Complaint. (ECF No. 46). The pleadings are now "closed" and a motion for judgment on the pleadings is permitted. *See* Fed. R. Civ. P. 12(c). A Rule 12(c) motion is subject to the same legal standard as a motion to dismiss under Rule 12(b)(6). *See, e.g.*, *Rose v. Bartle*, 871 F.2d 331, 342 (3d Cir. 1989). Accordingly, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences therefrom in favor of the non-moving party. *See Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991).

In all statutory construction cases, a court must "begin with the language of the statute." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). The first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Id.* (internal citations omitted). The inquiry ceases "if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Id.* Only "[w]hen the language of a statute is ambiguous, [do courts] look to its legislative history to deduce its purpose." *United States v. Hodge*, 321 F.3d 429, 437 (3d Cir. 2003).

None of the five circuit courts that has examined Section 856(a)(2) has found it ambiguous. *United States v. Chen*, 913 F.2d 183 (5th Cir. 1990); *United States v. Tamez*, 941 F.2d 770 (9th Cir. 1991); *United States v. Wilson*, 503 F.3d 195 (2d Cir. 2007); *United States v. Ramsey*, 406 F.3d 426 (7th Cir. 2005); *United States v. Harrison*, 133 F.3d 1084 (8th Cir. 1998); *United States v. Tebeau*, 713 F.3d 955 (8th Cir. 2013).

Safehouse's plan violates subsection (a)(2) because: (1) it would manage and control a place as either an owner or lessee, that (2) it would knowingly and intentionally make available, (3) for the purpose of unlawfully using a controlled substance. This plain reading of the statute is consistent with § 856(a)(2)'s broad language, which encompasses a range of relationships and conduct as to a person who manages or controls "any place," whether "permanently" or "temporarily." The statute covers not only property owners, but also lessees, agents, employees, occupants, and mortgagees. It applies whether the place is made available "with or without compensation," explicitly encompassing a situation such as this one where Defendants state they would not commercially profit from allowing illegal use at their facility. The statutory language plainly applies to a much larger set of conduct and potential relationships than a "crack house" or "drug-fueled rave," as Defendants contend. (*See* ECF. No. 3, Preliminary Statement at 4.)

Section 856's prohibition on Consumption Rooms, especially as it relates to the illegal use of a Schedule I drug such as heroin (or, worse, heroin mixed with fentanyl), aligns with the CSA's overall structure. First, § 856's prohibition on Consumption Rooms is consistent with the CSA's prohibition of illegal possession of heroin and street fentanyl in the first place. *See* 21 U.S.C. § 844. Consumption Room users would illegally possess controlled substances in the Consumption Room – one must possess drugs in order to use them. Second, Congress placed heroin on Schedule I of the CSA after determining that heroin has "no currently accepted medical use in treatment in the United States," 21 U.S.C. § 812(b)(1)(B), and that "[t]here is a lack of accepted safety for use of the drug . . . under medical supervision," *id.* § 812(b)(1)(C). Accordingly, physicians cannot prescribe Schedule I drugs (with exceptions that do not apply here). *Id.* § 829 (allowing prescriptions for only Schedule II-V drugs).

One of the government's concerns with purported "safe" injection sites – beyond their illegality – is that they would give people who use opioids and the public the false impression that using these deadly drugs can be safe given the right environment and supervision. That is exactly what Safehouse purports to offer: "assurance, to a medical certainty, that people within its care will not die of a drug overdose." (ECF No. 3 at ¶ 34; *see also id.* at ¶¶ 23, 46.) Safehouse's guarantee is an impermissible attempt to substitute its own judgment for that of Congress, which has already determined that heroin has a "lack of accepted safety for use," even "under medical supervision." 21 U.S.C. § 812(b)(1)(C).

Safehouse contends that the Court should interpret § 856 to permit Consumption Rooms because: (1) the U.S. Surgeon General and the CDC encourage clean needle exchange, (2) Congress has, in recent years, loosened restrictions on the use of funding for certain programs that provide sterile syringes, and (3) the federal government has authorized funding for overdose

reversal treatment, including the opioid overdose reversal drug Naloxone. (ECF No. 3 at ¶¶ 56-60, 71-73). Allowing clean needle exchanges, however, does not constitute a judgment that injection of illegal drugs is safe or even safe under supervision. And it certainly does not constitute a judgment that injection of illegal drugs is somehow legal or that Consumption Rooms themselves are legal. Rather, it reflects the policy judgment that allowing clean needle exchanges reduces the spread of communicable disease such as HIV and Hepatitis and promotes entry into treatment, outweighing any potential facilitation of underlying illegal drug use. *See* 76 Fed. Reg. 10038 (Feb. 23, 2011); 2016 Appropriations Act, 114 P.L. No. 113, 129 Stat. 2242 at § 520.[4] As to Naloxone (also known by its brand name Narcan), this reflects an effort to arm front-line overdose responders, not a judgment that illegal drugs are safe to use if Naloxone is nearby. Increased federal funding for fire fighters does not mean that arson can be done safely if near a fire station. Safehouse is wrong when it professes that the CSA currently reflects its own view that illegal drug use can be safe under supervision. Rather, the CSA specifically prohibits *precisely* Safehouse's proposed conduct.

Safehouse itself separately recognizes that its Complaint seeks a judicial "extension" of legislative measures authorizing needle exchanges and Naloxone availability to fill what it perceives to be a "gap at the time of drug consumption." (ECF No. 3 at ¶ 65). Safehouse is more than welcome to make this policy argument to Congress. But there is no corresponding "gap" in the law, and it is Congress' task, not the Court's—and certainly not Safehouse's—to decide whether such perceived gaps should be filled. *See Oakland Cannabis Buyers' Coop.*, 532 U.S.

---

[4] The 2016 Appropriations Act, which Safehouse cites in support of its assertion that sterile syringe services have broad support from the federal government (*see* ECF No. 3 at ¶ 60), provides that *no* appropriated funds shall be used to purchase sterile syringes, but that federal funds *may* be used for *other* elements of a drug-treatment program *if* the CDC and local health authorities determine that a locality is experiencing a significant increase in hepatitis infections or an HIV outbreak due to injection drug use, *and* provided that such program is otherwise operating in accordance with law. *See* 114 P.L. No. 113 at § 520.

483, 490 (2001) ("whether, as a policy matter, an exemption should be created is a question for legislative judgment, not judicial interference") (internal quotes omitted).

Accordingly, the Court should enter a judgment declaring that Safehouse's maintenance and operation of a Consumption Room would violate § 856(a)(2).

> ### B. Contrary to Safehouse's Contention, the Phrases "for the purpose of," "except as authorized by this subchapter," and "illegal . . . use" are Not Ambiguous.

Safehouse contends that three specific phrases within § 856 are ambiguous: (1) "for the purpose of," (2) "except as authorized by this subchapter," and (3) "unlawful[]. . .us[e]." (ECF No. 3 at ¶ 100). As discussed below, each phrase is unambiguous and supports the government's plain reading of the statute.

> #### 1. "For the purpose of": Defendants' Purportedly Beneficent Purposes Do Not Exempt Them from § 856(a)(2) Because *the Drug User's* Purpose is at Issue.

