**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>SAFEHOUSE, a Pennsylvania nonprofit<br>corporation; JOSE BENITEZ, as President and<br>Treasurer of Safehouse,<br>　　　　　　　　　Defendants. | Civil Action No.:  2:19-cv-00519 |

SAFEHOUSE, a Pennsylvania nonprofit
corporation,
　　　　　　　　　Counterclaim Plaintiff,

　　v.

UNITED STATES OF AMERICA,
　　　　　　　　　Counterclaim Defendant,

U.S. DEPARTMENT OF JUSTICE; WILLIAM P.
BARR, in his official capacity as Attorney General
of the United States; WILLIAM M. MCSWAIN, in
his official capacity as U.S. Attorney for the Eastern
District of Pennsylvania,
　　　　　　　　　Third-Party Defendants.

## SAFEHOUSE'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEPARTMENT OF JUSTICE'S MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

Page

OVERVIEW ...................................................................................................................1

BACKGROUND ............................................................................................................7

I.      The Opioid Epidemic in the City of Philadelphia...............................................7

II.     The Proliferation of Fentanyl and Growing Need for Increased Access to
        Naloxone ..............................................................................................................9

III.    Opioid Use Disorder and Harm Reduction as an Essential Tool in the Fight
        against the Opioid Epidemic ..............................................................................12

IV.     Safehouse, the Safehouse Model, and Supervised Consumption and Observation...........13

V.      Safehouse's Board Members ..............................................................................17

VI.     The DOJ's Threat to Prosecute Safehouse for Lawful, Lifesaving Conduct ...................18

ARGUMENT................................................................................................................19

I.      SECTION 856(a)(2) DOES NOT APPLY TO SAFEHOUSE .........................................19

        A.      Section 856 Does Not Apply Because Safehouse Would Not Be A Place
                Made Available "For the Purpose of" Unlawfully Using Controlled
                Substances ...........................................................................................19

                i.      Section 856 requires evidence that the primary or principal purpose
                        of the property is unlawful use.................................................20

                ii.     The legislative history of Section 856 confirms it narrowly targets
                        properties used for the purpose of unlawful drug activity .........................24

                iii.    The non-binding precedent upon which the DOJ relies does not
                        illuminate the legal standard for when a property is used "for the
                        purpose of" prohibited activities................................................26

        B.      Safehouse Is "Authorized By" the CSA Because It Is a Legitimate Medical
                Practice, which the CSA Does Not Regulate and Section 856 Does Not
                Prohibit...................................................................................................28

                i.      The CSA and Section 856 do not restrict or regulate the legitimate
                        practice of medicine ...............................................................28

                ii.     Safehouse's overdose prevention model will be carried out in the
                        usual course of professional practice with a legitimate medical
                        purpose....................................................................................32

        C.      "[U]nlawfully . . . using" Is Not Defined by Section 856 or the CSA and
                Renders Its Application to Safehouse Doubtful.........................................34

        D.      The Rule of Lenity and Clear Statement Rule Require Any Doubt to Be
                Resolved in Safehouse's Favor ................................................................36

i

II.    SECTION 856(a)(2) CANNOT APPLY TO SAFEHOUSE ............................................38

    A.    Application of Section 856 to a Medically Supervised Consumption Site Would Be Unconstitutional as an Exercise of Power Under the Commerce Clause ...........................................................................................................38

    B.    Enforcing Section 856(a)(2) Against Safehouse or Its Officers Would Violate the Religious Freedom Restoration Act ......................................44

        i.    Safehouse's decision to open a supervised consumption site is driven by its board members' religious obligations to save lives .............45

        ii.    The DOJ's efforts to ban Safehouse's overdose prevention site places a substantial burden on Safehouse's religious exercise .................49

CONCLUSION.............................................................................................................54

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

## CASES

*Adkins v. Kaspar*,
    393 F.3d 559 (5th Cir. 2004) ........................................................................52

*Bates v. Commander, First Coast Guard Dist.*,
    413 F.2d 475 (1st Cir. 1969) ........................................................................48

*Bond v. United States*,
    134 S. Ct. 2077 (2014) ..........................................................................29, 39

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) ........................................................44, 45, 49, 50, 52

*Caviezel v. Great Neck Pub. Sch.*,
    701 F. Supp. 2d 414 (E.D.N.Y. 2010) ...........................................................46

*Check v. N.Y.C. Dep't of Educ.*,
    No. 13-cv-791, 2013 WL 12113679 (E.D.N.Y. 2013) ....................................47

*Cheema v. Thompson*,
    67 F.3d 883 (9th Cir. 1995) ........................................................................51

*Chosen 300 Ministries, Inc. v. City of Phila.*,
    No. 12-3159, 2012 WL 3235317 (E.D. Pa. Aug. 9, 2012) ..............................49

*Cutter v. Wilkinson*,
    644 U.S. 709 (2005) ..................................................................................47

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1 (1824) .......................................................................39

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
    546 U.S. 418 (2006) ........................................................................45, 49, 50

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ..................................................................4, 29, 30, 32

*Gonzales v. Raich*,
    545 U.S. 1 (2005) ................................................................................42, 43

*Fallon v. Mercy Catholic Med. Ctr.*,
    877 F.3d 487 (3d Cir. 2017) .......................................................................48

*Fifth Ave. Presbyterian Church v. City of New York*,
    293 F.3d 570 (2d Cir. 2002) .......................................................................49

*Harbor Missionary Church Corp. v. City of San Buenaventura*,
  642 F. App'x 726 (9th Cir. 2016) ....................................................................49

*Hillsborough Cty. v. Automated Med. Labs., Inc.*,
  471 U.S. 707 (1985).........................................................................................39

*Holt v. Hobbs*,
  135 S. Ct. 853 (2015) ...........................................................................49, 51, 52, 53

*Jones v. United States*,
  529 U.S. 848 (2000).....................................................................................36, 37

*Kaemmerling v. Lappin*,
  553 F.3d 669 (D.C. Cir. 2008) .........................................................................46

*Korte v. Sebelius*,
  735 F.3d 654 (7th Cir. 2013) ...........................................................................46

*Life Techs. Corp. v. Promega Corp.*,
  137 S. Ct. 734 (2017).......................................................................................20

*Mason v. Gen. Brown Cent. Sch. Dist.*,
  851 F.2d 47 (2d Cir. 1988)...............................................................................47

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996)...........................................................................................4

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012).........................................................................................43

*Navajo Nation v. U.S. Forest Serv.*,
  535 F.3d 1058 (9th Cir. 2008) .........................................................................52

*O Centro Espirita Beneficiente v. Ashcroft*,
  389 F.3d 973 (10th Cir. 2004) .........................................................................51

*Patrick v. LeFevre*,
  745 F.2d 153 (2d Cir. 1984).............................................................................46

*Pitcher v. Laird*,
  421 F.2d 1272 (5th Cir. 1970) .........................................................................48

*Real Alts., Inc. v. Sec'y of HHS*,
  867 F.3d 338, 356 (3d Cir. 2017)......................................................................46

*Rewis v. United States*,
  401 U.S. 808, 812 (1971).................................................................................36

*Schmidt v. United States*,
  No. C 06-04378 CRB, 2006 WL 3734594 (N.D. Cal. Dec. 18, 2006) .............43

*Smith v. Kyler*,
   295 F. App'x 479 (3d Cir. 2008) ...................................................................51

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,
   531 U.S. 159 (2001)........................................................................................37

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)........................................................................................29

*Sorenson v. Sec'y of the Treasury*,
   475 U.S. 851 (1986)........................................................................................23

*Sullivan v. Stroop*,
   496 U.S. 478 (1990)........................................................................................23

*Sutton v. Rasheed*,
   323 F.3d 236 (3d Cir. 2003)...........................................................................47

*Taylor v. United States*,
   136 S. Ct. 2074 (2016)....................................................................................42

*United States v. Akinyoyenu*,
   199 F. Supp. 3d 106 (D.D.C. 2016) ...............................................................31

*United  States v. Antoine*,
   318 F.3d 919 (9th Cir. 2002) ..........................................................................51

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*,
   484 U.S. 365 (1988)........................................................................................23

*United States v. Birbragher*,
   603 F.3d 478 (8th Cir. 2010) ..........................................................................31

*United States v. Blake*,
   2006-cr-0030, 2009 WL 1124957 (D.V.I. Apr. 24, 2009)...............................28

*United States v. Butler*,
   No. CRIM.A. 02-300-01, 2004 WL 2577631 (E.D. Pa. Oct. 6, 2004)............28

*United States v. Chen*,
   913 F.2d 183 (5th Cir. 1990) ...............................................21, 23, 26, 28, 35

*United States v. Chube II*,
   538 F.3d 693 (7th Cir. 2008) ..........................................................................31

*United States v. Coles*,
   558 F. App'x 173 (3d Cir. 2014) ..............................................................28, 36

*United States v. Feingold*,
   454 F.3d 1001 (9th Cir. 2006) ........................................................................31

*United States v. Flemming*,
   617 F.3d 252 (3d Cir. 2010)..................................................................36

*United States v. Ford*,
   371 F.3d 550 (9th Cir. 2004) ...............................................................36

*United States v. Harrison*,
   133 F.3d 1084, 1085 (8th Cir. 1998) ...................................................35

*United States v. Johnson*,
   737 F.3d 444 (6th Cir. 2013) ...............................................................21

*United States v. Lopez*,
   514 U.S. 549 (1995).............................................................39, 40, 41, 43, 44

*United States v. Kukafka*,
   478 F.3d 531 (3d Cir. 2007)..................................................................40

*United States v. Lancaster*,
   968 F.2d 1250 (D.C. Cir. 1992) ...........................................................21

*United States v. Maynard*,
   278 F. App'x 214 (3d Cir. 2008) ..........................................................31

*United States v. McGuire*,
   178 F.3d 203 (3d Cir. 1999)..................................................................44

*United States v. Moore*,
   423 U.S. 122 (1975)..............................................................................31

*United State v. Morrison*,
   529 U.S. 598 (2000)....................................................................39, 40, 41

*United States v. Ramsey*,
   406 F.3d 426 (7th Cir. 2005) ...............................................................35

*United States v. Santos*,
   553 U.S. 507 (2008)..............................................................................36

*United States v. Stimler*,
   864 F.3d 253 (3d Cir. 2017)......................................................49, 51, 53

*United States v. Tebeau*,
   713 F.3d 955 (8th Cir. 2013) .........................................................27, 35

*United States v. Tamez*,
   941 F.2d 770 (9th Cir. 1991) ....................................................23, 27, 35

*United States v. Univ. C.I.T. Credit Corp.*,
   344 U.S. 218 (1952)..............................................................................37

*United States v. Verners*,
   53 F.3d 291 (10th Cir. 1995) ......................................................21

*United States v. Walker*,
   657 F.3d 160 (3d Cir. 2011)......................................................39

*United States v. Williams*,
   553 U.S. 285 (2008)....................................................................20

*United States v. Wilson*,
   503 F.3d 195 (2d Cir. 2007)......................................................35

*United States v. Zimmerman*,
   514 F.3d 851 (9th Cir. 2007) ...............................................46, 47

*Washington v. Klem*,
   497 F.3d 272 (3d Cir. 2007)......................................................52

*Welsh v. United States*,
   398 U.S. 333 (1970)....................................................................48

*W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*,
   862 F. Supp. 538 (D.D.C. 1994) ..........................................47, 49

*Wiggins v. Sargent*,
   753 F.2d 663 (8th Cir. 1985) .....................................................48

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972)...............................................................48, 50

*Yellowbear v. Lampert*,
   741 F.3d 48 (10th Cir. 2014) .....................................................50

*Zimmerman v. Corbett*,
   873 F.3d 414 (3d Cir. 2017)....................................................46, 47

## CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const. art. I., § 8, cl. 3...........................................................39

Comprehensive Addiction and Recovery Act of 2016, Pub. L. No. 114-198,
   130 Stat. 695 ..............................................................................10

   § 101, 130 Stat. 697 .............................................................10, 33

   § 107, 130 Stat. 703 ...................................................................10

   § 303(a)(l)(C)(v)-(iv), 130 Stat. 720-723......................................10

   § 703, 130 Stat. 741 ...................................................................11

§ 911, 130 Stat. 759 ...................................................................................11

Appropriations Act of 2016, § 520, 129 Stat. 2652 ......................................33

Controlled Substances Act, 21 U.S.C. § 801 *et seq.*:

21 U.S.C. § 801(2) ..........................................................................35, 41

21 U.S.C. § 801(3) ..................................................................................41

21 U.S.C. § 801(4) ..................................................................................41

21 U.S.C. § 801(5) ..................................................................................41

21 U.S.C. § 801(6) ..................................................................................41

21 U.S.C. § 802 .................................................................................5, 34

21 U.S.C. § 841(a) ........................................................................5, 31, 34

21 U.S.C. § 844 ...............................................................................4, 35

21 U.S.C. § 856(a)(1) ....................................................................*passim*

21 U.S.C. § 856(a)(2) ....................................................................*passim*

21 U.S.C. § 856(b) ...........................................................................18, 50

21 U.S.C. § 856(d) ..................................................................................18

Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*....................2

42 U.S.C. § 2000bb(a)(2) .......................................................................48

42 U. S. C. §2000cc-5(7)(A) ...................................................................52

Controlled Substance, Drug, Device and Cosmetic Act,
35 Pa. Stat. § 780-101 *et seq* ...............................................................11

35 Pa. Stat. § 780-113.7*l* ......................................................................34

42 U.S.C. § 290bb-2a ...................................................................................30

42 U.S.C. § 290dd-3 .....................................................................................10

21 C.F.R. § 1306.04 ......................................................................................29

**MISCELLANEOUS**

Black's Law Dictionary (11th ed. 2019)........................................................................21

CDC, *Commonly Used Terms: Opioid Overdose*,
      https://www.cdc.gov/drugoverdose/opioids/terms.html (last visited June 28,
      2019) ....................................................................................................................12

CDC, *Program Guidance for Implementing Certain Components of Syringe Services
      Programs* (2016), https://www.cdc.gov/hiv/pdf/risk/cdc-hiv-syringe-
      exchange-services.pdf.........................................................................................54

City of Phila., *Combating the Opioid Epidemic*,
      https://www.phila.gov/programs/combating-the-opioid-epidemic/reports-and-
      data/opioid-misuse-and-overdose-data/ (last visited last visited June 28,
      2019) ....................................................................................................................7, 8

City of Phila., Dep't of Pub. Health, *Opioid Misuse and Overdose Report* (Nov. 29,
      2018), https://www.phila.gov/media/20181129123743/Substance-Abuse-
      Data-Report-11.29.18.pdf ...................................................................................7, 8

City of Phila., Dep't of Pub. Health, *Philadelphia's Community Health Assessment:
      Health of the City 2018*,
      https://www.phila.gov/media/20181220135006/Health-of-the-City-2018.pdf
      (last visited June 28, 2019) ..................................................................................7

City of Phila., Office of the Mayor, *Executive Order No. 3-18 – Opioid Emergency
      Response Executive Order* (Oct. 3, 2018),
      https://www.phila.gov/ExecutiveOrders/Executive%20Orders /eo99318.pdf ....................8

City of Phila., *The Mayor's Task Force To Combat The Opioid Epidemic in
      Philadelphia: Final Report and Recommendations* (May 19, 2017),
      https://dbhids.org/wp-content/uploads/2017/04/OTF_Report.pdf...............................8, 12

132 Cong. Rec.:

      p. S19241 ..............................................................................................................24, 25

      p. S26474 ..............................................................................................................24

