# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | Civil Action No.   2:19-cv-00519-GAM |
| *Plaintiff,* | |
| v. | |
| SAFEHOUSE, a Pennsylvania nonprofit corporation; JEANETTE BOWLES, as Executive Director of Safehouse | |
| *Defendants.* | |
| SAFEHOUSE, a Pennsylvania nonprofit corporation, | |
| *Counterclaim Plaintiff,* | |
| v. | |
| UNITED STATES OF AMERICA, | |
| *Counterclaim Defendant,* | |
| And | |
| U.S. DEPARTMENT OF JUSTICE; WILLIAM P. BARR, in his official capacity as Attorney General of the United States; WILLIAM M. MCSWAIN, in his official capacity as U.S. Attorney for the Eastern District of Pennsylvania, | |
| *Third-Party Defendants.* | |

**BRIEF OF CURRENT AND FORMER PROSECUTORS, LAW ENFORCEMENT
LEADERS, AND FORMER DEPARTMENT OF JUSTICE OFFICIALS AND LEADERS
AS *AMICI CURIAE* IN OPPOSITION TO PLAINTIFF/COUNTERCLAIM DEFENDANT
UNITED STATES OF AMERICA AND THIRD-PARTY DEFENDANTS' MOTION FOR
<u>JUDGMENT ON THE PLEADINGS</u>**

**TABLE OF CONTENTS**

INTEREST AND IDENTITY OF AMICI CURIAE ....................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................................3

ARGUMENT ................................................................................................................4

     I.    The Epidemic of Opioid Overdoses Has Caused Extensive Harm .........................4

          A.    Criminalization Has Exacerbated, Not Prevented, The Overdose
               Epidemic ..............................................................................................5

          B.    Law Enforcement Agencies And Prosecutor Leaders Around The
               Country Are Embracing A Harm Reduction Model Because It Has
               Proven More Effective ........................................................................9

     II.    Public Safety Is Well-Served By Overdose Prevention Sites ...............................12

          A.    Overdose Prevention Sites Save Lives And Reduce The Adverse
               Impact Of Drug Use ..........................................................................12

          B.    Overdose Prevention Sites Promote Trust In The Justice System,
               Thus Enhancing Public Safety ..........................................................18

CONCLUSION ...........................................................................................................21

APPENDIX AMICI CURIAE .....................................................................................23

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Statutes**

21 U.S.C. § 856...............................................................................................................2, 4, 8

Prosecutorial Remedies and Tools Against the Exploitation of Children Today
    Act of 2003, Pub. L. No. 108-21, § 608, 117 Stat. 650, 691 (2003).........................................8

**Cases**

*Canada v. PHS Community Services Society*, [2011] 3 S.C.R. 134 (Can.) .............................16, 20

**Other Authorities**

Albany LEAD, *Report to Albany on the LEAD One-Year Anniversary,*(Apr. 5,
    2017),
    https://www.albanyny.gov/Libraries/APD/2017_Albany_LEAD_First_Year_
    Report_--_FINAL-2.sflb.ashx..............................................................................................10

Beckett, Katherine, *The Uses and Abuses of Police Discretion: Toward Harm
    Reduction Policing*, 10 Harv. L. & Pol'y Rev. 77 (2016) ........................................................6

Belackova, Vendula & Allison M. Salmon, *Overview of International Literature*,
    *Supervised Injection Facilities & Drug Consumption Rooms – Issue 1*
    (Sydney: Uniting Medically Supervised Injecting Centre ed. 2017)..............................13, 15

Beletsky, Leo, *America's Favorite Antidote: Drug-Induced Homicide in the Age
    of the Overdose Crisis* (May 18, 2018), https://ssrn.com/abstract=3185180 .........................19

Beletsky, Leo et al., *The Law (and Politics) of Safe Injection Facilities in the
    United States*, 98 Am. J. Pub. Health 231 (2008) ...................................................................8

Binswanger, Ingrid et al., *Release from Prison-A High Risk of Death for Former
    Inmates*, 356 New Eng. J. Med. 157 (2007) ...........................................................................7

British Columbia Ministry of Health, *Harm Reduction: A British Columbia
    Community Guide* (2005).....................................................................................................9, 11

Caulkins, Jonathan et al., *Towards a harm reduction approach to enforcement*, 8
    Safer Communities 9 (2009).................................................................................................9, 11

Center for Law Enforcement and Public Health, *Police Statement of Support for
    Drug Policy Reform* (Feb. 2019),
    https://cleph.com.au/application/files/4815/4957/9983/Statement_of_Support_
    for_Drug_Policy_Reform_Feb_2019.pdf ...........................................................................20

Centers for Disease Control and Prevention, *Drug Overdose Deaths* (Dec. 19, 2018), https://www.cdc.gov/drugoverdose/data/statedeaths.html ............................................5

City of Phila., *The Mayor's Task Force to Combat the Opioid Epidemic in Philadelphia, Final Report & Recommendations*, (May 19, 2017)...........................................7

City of Phila. Dep't of Pub. Health, *The Opioid Epidemic in Philadelphia: Implementation of the Mayor's Task Force Recommendations* (March 14, 2018), https://www.phila.gov/media/20180606132344/OTF_StatusReport_March201 8.pdf ...........................................................................................................................6

City of Phila., Dep't of Pub. Health, *Opioid Misuse and Overdose Report* (Nov. 29, 2018), https://www.phila.gov/media/20181129123743/Substance-Abuse-Data-Report-11.29.18.pdf...........................................................................12

City of Phila. Dep't of Pub. Health, Health Information Portal, Non-Fatal Overdose – Naloxone, https://hip.phila.gov/DataReports/Opioid/NFONaloxoneAdministration ..............................14

Collins, Susan et al., *LEAD Program Evaluation: Recidivism Report* (March 27, 2015), http://static1.1.sqspcdn.com/static/f/1185392/26121870/1428513375150/LEA D_EVALUATION_4-7-15.pdf?token=YJfAkZUM2cJSCNr9OVXSYu1IBR0%3D...................................................20

Darke, Shane et al., *The Ratio of Non-Fatal to Fatal Heroin Overdose*, 98 Addiction 1169 (2003)..............................................................................................5

DeBeck, Kora et al., *Injection drug use cessation and use of North America's first medically supervised safer injecting facility*, 113 Drug & Alcohol Dependence, nos. 2-3, Jan. 2011.......................................................................16

Drug Enforcement Administration, *The Opioid Threat in Pennsylvania*, Joint Intelligence Report 45 (Sept. 2018) ....................................................................6

Drug Policy Alliance, *The Drug War, Mass Incarceration and Race* (Jan. 2018), http://www.drugpolicy.org/sites/default/files/drug-war-mass-incarceration-and-race_01_18_0.pdf ..................................................................................7

Eichel, Larry & Meagan Pharis, *Philadelphia's Drug Overdose Death Rate Among Highest in Nation*, The Pew Charitable Trusts (Feb. 15, 2018), https://www.pewtrusts.org/en/research-and-analysis/articles/2018/02/15/philadelphias-drug-overdose-death-rate-among-highest-in-nation ..............................................................................................5

Fairbairn, Nadia et al., *Seeking refuge from violence in street-based drug scenes: Women's experiences in North America's first supervised injection facility*, 67 Soc. Sci. & Med. 817 (2008). ..................................................................................17

Farley M.D., Thomas, *Overdose prevention sites can help cities like Philadelphia save lives*, Stat News (Apr. 5, 2019) https://www.statnews.com/2019/04/05/overdose-prevention-sites-save-lives ........................5

Federal Bureau of Investigation, *2017 Crime in the United States* Table 29, (2017), https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/tables/table-29 ..................................................................................14

Feldman, Nina, *Philadelphia Department of Prisons will begin offering buprenorphine to male inmates again*, WHYY (Apr. 1, 2019) https://whyy.org/articles/philadelphia-department-of-prisons-will-begin-offering-buprenorphine-to-male-inmates-again/........................................................14