Even though it would be openly inviting illegal drug use within its location, Safehouse contends that its "singular purpose is to provide lifesaving medical treatment," and thus it would not be making the property that it manages available "for the purpose of unlawfully" using controlled substances. (*Id*. at ¶¶ 92-93). In making this contention, Safehouse interprets "for the purpose" as meaning that it – rather than those who would use the Consumption Rooms – must have the purpose that illegal drugs be used on the property it manages.

As discussed in detail below, every court that has interpreted the phrase "for the purpose of" has rejected Safehouse's statutory interpretation and found § 856(a)(2) to be unambiguous. *United States v. Chen*, 913 F.2d 183 (5th Cir. 1990); *United States v. Tamez*, 941 F.2d 770 (9th Cir. 1991); *United States v. Wilson*, 503 F.3d 195 (2d Cir. 2007); *United States v. Ramsey*, 406 F.3d 426 (7th Cir. 2005); *United States v. Harrison*, 133 F.3d 1084 (8th Cir. 1998); *United States*

*v. Tebeau*, 713 F.3d 955 (8th Cir. 2013). Each of these cases holds that the pertinent "purpose" is not that of the property manager – here, Safehouse. Rather, the "purpose" that matters under § 856(a)(2) is that of the so-called "participants" who would use illegal drugs at Safehouse's facility.

While not directly addressing the issue of whether § 856(a)(2) is ambiguous, decisions of this Court and the Third Circuit construing the statute are in full accord. *See United States v. Cole*, 558 F. App'x 173, 181 (3d Cir. 2014) (not precedential) (affirming conviction under § 856(a)(2), finding sufficient evidence permitting the jury to "infer [the defendant] intended that the property be used [by others] for manufacturing and storing controlled substances"); *United States v. Blake*, Crim. No. 06-30, 2009 WL 1124957, at *2 (D.V.I. Apr. 24, 2009) (holding, in challenge to conviction under § 856(a)(2), "the Government has proven that [the defendant] knowingly and intentionally allowed her home to be used for the purpose (albeit [her brother's] purpose) of manufacturing cocaine base and storing cocaine powder"); *United States v. Butler*, Crim. Nos. 02-300-01, 02-300-02, 2004 WL 2577631, at *3 (E.D. Pa. Oct. 6, 2004) (upholding conviction for violation of § 856(a)(2), reasoning "the evidence linking [the defendant] to the apartment was enough for a jury to conclude that he was the lessee or occupant and that he had made the space available for drug distribution"). The critical issue, then, is something that is not in dispute – *i.e.*, whether Safehouse knowingly would allow people onto its property who have the purpose to use illegal drugs. The answer to that question, of course, is yes.

In *Tamez*, the defendant was convicted of violating § 856(a)(2) after he allowed his car dealership to be used for cocaine distribution. The government presented evidence that officers made undercover cocaine purchases at the dealership from Tamez's employees and that other witnesses had delivered and purchased cocaine there. There was no evidence that Tamez himself

sold or bought cocaine. Like Safehouse, Tamez contended that a violation of § 856(a)(2) required that he personally intend to use the building for the purpose of manufacturing drugs or other prohibited activities, and argued his sole purpose was to run a car dealership.

The Ninth Circuit held that § 856(a)(2) is "not ambiguous" and rejected Tamez's claim, holding that his suggested interpretation would make section 856(a)(2) superfluous:

> Tamez' assertion that the statute requires that he *intend* to use the building for a prohibited purpose under section 856(a)(2) also ignores the plain meaning and interrelation of the two § 856 provisions. Section 856(a)(1) states: '[I]t shall be unlawful to—(1) knowingly open or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance...' This provision applies to purposeful activity and as such, if illegal purpose is, as Tamez suggests, a requirement of 856(a)(2), the section would overlap entirely with 856(a)(1) and have no separate meaning.

*Tamez*, 941 F.2d at 774 (emphasis in original). Rather, the Ninth Circuit held that "[b]oth provisions of § 856 must have meaning[.]" *Id.*; *cf. Pomper v. Thompson*, 836 F.2d 131, 133 (3d Cir. 1987) ("The cardinal principle of statutory construction" requires courts to "give effect, if possible, to every clause and word of [a] statute.") (internal citations omitted).

Further, the *Tamez* court stated, "it is clear that (a)(1) was intended to apply to deliberate maintenance of a place for a proscribed purpose, whereas (a)(2) was intended to prohibit an owner from providing a place for illegal conduct, and yet to escape liability on the basis of lack of illegal purpose, or of deliberate indifference." *Id.* Even though there was "no evidence that the business or its buildings were established or maintained for the purpose of drug activities, section

856(a)(2) requires only that proscribed activity was present, that Tamez knew of the activity and allowed that activity to continue." *Id*.[5]

The *Tamez* court noted that its decision was consistent with the holding in *United States v. Chen*, 913 F.2d 183, 190 (5th Cir. 1990). The Fifth Circuit was the first circuit court to address § 856(a)(2)'s purpose requirement. In *Chen*, the defendant purchased a motel that became an area for illegal drug dealing and use. *Id*. at 185. Chen conceded that she was aware that drug transactions were taking place in her motel and a jury convicted her under both 21 U.S.C. § 856(a)(1) and (a)(2). The trial court charged the jury to find the defendant guilty under both § 856(a) provisions if she deliberately ignored unlawful conduct that should have been obvious. The Fifth Circuit reversed with regard to § 856(a)(1), holding it requires the defendant to have the purpose or intention to manufacture, distribute, or use a controlled substance. *Id*. By contrast, the Fifth Circuit held that § "856(a)(2) is designed to apply to the person who may not have actually opened or maintained the place for the purpose of drug activity, but who has knowingly allowed others to engage in those activities by making the place 'available for use . . . for the purpose of unlawfully'" engaging in such activity. *Id*. Affirming the § 856(a)(2) conviction, the court held that "under § 856(a)(2), the person who manages or controls the building and then rents to others, need not have the express purpose in doing so that drug related activity take place; rather such activity is engaged in by others (*i.e.*, others have the purpose)." *Id*. (internal citation omitted).

---

[5] The Ninth Circuit reaffirmed *Tamez*'s key holding in *United States v. Ford*, 371 F.3d 550 (9th Cir. 2004), considering whether double jeopardy barred the government from prosecuting the defendant under § 856(a)(2) following his acquittal under § 856(a)(1). The defendant contended that "similar language in both (a)(1) and (a)(2) should be read to contain the same intent requirement—that is, the defendant must be shown to have acted 'for the purpose of' manufacturing, distributing, or using drugs." *Id*. The Ninth Circuit rejected this argument, invoking its holding in *Tamez* and the "twin conclusions that both subsections [of § 856] 'must have meaning' and have different intent requirements," namely that § 856(a)(2) requires that the manager or the controller of the property make the property available to *others*, knowing that illegal use will occur. *Id.* at 554.

Several other circuits considering the same issues have cited the holdings of *Tamez* and *Chen*. The Second Circuit held that it was the drug dealer's purpose, not the property owner's, that mattered under § 856(a)(2): "[t]he phrase 'for the purpose,' as used in this provision, references the purpose and design *not* of the person with the premises, but rather of those who are permitted to engage in drug-related activities there." *Wilson*, 503 F.3d at 197-98 (emphasis in original). In that case, the court held that the defendant's illegal act was making the property available for drug use or drug dealing by other people. *Id.*

The Seventh Circuit followed suit, holding that, "[s]everal circuits, including this one, have held that knowing or 'remaining deliberately ignorant' satisfies the knowledge component of § 856(a)(2)." *Ramsey*, 406 F.3d at 431 (citing *United States v. Banks*, 987 F.2d 463, 466 (7th Cir. 1993) ("In (a)(2) the 'purpose' may be that of others; the defendant is liable if he manages or controls a building that others use for an illicit purpose, and he either knows of the illegal activity or remains deliberately ignorant of it.")).