149 Cong. Rec.:

      p. S1669 ................................................................................................................25

      p. S1677 ................................................................................................................25

      p. S1678 ................................................................................................................25, 26

      p. S5153 ................................................................................................................26

HHS, *Facing Addiction in America: The Surgeon General's Spotlight on Opioids* 6
  (Sept. 19, 2018), https://addiction.surgeongeneral.gov/sites/default/
  files/Spotlight-on-Opioids_09192018.pdf ......................................................12

Sharon Larson et al., Supervised Consumption Facilities – Review of the Evidence
  20 (2017), https://dbhids.org/wp-
  content/uploads/2018/01/OTF_LarsonS_PHLReportOnSCF_Dec2017.pdf ....... 15, 32

Hoag Levins, *Optimizing Heroin Users' Treatable Moments in the ER* (June 2017),
  https://ldi.upenn.edu/news/optimizing-heroin-users-treatable-moments-er
  (last visited Apr. 2, 2019). ...................................................................................9

Diane E. Logan & G. Alan Marlatt, *Harm Reduction Therapy: A Practice-Friendly
  Review of Research,* 66 J. Clinical  Psychol. (2010). .........................................13

Memorandum from Att'y Gen. to All Exec. Dep'ts & Agencies, *Federal Law
  Protections for Religious Liberty* 4 (Oct. 6, 2017),
  https://www.justice.gov/crt/page/file/1006786/download..........................................51, 53

Pa. Dep't of Health, Standing Order DOH-002-2016: Naloxone Prescription for
  Overdose Protection, https://www.dos.pa.gov/ProfessionalLicensing/
  BoardsCommissions/Documents/SN%20-%20Naloxone%20
  Prescription%20for%20Overdose%20Prevention%20(Standing%20
  Order%20DOH-002-2016).pdf..................................................................................11, 34

Rod J. Rosenstein, *Fight Drug Abuse, Don't Subsidize It,* N.Y. Times (Aug. 27,
  2018), https://www.nytimes.com/2018/08/27/opinion/opioids-heroin-
  injection-sites.html..................................................................................................18

Safehouse, *About Safehouse*, https://www.safehousephilly.org/about ...........................45

Antonin Scalia & Bryan A. Garner*, Reading Law: The Interpretation of Legal Texts*
  (2012)......................................................................................................................20, 23

Adam Thiel, Fire Comm'r, *Philadelphia Fire Department Fiscal Year 2018 Budget
  Testimony*, at 6, http://phlcouncil.com/wp-content/uploads/2017/04/FY18-
  Fire-Budget-Testimony-final-version-4.12.17.pdf (last visited June 28, 2019) .................8

WHYY, *Fatal opioid overdoses expected to dip in Philly for first time in 5 years*
  (Dec. 24, 2018), https://whyy.org/articles/fatal-opioid-overdoses-expected-
  to-dip-in-philly-for-first-time-in-5-years/ .....................................................................7, 8

Michaela Winberg, Billy Penn, *HHS disputes report that nation's top doc came out
  in support of safe injection sites* (May 26, 2019),
  https://billypenn.com/2018/05/24/nations-top-doc-comes-out-in-support-of-
  safe-injection-sites/ ...............................................................................................16

Defendants Safehouse and Jose Benitez (collectively, "Safehouse") respectfully submit this brief in opposition to the motion for judgment on the pleadings filed by Plaintiff-Counterclaim Defendant United States and Third-Party Defendants U.S. Department of Justice, U.S. Attorney General William P. Barr, and U.S. Attorney for the Eastern District of Pennsylvania William M. McSwain (collectively, "the DOJ"). *See* DOJ Mot. for J. on Pleadings, ECF No. 47 ("DOJ Mot."). This Court should deny the DOJ's motion because 21 U.S.C. § 856 does not—and cannot— prohibit Safehouse from providing lifesaving, overdose prevention services in the City of Philadelphia.

## **OVERVIEW**

Safehouse and the DOJ agree that the opioid crisis "has reached epidemic proportions and caused an intolerable number of deaths and misery throughout the United States." DOJ Mot. 2. But according to the DOJ's motion for judgment on the pleadings, the fact that Safehouse will save lives, reduce public drug consumption, slow the spread of infectious disease, facilitate pathways to treatment and recovery, and provide lifesaving care for our most vulnerable neighbors as an exercise of religious and moral conscience is less important than the "rule of law." *Id.* at 2, 12. Under a correct interpretation of the applicable law, these facts do matter. The Controlled Substances Act ("CSA"), including 21 U.S.C. § 856, does not prohibit Safehouse from establishing a medical facility for the purpose of providing critical, lifesaving care at the time of drug consumption, when the risk of overdose death is most acute.

The DOJ's interpretation of Section 856 is not supported by the statutory text, purpose, or history, and is inconsistent with federal law and policy that endorse the harm-reduction strategies developed to mitigate the nation's opioid and overdose crisis. Taking the facts of Safehouse's counterclaims as true (facts that Safehouse will readily prove at an evidentiary hearing), Section

856 does not criminalize Safehouse's overdose prevention and medically supervised consumption services.  To the contrary, Safehouse will advance, not violate, federal law and policy.  The "rule of law" includes the constitutional system of federalism and the provisions of Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq*., both of which preclude the DOJ's efforts to prevent Safehouse from saving lives.  Accordingly, this Court should deny the DOJ's motion for judgment on the pleadings and schedule an evidentiary hearing at which Safehouse will prove the essential facts that establish the legality of its overdose prevention site under Section 856.

     I.       Section 856's plain text, statutory purpose, and legislative history establish that it *does not apply* to Safehouse.  As relevant here, Section 856 makes it unlawful to "knowingly open, lease, rent, use, or maintain" or to "manage or control any place . . . and knowingly and intentionally . . . make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance."  21 U.S.C. §§ 856(a)(1), (2).  Section 856 does not prohibit Safehouse from opening an overdose prevention site because: (A) Safehouse will operate a medical facility "for the purpose of" saving lives, not "for the purpose" of unlawful drug use; (B) Safehouse will operate its medically supervised consumption site in the course of legitimate medical practice and therefore its operation is "authorized by" the CSA, and the site is consistent with federal law and policy endorsing harm-reduction strategies to mitigate the opioid crisis; and (C) the CSA does not define "unlawful[]. . . us[e]," further casting doubt on Section 856's application to Safehouse's public-health approach to overdose prevention.  To the extent that any doubt remains that Section 856 applies to Safehouse, moreover, the rule of lenity and clear statement rule require interpreting the provision in Safehouse's favor.

A.     Section 856's plain text makes clear that an essential statutory element of that offense is that the property is maintained, opened, or made available "for the purpose" of unlawful drug activity.  Safehouse's medically supervised consumption facility will not be a place made available "for the purpose of unlawfully . . . using a controlled substance."  21 U.S.C. § 856(a)(2).

The DOJ does not dispute that Safehouse will operate its facility for the purpose of saving lives and providing medical care and drug treatment.  Yet the DOJ incorrectly contends that the purpose of Safehouse's facility does not matter.  The DOJ asserts that Section 856 "makes it unlawful to manage any place where people use [illegal] drugs," and therefore contends that the only "'purpose' that matters" is that of Safehouse participants, not the purpose of the Safehouse facility.

The DOJ's broad reading of Section 856(a)(2) is contrary to the statute's syntax and is not supported by the cases on which the DOJ relies.  The DOJ's argument misconstrues Section 856's purpose requirement, which requires the *property* to be maintained for an unlawful purpose.  The DOJ further conflates the potential criminal liability of drug users (who may come to Safehouse in possession of small quantities of drugs), with the entirely legal, and indeed vital medical services proposed by Safehouse and its staff.  Section 856 does not apply to Safehouse because the purpose of its facility will be to provide lifesaving medical care, not to promote unlawful drug use.

B.     Section 856 does not apply to activities "authorized by" the CSA.  *See* 21 U.S.C. § 856 (providing the statute applies "[e]xcept as authorized by this subchapter").  Safehouse is "authorized by" the CSA because its medically supervised consumption services will be conducted in the course of legitimate medical practice, which the CSA does not regulate or prohibit.  Safehouse's harm-reduction strategies are consistent with federal law and policy, which promote access to clean and sterile equipment for drug consumption, proximity and availability of opioid

3

reversal agents like Naloxone, and medical care for drug users to prevent infection and transmission of disease.

The DOJ disregards the U.S. Supreme Court's determination that the CSA is not designed to regulate legitimate medical practice. *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) ("Congress regulates medical practice insofar as it bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood. Beyond this, however, the statute manifests no intent to regulate the practice of medicine generally." (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996))).

The CSA affords registered medical practitioners wide discretion to use reasonable clinical judgment in the regulated practice of prescribing, administering, or distributing controlled substances. Section 856 therefore should not be interpreted to override medical and public-health judgment about how and where medical staff will offer opioid *reversal* agents and other urgent and primary care for individuals suffering from opioid and substance use disorder—medical interventions that the CSA does not regulate.

To the extent that the DOJ disagrees that Safehouse's overdose prevention model is consistent with legitimate medical practice, that is a question of fact. Safehouse has pleaded and will prove that supervised consumption sites are a medically accepted means of preventing overdose deaths, borne out by years of public-health and clinical data and the basic, indisputable pharmacologic mechanism of opioid overdose and overdose reversal. Safehouse will establish that its medical supervision model—which allows medical practitioners to supervise and remain in close proximity to drug users at the time of consumption—guarantees timely access to lifesaving overdose reversal agents and potentially urgent medical care.

C.     Section 856 does not define what constitutes "unlawfully . . . using" a controlled substance.  Whereas manufacture, storage, distribution, and possession of controlled substances are all defined terms under the CSA, *see* 21 U.S.C. §§ 802, 841(a), 844, nowhere does the CSA define the circumstances under which "use" of controlled substances is prohibited.  This omission is particularly troubling given that many opioids, including fentanyl, may be lawfully prescribed and distributed, and Safehouse will offer medical supervision and care without necessarily knowing the identity of the drugs used by its participants, or how they were obtained.

D.     Section 856's statutory purpose and legislative history further undermine the DOJ's case.  Safehouse's public-health approach to overdose prevention is plainly far removed from the conduct that Congress targeted when it enacted—and subsequently amended—Section 856, namely, "crack houses" and rave parties.  The rule of lenity and the clear statement rule compel this Court to adopt Safehouse's proposed interpretation of Section 856.

II.     The DOJ's threat to prosecute Safehouse is without merit because Section 856 cannot apply to Safehouse within the constitutional bounds of the Commerce Clause or in light of Safehouse's RFRA claim.

A.     The DOJ's expansive interpretation of Section 856 to target Safehouse's overdose prevention site would exceed the constitutional limits on Congress's Commerce Clause authority, which does not permit Congress to adopt a freestanding regulation of purely local, non-commercial activity that has no direct and substantial effect on interstate commerce.  Under the facts alleged in the pleadings, Safehouse's free medical and drug treatment services would not increase the interstate market for controlled substances.  This Court may avoid the serious constitutional question and federalism concerns raised by the DOJ's broad interpretation of Section 856 by adopting the alternative construction urged by Safehouse.

5

B.     RFRA precludes the DOJ's threatened prosecution of Safehouse. The DOJ's threatened prosecution of Safehouse substantially burdens Safehouse's sincerely held religious beliefs that call it to provide shelter and lifesaving care to individuals suffering from opioid and substance use disorder.  The DOJ mischaracterizes Safehouse's claim of religious exercise by focusing on whether there is a religious "right to possess illegal drugs or to provide a forum for using them."  DOJ Mot. 25.  Safehouse's pleadings demonstrate that Safehouse and its board hold the sincere religious conviction that preservation of human life is paramount—a belief deeply rooted in both Jewish and Christian traditions.  This is not a "philosophical disagreement" with the scope of the CSA, or a "half-hearted" assertion of religious faith, as the DOJ suggests.  *Id.* at 2, 24.  Rather, the facts alleged demonstrate that Safehouse's services will save lives, and Safehouse and its board sincerely believe that overdose prevention is an exercise of their religious obligation to preserve life, provide shelter to our neighbors, and to do everything possible to care for the sick.

Safehouse's religious obligation to save lives is not diminished by its reliance on medical and public-health evidence, which demonstrate that an overdose prevention site is an effective way to achieve its goals.  Faith-based social action does not ignore the agonies of the world; to the contrary, faith-based action may be informed by utilizing the best social, economic, and medical evidence.  The DOJ's assertion that there are "myriad ways" to alternatively "ease the toll of the opioid crisis" (*id.* at 28–29) further ignores the facts as pleaded, which establish that existing harm-reduction measures have failed to prevent thousands of needless overdose deaths.  Those facts rebut the DOJ's claim that forcing Safehouse to stand aside, while lives are lost, serves any legitimate, much less compelling government interest.

For these reasons, Safehouse respectfully requests that this Court deny the DOJ's motion for judgment on the pleadings.

6

# BACKGROUND[1]

## I.    THE OPIOID EPIDEMIC IN THE CITY OF PHILADELPHIA

Philadelphia is in the midst of an unprecedented public-health emergency due to the opioid epidemic and the opioid overdose crisis.  Counterclaims ¶ 17, ECF No. 3.  Between 2011 and 2014, most opioid-related deaths in Philadelphia had been caused by heroin.  *Id.* ¶ 20.  In the last several years, however, Philadelphia has experienced a dramatic increase in the number of deaths related to fentanyl—a powerful and fast-acting opioid that was involved in 87% of the overdose deaths that occurred in Philadelphia in 2017.[2]  *Id.*, Prelim. Statement.

The widespread proliferation of fentanyl has exacted a devastating human toll.  In the last two years, more than 2,300 individuals died because of an opioid overdose in Philadelphia.[3]  *Id.* ¶ 18.  Philadelphia's overdose fatality rate is nearly four times its homicide rate, with the City losing three of its citizens each day to opioid overdoses.[4]  *Id.*

The influx of fentanyl has also wreaked havoc on Philadelphia's neighborhoods.  On October 3, 2018, the Mayor of Philadelphia issued an Opioid Emergency Response Executive Order declaring that "Kensington and its surrounding neighborhoods are in the midst of a disaster"

---

[1] This Court must accept the allegations in the pleadings and reasonable inferences therefrom as true for purposes of resolving its motion for judgment on the pleadings, as acknowledged by the DOJ.  DOJ Mot. 4 n.3 (citing cases).  As a result, the factual background is drawn from the allegations in DOJ's Amended Complaint, ECF No. 35, Safehouse's Answer to the DOJ's Amended Complaint, ECF No. 45, Safehouse's Counterclaims and Third-Party Complaint against the DOJ ("Counterclaims"), ECF Nos. 3, 45, and the DOJ's Answer to Safehouse's Counterclaims, ECF No. 46.

[2] *See* City of Phila., Dep't of Pub. Health, *Opioid Misuse and Overdose Report* (Nov. 29, 2018), https://www.phila.gov/media/20181129123743/Substance-Abuse-Data-Report-11.29.18.pdf.

[3] *See* City of Phila., Dep't of Pub. Health, *Opioid Misuse and Overdose Report* (Nov. 29, 2018), https://www.phila.gov/media/20181129123743/Substance-Abuse-Data-Report-11.29.18.pdf;   City   of   Phila., *Combating the Opioid Epidemic*, https://www.phila.gov/programs/combating-the-opioid-epidemic/reports-and-data/opioid-misuse-and-overdose-data/ (last visited June 28, 2019); *see also* WHYY, *Fatal opioid overdoses expected to dip in Philly for first time in 5 years* (Dec. 24, 2018), https://whyy.org/articles/fatal-opioid-overdoses-expected-to-dip-in-philly-for-first-time-in-5-years/.