Friedman, Samuel et al., *Relationships of deterrence and law enforcement to drug-related harms among drug injectors in US metropolitan areas*, 20 AIDS 93 (2006)..................................................................................................8

Godfrey, Will, *Huge Harm Reduction Gathering Allows Portugal to Teach the World*, Filter (Apr. 29, 2019) https://filtermag.org/2019/04/29/huge-harm-reduction-gathering-allows-portugal-to-teach-the-world/ ........................................4

Harm Reduction Coalition, *Principles of Harm Reduction*, https://harmreduction.org/about-us/principles-of-harm-reduction ...........................................9

Harm Reduction International, *What is harm reduction?*, https://www.hri.global/what-is-harm-reduction ...................................................9

Hedegaard M.D., Holly et al., *Drug Overdose Deaths in the United States, 1999–2017*, Centers for Disease Control and Prevention, NCHS Data Brief No. 329 (Nov. 2018), https://www.cdc.gov/nchs/products/databriefs/db329.htm. ...................5

Huey, Laura, *What is Known About the Impacts of Supervised Injection Sites on Community Safety and Wellbeing? A Systematic Review*, 48 Sociology Publications 11-12 (2019)..................................................................................18

Kerr, Thomas et al., *Impact of a medically supervised safer injection facility on community drug use patterns: a before and after study*, 332 BMJ 220 (2006).......................15

Kilmer, Beau et al., *Considering Heroin-Assisted Treatment and Supervised Drug Consumption Sites in the United States*, RAND Corporation (2018) www.rand.org/t/RR2693.....................................................................................4

LEAD Bureau, www.leadbureau.org .....................................................................10

iv

McElrath, Karen et al., *Crime Victimization among Injection Drug Users*, 27 J. of Drug Issues 771 (1997) ...................................................................................................19

Marshall, Brandon et al., *Reduction in overdose mortality after the opening of North America's first medically supervised safer injecting facility: a retrospective population-based study*, 37 The Lancet 1429 (2011) ................................13, 17

Massachusetts Medical Society, *Report of the Task Force on Opioid Therapy and Physician Communication: Establishment of a Pilot Medically Supervised Injection Facility in Massachusetts*, (Apr. 2017)....................................................15

MSIC Evaluation Committee, *Final Report of the Evaluation of the Sydney Medically Supervised Injection Centre* 112-125 (2003), https://uniting.org/__data/assets/pdf_file/0007/136438/MSIC-final-evaluation-report-2003.pdf ..........................................................................................................18

Myer, Andrew & Linsey Belisle, *Highs and Lows: An Interrupted Time-Series Evaluation of the Impact of North America's Only Supervised Injection Facility on Crime*, 48 J. Drug Issues 36 (2017)......................................................16

National Research Council of the National Academies, *The Growth of Incarceration in the United States: Exploring Causes and Consequences* (Jeremy Travis, Bruce Western, & Steve Redburn eds. 2014) ...................................7

Ontario HIV Treatment Network, *What is the effectiveness of supervised injection services?*, 83 Rapid Review (May 2014), http://www.ohtn.on.ca/Pages/Knowledge-Exchange/Rapid-Responses/Documents/RR83-Supervised-Injection-Effectiveness.pdf;..................................15

Petrar, Steven et al., *Injection Drug Users' Perceptions Regarding Use of a Medically Supervised Safer Injecting Facility*, 32 Addictive Behaviors 1088 (2007) ...........................................................................................................13, 15

Pew Charitable Trusts, *Collateral Costs: Incarceration's Effect on Economic Mobility* (2010), https://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2010/coll ateralcosts1pdf.pdf;............................................................................................7

Pew Charitable Trusts, *More Imprisonment Does Not Reduce State Drug Problems* (March 2018), https://www.pewtrusts.org/-/media/assets/2018/03/pspp_more_imprisonment_does_not_reduce_state_dru g_problems.pdf ...........................................................................................7, 11

Potier, Chloe et al., *Supervised injection services: What has been demonstrated? A systematic literature review*, 145 Drug & Alcohol Dependence 50 (2014).........................15

Rothwell, Jonathan, *Drug offenders in American prisons: The critical distinction between stock and flow*, Brookings Institution (Nov. 25, 2015), http://www.brookings.edu/blogs/social-mobility-memos/posts/2015/11/25-drug-offenders-stock-flow-prisons-rothwell..........................................................7

Safehouse, Frequently Asked Questions, https://www.safehousephilly.org/about/faqs.............................................................3

Salmon, Allison, et al., *The Impact of a Supervised Injecting Facility on Ambulance Call-Outs in Sydney, Australia*, 105 Addiction 676 (2010)...................................14

Stauffer, Brian, *Every 25 Seconds: The Human Toll of Criminalizing Drug Use in the United States*, Human Rights Watch (Oct. 12, 2016), https://www.hrw.org/report/2016/10/12/every-25-seconds/human-toll-criminalizing-drug-use-united-states ...............................................................6

Tracy, Melissa et al., *Circumstances of witnessed drug overdose in New York City*, 79 Drug & Alcohol Dependence 181 (2005) .................................................19

Tyndall, Mark et al., *Attendance, Drug Use Patterns, and Referrals Made from North America's First Supervised Injection Facility*, 83 Drug & Alcohol Dependence 193 (2006) ................................................................16

U.S. Department of Justice Bureau of Justice Assistance, *What are the typical costs of a law enforcement overdose response program?*, https://bjatta.bja.ojp.gov/naloxone/what-are-typical-costs-law-enforcement-overdose-response-program .....................................................................13

Vancouver Coastal Health, *Insite user statistics*, http://www.vch.ca/public-health/harm-reduction/supervised-consumption-sites/insite-user-statistics ...........................4

Wolfram, Joel, *State Sen. Williams makes supervised injection site issue in Philly mayor's race*, WHYY (Apr. 2, 2019), https://whyy.org/articles/state-sen-williams-makes-supervised-injection-site-issue-in-philly-mayors-race .................................16

Wood, Evan et al., *Changes in public order after the opening of a medically supervised safer injecting facility for illicit injection drug users*, 171 Canadian Med. Assoc. J., 731 (2004) ........................................................17, 18

Wood, Evan et al., *Do Supervised Injecting Facilities Attract Higher-Risk Injection Drug Users*, 29 Am. J. Prev. Med., no. 2 (2005)......................................15

Wood, Evan et al., *Impact of a medically supervised safer injecting facility on drug dealing and other drug-related crime*, 13 Substance Abuse Treatment, Prevention, and Policy 1 (2006).................................................................20

Wood, Evan et al., *Rate of Detoxification Service Use and Its Impact Among a Cohort of Supervised Injecting Facility Users*, 102 Addiction 916 (2007).....................................15

## INTEREST AND IDENTITY OF AMICI CURIAE

Amici are 64 current or former prosecutors and law enforcement officials and former U.S. Department of Justice ("DOJ") officials and leaders with extensive expertise in prosecution, policing, and cooperative federal-state law enforcement activities.[1]  Amici are intimately familiar with the challenges of preserving public safety and health and combating the continuing national epidemic of opioid-related deaths.  Amici currently serve or have served in 27 states plus the District of Columbia, including in communities struggling to halt the tide of fatal overdoses caused by widespread substance use disorder, limited access to effective treatment, and a toxic supply stream flooded with powerful synthetic opioids.  These problems remain acute despite federal, state, and local law enforcement agencies' best efforts.