Most recently, the Eighth Circuit explored the issue in depth, agreeing with the other courts' unanimous views in *United States v. Tebeau*, 713 F.3d 955 (8th Cir. 2013). That case concerned the owner of a large property in Missouri who held music festivals at which drug use was widespread. The owner was aware of the drug activity and, echoing Safehouse's proposal here, even operated a medical facility on the campground known as "Safestock," where campers who had overdosed during the festival could go for medical treatment. *Id.* at 958. In entering a conditional guilty plea, Tebeau admitted that he had intended to make the campground available for individuals who had the intent to sell and use controlled substances. Tebeau argued on appeal that § 856(a)(2) required proof that he had the specific intent that illegal drugs would be stored, distributed, manufactured, or used on his property. The Eighth Circuit rejected his argument,

12

agreeing with the other circuit courts that § 856(a)(2) requires only that a defendant know that the drug selling and use were taking place on his property. *Id*. at 959-61 (stating that statutory interpretation requires consideration of the "bare meaning" of critical words or phrases, and that the "bare meaning" of the purpose requirement in § 856(a)(2) did not require specific intent). Considering that the drug sellers openly marketed their products and campers who overdosed were taken to "Safestock," the court held that "[s]uch open and obvious use is precisely the conduct prohibited by § 856(a)(2)'s plain language[.]" *Id*.

The statutory language, contrary to Safehouse's suggestion, is not ambiguous.  The government is not required to show that a defendant has the purpose to manufacture, distribute, store or use illegal drugs on the defendant's premises to establish a § 856(a)(2) violation. Instead, the government must show merely that Safehouse knowingly would allow people onto its property who have the purpose to use illegal drugs.

### 2. The Phrase "Except as Authorized by This Subchapter": Nothing in Subchapter I of the CSA Authorizes Consumption Rooms.

Safehouse contends that the phrase "except as authorized by this subchapter" in § 856 is ambiguous. (ECF No. 3 at ¶ 100). Tellingly, Safehouse does not describe how this phrase is ambiguous or what alternative meanings it may have. And most importantly, no provision *anywhere* in the CSA authorizes Consumption Rooms.[6]

The CSA is divided into two subchapters. Subchapter I is entitled "Control and Enforcement" and Subchapter II is entitled "Import and Export." Subchapter I is further divided

---

[6] Instead, Safehouse contradicts its own argument when it separately argues that § 856 "expressly exempts conduct authorized by Subchapter I from its civil and criminal penalties," thereby acknowledging the unambiguous scope of the "except as authorized" language. (ECF No. 3 at ¶ 86 (internal quotation marks and brackets omitted)). According to the plain language of the statute, as Safehouse apparently concedes, the phrase "[e]xcept as authorized by this subchapter" in § 856 refers to Subchapter I of the CSA.

into six parts. Relevant here, Part C governs the registration of and requirements for
manufacturers, distributors, and dispensers of controlled substances. Part D establishes criminal
offenses and penalties. Section 856(a)(2) is within Part D. Thus, the phrase that begins § 856,
"[e]xcept as authorized by this subchapter," refers to Subchapter I. Use of this phrase is common
throughout Part D of Subchapter I. As one court explained:

> This phrase – "except as authorized by this subchapter" – pervades the CSA's
> criminal prohibitions in Part D. *See, e.g.*, § 841(a)(1), (c)(1), (h)(1)(B); §
> 842(a)(6), (a)(8); § 843(c)(2)(A); § 856(a). Except for rare and limited instances,
> however, this Part of the CSA describes what is <u>prohibited</u> but does not elucidate
> what is <u>authorized</u>. *See id*. § 841(h)(3) (providing limited exceptions for some
> online offenses).

*United States v. Akinyoyenu*, 199 F. Supp. 3d 106, 113 (D.D.C. 2016) (emphasis in original). The
*Akinyoyenu* court explained that "Part D is rife with sections that lay out actions that constitute
criminal offenses unless they are authorized by the <u>administrative</u> requirements of Part C – for
instance, the prerequisite that a practitioner register before she dispenses prescription drugs." *Id.*
(emphasis in original). As "illustrated by these cross-referencing exceptions, 'except as
authorized by this subchapter' means what its plain language suggests." *Id*. Specifically, any
section of the CSA "can 'authorize' conduct." *Id*. "If a person does what is so authorized, the
CSA prevents her from being prosecuted criminally." *Id*. (citing §§ 841(a)(1), (h)(1)(A)).
Through this interlocking scheme, Congress "devised a closed regulatory system making it
unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a
manner authorized by the CSA." *Gonzales v. Raich*, 545 U.S. 1, 13 (2005).

   In asserting that its "overdose prevention services are legitimate medical services that fall
under § 856's express exemption" (ECF No. 3 at ¶ 90), Safehouse improperly attempts to
shoehorn its Consumption Room into conduct that Part C of Subchapter I authorizes. Safehouse
contends that 21 C.F.R. § 1306.04, which is titled "[p]urpose of issue of prescription," permits its

14

operation of a Consumption Room. This section provides, in relevant part, that "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." (*See* ECF No. 3 at ¶ 87). While § 1306.04 may govern medication-assisted treatment,[7] the conduct at issue in this suit – providing a space for the supervised consumption of illegal drugs – is not authorized by this section nor any other section within Subchapter I. Safehouse's Consumption Rooms would *not* involve a prescription, and therefore § 1306.04 cannot authorize the relevant conduct, which is otherwise a violation of § 856.[8]

Safehouse similarly relies on *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006), for the proposition that "[t]he CSA does not generally 'regulate the practice of medicine,' except 'insofar as it bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood.'" (*See* ECF No. 3 at ¶ 44). But

---

[7] Where medication-assisted treatment involves the dispensing of controlled substances (*i.e.*, methadone or buprenorphine), it must be carried out in conformity with the CSA. *See* 21 U.S.C. § 823(g).

[8] Safehouse contends that Consumption Rooms have been endorsed by professional associations and international bodies. (*See* ECF No. 3 at ¶ 88). Whether that is true does not change the illegality of such facilities. To the extent that is relevant at all, Safehouse does not contend that its proposed Consumption Rooms have the support of the U.S. Surgeon General or the Centers for Disease Control and Prevention, both of which Safehouse cites as authorities on the opioid crisis and supporters of sterile syringe exchange services. (*See id.* at ¶¶ 30, 57-59). Indeed, the U.S. Surgeon General does not support Consumption Rooms:

> The Administration and the Surgeon General do not support so called "safe" injection sites as a means to combat the opioid epidemic and its consequences. In addition, there is no evidence to demonstrate that these illegal sites reduce drug use or significantly improve health outcomes for those with opioid use disorder. So called "safe" injection sites lack the necessary scientific support to be considered a standardized evidence-based practice in the U.S.

*Surgeon General urges ER docs to advocate for evidence-based opioid treatment*, Steven Ross Johnson, Modern Healthcare (May 23, 2018) (available at https://www.modernhealthcare.com/article/20180523/NEWS/180529976/ surgeon-general- urges-er-docs-to-advocate-for-evidence-based-opioid-treatment).