[4] City of Phila., Dep't of Pub. Health, *Philadelphia's Community Health Assessment: Health of the City 2018*, at 5, https://www.phila.gov/media/20181220135006/Health-of-the-City-2018.pdf (last visited June 28, 2019).

due to the opioid crisis, and empowering city agencies and officials to lead efforts to reduce opioid deaths and transmission of disease and to increase entry into drug treatment.[5] *Id.* ¶ 19.

To combat this growing crisis, the Mayor of Philadelphia also created the Task Force to Combat the Opioid Epidemic in Philadelphia (the "Task Force"). *Id.* ¶ 27. The Task Force issued a report recommending the implementation of overdose prevention services and expansion of treatment access and capacity.[6] *Id.*

As of 2016, more than 70,000 Philadelphians were active heroin users. *Id.* ¶¶ 20-21, 30. Multiple people die every day from an opioid overdose.[7] *Id.* ¶ 18. Philadelphia's Emergency Medical Services ("EMS") is inundated with calls to respond to overdoses. *Id.* ¶ 24. EMS response times are variable, and for 46 percent of calls in 2017, more than 9 minutes elapsed before EMS arrived at the scene.[8] *Id.* In 2017, Philadelphia's EMS personnel administered Naloxone—an overdose reversal agent—to more than 5,400 overdose victims.[9] *Id.* ¶ 25. This number increased in 2018. *Id.* Emergency rooms are not equipped to provide the wraparound services needed to

---

[5] City of Phila., Office of the Mayor, *Executive Order No. 3-18 – Opioid Emergency Response Executive Order* (Oct. 3, 2018), https://www.phila.gov/ExecutiveOrders/Executive%20Orders/eo99318.pdf.

[6] *See* City of Phila., *The Mayor's Task Force To Combat The Opioid Epidemic in Philadelphia: Final Report and Recommendations* (May 19, 2017), https://dbhids.org/wp-content/uploads/2017/04/OTF_Report.pdf ("*Task Force Report*").

[7] *See* City of Phila., Dep't of Pub. Health, *Opioid Misuse and Overdose Report* (Nov. 29, 2018), https://www.phila.gov/media/20181129123743/Substance-Abuse-Data-Report-11.29.18.pdf; City of Phila., *Combating the Opioid Epidemic*, https://www.phila.gov/programs/combating-the-opioid-epidemic/reports-and-data/opioid-misuse-and-overdose-data/ (last visited June 28, 2019); *see also* WHYY, *Fatal opioid overdoses expected to dip in Philly for first time in 5 years* (Dec. 24, 2018), https://whyy.org/articles/fatal-opioid-overdoses-expected-to-dip-in-philly-for-first-time-in-5-years/.

[8] Adam Thiel, Fire Comm'r, *Philadelphia Fire Department Fiscal Year 2018 Budget Testimony*, at 6, http://phlcouncil.com/wp-content/uploads/2017/04/FY18-Fire-Budget-Testimony-final-version-4.12.17.pdf (last visited June 28, 2019).

[9] *See* City of Phila., Dep't of Pub. Health, *Opioid Misuse and Overdose Report* (Nov. 29, 2018), https://www.phila.gov/media/20181129123743/Substance-Abuse-Data-Report-11.29.18.pdf; City of Phila., *Combating the Opioid Epidemic*, https://www.phila.gov/programs/combating-the-opioid-epidemic/reports-and-data/opioid-misuse-and-overdose-data/ (last visited June 28, 2019)

overcome opioid addiction.[10]   *Id.* ¶ 26.   Safehouse would fulfill Philadelphia's dire need for overdose prevention services.  *Id.* ¶ 28.

## II.   THE PROLIFERATION OF FENTANYL AND GROWING NEED FOR INCREASED ACCESS TO NALOXONE

*Fentanyl.*  Fentanyl is a synthetic opioid now found in many of the opioids sold on the street in Philadelphia.  *Id.*  Fentanyl is often sold to drug users who mistakenly believe that they are purchasing less lethal drugs.  *Id.* ¶ 21.  Fentanyl is 50-to-100 times more potent than heroin, and its effects are felt within the human body much faster.  *Id.*  In the event of a fentanyl overdose, a person may stop breathing *2-to-3 minutes* after consumption.  *Id.*  Absent intervention, serious injury or death can occur as quickly as *3-to-5 minutes* consumption.  *Id.* ¶ 22.  Every second counts when responding to an opioid overdose.  *Id.*

*Naloxone.*   The immediate administration of Naloxone and similar opioid receptor antagonists provides lifesaving treatment by reversing an overdose. *Id.* ¶ 23.   This is not speculation.   An intervention using Naloxone or a similar opioid receptor antagonist will resuscitate and keep a person alive with medical certainty.  *Id.* ¶¶ 23, 68.  Although Naloxone is designed to be easily administered as an intra-nasal spray, a person experiencing an overdose (and thus losing consciousness) cannot self-administer Naloxone.  *Id.* ¶ 69.  As a result, Naloxone can work only if someone else is close by to administer it.  *Id.*  And since a person overdosing can lose respiratory function within minutes of consumption, time is of the essence in providing respiratory support and Naloxone to reverse an overdose.  *Id.*  The more time that elapses, the greater the risk of serious injury and death.

---

[10]   Hoag Levins, *Optimizing Heroin Users' Treatable Moments in the ER* (June 2017), https://ldi.upenn.edu/news/optimizing-heroin-users-treatable-moments-er (last visited June 28, 2019).

***Government Efforts to Increase Naloxone Access.***  With the help of federal, state, and local funding, Naloxone has been widely dispensed as a proven means of combatting opioid deaths.  *Id.* ¶ 70.  Despite increased availability of Naloxone, people are continuing to die from overdoses at alarming rates.  Outside of a medically supervised environment, even when help does arrive for an overdose victim, first responders, family members, and Good Samaritans sometimes lack sufficient doses of Naloxone or lack training in other respiratory support required to resuscitate that person.  *Id.*[11]  Medical supervision of opioid consumption ensures prompt and effective overdose reversal using a variety of available techniques.

Congress recognized the importance of Naloxone access when it enacted the Comprehensive Addiction and Recovery Act of 2016 ("CARA"), Pub. L. No. 114-198, 130 Stat. 695.  *Id.* ¶ 71; *see* CARA § 101, 130 Stat. 697.  CARA established a coordinated, public-health strategy to address the opioid crisis, including increased funding for education and awareness campaigns and improved access to overdose treatment.  Counterclaims ¶ 71.  CARA also amended the CSA to expand prescribing privileges for medically-assisted treatment ("MAT"), like buprenorphine and suboxone, to nurses practitioners and physicians assistants.  *See id.* § 303(a)(l)(C)(v)-(iv), 130 Stat. 720-723; Counterclaims ¶ 72.  CARA includes several measures that expand and encourage access to opioid reversal agents such as Naloxone.  For example, CARA empowers the Department of Health and Human Services ("HHS") to award grants to eligible entities providing overdose reversal treatment, including Naloxone.  *See id.* § 107, 130 Stat. 703 (42 U.S.C. § 290dd-3); Counterclaims ¶ 73.  CARA requires evaluation of state Good Samaritan laws that provide civil and criminal immunity to individuals who administer Naloxone to an

---

[11] For example, at times a single dose of Naloxone is not sufficient to reverse an overdose.  Counterclaims ¶ 70.  Multiple doses or intramuscular injections of Naloxone are sometimes required.  *Id.*  Oxygen and respiratory support may also be beneficial, and can serve as an alternative first-line treatment.  *Id.*

individual experiencing an overdose. *See id.* § 703, 130 Stat. 741; Counterclaims ¶ 73. CARA also directs the Secretary of HHS to "maximize the availability of opioid receptor antagonists, including [N]aloxone, to veterans." *See id.* § 911, 130 Stat. 759; Counterclaims ¶ 73.

Pennsylvania state law similarly recognizes the importance of Naloxone access. Counterclaims ¶ 74. In light of the growing opioid crisis, in 2010, the Pennsylvania General Assembly amended its state drug law (the Controlled Substance, Drug, Device and Cosmetic Act, 35 Pa. Stat. § 780–101 *et seq.*) by enacting the Drug Overdose Response Immunity statute ("the Good Samaritan Statute"). *Id.* That statute provides immunity from prosecution for persons who call authorities to seek medical care for a suspected overdose victim. *See* 35 Pa. Stat. § 780–113.7. Counterclaims ¶ 74. The Good Samaritan Statute also provides criminal, civil, and professional immunity to anyone who, in good faith, administers Naloxone to an individual experiencing an overdose. Former Governor of Pennsylvania, Tom Corbett, stated the Good Samaritan statute "will save lives and ensure those who help someone in need aren't punished for doing so." *Id.*

On April 18, 2018, the Pennsylvania Physician General issued a Standing Order that provides a statewide prescription for eligible persons to obtain Naloxone. *Id.* ¶ 75. The purpose of the Order is to "ensure that residents of the Commonwealth of Pennsylvania who are at risk of experiencing an opioid-related overdose, or who are family members, friends or other persons who are in a position to assist a person at risk of experiencing an opioid-related overdose . . . , are able to obtain Naloxone."[12] *Id.* (alteration in original). The Pennsylvania Physician General has continued to renew this Standing Order, consistent with Pennsylvania Governor Tom Wolf's Proclamation and as the opioid crisis continues in Pennsylvania. *Id.*

---

[12] Pa. Dep't of Health, Standing Order DOH-002-2016: *Naloxone Prescription for Overdose Protection* (Mar. 1, 2016), https://www.dos.pa.gov/ProfessionalLicensing/BoardsCommissions/Documents/SN%20-%20Naloxone%20 Prescription%20for%20Overdose%20Prevention%20(Standing%20Order%20DOH-002-2016).pdf ("Standing Order DOH-002-2016").

III.   **OPIOID USE DISORDER AND HARM REDUCTION AS AN ESSENTIAL TOOL IN THE FIGHT AGAINST THE OPIOID EPIDEMIC**

*Opioid Use Disorder.*  "Opioid use disorder" is defined by the Centers for Disease Control and Prevention ("CDC") to be a medical condition diagnosed "based on specific criteria such as unsuccessful efforts to cut down or control use, or use resulting in social problems and a failure to fulfill obligations at work, school, or home, among other criteria."[13]  *Id.* ¶ 30.  The Office of the Surgeon General has defined it as "[a] disorder characterized by loss of control of opioid use, risky opioid use, impaired social functioning, tolerance, and withdrawal."[14]  The Office of the Surgeon General has reported that more than eleven million Americans use illicit drugs or misuse prescription drugs, but that only one out of four of those people seek specialized treatment for opioid use disorder.[15]  *Id.*  In 2016, the Mayor's Task Force reported that more than 14,000 Medicaid recipients in Philadelphia sought treatment for opioid use disorder—a small fraction of those actually suffering from that condition.[16]  *Id.*

Harm-reduction strategies are an essential aspect of public-health initiatives.  *Id.* ¶ 31. "Harm reduction" is an umbrella term for interventions that aim to reduce problematic or otherwise harmful effects of certain behaviors.  In the context of substance and opioid use disorders, such interventions are necessary to minimize harm for individuals "who, for whatever reason, may not be ready, willing, or able to pursue full abstinence as a goal."  *Id.*  Harm reduction can include reducing the frequency of substance use, preventing the transmission of diseases such as HIV and

---

[13] CDC, *Commonly Used Terms: Opioid use disorder*, https://www.cdc.gov/drugoverdose/opioids/terms.html (last visited June 28, 2019).

[14] HHS, *Facing Addiction in America: The Surgeon General's Spotlight on Opioids* 6 (Sept. 19, 2018), https://addiction.surgeongeneral.gov/sites/default/files/Spotlight-on-Opioids_09192018.pdf.

[15] *Id.* at 6-7.

[16] *Task Force Report*, *supra* note 6, at 7-8.

Hepatitis C, providing syringe exchange, and offering medication-assisted treatments, overdose prevention, and wound care. *Id.* Harm-reduction strategies are necessary in light of the psychology of addiction and substance use disorder, and seek to help individuals engage in treatments to reduce, manage, and stop their substance use when appropriate.[17] *Id.* As the government has recognized, "[h]arm reduction programs provide health-oriented, cost-effective, and often cost-saving services to prevent and reduce substance use-related risks among those actively using substances, *and substantial evidence supports their effectiveness.*"[18]

## IV.  SAFEHOUSE, THE SAFEHOUSE MODEL, AND SUPERVISED CONSUMPTION AND OBSERVATION

*Formation of Safehouse.* Safehouse, a privately funded nonprofit corporation, was established in 2018 with the mission to save lives by providing a range of overdose prevention services. *Id.* ¶ 29. Safehouse's singular purpose is to offer lifesaving medical treatment, primary care, and wraparound services to a vulnerable population at high risk of overdose death and complications from opioid use disorder. *Id.* ¶ 92.

*The Safehouse Model.* Safehouse will combat the opioid crisis through the use of a comprehensive harm-reduction strategy to mitigate the catastrophic losses resulting from the opioid epidemic and overdose crisis in Philadelphia. *Id.* ¶ 32. In particular, Safehouse's overdose prevention services include the assessment of an individual's physical and behavioral health status, provision of sterile consumption equipment, provision of drug testing (*i.e.*, fentanyl test strips), medically supervised consumption and observation, overdose reversal, wound care and other primary care services, on-site education and counseling, on-site MAT and recovery counseling,

---

[17] *See* Diane E. Logan & G. Alan Marlatt, *Harm Reduction Therapy: A Practice-Friendly Review of Research,* 66 J. Clinical  Psychol. 201 (2010).

[18] *Id.* at 18.

distribution of Naloxone, and access to wraparound services such as housing, public benefits, and legal services.  *Id.* ¶ 33.[19]

Upon arrival at Safehouse, all participants will register and provide demographic information.  Answer ¶ 10.  A physical and behavioral health assessment will be conducted and a range of overdose prevention services offered.  *Id.*  Participants then will be directed to the medically supervised observation room, where they will be "offered on-site initiation of medically-assisted treatment, wound care, and referrals to primary care, social services, and housing opportunities."  *Id.*  Alternatively, participants may utilize Safehouse's medically supervised consumption room, and will be provided with sterile consumption equipment and fentanyl test strips.  *Id.*[20]  At that time, participants will be permitted to consume opioids or other drugs (none of which will be provided by Safehouse or sold at Safehouse) under the watchful eye of trained medical professionals supplied with sufficient doses of Naloxone and the ability to provide other forms of respiratory support.  *Id.*; Counterclaims ¶ 76.  From the consumption area, participants will be directed to the medically supervised observation room and again offered opportunities for drug treatment, medical care, and social services.  *Id.*

***Safehouse Will Save Lives, Improve Public-Health, and Reduce Drug Use.***  Under this model, Safehouse can offer assurance—to a medical certainty—that people within its care will not die of a drug overdose.  *Id.* ¶¶ 37, 76.  The Safehouse model provides those at highest risk of an opioid overdose with immediate access to medical care, including overdose reversal agents during

---

[19] In Philadelphia, an existing nonprofit community organization, Prevention Point Philadelphia, provides a wide range of medical and non-medical services intended to reduce the harms of the opioid crisis—but it does not provide medically supervised consumption or observation.  Am. Compl. ¶ 8, ECF No. 35.