Many of amici's communities have experienced unprecedented levels of fatal opioid overdoses.  The criminal justice and law enforcement agencies that amici lead or have led strive daily to respond to opioid-related overdoses and to save as many lives as possible, while also combating other hazards posed by public injection.  Discarded needles pose a serious safety risk in parks and on streets.  Blood-borne illnesses have spread rapidly, exacerbated by the sharing of needles among intravenous drug users without access to clean syringes, thus endangering people whether or not they use drugs.  Rampant public injection has made residents feel unsafe in their own communities.  And business owners and residents must contend with the daily prospect of finding people unconscious from an overdose in public places.  Punitive responses to these concerns further stigmatize and marginalize people who use drugs, thereby deterring them from

---

[1]      A full list of amici is included in the attached Appendix.  No party's counsel authored this brief in whole or in part, and no person other than amici curiae and their counsel funded the preparation or submission of this brief. All parties have consented to the filing of this brief.

1

accessing available treatment and support services.  As leaders of entities that protect public safety, amici understand the urgency of finding practical solutions to this public health crisis. Amici believe that communities can only manage the myriad problems posed by widespread abuse of opioids by working closely and in partnership with public health experts, both inside and outside of government.

Amici have an interest in this litigation because they recognize that overdose prevention sites (OPSs)[2] are among the harm reduction and public health interventions that have proven effective in preventing fatal overdoses and helping divert people from unnecessary and counterproductive interactions with the criminal justice system.  Amici, many of whom are currently or were previously responsible for enforcing the nation's drug laws, also believe that, as explained in Defendant Safehouse's Memorandum of Law in Opposition to the Department of Justice's Motion for Judgment on the Pleadings, Dkt. 48, the Controlled Substances Act cannot fairly be construed to prohibit operation of a facility specifically designed to address the most acute aspects of this national public health emergency.[3]  Accordingly, amici respectfully submit that the Court should declare that 21 U.S.C. § 856 does not prohibit public health organizations, such as Safehouse, from establishing an overdose prevention site that will prevent fatalities by providing immediate medical care to people experiencing drug-related overdoses.[4]

---

[2]    OPSs are also sometimes referred to as safe consumption sites, supervised consumption facilities, drug consumption rooms, or medically supervised consumption sites.  These facilities provide people who use drugs with a sanitary environment in which to inject drugs under supervision.  OPS staff observe the injection of drugs, which are provided by the participant rather than the facility, and staff are available to respond immediately in the event of an overdose.

[3]    Although this brief focuses on Safehouse, which is a facility providing medical and other services, various other forms of overdose prevention sites exist that provide life-saving overdose prevention services and response.

[4]    Amici acknowledge many current state Attorneys General, have submitted an amicus brief addressing issues of preemption and state and local police powers implicated by Plaintiff's request for declaratory relief.  As a result, amici here do not include current Attorneys General.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants seek to open a facility specifically designed to address the public health emergency posed by the epidemic of opioid-related overdoses.  Like a syringe exchange, the contemplated OPS would provide people who inject drugs with sterile equipment to minimize the spread of illness.  And like any emergency medical care provider, the contemplated OPS would also administer oxygen or naloxone to reverse overdoses.  But rather than pushing participants onto the streets to inject in an unhygienic and unmonitored place, such as behind a dumpster or in a public restroom, Defendant Safehouse would fill the life-threatening gap in existing services by providing space for supervised consumption and observation.  Supervision ensures that individuals who could otherwise be at high risk of death if they inject unsupervised or alone are within immediate reach of lifesaving medical care – including the administration of oxygen, CPR, or naloxone – in the event of an overdose.  Safehouse would also provide additional services to help injection drug users, who are often extremely medically vulnerable, stabilize their lives and improve their health.  These services would include on-site initiation of medication-assisted treatment for substance use disorder, basic medical services, wound care, physical and behavioral health assessments, and referrals to social services.[5]

While new in the United States, more than 110 OPSs currently operate in at least 11 other countries, with many more expected—for example, Portugal just recently opened the first of several planned mobile overdose prevention units.[6]  Not one of these OPSs has ever reported a

---

[5]      Safehouse, Frequently Asked Questions, https://www.safehousephilly.org/about/faqs.

[6]      *See* Beau Kilmer *et al.*, *Considering Heroin-Assisted Treatment and Supervised Drug Consumption Sites in the United States*, RAND Corporation 30-31 (2018), www.rand.org/t/RR2693 [hereinafter "RAND Report"]; Will Godfrey, *Huge Harm Reduction Gathering Allows Portugal to Teach the World*, Filter (Apr. 29, 2019), https://filtermag.org/2019/04/29/huge-harm-reduction-gathering-allows-portugal-to-teach-the-world/.

fatal overdose inside its facility.[7]  The supervision available in an OPS is directly responsible for

saving lives: for example, at a facility in Vancouver, Canada, 175,464 drug users visited the OPS

in 2017 and the OPS staff administered 2,151 overdose interventions.[8]  As law enforcement and

criminal justice leaders, amici's objective is to maintain public safety; saving the lives and

promoting the health of all members of the community is as central to that mission as preventing

and prosecuting crime.  Amici therefore urge the Court to deny Plaintiff/Counterclaim Defendant

United States of America and Third-Party Defendants' Motion for Judgment on the Pleadings

and to declare that 21 U.S.C. § 856 does not prohibit Safehouse from opening a facility that

exists for the purpose of preventing fatal drug-related overdoses.

## **ARGUMENT**

**I.   THE EPIDEMIC OF OPIOID OVERDOSES HAS CAUSED EXTENSIVE HARM**

Nationwide, 70,237 people died from drug-related overdoses in 2017.[9]  Since 1999, the

drug overdose death rate in the United States has increased nearly four-fold.[10]  Existing drug

policy strategies are insufficient to respond to a crisis of this scale.

---

[7]     *See, e.g.*, Vancouver Coastal Health, *Insite user statistics*, http://www.vch.ca/public-health/harm-reduction/supervised-consumption-sites/insite-user-statistics (last updated Feb. 2018) ("More than 3.6 million clients have injected illicit drugs under supervision by nurses at Insite since 2003. There have been 48,798 clinical treatment visits and 6,440 overdose interventions without any deaths.").

[8]     *Id.*

[9]     Centers for Disease Control and Prevention, *Drug Overdose Deaths* (Dec. 19, 2018), https://www.cdc.gov/drugoverdose/data/statedeaths.html. These figures describe only *fatal* drug overdoses.  *See* Shane Darke *et al.*, *The Ratio of Non-Fatal to Fatal Heroin Overdose*, 98 Addiction 1169, 1170 (2003) (estimating that there are between 20 to 30 non-fatal opioid-related overdoses events for every fatality).  Countless other people narrowly avoided death thanks only to the immediate assistance of first responders, a bystander's administration of the overdose "antidote" naloxone, or sheer chance.  Twenty-three states saw statistically significant increases in overdose-related mortality from 2016 to 2017.  *Id.*  2017 represents the latest CDC statistics available.

[10]     Holly Hedegaard, M.D. *et al.*, *Drug Overdose Deaths in the United States, 1999–2017*, Centers for Disease Control and Prevention, NCHS Data Brief No. 329 (Nov. 2018), https://www.cdc.gov/nchs/products/databriefs/db329.htm.

Philadelphia, like many other parts of the United States, contends daily with the epidemic of opioid-related deaths.  "In Philadelphia alone, on an average day the city morgue accepts three or more overdose victims, making the city's overdose death rate about triple its homicide rate."[11] Philadelphia County's 2016 drug overdose death rate was second among the 44 U.S. counties with over one million residents (Allegheny County was first), and Pennsylvania's drug overdose death rate increased 16.9 percent from 2016 to 2017.[12]

The devastating consequences of this crisis go beyond overdose fatalities.  Although the overall number of new HIV cases in Philadelphia has fallen over the last few years, the number of cases among those who inject drugs has substantially increased.  The number of new cases of Hepatitis C, most of which result from intravenous drug use, has also increased dramatically over the last several years.  The proportion of emergency room visits related to drug use has doubled since 2007.[13]  And the opioid crisis costs Philadelphia nearly a billion dollars annually.[14]  The severity of this crisis demands solutions of equal magnitude.