Additionally, the CDC published a guide outlining ten evidence-based strategies for preventing opioid overdose. This publication discusses targeted Naloxone distribution, and syringe services programs, among other measures, but does not include or endorse supervised injection. *See* Centers for Disease Control and Prevention. *Evidence-Based Strategies for Preventing Opioid Overdose: What's Working in the United States.* National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, 2018 (available at www. cdc.gov/drugoverdose/pdf/pubs/2018-evidence-based-strategies.pdf).

Consumption Rooms are predicated on "participants" possessing illegal drugs and Safehouse making its facility available for the use of illegal drugs – two things the CSA expressly forbids. In any event, *Oregon* has no application here. *Oregon* addressed whether the U.S. Attorney General could unilaterally prohibit doctors in Oregon from prescribing drugs to assist in suicide by taking the position that assisting suicide is not a "legitimate medical practice" within the meaning of 21 C.F.R. § 1306.04, which governs the prescription of drugs. *Oregon*, 546 U.S. at 254-55. Safehouse's proposed prescribing and/or dispensing are not at issue; its proposed operation of a Consumption Room is. That falls outside the prescribing conduct authorized in 21 C.F.R. § 1306.04, and which § 856 explicitly prohibits.

### 3. The Phrase "illegal…use": § 856(a)(2) Squarely Applies to Safehouse Because People Would Use Illegal Drugs in Its Consumption Rooms.

Safehouse next contends that § 856(a)(2) is ambiguous and should not apply to its proposed Consumption Rooms because the CSA purportedly does not define the phrase "unlawfully … using a controlled substance." (ECF No. 3 at ¶¶ 95-96). More specifically, Safehouse argues that the terms "unlawfully … using," when read together, render § 856 ambiguous because the CSA does not expressly criminalize drug "use." *Id.* Safehouse concludes that § 856(a)(2) therefore does not "plainly encompass" Safehouse's proposed activity. *Id.*

Safehouse's argument is irreconcilable with fundamental tenets of statutory construction and basic common sense. Section 856(a)(2) unambiguously provides that the consumption of illegal drugs by others is among the illicit drug activities that a property owner cannot knowingly allow on his or her property. *See Tebeau*, 713 F.3d at 961 ("[O]pen and obvious drug use is precisely the conduct prohibited by § 856(a)(2)'s plain language."). Safehouse fails to provide any alternative interpretation that would provide meaning to all parts of § 856(a)(2); indeed, there is no other reasonable interpretation.

Section 856(a)(2) provides that a person cannot "manage or control any place … and make available for use, with or without compensation, the place for the purpose of unlawfully … using a controlled substance." While the CSA does not specifically criminalize the act of "using" a controlled substance, it criminalizes a necessary predicate to use – possession – and extensively contemplates the distinction between lawful and unlawful use. In passing the CSA, Congress found that many controlled substances "have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people," but that "[t]he illegal importation, manufacture, distribution, and possession *and improper use* of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(1)-(2) (emphasis added).

The CSA provides for the lawful use of controlled substances with a valid prescription to an "ultimate user." *See id*. § 829 ("Prescriptions"). The CSA defines an "ultimate user" as "a person who *has lawfully obtained*, and who possesses, a controlled substance for his own use or for the use of a member of his household[.]" *Id*. § 802(27) (emphasis added). For example, a terminal cancer patient under the care of a doctor may lawfully use a controlled substance like fentanyl with a valid prescription. By contrast, simple possession of a controlled substance is illegal "unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice, or except as otherwise authorized by this subchapter or subchapter II." *Id*. § 844. Congress thus criminalized possession of illegally obtained controlled substances intended for personal use. *See United States v. Wallace*, 532 F.3d 126, 129 (2d Cir. 2008) ("Simple possession, in violation of 21 U.S.C. § 844, refers to possession for one's own use[.]") (internal quotation omitted). This made criminalizing illicit use unnecessary, because a user must first possess the illicit drug.

17

The Court must give effect to all parts of § 856(a)(2). *See Tavarez v. Klingensmith*, 372 F.3d 188, 190 (3d Cir. 2004). Section 856(a)(2) refers to "unlawfully … using a controlled substance" to distinguish the prohibited conduct, set forth in Part D of Subchapter I of the CSA, from the lawful uses of controlled substances contemplated by Part C. Otherwise § 856(a)(2) could apply to hospitals, nursing homes, and other properties where people legally use controlled substances. Safehouse offers no alternative interpretation, much less a plausible interpretation, that would exclude Consumption Rooms from the CSA's prohibitions.[9]

## C. None of Safehouse's Affirmative Defenses Has Merit

### 1. Contrary to Safehouse's Contention, "Medical Necessity" Does Not Excuse a Violation of the CSA.

Safehouse raises as an affirmative defense that its "proposed conduct is justified by medical necessity to avoid imminent serious bodily injury and death." (ECF No. 3, Affirmative Defense No. 2). The Supreme Court has already rejected this proposition in *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001).

In *Oakland Cannabis Buyers' Cooperative*, California voters approved a measure permitting the possession and cultivation of marijuana for medical use. The Oakland Cannabis Buyers' Cooperative was a nonprofit organization with a physician serving as its medical

---

[9] The Court should reject Safehouse's invocation of the rule of lenity because "[t]his case involves no ambiguity for the rule of lenity to resolve." *Gozlon-Peretz v. United States*, 498 U.S. 395, 410 (1991). Under the rule of lenity, "when ambiguity in a criminal statute cannot be clarified by either its legislative history or inferences drawn from the overall statutory scheme, the ambiguity is resolved in favor of the defendant." *United States v. Pollen*, 978 F.2d 78, 85 (3d Cir. 1992). The rule "requires more than a difficult interpretive question." *United States v. Flemming*, 617 F.3d 252, 270 (3d Cir. 2010). It applies only "if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." *Reno v. Koray*, 515 U.S. 50, 64-65 (1995) (internal quotations omitted) (holding that even differing judicial interpretations of a statute is insufficient to invoke the rule of lenity; *see also Huddleston v. United States*, 415 U.S. 814, 831 (1974) (the rule of lenity does not apply without a "grievous ambiguity"). Indeed, the rule only "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Gozlon-Peretz*, 498 U.S. at 410 (internal quotation omitted). As set forth above, § 856(a)(2) is not ambiguous at all, and certainly not so grievously ambiguous that the rule of lenity could apply.

director and with a staff of registered nurses. The United States sued to enjoin the Cooperative's operation. The Cooperative argued its members would suffer severe pain without the cannabis the Cooperative could medically provide. *United States v. Cannabis Cultivator Club*, 5 F. Supp. 2d 1086, 1101 (N.D. Cal. 1998). Like Safehouse, the Cooperative contended that, in violating federal law, it was choosing the lesser of two evils for the benefit of its members. It argued that § 841(a)(1), which prohibits the manufacture, distribution, dispensing, or possession of a controlled substance, was subject to an implied medical necessity exemption.

The Supreme Court expressly rejected a medical necessity exception to the CSA. *Oakland Cannabis Buyers' Coop.*, 532 U.S. at 490. The Court held that, because Congress classified marijuana as a Schedule I drug, the CSA reflects a determination that marijuana has no benefits warranting a medical exception. *Id.* ("[W]e need only recognize that a medical necessity exception for marijuana is at odds with the terms of the [CSA].") The Court also declared that "whether, as a policy matter, an exemption should be created is a question for legislative judgment, not judicial interference." *Id.* (internal quotation omitted).