[20] The provision of sterile consumption equipment will reduce of the risk of transmission of infectious diseases. Participants will safely dispose of used consumption equipment before leaving the supervised consumption area.  *Id.* Fentanyl test strips are used to detect the presence of fentanyl prior to consumption.  *Id.* n.12.  By alerting the participant to the presence of fentanyl and the increased risk of overdose, Safehouse would be practicing a harm-reduction strategy that encourages a dosage adjustment to a safer level.  *Id.*

and immediately after the time of use—which is the moment when Naloxone is most needed.  *Id.* ¶ 34.  By providing these services, Safehouse will save lives by preventing overdose deaths; similar overdose prevention efforts, including supervised consumption sites, have proven to be effective in other countries, and are backed by clinically sound data.  *Id.* ¶¶ 37, 76, 118, 131.  In fact, studies estimate that an overdose prevention site like Safehouse could reduce overdose deaths annually by 30% in the site's immediate vicinity.[21]  *Id.* ¶ 38. Moreover, in a 30-year period, no person has died of a drug overdose in any safe consumption site worldwide.

In addition, Safehouse's comprehensive services will encourage entry into drug treatment, reduce the burden on emergency services and first responders, prevent the transmission of infectious diseases, and create a safer community by reducing public consumption of illicit drugs and discarded consumption equipment.  *Id.* ¶ 36.  Allowing Safehouse to operate will not increase the manufacture, distribution, or possession of illegal drugs.  *Id.* ¶¶ 131-33.  Instead, when Safehouse does open, the demand for illegal drugs will decrease because some of its beneficiaries will seek and be provided with drug treatment. *Id.* ¶ 133.  These facts matter.[22]

*Safehouse's Overdose Prevention Services Are a Legitimate Medical and Public-Health Measure.*  The medical and public health measures that Safehouse will provide have been recognized and endorsed by prominent national and international medical and public-health associations including the American Medical Association, the American Public Health Association, AIDS United, the European Monitoring Center for Drugs and Drug Addiction, the

---

[21] Sharon Larson et al., *Supervised Consumption Facilities – Review of the Evidence* 20 (2017), https://dbhids.org/wp-content/uploads/2018/01/OTF_LarsonS_PHLReportOnSCF_Dec2017.pdf  ("*Supervised Consumption Facilities*").

[22] The only "facts" the DOJ addresses are out-of-context statements made by Safehouse Board Member Ed Rendell.  DOJ Mot. 1 n.1, 2 n.2.  Those statements are outside the scope of the pleadings and irrelevant to the issues pending before the Court.  Governor Rendell's concern that there is potential criminal exposure for Safehouse, is not surprising, in light of the DOJ's widely publicized (and misguided) interpretation of Section 856(a)(2).

Infectious Diseases Society of America, the HIV Medical Association, the International Drug Policy Consortium, and innumerable public-health experts, physicians, and addiction researchers. *Id.* ¶ 88. Safehouse's overdose prevention model has been endorsed and encouraged by Philadelphia's Public Health Commissioner and its Commissioner of the Department of Behavioral Health and Intellectual disAbility Services, who have announced that overdose prevention, including supervised consumption, is a critical medical and public-health intervention. *Id.* ¶ 89. Additionally, local officials, including Philadelphia's Mayor and District Attorney, support Safehouse's efforts to mitigate the opioid crisis. *Id.* ¶ 117.[23]

**Safehouse Code of Conduct.** Under no circumstance will Safehouse make available any illicit narcotic or opioid. Answer ¶ 10. Nor will it manufacture, sell, administer, or permit the distribution or sale of unlawful drugs on site. Counterclaims ¶ 112. Safehouse will not allow participants to share consumption equipment or help another person consume drugs. Nor will it allow staff to handle illegal drugs or help participants consume drugs. *Id.*

Safehouse, a non-profit corporation, will not charge participants for its harm-reduction and overdose prevention services. *Id.* It will not produce any revenue. In fact, it will not even permit the exchange of currency. Safehouse's services will be entirely local intrastate activity and its proposed conduct will not affect interstate commerce whatsoever. Safehouse will not adversely affect or otherwise undermine Congress's goal of suppressing the interstate market for illegal drugs, since studies show that medically supervised consumption sites actually reduce drug use. *Id.* ¶ 113. Allowing Safehouse to operate will not increase the manufacture, distribution, or

---

[23] Although the DOJ asserts that the U.S. Surgeon General made a "correction" about his support for supervised consumption sites (two weeks before its motion was filed), the Surgeon General's spokesman clarified nonetheless that the "conversation about harm reduction can range from basic education to condoms to SSPs *and all the way to safe injection sites*. Each community needs to look at their burden of disease, examine what the science says and to decide what is right for them." Michaela Winberg, Billy Penn, *HHS disputes report that nation's top doc came out in support of safe injection sites* (May 26, 2019), https://billypenn.com/2018/05/24/nations-top-doc-comes-out-in-support-of-safe-injection-sites/.

possession of illegal drugs. *Id.* ¶¶ 131-33. When Safehouse does open, the demand for illegal drugs will decrease because some of its beneficiaries will seek and be provided with drug treatment. *Id.* ¶ 133.

## V.    SAFEHOUSE'S BOARD MEMBERS

The members of Safehouse's Board, including Defendant Benitez, are Jews or Christians. *Id.* ¶124. Their religious beliefs are sincerely held and have been ingrained in them by their religious schooling, their devout families, and their practices of worship. *Id.* ¶ 125. In particular:

- **Frank A. James III** is a Christian and President of Missio Seminary (formerly known as Biblical Theological Seminary).

- **Chip Mitchell** is an adherent of Christianity and Lead Evangelist at the Greater Philadelphia Church of Christ.

- **Board President Defendant José Benitez** was raised and educated as a Roman Catholic. His entire professional life, including as Director of Prevention Point Philadelphia, has been an exercise in living out that faith and those teachings.

- **Board Vice President Ronda Goldfein** was raised with strong Jewish values and still worships in the small South Jersey synagogue cofounded by her grandfather. Her professional life, including as Executive Director of the AIDS Law Project of Pennsylvania, has been an exercise in living out that faith and those teachings.

*Id.* At the core of all board members' faith is the principle that the preservation of human life is paramount and overrides any other considerations. *Id.* ¶ 126. This principle is rooted in scriptures, and appears throughout the Hebrew Bible, the Talmud, and the New Testament. *Id.* ¶ 127.

The board members' religious beliefs obligate them to take action to save lives in the current overdose crisis, and thus to establish and run Safehouse in accordance with these tenets. *Id.* ¶ 128. Specifically, the board members believe that establishing an overdose prevention site effectuates their religious obligation to preserve life, provide shelter to their neighbors, and to do everything possible to care for the sick. *Id.* The DOJ's threats and the initiation of a lawsuit against Safehouse burden Safehouse's religious expression by forcing it to choose between the

exercise of its founders' and directors' religious beliefs and conformity with the DOJ's interpretation of Section 856.  *Id*. ¶ 129.

## VI. THE DOJ'S THREAT TO PROSECUTE SAFEHOUSE FOR LAWFUL, LIFESAVING CONDUCT

On November 9, 2018, the U.S. Attorney for the Eastern District of Pennsylvania, William M. McSwain, sent a letter to Safehouse declaring the DOJ's intent to pursue "appropriate legal remedies" for a purported "violation of the CSA." *Id.* ¶ 39, Ex. B.  Similarly, in a widely published op-ed, then–U.S. Deputy Attorney General Rod Rosenstein argued that supervised consumption sites violate federal law and could result in "up to 20 years in prison."[24]  *Id.* ¶ 40.

On February 5, 2019, the DOJ filed a complaint for a declaratory judgment that Safehouse's medically supervised consumption room would violate 21 U.S.C. § 856(a)(2).  *Id.* ¶ 41. Violation of Section 856 carries with it severe criminal and civil penalties, including fines of up to $2,000,000 and imprisonment for up to twenty years.  *See* 21 U.S.C. § 856(b) and (d). Safehouse has counterclaimed, seeking (i) a declaration that Section 856 does not—and cannot consistent with the U.S. Constitution and RFRA—prohibit Safehouse from operating a medically supervised consumption site, and (ii) an injunction preventing the DOJ from enforcing Section 856 against Safehouse.

To advance its erroneous interpretation of Section 856, the DOJ now moves for a judgment on the pleadings on its claim for declaratory relief—*i.e.*, a declaration from this Court allowing the DOJ to prosecute Safehouse for providing lawful and lifesaving overdose prevention services.

---

[24] *See* Rod J. Rosenstein, *Fight Drug Abuse, Don't Subsidize It,* N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/opinion/opioids-heroin-injection-sites.html.

<u>**ARGUMENT**</u>

**I.      SECTION 856(a)(2) DOES NOT APPLY TO SAFEHOUSE**

The DOJ's interpretation of Section 856 is contrary to basic principles of statutory construction, is inconsistent with the CSA's deference to the practice of medicine, and it is at odds with the federal government's endorsement of other, closely related harm-reduction strategies to mitigate the opioid crisis.  Section 856, as properly construed, does not apply to Safehouse, which seeks to prevent overdose deaths, reduce public drug consumption, prevent disease transmission, and encourage entry into drug treatment.  Providing medical care and treatment to an individual at a life-threatening moment is legitimate medical practice, which the CSA does not regulate, much less criminally proscribe.

>      **A.      Section 856 Does Not Apply Because Safehouse Would Not Be A Place Made Available "*For the Purpose of*" Unlawfully Using Controlled Substances.**

Section 856 prohibits property owners or managers from making available a property "for the purpose of" unlawful drug activities.  The DOJ does not dispute that the purpose of Safehouse's planned facility, including its supervised consumption site, is to save lives through an evidence-based public-health approach to overdose prevention.  It argues instead that the only relevant question is "whether Safehouse knowingly would allow people onto its property who have the purpose to use illegal drugs."  DOJ Mot. 9.  The language of Section 856 makes clear that the DOJ's interpretation is wrong: Section 856 turns on the purpose *of the place* itself, not the purpose of individual Safehouse participants.  Safehouse's purpose is to save lives by preventing overdose death.  It will not be a place made available "for the purpose of . . . using a controlled substance" within the meaning of Section 856.  21 U.S.C. § 856(a).

> ### i.   Section 856 requires evidence that the primary or principal purpose of the property is unlawful use

To interpret a statute, one must look to the plain meaning of its language.  Section 856(a) states in pertinent part:

> Except as authorized by this subchapter, it shall be unlawful to- . . .
>
> (1) **knowingly open, lease, rent, use, or maintain any place**, whether permanently or temporarily, **for the purpose of** manufacturing, distributing, or **using** any controlled substance;
>
> (2) **manage or control any place**, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, **and knowingly and intentionally** rent, lease, profit from, or **make available for use**, with or **without compensation, the place for the purpose of unlawfully** manufacturing, storing, distributing, or **using** a controlled substance.

*See id.* § 856(a) (emphasis added).[25]

Since it is unlawful under Section 856(a)(1) and (a)(2) to maintain or make available a "*place for the purpose* of . . . using a controlled substance," interpreting the term "purpose" is critical.  The phrase "for the purpose" modifies the immediately preceding term "place."  *See* Antonin Scalia & Bryan A. Garner*, Reading Law: The Interpretation of Legal Texts* 140-43 (2012) (The Grammar Canon: "Words are to be given the meaning that proper grammar and usage would assign them.").  It is a well-recognized interpretative principle that "[a] word is given more precise content by the neighboring words with which it is associated."  *Life Techs. Corp. v. Promega Corp.*, 137 S. Ct. 734, 740 (2017) (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)).  In other words, Section 856 only applies to a *place* that is "open[ed]," use[d]," or "maintain[ed]" "for the purpose of" unlawful drug activity.

---

[25] The facts alleged in the pleadings allow this Court to narrow its interpretive inquiry.  Safehouse will not be used for the purpose of unlawfully manufacturing, storing, or distributing any controlled substances and Safehouse will not permit anyone to use its facilities for any of those purposes.  Counterclaims ¶ 112.  Safehouse will not rent, lease, or profit from its facility or seek compensation from its participants.  *Id.*

The term "purpose" means "[a]n objective, goal, or end."  Black's Law Dictionary (11th ed. 2019); *see also* Merriam-Webster Dictionary (defining "purpose" as "something set up as an object or end to be attained").  Thus, the *purpose* for which a place is opened, maintained, or made available is the property's ultimate objective, *not* the *means* by which that objective is achieved.  The purpose of Safehouse and its facility is not to facilitate the unlawful use of drugs, but rather to provide necessary, urgent, lifesaving medical care and treatment to people with opioid and substance use disorder.  That singular *purpose* is unaltered by the fact that the *means* by which it achieves its goals is to provide shelter, proximity to medical care, and supervision to drug users at the time of consumption.

Courts analyzing Section 856 have acknowledged that it is the purpose of the property is an essential element.  For example, in *United States v. Chen*, 913 F.3d 183 (5th Cir. 1990)—a case relied upon by the DOJ—the Fifth Circuit concluded that, under Section 856(a)(1) "it is strictly incumbent upon the government to prove beyond a reasonable doubt *not* that a defendant knowingly maintained a place *where* controlled substances were used or distributed, but rather, that a defendant knowingly maintained a place *for the specific purpose of distributing or using a controlled substance*."  *Id.* at 189 (emphases in original); *accord United States v. Johnson*, 737 F.3d 444, 448 (6th Cir. 2013) (requiring the government to show that "[d]rug storage thus constituted a 'significant or important reason' for which [the defendant] maintained his home"); *United States v. Verners*, 53 F.3d 291, 296 (10th Cir. 1995) (same); *United States v. Lancaster*, 968 F.2d 1250 (D.C. Cir. 1992) (same).

Rather than apply that straightforward statutory text, DOJ contends that Section 856(a)(2)—but not Section 856(a)(1)—focuses on the "drug user's purpose" in using Safehouse rather than the purpose of Safehouse's medical facility.  Safehouse's purpose is not determined by

the many reasons an individual Safehouse participant may enter the premises, as the DOJ claims. That interpretation is incorrect and contrary to the statutory text. First, Section 856(a) is devoid of any reference to the purpose of any third party (*i.e.*, Safehouse participants). The DOJ's interpretation, if adopted, would lead to a substantial expansion of criminal liability for property owners, who under the DOJ's view of the statute, could be prosecuted for simply *knowing* that illegal drugs are consumed by anyone they permit to enter or remain on their property. *See* DOJ Mot. 9; *id.* at 13 (asserting that it "must show merely that Safehouse knowingly would allow people onto its property who have the purpose to use illegal drugs"). Felony statutes are not to be lightly interpreted so expansively. The breadth of the DOJ's position goes well beyond any reasonable interpretation of Section 856's scope. For example, under the DOJ's reasoning, a property owner could face severe criminal liability for allowing her child to stay at home under her care knowing that the child was addicted to and using drugs. A homeless shelter could be criminally liable for knowingly providing housing for people who currently are addicted to and using controlled substances on the premises. That is plainly not what Congress intended or enacted here.

The DOJ's reading of Section 856 also would be entirely inconsistent with federally funded programs and guidance by the U.S. Department of Housing and Urban Development ("HUD"). HUD's "Housing First" program expressly endorses and funds providers who offer housing to current substance abusers. HUD guidance states that such providers should not deem onsite drug use to be a lease violation that requires eviction.[26] Plainly, HUD does not believe its federally funded providers violate Section 856, or any other provision of the CSA, by providing shelter and housing to current drug users, even knowing that they are using on site. The same rationale applies

---

[26] *See* HUD Exchange, *Housing First in Permanent Supportive Housing* (July 2014), available at: https://www.hudexchange.info/resource/3892/housing-first-in-permanent-supportive-housing-brief/.

here.  The "purpose" of a Housing First program is to provide a stable home; similarly, the "purpose" of Safehouse is to provide lifesaving medical care to current drug users.