### A.    Criminalization Has Exacerbated, Not Prevented, The Overdose Epidemic

As current and former law enforcement and criminal justice leaders and professionals, amici have seen first-hand how the classic "war on drugs" approach to drug control—an almost

---

[11]    Thomas Farley, M.D., *Overdose prevention sites can help cities like Philadelphia save lives*, Stat News (Apr. 5, 2019) https://www.statnews.com/2019/04/05/overdose-prevention-sites-save-lives.

[12]    Larry Eichel & Meagan Pharis, *Philadelphia's Drug Overdose Death Rate Among Highest in Nation*, The Pew Charitable Trusts (Feb. 15, 2018), https://www.pewtrusts.org/en/research-and-analysis/articles/2018/02/15/philadelphias-drug-overdose-death-rate-among-highest-in-nation. Philadelphia's drug overdose death rate was 46 per 100,000; the 44-county median rate was 13 per 100,000.

[13]    City of Phila. Dep't of Pub. Health, *The Opioid Epidemic in Philadelphia: Implementation of the Mayor's Task Force Recommendations*, 9 (March 14, 2018), https://www.phila.gov/media/20180606132344/OTF_StatusReport_March2018.pdf.

[14]    Drug Enforcement Admin., *The Opioid Threat in Pennsylvania*, Joint Intelligence Report 45 (Sept. 2018).

exclusive focus on aggressive enforcement of criminal law—has exacerbated the overdose epidemic.  This experience confirms that no jurisdiction can arrest its way out of this public health problem.  Fatal overdoses are a symptom of substance use disorder, a medical condition requiring a medical response.

Amici's experience comports with the available evidence.  Between 1981 and 2006, the number of drug arrests in the United States quadrupled to nearly two million per year, disproportionately affecting people and communities of color.[15]  An estimated 74 percent of the people processed at Philadelphia prisons test positive for drug use upon admission to jail, and "[d]rug crimes have been the predominant reason for new admissions into state and federal prisons in recent decades."[16]

These massive increases in drug arrests and drug-related incarcerations have not reduced drug consumption.  The evidence is persuasive that "higher rates of drug imprisonment do not translate into lower rates of drug use, arrests, or overdose deaths."[17]  In fact, when a person with substance use disorder is incarcerated, the weeks following release pose a dramatically elevated

---

[15]    Katherine Beckett, *The Uses and Abuses of Police Discretion: Toward Harm Reduction Policing*, 10 Harv. L. & Pol'y Rev. 77, 81 (2016); *see also* Brian Stauffer, *Every 25 Seconds: The Human Toll of Criminalizing Drug Use in the United States*, Human Rights Watch (Oct. 12, 2016), https://www.hrw.org/report/2016/10/12/every-25-seconds/human-toll-criminalizing-drug-use-united-states ("In every state for which we have sufficient data, Black adults were arrested for drug possession at higher rates than white adults[.]").

[16]    City of Phila., *The Mayor's Task Force to Combat the Opioid Epidemic in Philadelphia, Final Report & Recommendations*, 11 (May 19, 2017) [hereinafter "Mayor's Task Force Report"]; Jonathan Rothwell, *Drug offenders in American prisons: The critical distinction between stock and flow*, Brookings Institution (Nov. 25, 2015), http://www.brookings.edu/blogs/social-mobility-memos/posts/2015/11/25-drug-offenders-stock-flow-prisons-rothwell.

[17]    The Pew Charitable Trusts, *More Imprisonment Does Not Reduce State Drug Problems*, 5 (March 2018), https://www.pewtrusts.org/-/media/assets/2018/03/pspp_more_imprisonment_does_not_reduce_state_drug_problems.pdf.  Mandatory minimum sentencing regimes, including those for drug offenses, "have few if any deterrent effects."  National Research Council of the National Academies, *The Growth of Incarceration in the United States: Exploring Causes and Consequences* at 83 (Jeremy Travis, Bruce Western, & Steve Redburn eds. 2014).

risk of fatal overdose.[18]  Mass incarceration for drug offenses also has devastating consequences for those incarcerated, their families, and their communities.[19]  Excessive punishment of drug crimes perpetuates the cycles of generational trauma and socioeconomic marginalization that, in turn, intensify the social determinants of drug use.

A strict-enforcement approach also stigmatizes people who use drugs in ways that increase health risks, drive problems underground, and magnify social harms.  Fear of arrest and incarceration does not reliably deter drug use, but it does deter intravenous drug users from accessing healthcare, harm reduction services, and treatment that could save their lives and significantly reduce the social costs of their drug use.[20]  Fear and shame force people who use drugs to turn to isolated and dangerous spaces—such as alleys and abandoned houses—where hygienic injection is impossible.  These environments increase transmission of blood-borne diseases like HIV, Hepatitis C, and septicemia.[21]  Isolation increases the risk of fatal overdose: people injecting alone are unlikely to be discovered and to receive the overdose "antidote" naloxone within the critical minutes before a drug overdose can kill by asphyxiation.

Given the stark evidence that criminalizing drug use only increases its harms, the federal government's attempt to extend the Controlled Substances Act to block a public health response to the overdose crisis is perplexing.  Amici, who have served in federal agencies that enforce the

---

[18]     *See* Ingrid A. Binswanger *et al.*, *Release from Prison-A High Risk of Death for Former Inmates*, 356 New Eng. J. Med. 157, 165 (2007).

[19]     The Pew Charitable Trusts, *Collateral Costs: Incarceration's Effect on Economic Mobility*, 3-5 (2010), https://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2010/collateralcosts1pdf.pdf; Drug Policy Alliance, *The Drug War, Mass Incarceration and Race*, 2 (Jan. 2018), http://www.drugpolicy.org/sites/default/files/drug-war-mass-incarceration-and-race_01_18_0.pdf.

[20]     Leo Beletsky *et al.*, *The Law (and Politics) of Safe Injection Facilities in the United States*, 98 Am. J. Pub. Health 231, 231 (2008).

[21]     *Id.*; *see also* Samuel R. Friedman *et al.*, *Relationships of deterrence and law enforcement to drug-related harms among drug injectors in US metropolitan areas*, 20 AIDS 93, 97 (2006) (showing that strict criminal law enforcement is associated with higher incidence of HIV among injected drug users).

Controlled Substances Act and state agencies with their own (often similar or even identical) criminal drug laws, have never seen these laws used to prohibit public health and harm reduction programs such as syringe exchange facilities, naloxone provision services, or OPSs.  Amici understand that substance use disorder is, first and foremost, a medical condition requiring medical treatment.  Criminal sanctions by themselves do not address—and in fact, often exacerbate—the root causes of substance use disorder.  Section 856 was enacted to target the manufacturing of crack cocaine in "crack houses" and amended to address ecstasy use at raves;[22] it was never intended to target public health facilities like OPSs.

---

[22]    *See* Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (PROTECT Act), Pub. L. No. 108-21, § 608, 117 Stat. 650, 691 (2003).

8

B.     **Law Enforcement Agencies And Prosecutor Leaders Around The Country Are Embracing A Harm Reduction Model Because It Has Proven More Effective**

OPSs fit comfortably within an approach to the opioid epidemic known as "harm reduction," which has proven a more effective response than simply arresting and incarcerating people who struggle with substance use disorder.  Harm reduction describes an approach to addressing drug use generally, and the opioid crisis in particular, by "targeting directly drug-related harms rather than drug use itself."[23]  Harm reduction encompasses numerous practices, including "drug consumption rooms, needle and syringe program[s], non-abstinence-based housing and employment initiatives, drug checking, overdose prevention and reversal, psychosocial support, and the provision of information on safer drug use."[24]  Extensive evidence demonstrates that these practices are cost-effective and have a positive impact on individual and community health.[25]  Central to harm reduction is the principle that institutions must structure their services "to meet drug users 'where they're at.'"[26]

Harm reduction has been accepted as a proven response to substance use disorder globally, and numerous U.S. law enforcement organizations have similarly recognized that harm reduction strategies address substance use disorder and the overdose epidemic more effectively than arrests and prosecution.  For example, 36 jurisdictions have already implemented a Law

---

[23]     *See, e.g.*, Jonathan P. Caulkins *et al.*, *Towards a harm reduction approach to enforcement*, 8 Safer Communities 9, (2009); Harm Reduction International, *What is harm reduction?*, https://www.hri.global/what-is-harm-reduction.