Here, at the outset, Safehouse's argument is even less compelling than the Cooperative's because there is no state legislation supporting Safehouse's proposal. Additionally, the CSA contains no medical exception for heroin – a Schedule I drug – that would allow Safehouse's staff to "medically supervise" its injection. As Safehouse acknowledges and Congress has found, heroin has a high potential for abuse. It has no currently accepted medical use, and is not safe even under medical supervision. 21 U.S.C. § 812(b)(1)(B), (C). Safehouse's claimed medical necessity exception is an issue for legislative judgment, not judicial interference. Thus, the only lawful mechanism for Safehouse to pursue its goals is to petition Congress to amend the CSA.

### 2.   Safehouse's Affirmative Defense that the CSA is Unconstitutional as Applied is Foreclosed by *Gonzales v. Raich*.

Equally flawed is Safehouse's contention that § 856 of the CSA is unconstitutional as applied to it because it intends to "produce no revenue" and to operate an "entirely local" "facility" that will not, for example, sell or manufacture unlawful drugs. (ECF No. 3 at ¶ 112).[10] The Court's decision in *Gonzales v. Raich*, 545 U.S. 1 (2005), squarely rejected a similar Commerce Clause challenge to the application of the CSA to individuals who grew or obtained marijuana at no cost for alleged "medicinal purposes." *Id.* at 5. The Supreme Court explained that its prior "case law firmly establishe[d] Congress' power to regulate purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce." *Id.* at 17; *see also Delaware Cty., Pa. v. Fed. Hous. Fin. Agency*, 747 F.3d 215, 226 (3d Cir. 2014) (same).

"[A] primary purpose of the CSA is to control the supply and demand of controlled substances in both lawful and unlawful drug markets." *Raich*, 545 U.S. at 19. "[W]hen it enacted comprehensive legislation to regulate the interstate market in a fungible commodity [such as marijuana, heroin, and other Schedule I drugs], Congress was acting well within its authority to 'make all Laws which shall be necessary and proper' to 'regulate Commerce . . . among the several States[.]'" *Id.* at 22 (quoting U.S. Const. Art. I, § 8)). That the CSA may "ensnare[]some purely intrastate activity is of no moment." *Id.* As the Supreme Court explained, "the CSA is a statute that directly regulates economic, commercial activity," and Congress permissibly chose to include "intrastate, noncommercial cultivation, possession and use of marijuana" within the CSA's prohibitions. *Id.* at 26.

---

[10] To the extent that Safehouse is also challenging § 856(a)(2)'s facial constitutionality (*see* ECF No. 45, Affirmative Defense No. 4), the government reserves its right to address such a challenge in its reply brief.

The *Raich* holding applies squarely here. As the Supreme Court explained, "the activities regulated by the CSA are quintessentially economic"; "[t]he CSA is a statute that regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market." *Id.* at 25-26. No CSA provision creates an exemption from the CSA's categorical prohibition against maintaining or controlling drug-involved premises where, as here, the facility will be used by individuals who will possess or use Schedule I drugs such as heroin or other illegal drugs at the facility. As in *Raich*, the absence of such an exemption is not "of doubtful constitutionality," as Safehouse suggests. (*See* ECF No. 3 at ¶ 115). To the contrary, based on Congress' detailed findings regarding the flow of Schedule I drugs in the interstate market, "Congress could have rationally concluded that the aggregate impact on the national market of all the transactions exempted from federal supervision is unquestionably substantial." *Raich*, 545 U.S. at 32.

For example, when Congress enacted the CSA, it expressly found that "[a] major portion of the traffic in controlled substances flows through interstate and foreign commerce," and that even "[i]ncidents of the traffic [in controlled substances] which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and *possession*, nonetheless have a substantial and direct effect upon interstate commerce." 21 U.S.C. § 801(3)(A) (emphasis added). That is because "controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution and controlled substances normally flow through interstate commerce prior to such possession." *Id.* § 801(3)(B), (C); *see also id.* § 801(4) ("Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances."). These findings foreclose Safehouse's assertion that Congress intended to exempt from § 856's scope its proposed Consumption Rooms. As Congress

expressly found, even purely "local" use and possession of controlled substances have a substantial impact on interstate commerce as evidenced by the fact that these drugs typically have moved through the interstate market before ending up in the hands of the individuals for whom Safehouse seeks to provide a Consumption Room. *See id.*; *see also Raich*, 545 U.S. at 32.

Nor do principles of federalism support Safehouse's claim that this Court should invalidate § 856 of the CSA. (*See* ECF No. 3 at ¶¶ 107-10) (alleging that the government's interpretation of § 856 wrongly creates "a general police power" and that the regulation of health and safety is generally left to the States). No provision of Pennsylvania law permits Safehouse to maintain or control its premises in a manner that directly conflicts with the prohibitions in § 856. Even if such a law existed, it could not "serve to place [Safehouse's] activities beyond congressional reach." *Raich*, 545 U.S. at 29. Indeed, "[t]he Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail. It is beyond peradventure that federal power over commerce is 'superior to that of the States to provide for the welfare or necessities of their inhabitants,' however legitimate or dire those necessities may be." *Id.* (internal citation omitted).

### 3. Safehouse's Claim that the Religious Freedom Restoration Act Protects Its Religious Expression Fails as a Matter of Law.

Finally, Safehouse asserts that maintaining a place for the supervised consumption of illegal drugs "is an exercise of the religious beliefs of its Board of Directors, who hold as core tenets preserving life, providing shelter to neighbors, and ministering to those most in need of physical and spiritual care." (*See* ECF No. 3, Preliminary Statement at 3). While Safehouse does not contend that its founders' faiths explicitly direct them to operate Consumption Rooms, it contends that "the provision of overdose prevention service *effectuates* their religious obligation to preserve life, provide shelter to our neighbors, and to do everything possible to care for the

sick." (*Id.* at 40, ¶ 128) (emphasis added). Safehouse[11] therefore seeks a declaration that any prohibition on its operation of a supervised Consumption Room would violate the Religious Freedom and Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA").

RFRA prevents the federal government from "substantially burden[ing] a person's exercise of religion" unless the government "demonstrates that application of the burden to the person – (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." *Id.* § 2000bb-1(a), (b). To invoke RFRA in the first place, however, a claimant must make out a *prima facie* case that (1) it possesses a sincerely held belief that (2) is religious in nature, and (3) application of the challenged law would substantially burden the litigant's religious belief. *See United States v. Stimler*, 864 F.3d 253, 267-68 (3d Cir. 2017), *vacated on other grounds by United States v. Goldstein*, 902 F.3d 411 (3d Cir. 2018).