The DOJ also provides no justification for its contention that the phrase "place for the purpose" should be given an entirely different and far more expansive meaning in Section 856(a)(2) than in Section 856(a)(1).  Both Section 856(a)(1) and (a)(2) use the phrase *"the place for the purpose*."[27]  It is a basic tenet of statutory interpretation that a word or phrase in a statute is presumed to bear the same meaning throughout the statutory text.  *See* Antonin Scalia & Bryan A. Garner, Reading Law 170 (2012); *see, e.g., Sullivan v. Stroop*, 496 U.S. 478, 484-85 (1990) (It is the "normal rule of statutory construction that 'identical words used in different parts of the same act are intended to have the same meaning.'") (quoting *Sorenson v. Sec'y of the Treasury*, 475 U.S. 851, 860 (1986)); *see also United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).  There is no meaningful difference in the relevant portion of the two subsections of Section 856 that would justify the DOJ's dramatically disparate interpretations.

The DOJ is further incorrect that its interpretation of Section 856(a)(2) is required to prevent it from "overlap[ping] entirely with 856(a)(1) and hav[ing] no separate meaning."  DOJ Mot. 10 (quoting *United States v. Tamez*, 941 F.2d 770, 774 (9th Cir. 1991)).  To the contrary, Section 856(a)(1) and Section 856(a)(2) prohibit different activities:  Section 856(a)(1) targets those who "open," "lease," rent," "use" or "maintain," property, *i.e.*, typically the operator of the property; whereas Section 856(a)(2) targets those who "manage or control any place" and who then "rent, lease, profit from or make available for use," the property, *i.e.,* typically the landlord or manager.  *Cf. Chen,* 913 F.2d at 190 ("Based on our reading of the statute, § 856(a)(2) is

---

[27] The only textual difference is, in Section 856(a)(1), the phrase "whether permanently or temporarily" comes between "place" and "for the purpose of"; whereas that same phrase ""whether permanently or temporarily" appears earlier in the text of Section 856(a)(2).  That minor textual difference does not signify any substantive change in the statutory meaning of the phrase "place . . . for the purpose of."

designed to apply to the person who may not have actually opened or maintained the place for the purpose of drug activity, but who has knowingly allowed others to engage in those activities by making the place 'available for use . . . for the purpose of unlawfully' engaging in such activity." (alteration in original)). Both subsections impose the same requirement, however, that the *purpose* of the *property* is unlawful manufacture, distribution, storage, or use of controlled substances.

The purpose of Safehouse and its facility is to provide lifesaving medical treatment, primary care, and wraparound services to a vulnerable population at high risk of overdose death and complications from opioid use disorder.  Counterclaims ¶ 92.  For that reason alone, Section 856 does not apply to Safehouse or to a property used for such a vital medical purpose.

> ii.  *The legislative history of Section 856 confirms it narrowly targets properties used for the purpose of unlawful drug activity*

The legislative history confirms that Section 856(a)(2) was intended to impose liability on landlords or property-owners who make their properties available for unlawful purposes; it was not intended to expand dramatically the statute, as suggested by the DOJ.  Congress enacted Section 856(a) to "[o]utlaw[] operation of houses or buildings, so-called 'crack houses,' where 'crack,' cocaine and other drugs are manufactured and used."  *See* 132 Cong. Rec. S26474. Statements from sponsoring Senators establish that Section 856 was intended to prosecute landlords and property owners for maintaining a property (referred to as "crack houses" in legislative debate) for the purpose of drug use.  Sponsoring Senator Chiles stated the Act would address law enforcement's difficulties in arresting "crack house" operators: "When police raid these crack houses, the dealers and users can easily dispose of the drugs, thus avoiding arrest.  This bill makes it a felony to operate such a house, to be present at the house."  *See id* (Statement of Senator Chiles); *see also id.* at S19241.  Sponsoring Senator Biden described Section 856 as

establishing a "new offense[] for opening or maintaining a building, or 'crack house,' where the drug is produced, sold, and used." *Id.* at S19241

In 2003, Senator Biden introduced the Illicit Drug Anti-Proliferation Act ("2003 Amendment"), after a Senate hearing was held on the topic of "the proliferation of Ecstasy and other club drugs," and the role of rave promoters in drug distribution. *See* 149 Cong. Rec. S1669, S1677. The proposed 2003 Amendment changed Section 856 in two ways. "First, it made the 'crack house statute' apply not just to ongoing drug distribution operations, but to 'single-event' activities, including an event where the promoter has as his primary purpose the sale of Ecstasy or other illegal drugs." *Id.* "[S]econd, it made the law apply to outdoor as well as indoor activity." *Id.*

Senator Biden noted that "[t]he purpose of my legislation is not to prosecute legitimate law-abiding managers of stadiums, arenas, performing arts centers, licensed beverage facilities and other venues because of incidental drug use at their events." *Id.* at S1669, S1678. Senator Biden continued: "My bill would help in the prosecution of rogue promoters who not only know that there is drug use at their event but also *hold the event for the purpose of illegal drug use or distribution. That is quite a high bar.*" *Id.* (emphasis added); *see also id.* (explaining that the bill targets "*any venue whose purpose is to engage in illegal narcotics activity*" (emphasis added)). Thus, the 2003 Amendment was intended to prosecute property owners or managers who (1) "know" of illegal drug use on their property and (2) intend their property to be used "*for the purpose* of illegal drug use.*" *Id.* (emphasis added). But it was not intended to permit the prosecution of a legitimate entity, such as Safehouse, as Senator Biden explained that Section 856(a)(2) merely "amends, 21 U.S.C. 856, [which] has been on the book for nearly two decades

and I *am unaware of it ever being used to prosecute a legitimate business*." *Id.* at S5153 (emphasis added).

This history refutes the DOJ's position that it suffices if a property owner merely knows that drug use is occurring on his or her property. Rather, the legislative history conforms to the statutory text, which is to limit Section 856's application to property that is operated or maintained *for the purpose of* drug distribution and use.

> ### iii. *The non-binding precedent upon which the DOJ relies does not illuminate the legal standard for when a property is used "for the purpose of" prohibited activities*

Rather than confront these norms of statutory construction or dispute Safehouse's actual purpose of providing medical care, the DOJ relies upon non-binding circuit case law to support its erroneous position that the only relevant purpose under Section 856(a)(2) is "that of the so-called 'participants' who would use illegal drugs at Safehouse's facility." DOJ Mot. 9. As a preliminary matter, the Third Circuit has never held that "purpose" under Section 856(a)(2) refers to the purpose of a third-party individual, rather than the purpose of the premises at issue. *See id.* The cases upon which the DOJ relies do not grapple with the purpose of a property because it was clear from the overwhelming evidence presented that the property in question was used for drug distribution or manufacture. Instead, the DOJ's cited cases focus on the *mens rea* of the defendant and evaluate whether sufficient evidence established that the defendant knew or intended that the property be used for prohibited drug activity. Certainly no case dealt with the issue presented here—*i.e.*, whether medical professionals may permit drug users to remain under their supervision at the time of drug consumption for the purpose of providing potentially urgent medical care.

In *Chen*, for example, the owner of a motel was accused of knowingly making the property available for overt and notorious drug distribution, in violation of both Sections 856(a)(1) and (a)(2). The Fifth Circuit correctly found that Section 856(a)(1) requires proof that *the defendant*

have the specific purpose to use the property for improper distribution, manufacture, storage, or use.  913 F.2d at 189-90.  The *Chen* court found, however, that under Section 856(a)(2), "the person who manages or controls the building and then rents to others, need not have the express purpose in doing so that drug related activity take place; rather such activity is engaged in by others (*i.e.*, others have the purpose)."  *Id.* at 190.  The court found it sufficient for liability under Section 856(a)(2) if "she had actual knowledge that she was renting, leasing, or making available for use the [premises] *for the purpose of* unlawfully storing, distributing, or using a controlled substance" or was willfully blind to that fact.  *Id.* at 191-92 (emphasis added).  The Court's resulting decision dealt only with the necessary mental state for the owner or manager of the property (knowing or intentional), but the Fifth Circuit did not need to answer the threshold question of the property's purpose because it found "overwhelming evidence at trial" demonstrated that the motel was being used for the purpose of "drug related activities."  *Id.* at 191.  In particular, the owner/defendant told an undercover officer that he could purchase cocaine "in almost any room," witnesses testified that everyone at the motel was "involved in selling drugs," and the owner/defendant "would encourage tenants to make drug sales so that their rent could be paid."  *Id.* at 185-86.  Safehouse's proposed medical intervention bears no resemblance to the drug motel in *Chen*.

*United States v. Tebeau* is similarly distinguishable.  713 F.3d 955 (8th Cir. 2013).  In that case, the defendant used his property to host music festivals and admitted that he intended for his property to be used for drug-related activities.  *See id.* at 958.  The defendant further admitted that he was aware individuals were selling drugs on his premises, and it was estimated that approximately *$500,000* in illegal drugs were sold *at each event*.  *See id.* at 958, 961.

Likewise, the car dealership at issue in *Tamez* was the location of repeated drug sales.  *See* 941 F.2d at 772-73.  The owner of the car dealership (the defendant) *was the source of the drugs*

*used* on the property and had a unity of purpose with the third-party actors that engaged in prohibited conduct on the property.  *Id.*  On appeal, the defendant argued that Section 856(a)(2) was only intended to apply to drug manufacturing operations.  *Id.* at 773.  Although the court refused to examine the purpose of the property in assessing whether the owner of the dealership could be charged under the statute, it did so based solely "on the logic of *Chen*," with little additional analysis. *Id.* at 774.

Finally, the cases cited by the DOJ from within the Third Circuit do not support its argument.  In *United States v. Coles*, 558 F. App'x 173, 181 (3d Cir. 2014) (non-precedential), the court upheld a Section 856 conviction where the apartment, rented by the defendant, had widespread evidence of crack production, including "masks, goggles, latex gloves, cutting agents to dilute the cocaine, and drug packaging paraphernalia" and "white powder sprayed across some parts of the carpet in the living room."  Likewise, in *United States v. Blake*, 2006-cr-0030, 2009 WL 1124957 (D.V.I. Apr. 24, 2009), the court found the defendant "knowingly and intentionally allowed her home to be used for the purpose . . . of manufacturing cocaine base and storing cocaine powder."  Finally, in *United States v. Butler*, No. CRIM.A. 02-300-01, 2004 WL 2577631, at *3 (E.D. Pa. Oct. 6, 2004), the defendant permitted his co-conspirator to sell drugs from his apartment. Each of those cases involved places that were undoubtedly used for purposes of drug manufacturing and distribution, and the question was only whether the defendant had sufficient knowledge of that activity to be held liable.

> **B.**    **Safehouse Is "Authorized By" the CSA Because It Is a Legitimate Medical Practice, which the CSA Does Not Regulate and Section 856 Does Not Prohibit**
>
> > *i.*    *The CSA and Section 856 do not restrict or regulate the legitimate practice of medicine*

The CSA protects medical professionals and facilities from prosecution or civil enforcement for engaging in the legitimate practice of medicine, which includes Safehouse's

proposed overdose prevention services.  The Drug Enforcement Administration regulations implementing the relevant subchapter of the CSA similarly recognize that registered medical practitioners may administer, prescribe, or distribute controlled substances "*for a legitimate medical purpose* by an individual *practitioner acting in the usual course of his professional practice*."  *See* 21 C.F.R. § 1306.04 (emphasis added).  Section 856's plain text is consistent with that well-established limitation on the CSA's reach by providing, "[*e*]*xcept as authorized by this subchapter*," it is unlawful to knowingly open or use any place, or manage or control any place, for the purpose of manufacturing, distributing, or using any controlled substance.  *See* 21 U.S.C. § 856(a) (emphasis added).

Though the CSA creates a comprehensive statutory and regulatory regime regarding the manufacture, distribution, and possession of drugs contained in the CSA's schedules, it does not regulate medical treatment or the practice of medicine.  *See Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) ("[T]he statute manifests no intent to regulate the practice of medicine generally."). That is because "[t]he protection of public health falls within the traditional scope of a State's police powers."  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 596 (2011).  While "[t]he States have broad authority to enact legislation for the public good" through their "police power," the "Federal Government, by contrast, has no such authority."  *Bond v. United States*, 134 S. Ct. 2077, 2086 (2014); *Oregon,* 546 U.S. at 270.

In *Oregon*, the Supreme Court recognized that the Attorney General possesses "limited powers," under the CSA and held that the CSA did not permit the DOJ to criminalize medical prescription of controlled substances to enable physician-assisted suicide.  The Supreme Court noted two areas in which the Attorney General has authority to enforce the CSA: "control" and "registration."  *See Oregon*, 546 U.S. at 259.  With respect to the Attorney General's authority to

"control" drugs, the Supreme Court noted "control" is a "term of art" and refers to the Attorney General's authority "to add a drug or other substance, or immediate precursor, to a schedule under part B of this subchapter." *Id.* at 260. Even if "control" had a more expansive definition, the Attorney General does not have authority to promulgate rules "based on his view of legitimate medical practice." *See id.*

With respect to the Attorney General's "registration" power, the Court held that the Attorney General does not have the authority "to decide what constitutes an underlying violation of the CSA in the first place." *Id.* at 262. The Court rejected the notion that the Attorney General was permitted to "criminalize even the actions of registered physicians," finding that such authority would be "unrestrained" and contrary to Congress's "painstaking[]" description of the Attorney General's power over registration. *See id.* The Court observed that the CSA allocates the authority to "determine the appropriate methods of professional practice in the medical treatment of . . . narcotic addiction" to the Secretary of Health and Human Services, not the Attorney General. *See id.* (citing 42 U.S.C. § 290bb-2a). Accordingly, the Supreme Court concluded "[t]he structure of the CSA . . . conveys an unwillingness to cede medical judgments to an executive official who lacks medical expertise." *Id.* at 266. In sum, the Supreme Court held that "[t]he [CSA] and our case law amply support the conclusion that Congress regulates medical practice insofar as it bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood." *Id.* at 269-70. It is thus clear from the Court's decision in *Oregon* that the Attorney General cannot use the CSA to regulate the legitimate practice of medicine, particularly outside of the limited areas of registration and control. These limited areas are not implicated by Safehouse, which will not store, prescribe, distribute, or administer controlled substances.

The limitation of the DOJ's ability to use the CSA to regulate legitimate medical practice is well-settled and regularly applied as a defense to criminal prosecution under the Act.  For instance, in *United States v. Chube II*, the Seventh Circuit explained that to prosecute a medical practitioner under the CSA, a jury would have to find that the medical professional knowingly and intentionally acted "outside the course of professional practice" and without "a legitimate medical purpose."  538 F.3d 693, 697 (7th Cir. 2008); *see also United States v. Moore*, 423 U.S. 122, 124 (1975).  The Ninth Circuit likewise explained that, in order to convict a practitioner for unlawfully dispensing controlled substances under 21 U.S.C. § 841(a), the jury would have to find (among other things) "that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical purpose," and "that the practitioner acted with intent to distribute the drugs and with intent to distribute them outside the course of professional practice."  *United States v. Feingold*, 454 F.3d 1001, 1008 (9th Cir. 2006); *United States v. Maynard,* 278 F. App'x 214, 218 (3d Cir. 2008) (non-precedential) (similar); *see also United States v. Birbragher*, 603 F.3d 478, 485-86 (8th Cir. 2010) (interpreting the phrase "professional practice" as meaning "generally accepted medical practice").