[24]     Harm Reduction International, *supra* note 23.

[25]     *Id.*; British Columbia Ministry of Health, *Harm Reduction: A British Columbia Community Guide* 6-12 (2005) (summarizing the evidence supporting the efficacy of various harm-reduction approaches).

[26]     Harm Reduction Coalition, *Principles of Harm Reduction*, https://harmreduction.org/about-us/principles-of-harm-reduction (last visited May 9, 2019).

Enforcement Assisted Diversion ("LEAD") model, which enlists police and prosecutors to work with community groups and social service agencies to provide harm reduction interventions in lieu of a punitive, criminal justice response.[27]  The results are striking: for instance, the Albany LEAD program diverted an individual with a "30-40 bag per day" heroin habit toward medication assisted treatment, housing assistance, and medical care, rather than incarceration for a shoplifting charge.  Prior to LEAD's intervention, the individual had a significant criminal history; after his diversion, he had zero re-arrests and had maintained his housing and physical health.  As LEAD reported: "Through diversion to an intensive case-management approach, public safety has been protected in more meaningful ways than would have been achieved by making a standard arrest."[28]

LEAD programs are rapidly spreading: 59 jurisdictions are currently considering, developing, or launching LEAD programs.  This is a testament both to the benefits accruing to law enforcement agencies and the communities they serve and to the increased trust and cooperation born of incorporating public health and harm reduction strategies into the response to the opioid crisis.  Amici who have introduced harm reduction programs in their own jurisdictions have seen how such strategies lead to more positive interactions between vulnerable members of the community and law enforcement.  This mutual understanding builds relationships that can lead to greater cooperation and better outcomes during police interactions with the people they serve, thereby promoting improved public safety.

---

[27]     *See* LEAD Bureau, www.leadbureau.org (last visited May 9, 2019).

[28]     *See* Albany LEAD, *Report to Albany on the LEAD One-Year Anniversary*, 10 (Apr. 5, 2017), https://www.albanyny.gov/Libraries/APD/2017_Albany_LEAD_First_Year_Report_--_FINAL-2.sflb.ashx.

Particularly when employed within a comprehensive public health framework, harm reduction techniques can successfully address some of the most significant limitations of the traditional approach to the opioid crisis.  One report concludes as follows:

> Harm reduction saves lives and improves quality of life by allowing drug users to remain integrated in society.  The alienation and marginalization of people who use drugs often compound the reasons why they engage in unsafe drug use.  Harm reduction also reduces health care costs by reducing drug-related overdose, disease transmission, injury and illness, as well as hospital utilization.
>
> Harm reduction benefits the community through substantial reductions in open drug use, discarded drug paraphernalia, drug-related crime, and associated health, enforcement and criminal justice costs.  It lessens the negative impact of an open drug scene on local business and improves the climate for tourism and economic development.[29]

Criminal justice leaders should not take a back seat in implementing harm reduction strategies.[30]  Police, prosecutors, and others involved in the criminal justice system have adopted several harm reduction strategies, including referring users to treatment or social service agencies before arrest or charging, obtaining familiarity with and implementing overdose remediation techniques and medications such as naloxone, and warning users when a shipment of tainted drugs hits a city's streets.[31]  These duties are integral to the oath officers take to protect

---

[29]     British Columbia Ministry of Health, *supra* note 25, at 4; *see also id.* at 6-12 (identifying various harm-reduction strategies for addressing opioid abuse).

[30]     Caulkins, *supra* note 23, at 9 ("The traditional view of harm-reduction relegates policing to a passive or peripheral role, but law enforcement is uniquely empowered to address market related harm."); British Columbia Ministry of Health, *supra* note 25, at 8-9 (discussing harm reduction techniques based in law enforcement policies and procedures).

[31]     *See* Caulkins, *supra* note 23, at 14 (listing positive harm reduction actions law enforcement professionals can take); The Pew Charitable Trusts, *supra* note 17 at 7.

and serve their communities and to the aim of prosecutors to serve the public and promote the community's wellbeing.

OPSs fill a critical need in the harm reduction efforts of cities like Philadelphia: they prevent overdose fatalities among some of the most at-risk groups.  While 2,300 people died from overdoses in Philadelphia in the last two years alone, not one person has died of an overdose within an OPS anywhere in the world.[32]  As described below, OPSs are evidence-based, public health focused facilities that can help address the opioid crisis in a manner consistent with smart and effective criminal justice policies.

## II.   PUBLIC SAFETY IS WELL-SERVED BY OVERDOSE PREVENTION SITES

Introducing an OPS into a community ravaged by opioid deaths permits law enforcement agencies to use resources more efficiently and promotes trust and cooperation between law enforcement agencies and a population subject to a disproportionate volume of police interactions.  Empirical evidence also shows that OPSs can reduce crime and public nuisances related to injection drug use.  Accordingly, OPSs are valuable tools for protecting public safety, and there is no basis for concluding that federal law prevents states and localities from employing them as part of a multifaceted solution.

### A.   Overdose Prevention Sites Save Lives And Reduce The Adverse Impact Of Drug Use

OPSs have been proven to save lives—the primary objective of these sites.  For example, multiple studies of OPSs in Vancouver, Canada and Sydney, Australia have demonstrated that overdose-related morbidity and mortality are reduced when people inject drugs at an OPS rather

---

[32]     *See* City of Phila., Dep't of Pub. Health, *Opioid Misuse and Overdose Report* (Nov. 29, 2018), https://www.phila.gov/media/20181129123743/Substance-Abuse-Data-Report-11.29.18.pdf.

than on the street.[33]  In Vancouver, a statistical analysis of the overdose prevention facility

known as Insite estimated that the facility prevented an average of 1.9 to 11.7 deaths annually

over four years.  This would have accounted for between 6 percent and 37 percent of the

overdose fatalities in the neighborhood during that period.[34]  Also, compared to the period before

Insite's opening, Vancouver experienced 35 percent fewer overdoses in the area within 500

meters of the facility. [35]  Similarly, during its first eighteen months of operation, Sydney's

Medically Supervised Injecting Centre ("MSIC") managed 409 overdoses without a single

death.[36]

By reducing fatal overdoses in the community and moving some of the highest-risk

injection drug use from streets and alleys to a facility with medical supervision, OPSs can reduce

the burden on law enforcement resources caused by the opioid epidemic.  Overdoses, whether

fatal or not, require responses from police, EMS, and other first responders; these increasingly

common overdose calls prevent personnel from addressing other public safety concerns.  Often,

these emergency responses require administration of one or more doses of naloxone, which can

cost as much as $60 per dose.[37]  The Philadelphia Police Department, for instance, has regularly

---

[33]     See, e.g., See Vendula Belackova and Allison M. Salmon, *Overview of International Literature*, Supervised Injection Facilities & Drug Consumption Rooms Issue 1, 8-18 (Aug. 2017).

[34]     M-J S. Milloy et al., *Estimated Drug Overdose Deaths Averted by North America's First Medically-Supervised Safer Injection Facility*, 3(10) PLoS One 3 e3351, 4 (2008).