Defendants assert that § 856's application to Safehouse violates RFRA inasmuch as it "burdens Safehouse by forcing it to choose between the exercise of its founders' and directors' religious beliefs" and conformity with the law. (ECF No. 3 at ¶ 129). Safehouse's RFRA claim fails as a matter of law. Safehouse cannot show that application of § 856(a) is a substantial burden upon its religious exercise because its founders and board members have multiple legal alternatives for effectuating their religious beliefs. (*See, e.g.*, ECF No. 3 at ¶ 33). Furthermore, even accepting all well-pleaded allegations in Defendants' counterclaim as true, Safehouse

---

[11] For the limited purposes of this Rule 12 motion, the government does not contest that Safehouse is an entity that can engage in religious exercise, *see Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), or that Safehouse has standing to assert the religious free exercise rights of its board members, *see Curto v. A Country Place Condo. Ass'n*, 921 F.3d 405, 410 n.2 (3d Cir. 2019) (stating a condo association lacked associational standing to assert the religious free exercise rights of its Orthodox Jewish members where the association did not have a religious purpose). The government reserves its right to raise such arguments in the future.

continually asserts that its true motivation is socio-political or philosophical – not religious – and thus not protected by RFRA.

### a. Application of § 856(a) to Safehouse Does Not Substantially Burden Defendants' Claimed Religious Beliefs.

Whether the government has imposed a "substantial burden" under RFRA is a legal conclusion, not an issue of fact. *Geneva College v. Sec'y U.S. HHS*, 778 F.3d 422, 436 (3d Cir. 2015); *see also Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151, 1176 (10th Cir. 2015) ("[C]ourts – not plaintiffs – must determine if a law or policy substantially burdens religious exercise."); *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008) (not "accepting as true" the legal conclusion regarding substantial burden in reviewing a district court's dismissal of a RFRA claim). A court must not accept every allegation of substantial burden without question. *Real Alternatives, Inc. v. Sec'y of HHS*, 867 F.3d 338, 357 (3d Cir. 2017). "To the contrary, RFRA's demand for judicial review has been recognized by the Supreme Court, [the Third Circuit] in *Geneva*, and by virtually all of our sister circuits, which have not hesitated to examine whether an alleged burden is sufficiently 'substantial' under RFRA." *Id.* at 357.

Government action does not constitute a substantial burden if it "does not coerce the individuals to violate their religious beliefs or deny them the 'rights, benefits, and privileges enjoyed by other citizens.'" *Geneva*, 778 F.3d at 442 (quoting *Lyng v. NW Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988)). Rather, a substantial burden only exists if: "1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available . . . versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the Government puts substantial pressure on an adherent to

substantially modify his behavior and to violate his beliefs." *Real Alternatives*, 867 F.3d at 356

(quoting *Mack v. Warden Loretto FCI*, 839 F.3d 286, 304 (3d Cir. 2016)).

In enforcing the CSA, the government is not coercing Safehouse, its founders, or board

members to act. There is no affirmative obligation on Safehouse to act at all, or to act in a way

that violates its religious beliefs. *See Lyng*, 485 U.S. at 450-51. *Cf. Goodall by Goodall v.*

*Stafford Cnty. Sch. Bd.*, 60 F.3d 168, 172-73 (4th Cir. 1995) (no substantial burden where

plaintiffs were neither compelled to engage in conduct proscribed by their religious beliefs nor

forced to abstain from any action which their religion mandates that they take). The government

is also not preventing Safehouse from engaging in activity in which others may engage. There is

no generally available right to possess illegal drugs or to provide a forum for using them. This

prohibition applies to everyone with equal force – regardless of religion.

The government also is not pressuring Safehouse to modify its behavior or cease a

religious exercise. Safehouse does not contend that its founders or board members have or are

maintaining a place for the supervised use of illegal drugs. Instead, Defendants assert their wish

to do so. However, in the absence of active religious exercise or a history of practice, Safehouse

cannot assert that the government is forcing it to modify its behavior. Rather, the government is

asking Safehouse to maintain the *status quo* and refrain from embarking on a path of illegality

without legislative action authorizing it to do so. The government asks Safehouse only to obey

the law by refraining from maintaining a place for the illegal use of deadly drugs. "A

government action or regulation does not rise to the level of a substantial burden on religious

exercise if it merely prevents the adherent from . . . acting in a way that is not otherwise

generally allowed." *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004); *cf. Washington v.*

*Klem*, 497 F.3d 272, 279 (3d Cir. 2007); *Smith v. Kyler*, 295 F. App'x 479, 483 (3d Cir. 2008)

(noting that the plaintiff had not been denied a benefit because of his religious beliefs or forced to modify his behavior).

Even if this Court accepts Safehouse's contention that it seeks to begin a new religious exercise, without history or precedent, and that enforcement of the CSA burdens its ability to do so, this Court can rule as a matter of law that there is no substantial burden here. Enforcement of § 856 of the CSA does not require Safehouse to abandon its founders' core tenants of preserving life, providing shelter to neighbors, and helping the sick. At most, it restricts "one of a multitude of means," which does not constitute a substantial burden. *Henderson v. Kennedy*, 253 F.3d 12, 15 (D.C. Cir. 2001).

In determining whether any asserted burden is substantial, this Court can consider whether Safehouse's founders and board members have acceptable alternative legal means to practice their religion that do not involve violating the CSA. *See Stimler*, 864 F.3d at 268. *See Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir. 1995) (no substantial burden in Act restricting access to abortion clinics where plaintiffs did not allege that their religion required them to physically obstruct clinic areas and the plaintiffs otherwise had "ample avenues open" by which they could express their deeply held beliefs); *Planned Parenthood Ass'n v. Walton*, 949 F. Supp. 290, 296 (E.D. Pa. 1996) (same); *Mahoney v. Doe*, 642 F.3d 1112, 1120-21 (D.C. Cir. 2011) (no RFRA violation for plaintiff barred from chalking the sidewalk in front of the White House

where plaintiff did not claim that chalk art was the exclusive medium through which he could express his religious views).[12]

In *Stimler*, the Third Circuit affirmed the district court's denial of a motion to dismiss a criminal indictment under RFRA. The defendants were three Orthodox Jewish rabbis who were charged with various kidnapping-related offenses in connection with their religiously inspired attempts to forcibly help Orthodox Jewish women obtain divorces from their recalcitrant husbands. *Stimler*, 864 F.3d at 259. In weighing whether the criminal prosecution imposed a substantial burden, the district court considered that when a husband refuses to consent to divorce, it is considered a religious commandment or a "mitzvah" in Orthodox Judaism to assist a woman in obtaining consent, and that Jewish law authorizes "certain forms of force" in providing such assistance. *United States v. Epstein*, 91 F. Supp. 3d 573, 580 (D.N.J. 2015).

While the district court accepted that helping a woman to obtain a religious divorce was authorized by Jewish law and therefore part of the defendants' legitimate religious exercise, it held that "there is also no dispute that there are alternative means of coercion to perform this mitzvah," including secular legal methods. *Id.* at 582. The court held that "[t]hese alternative and meaningful means . . . do not violate the criminal laws of the United States, yet still permit Orthodox Jews to participate in the mitzvah[.]" *Id.* at 582. Because "acceptable alternative means of religious practice . . . remained available to the defendants," the Third Circuit affirmed the

---

[12] *See also Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813-14 (8th Cir. 2008) (BOP's refusal to provide halal meat meals did not constitute a substantial burden on inmate's religion where inmate had not "exhausted alternative means of accommodating his religious dietary needs"); *Watkins v. Shabazz*, 180 F. App'x 773, 775 (9th Cir. 2006) (not precedential) (no substantial burden because defendants gave the inmate two alternatives – eating the nutritionally adequate meat-substitute meals or finding an outside organization to provide halal meat); *cf. Cash v. IRS*, 2019 U.S. Dist. LEXIS 11603, at *26 (M.D. Pa. 2019) (individual mandate of Affordable Care Act did not put substantial pressure on an individual to modify his behavior and violate his religious beliefs where he had the option to make a shared responsibility payment in lieu of obtaining health insurance); *Allah v. Stachelek*, 1998 U.S. Dist. LEXIS 7972, at *42 (E.D. Pa. May 29, 1998) (no RFRA violation where plaintiffs had alternatives available to comply with their religious beliefs).

district court's determination that indictment for kidnapping did not substantially burden the defendant's religious exercise. *Stimler*, 864 F.3d at 268, *affirming Epstein*, 91 F. Supp. 3d 573.