Finally, the DOJ is incorrect that only prescribing, dispensing, and administering controlled substances can be "authorized" by the CSA as within the scope of medical practice.  *See* DOJ Mot. 13-15.  To the contrary, those activities are regulated by the CSA, and therefore it makes sense that courts require affirmative authorization to fall within the CSA's protection for legitimate medical practices.  *See United States v. Akinyoyenu,* 199 F. Supp. 3d 106, 113 (D.D.C. 2016).  The case for authorization is even stronger, however, for medical practice that does *not* involve CSA-regulated activities, such as the overdose prevention services proposed by Safehouse.

Because Safehouse will not prescribe, administer, or distribute controlled substances, it is even further from the CSA's regulatory scope than prescriptions of controlled substances to enable physician-assisted suicide, which was at issue in *Oregon*. Rather, Safehouse proposes to provide sterile drug consumption equipment; Naloxone; a clean, medically supervised environment; urgent respiratory support; and primary medical care—none of which are even arguably proscribed or regulated by the CSA. The DOJ is incorrect that Safehouse implicates, much less violates, the CSA by providing a facility in which to effectively offer these medical services by allowing its participants to remain under medical supervision at the time of drug consumption.

> ii.   *Safehouse's overdose prevention model will be carried out in the usual course of professional practice with a legitimate medical purpose.*

Safehouse's medical staff will be engaged in the legitimate practice of medicine by operating a facility that provides immediate access to overdose reversal agents, urgent medical care, and rehabilitation options. Safehouse will operate within established standards of care in the medical field. At Safehouse, no medical professionals will administer, prescribe, or distribute narcotics; rather, medical professionals will merely staff and supervise the consumption site with the goal of treating and preventing acute overdoses using opioid reversal agents, which are not controlled substances regulated by the CSA, and provide respiratory support and urgent care.

By providing these services, Safehouse will prevent overdose deaths. Overdose prevention efforts, including supervised consumption sites, have been in existence for over thirty years and have proven to be effective through clinically sound data. Counterclaims ¶¶ 37, 76, 118, 131. In fact, studies estimate that an overdose prevention site like Safehouse could reduce overdose deaths annually by 30% in the site's immediate vicinity.[28]  *Id*. ¶ 38. Opioid receptor antagonists, like

---

[28] *Supervised Consumption Facilities*, *supra* note 21.

Naloxone, are highly effective and, if given in time and in sufficient quantity, will reverse an otherwise fatal overdose with medical certainty.  *Id.* ¶ 68.

The medical and public health measures that Safehouse proposes have been recognized and endorsed by prominent national and international medical and public-health associations including the American Medical Association, the American Public Health Association, AIDS United, the European Monitoring Center for Drugs and Drug Addiction, the Infectious Diseases Society of America, the HIV Medical Association, the International Drug Policy Consortium, and innumerable public health experts, physicians, and addiction researchers.  Counterclaims ¶ 88. Philadelphia's Public Health Commissioner and its Commissioner of the Department of Behavioral Health and Intellectual disAbility Services have each announced that overdose prevention, including supervised consumption, is a critical medical and public-health intervention to mitigate Philadelphia's overdose crisis.  *Id.* ¶ 89.

Safehouse's goal and model are entirely consistent with federal and state law and guidance regarding the public-health benefits of needle exchanges and CARA's legislative goal of developing a comprehensive approach to combatting the opioid crisis.  Federal law and HHS guidance endorse syringe exchange programs and authorize federal funding of most elements of local- and state-sponsored syringe exchange programs.  *See* Appropriations Act of 2016, § 520, 129 Stat. 2652.  Congress also recognized the importance of Naloxone access when it enacted CARA.  *See* CARA § 101, 130 Stat. 697.  Pennsylvania similarly enacted the Drug Overdose Response Immunity Statute and declared a Disaster Emergency—which provides a standing statewide prescription for Naloxone, intended to ensure "family members, friends or other persons

who are in a position to assist a person at risk of experiencing an opioid-related overdose . . . are able to obtain Naloxone."[29]  *See* 35 Pa. Stat. § 780-113.7*l*; Counterclaims ¶ 75.

It would be unreasonable to interpret federal law to allow Safehouse to lawfully establish a facility that furnishes sterile consumption equipment and which is well-stocked with Naloxone, only to criminally punish Safehouse with a 20-year felony if it allows participants to remain within the same facility and under the supervision of its medical practitioners at the critical moment of drug consumption, when overdose risk is most acute.  The DOJ's interpretation of Section 856 cannot be reconciled with the medical facts recognized by Congress and federal health policy. Safehouse's modest extension of federally endorsed and funded harm reduction measures will close a short, but critical gap in care at the time of drug consumption, and therefore is not barred by federal law.

    **C.**    **"[U]nlawfully . . . using" Is Not Defined by Section 856 or the CSA and Renders Its Application to Safehouse Doubtful.**

Safehouse will not manufacture, store, or distribute any controlled substances.  The only possible portion of Section 856(a)(2) that could apply is the prohibition against providing a place for "for the purpose of" "unlawful[] . . . use"—an undefined term that does not plainly encompass Safehouse's medically supervised consumption services model, which allows individuals to consume drugs in its facility only for the purpose of enabling access to critical medical intervention.

Although the CSA elsewhere expressly defines and prohibits the unauthorized manufacture, storage, or distribution of controlled substances (*see generally* 21 U.S.C. §§ 802 (definitions), 841(a) (prohibition of manufacture, possession and distribution)), nowhere does it define or prohibit drug consumption or use.  Since it is not necessarily illegal under federal law to

---

[29] Standing Order, *supra* note 12.

use opioids or fentanyl (and indeed fentanyl and some other opioids may be lawfully prescribed and used), it is unclear from either Section 856 or the CSA as a whole what "unlawfully . . . using" means.  At the very least, that undefined phrase does not plainly encompass Safehouse's overdose prevention site.

In the DOJ's view, this Court should read "unlawfully . . . using a controlled substance" to mean "use an unlawful controlled substance," *i.e.*, "consumption of illegal drugs."  DOJ Mot. 16. Unlawfully is an adverb, which necessarily modifies the verb that follows it (*i.e.*, using).  The statute does not use the adjective "unlawful[]" to modify the term "controlled substance," as the DOJ suggests.

This Court also should not accept the DOJ's rewriting of Section 856 to equate "use" with "possession" of controlled substances.  *Id.* at 17.  "Use" is nowhere defined in the CSA, while possession is defined in 21 U.S.C. § 801(2) and proscribed in Section 844.  But Section 856 does not use the term "possession" and the DOJ provides no basis for assuming that Congress used the term "unlawfully use" as a mere substitute for that term.  It is perhaps for that reason that none of the cases cited by the DOJ—and no case of which Safehouse is aware—involved Section 856(a) charges based solely on making a property available for the use, but not manufacture, storage, or distribution, of controlled substances.[30]  Because "using" controlled substances—unlike illegally

---

[30] *See, e.g.*, *Chen*, 913 F.2d at 186 (evidence showed that defendant permitted drug transactions to occur in motel rooms, encouraged tenants to make drug sales to pay rent, stored drugs and drug proceeds for tenants, and loaned money to tenants to purchase drugs); *Tamez*, 941 F.2d at 773-74 (evidence showed that Tamez employees sold cocaine out of the Tamez car dealership, that the dealership was used as a distribution center, and that Tamez financed his car business with proceeds from the drug sales); *United States v. Harrison*, 133 F.3d 1084, 1085 (8th Cir. 1998) (evidence showed that property owner was present on ten occasions when methamphetamines were manufactured on his property using his equipment); *United States v. Ramsey*, 406 F.3d 426, 429 (7th Cir. 2005) (evidence showed that a trailer was used for the purpose of selling crack cocaine, with 35-40 purchases made out of the trailer); *United States v. Ford*, 371 F.3d 550, 552 (9th Cir. 2004) (evidence showed a negotiated and planned a drug sale out of a property with a confidential informant); *United States v. Wilson*, 503 F.3d 195, 198 (2d Cir. 2007) (evidence showed drugs were manufactured in the properties with the property owner's knowledge); *Tebeau*, 713 F.3d at 958 (evidence showed hundreds of drug sellers attended ten music festivals, sold drugs out in the open, and made hundreds of thousands of

manufacturing, distributing or storing of controlled substances—is not "unlawful[]" under the CSA, there is significant ambiguity as to whether, or in what circumstances, that provision prohibits Safehouse's supervised consumption site. Such ambiguity is heightened by the fact that Safehouse and its staff will not necessarily inquire into or know the identity of the substance used by its participants or the circumstances by which it was obtained; Safehouse therefore will not know whether a participant is "unlawfully . . . using" a controlled substance. Section 856 should not be interpreted to impose criminal liability on that basis.

### D. The Rule of Lenity and Clear Statement Rule Require Any Doubt to Be Resolved in Safehouse's Favor

The Court need not look beyond the text of the CSA to conclude that Safehouse's overdose prevention model would not violate Section 856. The DOJ's interpretation of Section 856(a)(2) is incorrect as a matter of law. Even if the DOJ's strained interpretation of Section 856(a)(2) were plausible (and it is not), any ambiguity triggers several canons of statutory interpretation—the rule of lenity, the clear statement rule, and the doctrine of constitutional avoidance—each of which provides an independent basis for endorsing Safehouse's reading of federal law. *See, e.g., Jones v. United States*, 529 U.S. 848, 850 (2000).

It is well-settled that where there is "ambiguity in a criminal statute that cannot be clarified by either its legislative history or inferences drawn from the overall statutory scheme," courts must interpret that statute in "favor of lenity"—*i.e.*, in favor of the defendant. *United States v. Flemming*, 617 F.3d 252 (3d Cir. 2010); *Rewis v. United States*, 401 U.S. 808, 812 (1971). Put differently, "[u]nder a long line of [Supreme Court] decisions, *the tie must go to the defendant*." *United States v. Santos*, 553 U.S. 507, 514-15 (2008) (plurality) (Scalia, J.) (emphasis added).

---

dollars from the sales at each concert); *Coles*, 558 F. App'x 176 (evidence showed that Coles was the leader of an organization that processed, packaged, and distributed cocaine and cocaine base at the property).

Similarly, the clear statement rule provides that "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Univ. C. I. T. Credit Corp*., 344 U.S. 218, 221-22 (1952). "This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed," but also it "places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead." *Id.*

These interpretive principles have special force in this case, where the federal government's interpretation of Section 856 raises significant federalism concerns and is indifferent to Safehouse's indisputably benevolent, lifesaving goals and the dire need for the overdose prevention services Safehouse intends to provide. As the Supreme Court has explained, where Congress enacts criminal law that touches on areas traditionally falling within the authority of the states, courts will assume—"unless Congress conveys its purpose clearly"—that Congress "will not be deemed to have significantly changed the federal-state balance in the prosecution of crimes." *Jones*, 529 U.S. at 850 (internal quotation marks omitted); *see also Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172-73 (2001) (applying the principle to an agency's interpretation of a statute that "push[es] the limit of congressional authority"). There is no basis for this Court to presume that, by enacting Section 856, Congress intended to disrupt the traditional balance of federal and state authority over public health initiatives. *See, e.g.*, *U.S. Army Corps of Eng'rs*, 531 U.S. at 159.

The portions of Section 856(a) invoked by the DOJ here—"make available for use, . . . without compensation, the place for the purpose of unlawfully . . . using a controlled substance"— already stand at the outer reaches of any plausible reading of that provision.  None of the cases the DOJ cites involves charges under Section 856(a) based solely on unlawful use, much less on any remotely analogous basis against a not-for-profit medical facility.  A ruling in favor of Safehouse will not in any way affect the DOJ's enforcement of federal drug laws or call into question the validity of any prior prosecution.  Here, the words of Section 856 must be read in the context of the CSA as a whole, its purpose, and its history, which evince no intent to criminalize Safehouse's medical and public health intervention to prevent overdose deaths, much less do so unambiguously.  To the extent that any doubt remains, lenity requires it to be resolved in Safehouse's favor.

## II.  SECTION 856(a)(2) CANNOT APPLY TO SAFEHOUSE

A construction that applies Section 856(a)(2) to Safehouse would exceed the scope of Congress's authority to regulate commerce.  The DOJ's threatened prosecution of Safehouse for operating a medically supervised consumption site would also violate RFRA because it would substantially burden Safehouse's religious mission to save lives and prevent overdose deaths, without furthering any compelling governmental interest.  As a result, Section 856(a)(2) cannot lawfully prohibit Safehouse's proposed overdose prevention facility.

### A.  Application of Section 856 to a Medically Supervised Consumption Site Would Be Unconstitutional as an Exercise of Power Under the Commerce Clause

Application of Section 856 to prohibit Safehouse's proposed non-commercial medically supervised consumption and observation site does not fall within Congress's authority to regulate

interstate commerce and therefore is unconstitutional.[31]  Federal legislation that exceeds the scope of Congress's enumerated sources of Article I authority—either on its face or as-applied—is unconstitutional.  *See, e.g.*, *United States v. Lopez*, 514 U.S. 549, 556 (1995).  The Constitution gives Congress the power "[t]o regulate Commerce . . . among the several States[.]"  U.S. Const., Art. I., § 8, cl. 3; *see Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 189-90 (1824).  When Congress enacts criminal legislation, principles of federalism weigh against interpreting Congress's commerce authority in a manner that converts it into a "general police power of the sort retained by the states."  *Lopez*, 514 U.S. at 567.  For that reason, the Supreme Court has always "rejected readings of . . . the scope of federal power that would permit Congress to exercise a police power."  *United States v. Morrison*, 529 U.S. 598, 618-19 (2000).  That is because State governments, not the federal government, "possess primary authority for defining and enforcing the criminal law."  *Lopez*, 514 U.S. at 561 n.3.  And "the regulation of health and safety matters is primarily, and historically, a matter of local concern."  *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985); *Bond*, 572 U.S. at 853-54.  Congress therefore may regulate only: (i) the "use of the channels of inter-state commerce"; (ii) "the instrumentalit[ies] of interstate commerce, or persons or things in inter-state commerce"; and (iii) "activit[ies] that substantially affect interstate commerce."  *Lopez*, 514 U.S. at 559.  Application of Section 856 to non-commercial activities at a property based solely on unlawful "use" does not fall with any of these three categories.

As an initial matter, Section 856 lacks "a jurisdictional element limiting the reach of the law to a discrete set of activities that additionally has an explicit connection with or effect on interstate commerce."  *United States v. Walker*, 657 F.3d 160, 178 (3d Cir. 2011); *United States v.*

---

[31] Under no circumstance will Safehouse make available any illicit narcotic or opioid; manufacture, sell, or administer unlawful drugs, or permit the distribution or sale of drugs on site, nor will it charge participants for its harm reduction and overdose prevention services or permit the exchange of currency.  Counterclaims ¶ 112.

*Kukafka*, 478 F.3d 531, 535-36 (3d Cir. 2007). Moreover, making a property available on an entirely local, non-commercial basis for drug "use" is not, as the DOJ asserts, "part of an economic class of activities that have a substantial effect on interstate commerce."[32] Therefore, it cannot "be sustained under [Supreme Court] cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id*. Any "link between the regulated activity and interstate commerce" that can be imagined only by creating a speculative chain of contingencies and "pil[ing] inference upon inference." *Lopez*, 514 U.S. at 567; *Morrison*, 529 U.S. at 612. Concerns about attenuation are especially pressing in the context of criminal statutes like Section 856.