[35]     Brandon D.L. Marshall et al., *Reduction in Overdose Mortality After the Opening of North America's First Medically Supervised Safer Injecting Facility: A Retrospective Population-Based Study*, 37 The Lancet 1429, at 5 (2011); Steven Petrar, *Injection drug users' perceptions regarding use of a medically supervised safer injecting facility*, 32 Addictive Behaviors, 1088, 1092 (2007).

[36]     Ingrid Van Beek, *The Sydney Medically Supervised Injecting Centre: A Clinical Model*, 14(4) Critical Public Health 391, 395 (2003).

[37]     See U.S. Department of Justice Bureau of Justice Assistance, *What are the typical costs of a law enforcement overdose response program?*, https://bjatta.bja.ojp.gov/naloxone/what-are-typical-costs-law-enforcement-overdose-response-program (last visited May 9, 2019).

administered naloxone more than 100 times per quarter, and Philadelphia EMS have regularly administered naloxone to more than 1,000 people per quarter.[38]

OPSs have been shown to substantially reduce these burdens on law enforcement and first responders, instead allowing medically trained staff within a designated facility to respond to overdoses.  For instance, the presence of an OPS in Sydney, Australia significantly reduced the burden on ambulance services in the vicinity of the site.[39]  By diverting overdoses from the street to a controlled, medically supervised facility, and by allowing for more effective early responses to overdoses (often with oxygen rather than more costly and physically taxing naloxone), OPSs advance public safety and allow law enforcement agencies to dedicate their resources to other objectives.

Policing people who publicly inject drugs poses burdens and challenges beyond the high cost of the immediate response to an overdose.  People who inject publicly account for a disproportionate share of police interactions and criminal prosecutions.[40]  The result of an arrest-only response is often that medical treatment occurs within an incarcerated setting (if at all). Currently, as in many American communities, Philadelphia's largest provider of medication-assisted treatment is its jail.[41]  By encouraging and increasing substance use treatment services in

---

[38]     City of Phila. Dep't of Pub. Health, Health Information Portal, Non-Fatal Overdose – Naloxone, https://hip.phila.gov/DataReports/Opioid/NFONaloxoneAdministration (last visited May 9, 2019).

[39]     *See* Salmon, A. M., et al., *The Impact of a Supervised Injecting Facility on Ambulance Call-Outs in Sydney, Australia*, 105 Addiction 676, 678 (2010).

[40]     *See e.g.*, Federal Bureau of Investigation, *2017 Crime in the United States* Table 29, (2017), https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/tables/table-29 (documenting that the highest number of arrests in the United States in 2017 were for drug abuse violations).

[41]     Nina Feldman, *Philadelphia Department of Prisons will begin offering buprenorphine to male inmates again*, WHYY (Apr. 1, 2019) https://whyy.org/articles/philadelphia-department-of-prisons-will-begin-offering-buprenorphine-to-male-inmates-again/

the community, OPSs help stabilize patients' lives, thereby reducing future negative interactions with law enforcement and first responders, allowing law enforcement to allocate resources elsewhere, and creating a more positive pathway to self-help.

Multiple studies have also shown significant additional public health benefits associated with OPSs. These facilities have been demonstrated to reduce harmful behaviors, reduce blood-borne virus transmission, reduce infections, increase access to substance use disorder treatment, and connect users to other critical healthcare and social services.[42] For example, a survey of 1,082 Insite users found that, after visiting the facility, 71 percent indicated they had engaged in less outdoor injecting, 49 percent reported cleaning the injection site more frequently, and 37 percent reported reusing syringes less often.[43] These benefits are experienced by individuals with the greatest need for support: people who are "homeless, unsure of how to access clean drug equipment such as needles, ha[ve] overdosed in the past, and tend[] to inject in public spaces."[44]

OPSs also serve as critical lifelines to health and social services.[45] One study associated the Vancouver OPS with a 30 percent increase in the use of detoxification services compared to the year before it opened.[46] Another study found that regular use of the Vancouver OPS and

---

[42]    *See* Belackova, *supra* note 33, at 8; Chloe Potier *et al.*, *Supervised injection services: What has been demonstrated? A systematic literature review*, 145 Drug & Alcohol Dependence 50-61(2014); Ontario HIV Treatment Network, *What is the effectiveness of supervised injection services?* 83 Rapid Review (May 2014), http://www.ohtn.on.ca/Pages/Knowledge-Exchange/Rapid-Responses/Documents/RR83-Supervised-Injection-Effectiveness.pdf; Thomas Kerr *et al.*, *Impact of a medically supervised safer injection facility on community drug use patterns: a before and after study*, 332 BMJ 220, 221 (2006).

[43]    *See* Petrar, *supra* note 35, at 1091.

[44]    Massachusetts Medical Society, *Report of the Task Force on Opioid Therapy and Physician Communication: Establishment of a Pilot Medically Supervised Injection Facility in Massachusetts*, 12 (Apr. 2017).; Belackova, *supra* note 33, at 8-9; Evan Wood *et al.*, *Do Supervised Injecting Facilities Attract Higher-Risk Injection Drug Users*, 29 Am. J. Prev. Med., no. 2, 2005, at 126, 127-29.

[45]    *See, e.g.* Evan Wood *et al.*, *Rate of Detoxification Service Use and Its Impact Among a Cohort of Supervised Injecting Facility Users*, 102 Addiction 916, 918 (2007).

[46]    *See, e.g. id*.

contact with its counselors was "associated with entry into addiction treatment, and enrollment in addiction treatment programs [which were] positively associated with injection cessation."[47] OPSs are also a conduit to other critical services such as housing, social work, and mental health treatment.[48]

OPS opponents sometimes voice the fear that opening an OPS will create a so-called "honeypot effect," drawing drug dealers and attendant crime and public nuisance to a neighborhood.[49] The evidence is to the contrary. Communities' experiences with the more than 110 OPSs in operation worldwide demonstrate that OPSs can, in fact, reduce the negative effects of injection drug use and enhance public safety.[50] In Vancouver, controlled quantitative studies documented an abrupt and durable decline in property crimes and violent crimes in the area around the OPS compared to crime rates elsewhere in the city.[51] The Supreme Court of Canada reached the same conclusion in a landmark 2011 case, affirming findings that the Vancouver OPS "is effective in reducing the risk of death and disease and has had no negative impact on the legitimate criminal law objectives."[52] An empirical study in Sydney likewise concluded that no local increases in property crimes, drug-related crimes, or loitering could be attributed to the

---

[47]    Kora DeBeck *et al.*, *Injection drug use cessation and use of North America's first medically supervised safer injecting facility*, 113 Drug & Alcohol Dependence, nos. 2-3, Jan. 2011, at 172, 174-75.

[48]    *See, e.g.*, Mark W. Tyndall, *et al.*, *Attendance, Drug Use Patterns, and Referrals Made from North America's First Supervised Injection Facility*, 83 Drug & Alcohol Dependence, no.3, July 27, 2006, at 193, 197.

[49]    *See, e.g.*, Joel Wolfram, *State Sen. Williams makes supervised injection site issue in Philly mayor's race*, WHYY (Apr. 2, 2019), https://whyy.org/articles/state-sen-williams-makes-supervised-injection-site-issue-in-philly-mayors-race (describing a community meeting with residents "worried [an OPS] would attract drug dealers and violent crime in the vicinity").

[50]    *See* RAND Report, *supra* note 6, at 30-31.

[51]    Andrew J. Myer & Linsey Belisle, *Highs and Lows: An Interrupted Time-Series Evaluation of the Impact of North America's Only Supervised Injection Facility on Crime*, 48 J. Drug Issues 36, 43 (2017).