Similarly, in *Henderson v. Kennedy*, the D.C. Circuit considered a RFRA claim by claimants challenging a ban on t-shirt sales on the National Mall, who contended they were Christians obligated to preach the gospel "to the whole world . . . by all available means," including offering religious t-shirts for sale. 253 F.3d 12, 15 (D.C. Cir. 2001). The D.C. Circuit held the claimants could not show a substantial burden because they could not claim that a ban on certain commercial activity on the Mall either forced them to engage in conduct forbidden by their religion or prevented them from engaging in conduct their religion required. *See id.* Furthermore, the claimants' broad religious conviction that they must spread the gospel by "all available means" was not substantially burdened by a restriction on the sales of t-shirts because claimants had other means to satisfy their religious requirement, including distributing t-shirts for free or selling them in surrounding areas. *Id.* at 17.

Like the RFRA claimants in *Stimler* and *Henderson*, Safehouse, too, has multiple legal ways in which its founders and board members may satisfy their religious beliefs that they must shelter their neighbors, administer to the sick, and work to save lives. In fact, Safehouse's Complaint details multiple beneficial ways in which its organizers plan to work to ease the toll of the opioid crisis. Safehouse contends it plans to assess an individual's physical and behavioral health status, provide sterile drug consumption equipment, offer overdose reversal, wound care, and primary care services, on-site education and counseling, on-site medication-assisted treatment and recovery counseling, distribution of Naloxone, and access to social services such as housing, public benefits, and legal services. (ECF No. 3 at ¶ 33).

Assuming compliance with applicable statutory and regulatory requirements, *e.g.,* 21 U.S.C. §§ 822, 823(g) and 21 C.F.R. § 1301.12, none of these measures runs afoul of the CSA, and all align with Safehouse's asserted religious beliefs. The government does not seek to block those lawful activities. Accordingly, Safehouse's founders and board members remain able to follow the precepts of their religion through methods other than maintaining a place for the use of illegal drugs. Given the myriad ways in which Safehouse and its organizers can act to help people with opioid use disorder within the bounds of the law, Safehouse cannot show that the exercise of its asserted religious beliefs is substantially burdened by enforcement of the CSA's prohibition on maintaining a place for the illegal use of drugs.

Because Safehouse cannot show a substantial burden on its religious practice, this Court should hold that Safehouse has failed to make out a *prima facie* RFRA defense. *See Stimler*, 864 F.3d 253 at 268; *Cheffer*, 55 F.3d at 1522-23 (where no substantial burden on religious practice existed, the Court need not reach whether the challenged Act was the least restrictive means to further a compelling state interest). *See also Adams v. Comm'r*, 170 F.3d 173, 176 (3d Cir. 1999) (before the government must prove that enforcement of a law is the least restrictive means of advancing a compelling state interest, a plaintiff first must "demonstrate a substantial burden on [its] exercise of [its] religious beliefs"). The Court should therefore hold as a matter of law that applying § 856(a) to Safehouse does not violate RFRA.

> **b.  Safehouse Admits that It Seeks to Engage in Activity that is Motivated by Socio-Political or Philosophical Reasons, Not Religious Ones.**

Safehouse's failure to establish a substantial burden on religious exercise means this Court need go no further in evaluating Defendants' RFRA claim, which fails as a matter of law. Additionally, however, repeated allegations in Safehouse's pleading reveal that Defendants

cannot meet the second element of a *prima facie* RFRA claim—that their asserted belief is religious in nature. *See Stimler*, 864 F.3d at 267-268. Safehouse generally alleges that its founders have sincere religious beliefs regarding providing aid to those in need. However, Safehouse's specific allegations fail to show that these beliefs are in fact what animates its declared intention to operate an injection site. When Safehouse discusses its intention to operate an injection site, it explains that its plans are actually motivated by its view of the opioid crisis and the views of parts of the medical community. These beliefs are socio-political, medical, or moral – not religious.

While courts may not question the *bona fides* of an asserted belief, Third Circuit and Supreme Court precedent permits courts to identify with particularity the belief motivating the adherent's activity and assess whether it is religious or secular in nature. *See Sutton v. Rasheed*, 323 F.3d 236, 251-52 (3d Cir. 2003) (evaluating whether a proffered viewpoint was religious or secular in nature); *cf. Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (in a case under Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), inquiry into the truth of an asserted belief is impermissible, but not inquiry into the religiosity of a belief). "An individual's assertion that the belief he holds [is religious] does not . . . automatically mean the belief is religious."*Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51 (2d Cir. 1988) (conducting threshold inquiry into whether belief is religious or based on secular or scientific principles).[13] *Cf. Caviezel v. Great Neck Pub. Sch.*, 701 F. Supp. 2d 414, 430 (E.D.N.Y. 2010) (construing the applicability of a New York state law exemption to vaccination, and finding that plaintiff's "reluctance to have her daughter vaccinated did not arise from a religious belief, but from a personal, moral, or cultural feeling against vaccination*"*); *Check v. N.Y.C. Dep't of Educ.*,

---

[13] *But see Wiggins v. Sargent*, 753 F.2d 663, 666-67 (8th Cir. 1985) (belief that is both religious and secular can qualify for Constitutional protection); *Callahan v. Woods*, 658 F.2d 679, 687 (9th Cir. 1981).

2013 U.S. Dist. LEXIS 71124, at *22 (E.D.N.Y. 2013) (denying claim for religious exemption to vaccine requirement brought by Catholic plaintiff, given plaintiff's "extensive testimony" regarding her perception that vaccines are dangerous).

Not all sincerely held beliefs are religious in nature and therefore eligible for Constitutional protection. *See Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972); *see also United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996). Secular activity inspired by an individual moral imperative or a philosophical disagreement with the law is not protected. *See Real Alternatives*, 867 F.3d at 350 (stating this country has a "vast history of legislative protections that single out and safeguard religious freedom but not moral philosophy.") The government does not challenge the sincerity of Defendants' asserted religious belief in the value of human life, which Safehouse contends arises from the teachings and scriptures of Christianity and Judaism and its founders' and board members' religious upbringings. (*See* ECF No. 3 at ¶ 126). But, where Safehouse seeks to open a Consumption Room because of its nonreligious beliefs concerning the current state of opioid abuse in Philadelphia – as it repeatedly states throughout its pleading – it asserts a moral philosophy. The Court can therefore identify with particularity the beliefs actually motivating Safehouse's plans to operate a supervised injection site, and determine whether they are religious. *See Yoder*, 406 U.S. at 216 (noting that "to have the protection of the Religion Clauses, the claims must be rooted in religious belief," rather than being "based on purely secular considerations").