Congress has never found that any conduct remotely similar to Safehouse's proposed model substantially affects interstate commerce. When Congress adopted the CSA in 1970 it did not find that "use" of a controlled substance had any effect on interstate commerce. Congress found that illegal importation, manufacture, distribution, and possession had an effect on interstate commerce, but that finding notably did not include improper use:

> A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, ***such as manufacture, local distribution, and possession,*** nonetheless have a substantial and direct effect upon interstate commerce because—
>
> (A)  after manufacture, many controlled substances are transported in interstate commerce,
>
> (B)  controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and
>
> (C)  controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.

---

[32] As explained above, the DOJ's efforts to have this Court rewrite the term "use" to mean "possession" should be rejected outright.

*Id.* § 801(3) (emphasis added).  Similarly, the findings in Sections 801(4), (5) and (6) concerning the interstate effect of local drug activities conspicuously omit "use" from the listed activities.  *Id.* § 801(4)–(6).[33]  Those findings indicate that Congress did not see regulation of drug use as falling within its commerce authority.

Congress separately adopted Section 856 in 1986—a decade-and-a-half after Congress's 1970 findings—and it amended the statute in 2003.  Congress made no additional findings about the impact of drug use on interstate commerce at that time.  In fact, by expressly targeting non-compensated uses of property, Section 856 is written to capture conduct that lacks "an explicit connection with or effect on interstate commerce."  *Lopez*, 514 U.S. at 562.  Given that regulation of drug use is traditionally a local concern, courts should "reject[] readings of . . . the scope of federal power that would permit Congress to exercise a police power."  *United States v. Morrison*, 529 U.S. at 618-19.

In addition, the operation of Safehouse will not facilitate or increase the interstate market for controlled substances.  Whether drug use takes place in safe and medically supervised conditions or on the street cannot plausibly affect the interstate market demand; participants will have already obtained any drugs before arriving at Safehouse.  This Court, moreover, must accept as true the allegation that "[t]he operation of Safehouse's overdose prevention services will have no adverse impact on the legitimate CSA goal of suppressing the interstate market for illegal drugs.

---

[33] That omission was not an oversight.  In the same provision, Congress addressed "improper drug use" in the context of health and welfare, finding that "illegal importation, manufacture, distribution, and possession *and improper use* of controlled substances have a substantial and detrimental effect on *the health and general welfare of the American people*."  21 U.S.C. § 801(2) (emphases added).  No similar finding was made, however, as to the effect of "use" on commerce.

In fact, studies show that medically supervised consumption sites actually reduce drug use."[34] Counterclaims ¶ 113.

The DOJ fails to address the lack of nexus between Safehouse's proposed site and interstate commerce. Instead, the DOJ incorrectly argues that the Supreme Court's decision in *Gonzales v. Raich*, 545 U.S. 1 (2005), forecloses Safehouse's Commerce Clause challenge to Section 856(a)(2). DOJ Mot. 20-21. *Raich*'s holding and reasoning do not apply here. In *Raich*, the Supreme Court held that the CSA's prohibitions on intrastate possession and manufacture of marijuana constituted a valid exercise of congressional authority. As the Court explained,

> Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would similarly affect price and market conditions. . . . [T]he regulation is squarely within Congress' commerce power because production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity.

*Raich*, 545 U.S. at 19.[35] The Court has repeatedly stressed since *Raich* that its holding depended on Congress's judgment that prohibiting intrastate possession and manufacture of marijuana would affect the national market for marijuana. *See, e.g.*, *Taylor v. United States*, 136 S. Ct. 2074, 2077–78 (2016) ("We held in [*Raich*] that the Commerce Clause gives Congress authority to regulate the national market for marijuana, including the authority to proscribe the purely intrastate

---

[34] The DOJ's response is that "'safe' injection sites . . . would give people who use opioids and the public the false impression that using these deadly drugs can be safe given the right environment and supervision." DOJ Mot. 6. The DOJ presumes that this would lead "people who use opioids and the public" to buy more of them and thus impact the commerce that the CSA seeks to suppress. *Id.* That assertion is contradicted by Safehouse's pleaded facts, which cite to clinical and public health evidence that supervised consumption sites do *not* encourage or increase illicit drug use, but rather, lead to greater rates of drug treatment. Answer 3 & n.5. In any event, that is a disputed factual proposition not properly raised in a motion for judgment on the pleadings.

[35] *See Raich*, 545 U.S. at 28-29 ("One need not have a degree in economics to understand why a nationwide exemption for the vast quantity of marijuana (or other drugs) locally cultivated for personal use (which presumably would include use by friends, neighbors, and family members) may have a substantial impact on the interstate market for this extraordinarily popular substance. The congressional judgment that an exemption for such a significant segment of the total market would undermine the orderly enforcement of the entire regulatory scheme . . . is not only rational, but 'visible to the naked eye.'").

production, possession, and sale of this controlled substance"); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 560–61 (2012) (Roberts, C.J.) (explaining that the CSA was "comprehensive legislation to regulate the interstate market" in marijuana and that the Court denied an exemption to individuals who engaged in "only intrastate possession and consumption . . . on the ground that marijuana is a fungible commodity, so that any marijuana could be readily diverted into the interstate market."). As discussed above, Congress has never determined, and no evidence suggests, that the availability of local property, on an uncompensated basis, for drug "use" has any effect on interstate commerce.

In addition, like the non-commercial possession of weapons in *Lopez*, Section 856 is "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Raich*, 545 U.S. at 24 (quoting *Lopez*, 514 U.S. at 561). The provision at issue here regulates only *the place* in which use occurs; it is a single-subject statutory provision with a non-economic objective removed from the core of the CSA's broader regulatory regime. *See Schmidt v. United States*, No. C 06-04378 CRB, 2006 WL 3734594, at *1 (N.D. Cal. Dec. 18, 2006) (describing Section 856 as "a statute that relates not specifically to the manufacture, distribution, or dispensation of controlled substances").

Nor is it essential to DOJ's enforcement of Section 856 or other provisions of the CSA to apply Section 856(a)(2) to property made available, on an uncompensated basis, for individual drug use. To the contrary, it is unprecedented. Every successful prosecution under Section 856 of which Safehouse is aware has involved premises used for purpose of commercially manufacturing, storing, or distributing controlled substances. None involved only unlawful drug use. Certainly this is true for the cases cited by the DOJ, as explained above.

As the Third Circuit has observed, "'in view of our complex society,' there is virtually nothing that does not affect interstate commerce in some manner." *United States v. McGuire*, 178 F.3d 203, 209-10 (3d Cir. 1999) (quoting *Lopez*, 514 U.S. at 555). "Though certain conduct may appear to be the quintessence of local activity, if we 'follow the money' the trail we will always disclose *some* effect on interstate and/or foreign commerce." *Id.* ("Even such a seemingly parochial action as borrowing a cup of sugar from a neighbor can be viewed as part of the stream of commerce that extends to refineries overseas."). Because "such an inconsequential effect can[not] support the exercise of federal jurisdiction over a purely intrastate concern without obliterating the distinctions between state and federal jurisdiction," *id.* at 210, this Court should reject the DOJ's attempt to expand Congress's authority to regulate local, intrastate, non-commercial activity.

In sum, the DOJ's threatened prosecution of Safehouse would be unconstitutional. This Court can and should avoid these constitutional doubts by concluding that Section 856 does not prohibit Safehouse from operating an overdose prevention site. Alternatively, this Court should conclude that Section 856, on its face and as-applied to Safehouse, would impermissibly extend the statute beyond the limits of congressional authority set forth in Article I of the Constitution.

### B.   Enforcing Section 856(a)(2) Against Safehouse or Its Officers Would Violate the Religious Freedom Restoration Act

RFRA prohibits the "Government [from] substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the "Government . . . demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§2000bb–1(a), (b). The term "person" includes nonprofit corporations, such as Safehouse. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 708

(2014).  "To establish a prima facie case under RFRA, [a plaintiff] must allege that the government (1) substantially burdened (2) a sincere (3) religious exercise." *Mack v. Warden Loretto FCI*, 839 F.3d 286, 304 (3d Cir. 2016). In cases involving corporate entities, courts examine the beliefs of the owners of the entity. *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014) (focusing on the corporate owners' religious practices when assessing the beliefs of a closely held corporation).

The mission statement of Safehouse announces, "The leaders and organizers of Safehouse are motivated by the Judeo-Christian beliefs ingrained in us from our religious schooling, our devout families and our practices of worship. At the core of our faith is the principle that preservation of human life overrides any other consideration."[36]  Driven by its board members' religious obligation to save lives, Safehouse is in the process of opening an overdose prevention site, which will include medically supervised consumption.  Safehouse's counterclaims describe in detail the necessity and efficacy of these overdose prevention services—and the inadequacy of alternatives.  The DOJ's attempt to block these services substantially burdens Safehouse's lifesaving religious mission and, if the DOJ is successful, would result in avoidable overdose deaths.  The DOJ's decision to prevent the saving of life cannot be described, with any plausibility, as the least restrictive means of achieving a compelling governmental interest.

   i. *Safehouse's decision to open a supervised consumption site is driven by its board members' religious obligations to save lives*

A party invoking the protection of RFRA must seek to engage in a "sincere exercise of religion." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430-31 (2006) ("*O Centro*"). In cases involving corporate entities, the religious beliefs are determined in accordance with normal principles of corporate governance.  *See, e.g.*, *Hobby Lobby*, 573 U.S. at

---

[36] *See* Safehouse, About Safehouse, https://www.safehousephilly.org/about (last visited June 28, 2019).

717-19 (rejecting the argument that closely held corporations cannot hold religious beliefs because of possible disagreement between its owners as to religious issues, and explaining that such disagreements are resolved like any other corporate dispute).

Safehouse's religious beliefs are determined by its board and its mission.  Safehouse's mission statement proclaims: "At the core of our faith is the principle that preservation of human life overrides any other considerations."  Safehouse has further alleged that each Safehouse board member is a follower of a religious faith (Counterclaims ¶ 124); that the entire board shares the religious belief—rooted in scriptures—that they are obligated to "preserve life, provide shelter to [their] neighbors, and to do everything possible to care for the sick" (*id.* ¶¶ 126-28); and that the provision of supervised consumptions facilities would effectuate that obligation. *Id.* ¶ 128.  Each Safehouse board member believes in the existence of God, and in the scripture of their respective faiths. *See id.* ¶ 124 (describing the religious practices of the board). The positive commandment to save lives animating the Safehouse mission—"the core of all board members' faith" (*id.* ¶ 126)—derives from the members' religious texts. *Id.* ¶ 127 (listing examples of Jewish and Christian scripture that impose a religious obligation to value and preserve human life).

The religious nature of these beliefs and their sincerity are issues of fact.  *Real Alts., Inc. v. Sec'y of HHS*, 867 F.3d 338, 356 (3d Cir. 2017) (citing *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008)); *see also Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013) (explaining that "sincerity and religiosity . . . are factual inquiries"); *United States v. Zimmerman*, 514 F.3d 851, 854 (9th Cir. 2007) (observing that "whether . . . religious beliefs are sincerely held . . . is a question of fact"); *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984) (noting that "assessing a claimant's sincerity of belief demands a full exposition of facts").  At this stage of the litigation, then, the Court must credit Safehouse's allegations as true and treat Safehouse's mission as an

exercise of its religious convictions. *See Zimmerman v. Corbett*, 873 F.3d 414, 417-18 (3d Cir. 2017).  That should foreclose the DOJ's motion for judgment on the pleadings on this issue.

Although the DOJ acknowledges this standard of review is correct (*see* DOJ Mot. 4 fn. 3), it nevertheless insists that, when ruling on a motion for judgment on the pleadings, the Court may disregard the pleaded facts and make its own determination as to whether Safehouse asserts sincerely held religious beliefs.  DOJ Mot. 30.  None of the cases cited by the DOJ supports this position.  *See id.* at 30-31 (citing *Sutton v. Rasheed*, 323 F.3d 236, 240 (3d Cir. 2003) (appeal from grant of summary judgment); *Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 50 (2d Cir. 1988) (appeal following a bench trial); *Caviezel v. Great Neck Pub. Sch.*, 701 F. Supp. 2d 414, 416 (E.D.N.Y. 2010) (ruling on a motion for a preliminary injunction following an evidentiary hearing); *Check v. N.Y.C. Dep't of Educ.*, No. 13-cv-791, 2013 WL 12113679, at *1 (E.D.N.Y. 2013) (same)).  In the sole case cited that involves a Rule 12 motion, the Court refused to resolve the factual dispute between the parties.  *See Cutter v. Wilkinson*, 644 U.S. 709, 725 n.13 (2005). There is no support for resolving any factual dispute about Safehouse's religious beliefs at this stage of the proceedings.

The substance of the DOJ's argument is also flawed.  It first contends that Safehouse cannot engage in a religious exercise because it claims that Safehouse is informed by its "socio-political belief" and "individual, medical, and public health-based judgment."  DOJ Mot. 32.  The DOJ similarly attempts to re-characterize Safehouse's religious convictions as "moral beliefs" or "individual philosophical views." DOJ Mot. 32-34.  But courts have never required the faithful to ignore the world around them; rather, faith-based action may certainly be informed by social, medical, and economic evidence.  *Western Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*, 862 F. Supp. 538, 546 (D.D.C. 1994) (feeding program was "[u]nquestionably . . . in every

47

respect [a] religious activity and form of worship" even though "[i]t also happen[ed] to provide, at no cost to the city, a sorely needed social service"); *see also Welsh v. United States*, 398 U.S. 333, 342 (1970) (a person's beliefs may be religious even if they also contain a "substantial political dimension"); *Wiggins v. Sargent*, 753 F.2d 663, 666 (8th Cir. 1985) ("[A] belief can be both secular and religious. The categories are not mutually exclusive."); *Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir. 1981) ("[A] coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one."); *Pitcher v. Laird,* 421 F.2d 1272 (5th Cir. 1970) (conscientious objectors may have political and sociological beliefs as well as qualifying religious scruples); *Bates v. Commander, First Coast Guard District,* 413 F.2d 475 (1st Cir. 1969) (religious belief not disqualified as a mere "personal moral code" because it affects political views).

The religious nature of Safehouse's actions is therefore unchanged by the entity's decision to further its religious obligations through means that are scientifically proven. Instead, as the DOJ recognizes, conduct loses religious protection only when it is "based on *purely* secular considerations." DOJ Mot. 31 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972)) (emphasis added). That is not the case here. The DOJ does not dispute the "sincerity of Defendants' asserted religious belief," (*id.*), and Safehouse has alleged that it is those beliefs that motivate its decision to open an overdose prevention site, which will include supervised consumption, to provide lifesaving medical care. Counterclaims ¶¶ 128, 142. Safehouse's decision to operate a supervised consumption site is therefore just one part of "a comprehensive system of beliefs about fundamental or ultimate matters," and therefore qualifies as a religious—rather than philosophical or moral—exercise for the purposes of RFRA. *Fallon v. Mercy Catholic Med. Ctr. of Southeastern*

*Pa.*, 877 F.3d 487, 492 (3d Cir. 2017).[37] The Court should not second-guess Safehouse's professed religious faith and conviction, although Safehouse's board members are more than willing to testify at a hearing to establish both the nature of their beliefs and their sincerity.