[52]    *Canada v. PHS Community Services Society*, [2011] 3 S.C.R. 134, 189 (Can.).

opening of an OPS.[53]  OPSs also protect their participants, who are more likely than the general population to be victims of violent and property crimes.[54]  And a 2018 RAND Corporation review of the empirical literature concluded that "[n]o study reported an increase in crime associated with [OPS] operation."[55]

Similarly, a study of the Vancouver OPS found that daily counts of suspected drug dealers in the vicinity did not increase after the OPS was opened.[56]  The reasoning is simple: OPSs tend to serve people in the immediate neighborhood, rather than drawing in people from farther away.  For instance, over 70 percent of frequent users of the Vancouver OPS reported living within four blocks of the facility.[57]  And while overdose mortality dropped approximately 35 percent in the area within 500 meters of the facility following its opening, there were no significant changes in overdose mortality further away.[58]  This concentrated benefit suggests that the OPS was primarily serving people already in that area, rather than attracting people from elsewhere in the city.  Because an OPS largely serves its immediate neighborhood, rather than drawing in new users, there is no additional demand drawing drug dealers into the area.  To the extent drug dealers do operate in an OPS's vicinity, police and prosecutors are well equipped to

---

[53]     Karen Freeman *et al.*, *The impact of the Sydney Medically Supervised Injecting Centre (MSIC) on crime*, 24 Drug & Alcohol Rev. 173, 182-184 (2005).

[54]     *See, e.g.*, Nadia Fairbairn *et al.*, *Seeking refuge from violence in street-based drug scenes: Women's experiences in North America's first supervised injection facility*, 67 Soc. Sci. & Med. 817, 817 (2008).

[55]     RAND Report, *supra* note 6, at 34.

[56]     Evan Wood *et al.*, *Changes in public order after the opening of a medically supervised safer injecting facility for illicit injection drug users*, 171 Canadian Med. Assoc. J., 731, 733 (2004).

[57]     Marshall, *supra* note 35 at 1431.

[58]     *Id.* at 1433.

disrupt this illicit commerce using their existing tools and expertise.  The presence of an OPS

need not prevent law enforcement from going after dealers and traffickers as they always have.

OPSs also tend to decrease public nuisances associated with large-scale public injection

in public streets, alleys, parks, and restrooms.[59]  The prevalence of discarded needles and other

injection-related litter tends to drop near an OPS, since an OPS moves consumption inside and

provides safe disposal facilities.[60]  Studies have also found that opening an OPS does not

increase drug-related loitering or create open-air drug scenes in the area surrounding an OPS.[61]

### B.    Overdose Prevention Sites Promote Trust In The Justice System, Thus Enhancing Public Safety

Amici understand that developing and retaining the trust of the communities they serve is

vital to effectively enforcing the law and protecting public safety.  Police and prosecutors can

neither prevent nor solve crimes without cooperation and trust from the people they serve.  But

community trust requires that people view the criminal justice system and law enforcement as

legitimate.  Adopting a harm reduction approach—and treating substance use disorder as the

public health issue it is—promotes a community's belief in the legitimacy of its law enforcement

agencies.  Harm reduction strategies further enhance legitimacy by embracing proactive and

supportive public health approaches that save lives, stabilize communities, and disrupt the cycles

of trauma that perpetuate crime.

---

[59]      Wood, *supra* note 56, at 732.

[60]      MSIC (Medically Supervised Injection Centre) Evaluation Committee, *Final Report of the Evaluation of the Sydney Medically Supervised Injection Centre* 112-125 (2003), https://uniting.org/__data/assets/pdf_file/0007/136438/MSIC-final-evaluation-report-2003.pdf.

[61]      *See* Laura Huey, *What is Known About the Impacts of Supervised Injection Sites on Community Safety and Wellbeing? A Systematic Review,* 48 Sociology Publications 11-12 (2019) (collecting studies).

Conversely, the punitive approach to managing substance use disorder breeds distrust and amplifies the harms of drug use. For instance, excessive policing of people who use drugs creates frequent, often hostile contacts with police and is shown to disproportionately affect communities of color.[62] Repeated searches, arrests, prosecutions, and punishment in response to a public health concern exacerbate tension between police and the community, thereby eroding trust. Treating overdose locations as crime scenes can also alienate community members and dissuade people from calling for help.[63] Indeed, people witnessing an overdose often delay calling emergency services due to fear of the police.[64] This trust deficit costs lives, since even a few minutes' delay can turn an overdose into a fatality.

Aggressive enforcement can also deter people who use drugs from reporting crimes committed against them. As noted above, people who use drugs are more frequently victims of crime than the general population,[65] but they are unlikely to report those crimes unless there is a relationship of mutual trust with law enforcement. This dynamic can lead to increased lawlessness in areas where drug use is common, as crimes against vulnerable people go unreported. Harm reduction programs, including OPSs, instead reduce crime by stabilizing lives.

---

[62]    *See* Jamie Fellner, *Race, Drugs, and Law Enforcement in the United States*, 20 Stan. Law & Pol. Rev. 269-74 (2009), https://www-cdn.law.stanford.edu/wp-content/uploads/2018/03/fellner.pdf.

[63]    *See* Leo Beletsky, *America's Favorite Antidote: Drug-Induced Homicide in the Age of the Overdose Crisis* 59-63 (May 18, 2018), https://ssrn.com/abstract=3185180.

[64]    *See* Melissa Tracy *et al.*, *Circumstances of witnessed drug overdose in New York City: implications for intervention*, 79 Drug & Alcohol Dependence 181, 183-185 (2005) ("The most commonly cited reason for delaying or failing to get help was fear of police response (52.2%). Among those who called for medical help at the last witnessed overdose, 21.2% delayed before calling for help; the most frequently reported reason for the delay was fear of police response (66.3%).").

[65]    *See* Karen McElrath *et al.*, *Crime Victimization among Injection Drug Users*, 27 J. of Drug Issues 771, 779 (1997).

For example, Seattle's LEAD program significantly reduced re-arrest rates for participants, as compared to people subject to standard criminal prosecution.[66]

Law enforcement and criminal justice leaders in cities with OPSs recognize the stabilizing effects an OPS can bring to a drug-ridden community.  This understanding is critical, because a harm reduction facility cannot be effective unless the police allow people to come and go without fear of arrest.  Indeed, local police tend to quickly become a major source of referrals for OPS participants after the facilities open.[67]  These referrals indicate that local law enforcement working in communities beset by frequent overdoses come to trust OPSs as a constructive part of the collective effort to protect the community.

Supportive, non-punitive interactions between law enforcement officers and people who use drugs, who rarely begin with positive attitudes toward police, can make the entire community safer by promoting mutual understanding and cooperation.  That is why numerous law enforcement groups have publicly endorsed harm reduction policies, noting that "[p]olice are at the front-line of this 'war', and many individuals around the world are growing weary of fighting a 'war' that has so many negative outcomes, especially poor health outcomes, for so many of those involved.  Police have growing concerns about a system that pits them against everyday citizens."[68]

---

[66]     *See* Susan E. Collins *et al.*, *LEAD Program Evaluation: Recidivism Report* (March 27, 2015), http://static1.1.sqspcdn.com/static/f/1185392/26121870/1428513375150/LEAD_EVALUATION_4-7-15.pdf?token=YJfAkZUM2cJSCNr9OVXSYu1IBR0%3D.

[67]     *See* Evan Wood *et al.*, *Impact of a medically supervised safer injecting facility on drug dealing and other drug-related crime*, 13 Substance Abuse Treatment, Prevention, and Policy at 1, 3 (2006).

[68]     Center for Law Enforcement and Public Health, *Police Statement of Support for Drug Policy Reform* (Feb. 2019), https://cleph.com.au/application/files/4815/4957/9983/Statement_of_Support_for_Drug_Policy_Reform_Feb_2019.pdf.  *See also, e.g.*, *PHS Community Services Society*, 3 S.C.R. at 151 ("The Vancouver police support Insite.").