Defendants' Answer and Counterclaim is replete with allegations demonstrating that the driving rationale for Safehouse's proposal to maintain a site for the supervised use of drugs is socio-political, medical, and philosophical. Safehouse contends that it seeks to engage in "harm reduction," with the purpose of "reduc[ing] harm for individuals 'who, for whatever reason, may

not be ready, willing, or able to pursue full abstinence as a goal.'" (ECF No. 3 at ¶ 31).

Safehouse categorizes its proposed action as a "modest extension of already-endorsed harm

reduction measures" and states that supervised injection has been endorsed by authorities in the

medical community. (*Id.* at ¶¶ 65, 88). Safehouse contends that "compassionate and

conscientious medical providers"[14] should be permitted to operate a location for the medically

supervised use of drugs, and that this is supported by "medical facts recognized by Congress, the

CDC, and federal health policy." (*Id.* at ¶¶ 63-64).

In these examples and throughout its counterclaim, Safehouse repeatedly asserts a socio-

political belief that its board members and founders are justified in ignoring the CSA because of

a philosophical disagreement with its scope. Defendants seek to open a Consumption Room

based on their view of medical practice and appropriate public health treatment. This is an

individual, medical, and public health-based judgment, not a religious belief. *See Fallon v.

Mercy Catholic Med. Ctr.*, 877 F.3d 487, 492 (3d Cir. 2017).

In *Fallon*, the Third Circuit considered, in the context of a Title VII suit, whether an

individual established a sincere religious belief in opposing a vaccination requirement imposed

by his employer. *See* 877 F.3d at 490. Under Third Circuit precedent, to evaluate the religiosity

of a belief, the Court determined whether the plaintiff's beliefs "'address[] fundamental and

ultimate questions having to do with deep and imponderable matters,' are 'comprehensive in

nature,' and are accompanied by 'certain formal and external signs.'" *Id.* at 491 (citing *Africa v.

Pennsylvania*, 662 F.2d 1025, 1031 (3d Cir. 1981)); *see also id.* n.18 (noting the *Africa* court's

standard has "met with considerable agreement"). The plaintiff asserted that his beliefs, which

---

[14] Safehouse makes no claim regarding the religious beliefs of the medical providers who would staff its proposed Consumption Rooms.

were partially inspired by Buddhism—though he did not contend he was Buddhist—counseled him not to harm his own body, and to make his own decision regarding whether a flu shot would harm him. He argued that consenting to be inoculated against the flu would violate his strongly held beliefs that the vaccination would do him more harm than good. *See id.* at 492.

In rejecting the argument that this belief qualified as religious, the Third Circuit explained that the plaintiff had applied "one general moral commandment (which might be paraphrased as, 'Do not harm your own body') to come to the conclusion that the flu vaccine is morally wrong." The Court held this moral commandment was an "isolated moral teaching," not a comprehensive system of beliefs about fundamental or ultimate matters warranting Constitutional protection. *Id.* (citing *Africa*, 662 F.2d at 1032). The Court also held that the plaintiff's underlying belief that the flu vaccine may do more harm than good was a medical belief, not a religious one. *Id.*

Similarly, Safehouse has emphasized, throughout its pleading, its judgment that supervised injection sites do more good than harm, based on medical, socio-political, and moral beliefs. The basis of defendants' claims – that Safehouse will reduce the harm of the opioid crisis and therefore justify acting in contravention of the law – reveals that defendants have made personal, philosophical judgments based on their understanding of the current medical, social, and political climate. The allegations in Safehouse's pleading show the socio-political and moral rationale behind its plan to open a Consumption Room. Defendants' admissions in this regard should guide this Court's determination about the secular nature of their proposal. RFRA does not protect such beliefs.

And as a practical matter, RFRA simply cannot protect such beliefs. If supposed "harm reduction" were enough to trigger RFRA protection, there would be no end to the possible RFRA challenges that well-meaning but ill-advised claimants could conjure based on their moral beliefs. What of, for example, the bank robber who claims that he steals from the rich to give to the poor in order to "reduce harm" to the underprivileged community or even to "save lives"? Or, what of the embezzler who does the same? What if, in another step toward contemplated "harm reduction," Safehouse proposed to distribute clean heroin to drug users to reduce the harm of fentanyl contamination, or the dangers of buying from drug dealers? Should courts entertain RFRA challenges arising from individual philosophical views of justice or "harm reduction"? Of course not. This is a nation of laws, and Safehouse's asserted RFRA claim that it can violate these laws to "reduce harm" consistent with its philosophical mission must fail.

Finally, even if Safehouse were to show that maintaining a drug-involved premises is a religious exercise by its founders or board members, it does not argue, and lacks standing to argue, that the illegal use of drugs *by others* is part of Safehouse's founders' or board members' religious beliefs. Possession of illegal drugs is still prohibited under federal law. See 21 U.S.C. § 844(a). Under § 844(a), it is illegal to possess fentanyl without a valid prescription or order issued by a licensed practitioner and it is always illegal to possess heroin. Where the underlying activity Safehouse seeks to invite remains illegal, Safehouse's RFRA argument fails as a practical matter. In other words, even if this Court were to recognize an exception to § 856(a) for Safehouse, the activity Safehouse invites to occur within a place it would control and maintain is still illegal, penalized through fines or a term of imprisonment, and subject to federal enforcement. *See* § 844(a).

In short, Defendants present a sincerely held belief that affording a safe injection site for unlawful users of heroin, fentanyl, and other opioids would do more good than harm. This conclusion is not religious, but instead is a judgment based on social and medical practice. Most importantly, Defendants' conclusion runs afoul of a flatly contradictory Congressional determination, *i.e.*, that it is unlawful to provide a site for the illegal use of controlled substances, and that the use of heroin in particular serves no medical purpose. Defendants may not violate this law. Instead, they should seek recourse, if any, through the ordinary political and legislative process – not in the courts.

### III.    CONCLUSION

For the foregoing reasons, the United States requests that its motion for judgment on the

pleadings be granted, and that this Court enter a judgment in its favor and against

Defendant/Counterclaim Plaintiffs Safehouse and Jose A. Benitez.


Dated:  June 11, 2019                                    Respectfully submitted,


JOSEPH H. HUNT
Assistant Attorney General
Civil Division                                                   WILLIAM M. McSWAIN
                                                                 United States Attorney

GUSTAV W. EYLER
Branch Director
Consumer Protection Branch

JAMES J. GILLIGAN                                          GREGORY B. DAVID
Acting Director                                            Assistant United States Attorney
Federal Programs Branch                                    Chief, Civil Division

ANDREW E. CLARK
Assistant Director
Consumer Protection Branch                                 JOHN T. CRUTCHLOW
                                                           ERIC D. GILL
JACQUELINE COLEMAN SNEAD                                    BRYAN C. HUGHES
Assistant Director                                         ERIN E. LINDGREN
Federal Programs Branch                                    Assistant United States Attorneys
                                                           Eastern District of Pennsylvania
                                                           615 Chestnut Street, Suite 1250
DANIEL K. CRANE-HIRSCH                                      Philadelphia, PA  19106-4476
Trial Attorney                                             TEL:  (215) 861-8200
Consumer Protection Branch                                 FAX:  (215) 861-8618

TAMRA T. MOORE
Senior Counsel                                             *Counsel for the United States*
Federal Programs Branch

*Co-Counsel for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I caused a true and correct copy of the foregoing

Motion for Judgment on the Pleadings, which was filed electronically and is available for

viewing and download from the court's CM/ECF system, to be served upon all counsel of

record.

GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

Dated: June 11, 2019