The DOJ suggests that a ruling in favor of Safehouse will contribute to a breakdown of the rule of law and a rise in defendants asserting RFRA claims.  DOJ Mot. 34.  RFRA necessarily requires courts in certain circumstances to excuse religious believers from generally applicable laws.  *See Hobby Lobby*, 573 U.S. at 694-95 (citing 42 U.S.C. § 2000bb(a)(2)).  Courts already grapple with—and have previously accommodated—religious defenses to otherwise-criminal conduct.  *See O Centro*, 546 U.S. at 439 (affirming a preliminary injunction permitting a religious group to consume a controlled substance).  Denial of the DOJ's motion for judgment on the pleadings will therefore do nothing to change the courts' competency to safeguard religious rights while ensuring that the rule of law abides.

     ii.     *The DOJ's efforts to ban Safehouse's overdose prevention site places a substantial burden on Safehouse's religious exercise*

Section 856(a)(2), if interpreted in the manner the DOJ advocates, would substantially burden Safehouse's religious exercise.  A substantial burden exists when the "an individual face[s] 'serious disciplinary action' for acting on their religious beliefs."  *United States v. Stimler*, 864 F.3d 253, 268-69 (3d Cir. 2017) (quoting *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015)).  "[T]he

---

[37] Additionally, although religious beliefs are "not limited to beliefs which are shared by all of the members of a religious sect," *Holt v. Hobbs*, 135 S. Ct. 853, 858 (2015), Safehouse's calling to look after those in need has long been recognized as an integral part of religious practice. *See Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574-75 (2d Cir. 2002) (Christian scripture directing believers "to care for the least, the lost, and the lonely of this world" provided the religious basis for the provision of sleeping space to the homeless to constitute religious exercise); *Harbor Missionary Church Corp. v. City of San Buenaventura*, 642 F. App'x 726, 729 (9th Cir. 2016) (provision of shelter to the homeless effectuated plaintiff's belief in "Christian compassion towards the oppressed, poor, and hungry"); *W. Presbyterian Church*, 862 F. Supp. at 544, 547 (noting that a feeding program for the indigent was "a form of worship akin to prayer," and that "the concept of acts of charity as an essential part of religious worship is a central tenet of all major religions"); *Chosen 300 Ministries, Inc. v. City of Phila.*, No. 12-3159, 2012 WL 3235317, at *17 (E.D. Pa. Aug. 9, 2012) (noting, in a case decided under the Pennsylvania Religious Freedom Protection Act, that plaintiffs "observe their faith by providing sustenance to the poor, needy, and homeless").

inquiry here isn't into the merit of the plaintiff's religious beliefs or the relative importance of the religious exercise . . . . Instead, the inquiry focuses only on the coercive impact of the government's actions." *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014) (Gorsuch, J.).  The DOJ cannot use the substantial burden analysis simply to cast aside the plaintiff's religious beliefs as "half-hearted," as the DOJ seeks to do here.  DOJ Mot. 2.

The threat of criminal sanctions for exercising a religious belief constitutes a substantial burden.  *See Yoder*, 406 U.S. at 218 (effect of law mandating, "under threat of criminal sanction," conduct at odds with Amish beliefs was "not only severe, but inescapable"); *O Centro*, 546 U.S. at 426 (government conceded that prosecution under the Controlled Substances Act would constitute a substantial burden).  Fines may also substantially burden a religious exercise.  For example, in *Hobby Lobby*, the Court "ha[d] little trouble concluding" that a potential fine of $800,000 substantially burdened the plaintiff corporation's religious exercise.  573 U.S. at 719-20*; see also Yoder*, 406 U.S. at 208, 218 (explaining that a $5 fine for violating compulsory school attendance laws was a "grave interference" with defendants' religious tenets).

The DOJ's present actions squarely fit the definition of "substantial burden."  In response to Safehouse's announcement that it was opening an overdose prevention facility, the U.S. Attorney's Office threatened criminal and civil sanctions for a purported Section 856(a) violation, and commenced this lawsuit.  Counterclaims ¶¶ 39-41.  Successful prosecution of Safehouse under Section 856(a)(2) carries fines of up to $2,000,000.  *See* 21 U.S.C. § 856(b). The threat of prosecution under Section 856(a)(2)—which subjects individuals to up to twenty years' imprisonment—also places substantial pressure on Safehouse's officers to refrain from operating

a supervised consumption site or "face 'serious disciplinary action' for acting on their religious beliefs." *Stimler*, 864 F.3d at 268-69.  There should be no dispute as to substantial burden.[38]

The DOJ nevertheless asserts that it "is not pressuring Safehouse to modify its behavior or cease a religious exercise" because Safehouse has not yet opened an overdose prevention facility. DOJ Mot. 25.  Not so.  As a factual matter, the DOJ is incorrect in its claim that Safehouse has yet to commence its religious exercise—Safehouse has already begun the process of "working with community partners to find a suitable location[] to deliver [overdose prevention] services," and continues to solicit donations in furtherance of its mission.  *See* DOJ Compl., Ex. A at 6, 16, ECF No. 1-2.

A believer need not start exercising its religious beliefs—and risk government recrimination—before invoking RFRA: the inmate in *Holt v. Hobbs* challenged the prison's grooming policy in court before he started growing a beard to the length required by his religion (135 S. Ct. at 861);[39] the worshippers in *O Centro* successfully prevented a prosecution under the Controlled Substances Act, even though the *status quo* prohibited the sacramental use of ayahuasca. *O Centro Espirita Beneficiente v. Ashcroft*, 389 F.3d 973, 980 (10th Cir. 2004) (per curiam), *aff'd sub nom. O Centro*, 546 U.S. 418 (2006)), and the Sikh children in *Cheema v. Thompson* stayed at home before their RFRA claim was litigated rather than attend school and risk expulsion for wearing their articles of faith. 67 F.3d 883, 885-86 (9th Cir. 1995), *overruled on other grounds by United States v. Antoine*, 318 F.3d 919 (9th Cir. 2002).  RFRA does not require Safehouse to wait until its board members are arrested and the entity fined before seeking judicial

---

[38] *See* Memorandum from Att'y Gen. to All Exec. Dep'ts & Agencies, *Federal Law Protections for Religious Liberty* 4 (Oct. 6, 2017), https://www.justice.gov/crt/page/file/1006786/download  ("Attorney General Memo") ("In general, a government action that bans an aspect of an adherent's religious observance or practice . . . will qualify as a substantial burden on the exercise of religion").

[39] The Court ruled in plaintiff's favor under the Religious Land Use and Institutionalized Persons Act, but a RFRA claim is analyzed "pursuant to the same standard." *Holt*, 135 S. Ct. at 860.

intervention.    The threat of enforcement is enough to substantially burden Safehouse by

"coerc[ing] it to act contrary to [its] religious beliefs by the threat of civil or criminal sanctions."

*Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008) (internal quotations

omitted)).[40]  Safehouse did not chose the timing of this action; the DOJ brought suit. For the same

reasons that the DOJ's case does not fail under Article III on ripeness grounds, Safehouse's RFRA

defense is not premature.

The DOJ's contention that this burden is insubstantial because Safehouse could allegedly

practice its religion in ways that would not violate the CSA is contrary to current law.  In 2000,

"RLUIPA amended RFRA's definition of the 'exercise of religion' . . . to include 'any exercise of

religion, whether or not compelled by, or central to, a system of religious belief.'"  *Hobby Lobby*,

573 U.S. at 696 (quoting 42 U. S. C. §2000cc-5(7)(A)).  In *Holt*, moreover, the Supreme Court

rejected the very argument that the DOJ now presses—that "the availability of alternative means

of practicing religion is a relevant consideration" under RFRA.  135 S. Ct. at 862.  Rather, as the

Court held, the "'substantial burden' inquiry asks whether the government has substantially

burdened religious exercise . . . , not whether the . . . claimant is able to engage in other forms of

religious exercise."  *Id.* at 862.[41]

---

[40] The cases cited by the DOJ (*see* Mot. 25-26) have nothing to do with the interplay between the 'substantial burden' analysis and the *status quo*: In both *Adkins v. Kaspar* and *Smith v. Kyler*, the inmate plaintiffs lost because their ability to hold religious gatherings was burdened by "a dearth of qualified outside volunteers available to go to [the prison], not from some rule or regulation that directly prohibits such gatherings." *Adkins v. Kaspar*, 393 F.3d 559, 571 (5th Cir. 2004); *Smith v. Kyler*, 295 F. App'x 479, 483 (3d Cir. 2008) (non-precedential) (quoting *Adkins*). And, in *Washington v. Klem*, the Third Circuit agreed that an inmate was substantially burdened by a prison rule that applied equally to all inmates. 497 F.3d 272, 282 (3d Cir. 2007). Here, it is the DOJ—not a third party—that actively seeks to interfere with Safehouse's religious exercise.

[41] The Court was discussing RLUIPA but a RFRA claim is analyzed "pursuant to the same standard." *Holt*, 135 S. Ct. at 860.

Nevertheless, the DOJ urges the Court to draw a parallel between this case and *United States v. Stimler*, in which the Third Circuit rejected a RFRA defense to a violent felony charge. The court held that the burden on defendants' religious exercise was not substantial because "none of the defendants argue[d] that they [we]re unable to participate in [religious practice] without engaging in kidnapping." *Stimler*, 864 F.3d at 268.[42]   Beyond the obvious dissimilarity between this case and *Stimler*, the Court in *Stimler* did not consider—and the parties did not address in their briefs—whether subsequent Supreme Court precedent in *Holt* undermined the vitality of the "alternative means of practice" analysis that the Third Circuit previously employed.

In any event, even assuming that analysis applied, the DOJ's argument only has force if the Court is willing to ignore the facts alleged in Safehouse's counterclaims, which describe why harm-reduction methods that do not include supervised consumption have so far failed to curb the thousands of overdose deaths in Philadelphia.[43]   Requiring Safehouse to forgo its supervised consumption facility would lead to avoidable overdose deaths; it would force Safehouse to violate

---

[42] The defendants in *Stimler* were convicted of kidnapping for the tactics they employed in encouraging recalcitrant male members of their own ultra-Orthodox religious community to allow their wives a divorce.

[43] The DOJ's interpretation of RFRA, and dismissiveness toward Safehouse's religious beliefs, cannot be reconciled with the position it has taken in its own briefs recently filed in this very Court or the U.S. Attorney General's recent interpretive guidance on the subject.  Only ***three days after its motion was filed***, the DOJ filed a brief in this Court arguing that, under RFRA, a courts' "narrow function in this context is to determine whether the line drawn [by a religious objector] reflects an honest conviction," as opposed to "in effect tell[ing] the plaintiffs that their beliefs are flawed."  DOJ Br. in Op. to Summ. J. at 16-17, *Commonwealth v. Trump*, No. 17-cv-4540 (E.D. Pa. June 14, 2019), ECF No. 211.  In that same case, the DOJ argued that the Court should "decline to question the Individual Plaintiffs' religious beliefs under the guise of adjudicating substantial burden. [It should] respect their convictions and conclude that the Contraceptive Mandate —which forces them, under threat of monetary penalty, to sign up for and participate in a system that violates their devoutly held beliefs about human life—is a substantial burden on their exercise of religion." DOJ Br. in Opp. to Prelim. Injunction at 26, *Commonwealth v. Trump*, No. 17-cv-4540 (E.D. Pa. Nov. 16, 2017), ECF No. 15.  Likewise, the Attorney General instructed all federal agencies and departments that "[r]eligious adherents will often be required to draw lines in the application of their religious beliefs, and government is not competent to assess the reasonableness of such lines drawn, nor would it be appropriate for government to do so." Attorney General Memo at 4, ¶ 14.  The outcome-oriented and selective approach the DOJ has taken toward its interpretation of RFRA shows the DOJ simply does not like Safehouse's religious beliefs, not that those beliefs are not entitled to protection.

its religious obligation to save lives; and it would substantially burden Safehouse's religious exercise.

The DOJ's final rejoinder is that "Safehouse's RFRA argument fails as a practical matter" because Safehouse cannot legalize the possession of controlled substances by Safehouse's constituents.  DOJ Mot. 34.  This assessment does not alter Safehouse's religious obligation to help those in need or prevent the operation of a supervised consumption facility.  Syringe exchange programs, for example, provide clean needles to individuals who use heroin or fentanyl. Counterclaims ¶ 5. Even though "the underlying activity [they] seek[] to invite remains illegal," *id.* at 34, the DOJ's encourages and funds many of these facilities.[44]  The fact that those to whom Safehouse seeks to provide services might have broken the law has no bearing on the religious nature of Safehouse's exercise, the burden placed on that exercise by the DOJ, or whether Safehouse is entitled to protection under RFRA.

## <u>CONCLUSION</u>

Accepting the facts in the pleadings as true, as required at this stage under Fed. R. Civ. P. 12(c), 21 U.S.C. § 856 would not prohibit Safehouse from operating and establishing an overdose prevention facility that provides medically supervised consumption services. Accordingly, Defendants Safehouse and Jose Benitez respectfully request that this Court deny the DOJ's motion for judgment on the pleadings.

---

[44] *See* CDC, *Program Guidance for Implementing Certain Components of Syringe Services Programs* (2016), https://www.cdc.gov/hiv/pdf/risk/cdc-hiv-syringe-exchange-services.pdf (last visit June 28, 2019).

Dated:  June 28, 2019                              Respectfully submitted,


**DLA PIPER LLP (US)**


By:  */s/ Ilana H. Eisenstein*
Ilana H. Eisenstein
*ilana.eisenstein@dlapiper.com*
Courtney G. Saleski
*courtney.saleski@dlapiper.com*
Ben C. Fabens-Lassen
*ben.fabens-lassen@dlapiper.com*
Megan E. Krebs
*megan.krebs@dlapiper.com*
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, Pennsylvania 19103-7300
Tel:     215.656.3300


Thiru Vignarajah (admitted *pro hac vice*)
*thiru.vignarajah@dlapiper.com*
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland, 21209-3600
Tel:     410.580.3000


Adam I. Steene (admitted *pro hac vice*)
*adam.steene@dlapiper.com*
1251 Avenue of the Americas
New York, New York, 10020-1104
Tel:     212.335.4500

**AIDS LAW PROJECT OF**
**PENNSYLVANIA**

Ronda B. Goldfein
*goldfein@aidslawpa.org*
Yolanda French Lollis
*lollis@aidslawpa.org*
Adrian M. Lowe
*alowe@aidslawpa.org*
Jacob M. Eden
*eden@aidslawpa.org*
1211 Chestnut Street, Suite 600
Philadelphia, Pennsylvania 19107
Tel:     215.587.9377
Fax:     215.587.9902

55

**LAW OFFICE OF PETER GOLDBERGER**

Peter Goldberger
50 Rittenhouse Place
Ardmore, Pennsylvania 19003
Tel:      610.649.8200
*peter.goldberger@verizon.net*

**SETH F. KREIMER, ESQUIRE**

Seth F. Kreimer (PA Bar No. 26102)
3501 Sansom Street
Philadelphia, Pennsylvania 19104
Tel:      215.898.7447
*skreimer@law.upenn.edu*

*Attorneys for Defendants and Counterclaim Plaintiff Safehouse and Jose Benitez*

56

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 28th day of June, 2019, I caused Defendants Safehouse and Jose Benitez's brief in opposition to the motion for judgment on the pleadings filed by Plaintiff-Counterclaim Defendant United States and Third-Party Defendants U.S. Department of Justice, U.S. Attorney General William P. Barr, and U.S. Attorney for the Eastern District of Pennsylvania William M. McSwain to be filed with the Clerk of Court of the United States District Court for the Eastern District of Pennsylvania using the ECF system, it is available for viewing and downloading from the ECF system, and a true and correct copy was served via ECF to all counsel of record registered with the ECF system.


BY: <u>/s/ *Ilana H. Eisenstein*</u>