Distorting federal drug laws to prohibit an OPS or to prosecute its sponsors would undermine community trust in the justice system and faith in the fair and sensible application of our drug laws.  Interpreting federal criminal law to bar empirically validated harm reduction measures would make no one safer; it would only impede cooperation between criminal justice agencies and the communities they serve.

*     *     *

Amici believe that OPSs advance their criminal justice and law enforcement mission:  to protect their communities from harm and serve those who need support.  As Safehouse's Memorandum of Law in Opposition to the Department of Justice's Motion for Judgment on the Pleadings amply demonstrates, the Controlled Substances Act does not criminalize public health facilities.  Amici therefore submit that Philadelphia and other American communities gripped by this public health emergency should be able to make use of the proven benefits of an OPS to save lives, improve public health, and enhance community trust and public safety.

## CONCLUSION

For the foregoing reasons, amici respectfully submit that the Court should deny Plaintiff/Counterclaim Defendant United States of America and Third-Party Defendants' Motion for Judgment on the Pleadings.

Dated: July 10, 2019                       Respectfully submitted,


                                           /s/ Daniel Segal

                                           Daniel Segal
                                           Matthew A. Hamermesh
                                           (PA ID Nos. 26218, 82313)
                                           HANGLEY ARONCHICK SEGAL PUDLIN AND
                                           SCHILLER
                                           One Logan Square, 27th Floor

21

Philadelphia, PA 19103
(215) 568-6200
das@hangley.com
mah@hangley.com

Mark C. Fleming *(pro hac vice admission pending)*
Tasha J. Bahal *(pro hac vice admission pending)*
Jillian Schlotter *(pro hac vice admission pending)*
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
mark.fleming@wilmerhale.com
tasha.bahal@wilmerhale.com
jillian.schlotter@wilmerhale.com

Nick Werle *(pro hac vice admission pending)*
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
nick.werle@wilmerhale.com


***Attorneys for Amici Curiae***

**APPENDIX**

**AMICI CURIAE**

This Appendix provides amici's names and titles for identification purposes only.  The listing of these affiliations does not imply any endorsement of the view expressed herein by amici's institutions.

**Roy L. Austin**
Former Deputy Assistant to the President
for Urban Affairs, Justice and Opportunity

    White House Domestic Policy Council

Former Deputy Assistant Attorney General,
Civil Rights Division

    U.S. Department of Justice

**Chiraag Bains**
Former Trial Attorney, Criminal Section,
Civil Rights Division

    U.S. Department of Justice

Former Senior Counsel to the Assistant
Attorney General, Civil Rights Division

    U.S. Department of Justice

**Wesley Bell**
Prosecuting Attorney

    St. Louis County, MO

**Kenyen Brown**
Former U.S. Attorney

    Southern District of Alabama

**Kimberly B. Cheney**
Former Attorney General

    State of Vermont

**Aramis Ayala**
State Attorney

    Ninth Judicial Circuit, FL

**Diana Becton**
District Attorney

    Contra Costa County, CA

**Sherry Boston**
District Attorney

    DeKalb County, GA

**Mike Butler**
Chief

    Longmont Police Department, CO

**Jerry L. Clayton**
Sheriff

    Washtenaw County, MI

**Scott Colom**
District Attorney

    16th Circuit Court, MS

**John C. Creuzot**
District Attorney

    Dallas County, TX

**Michael Dougherty**
District Attorney

    20th Judicial District, CO

**Kim Foxx**
State's Attorney

    Cook County, IL

**Kimberly Gardner**
Circuit Attorney

    City of St. Louis, MO

**Sarah F. George**
State's Attorney

    Chittenden County, VT

**Eric Gonzalez**
District Attorney

    Kings County, NY

**Brendan Cox**
Chief (Ret.)

    Albany Police Department, NY

Director of Policing Strategies

    LEAD Support Bureau

**Satana Deberry**
District Attorney

    Durham County, NC

**Mark Dupree**
District Attorney

    Wyandotte County, KS

**Neill Franklin**
Major (Ret.)

    Maryland State Police and
    Baltimore Police Department

Executive Director

    Law Enforcement Action
    Partnership

**George Gascón**
District Attorney

    City and County of San Francisco,
    CA

**Joe Gonzales**
District Attorney

    Bexar County, TX

**Mark Gonzalez**
District Attorney

    Nueces County, TX

**Andrea Harrington**
District Attorney

      Berkshire County, MA

**Peter S. Holmes**
City Attorney

      Seattle, WA

**Lawrence S. Krasner**
District Attorney

      Philadelphia, PA

**Jackie Lacey**
District Attorney

      Los Angeles County, CA

**Chris Magnus**
Chief

      Tucson Police Department, AZ

**Isaiah McKinnon**
Chief (Ret.)

      Detroit Police Department, MI

**Robert J. Hoffman**
Chief (Ret.)

      Plainfield Police Department, CT

**John Hummel**
District Attorney

      Deschutes County, OR

**Miriam Aroni Krinsky**
Former Assistant U.S. Attorney

      Central District of California

Former Criminal Appellate Chief and
Chief, General Crimes

      Central District of California

Former Chair

      Solicitor General's Criminal
      Appellate Advisory Group

Executive Director

      Fair and Just Prosecution

**William Lansdowne**
Chief (Ret.)

      San Diego Police Department, CA
      San Jose Police Department, CA
      Richmond Police Department, CA

**James L. Manfre**
Sheriff (Ret.)

      Flagler County, FL

**Dan P. Meloy**
Chief (Ret.)

      Colerain Township Police
      Department, OH

Former Director of Public Safety

      Colerain Township, OH

**Spencer Merriweather**
District Attorney

> Mecklenburg County, NC

**Kenneth Mighell**
Former U.S. Attorney

> Northern District of Texas

**Bill Nettles**
Former U.S. Attorney

> District of South Carolina

**Channing Phillips**
Former U.S. Attorney

> District of Columbia

**Rachael Rollins**
District Attorney

> Suffolk County, MA

**Stephen Rosenthal**
Former Attorney General

> State of Virginia

**Ronal Serpas**
Superintendent (Ret.)

> New Orleans Police Department, LA

Chief (Ret.)

> Metropolitan Nashville Police
> Department, TN

Chief (Ret.)

> Washington State Patrol, WA

**Brian Middleton**
District Attorney

> Fort Bend County, TX

**Marilyn Mosby**
State's Attorney

> Baltimore City, MD

**Jim Petro**
Former Attorney General

> State of Ohio

**Ira Reiner**
Former District Attorney

> Los Angeles County, CA

Former City Attorney

> Los Angeles, CA

**Jeff Rosen**
District Attorney

> Santa Clara County, CA

**Dan Satterberg**
Prosecuting Attorney

> King County, WA

**Harry L. Shorstein**
Former State Attorney

> Fourth Judicial Circuit, FL

26

**Carol Siemon**
Prosecuting Attorney

  Ingham County, MI

**Norm Stamper**
Chief (Ret.)

  Seattle Police Department, WA

**David Sullivan**
District Attorney

  Northwestern District, MA

**Thomas W. Synan Jr.**
Chief

  Newtown Police Department, OH

**Jennifer Tejada**
Chief

  Emeryville Police Department, CA

**Raúl Torrez**
District Attorney

  Bernalillo County, NM

**Peter Volkmann**
Chief

  Village of Chatham Police
  Department, NY

**David Soares**
District Attorney

  Albany County, NY

**Carter Stewart**
Former U.S. Attorney

  Southern District of Ohio

**Thomas P. Sullivan**
Former U.S. Attorney

  Northern District of Illinois

**Betty Taylor**
Chief (Ret.)

  Winfield Police Department, MO

**Steve Tompkins**
Sheriff

  Suffolk County, MA

**Cyrus R. Vance**
District Attorney

  New York County, NY

**Andrew H. Warren**
State Attorney

  Thirteenth Judicial Circuit, FL

27