## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | : | |
| | : | |
| | : | **CIVIL ACTION** |
| v. | : | **No. 19-0519** |
| | : | |
| SAFEHOUSE, a Pennsylvania nonprofit<br>Corporation;<br>JOSE BENITEZ, as President and<br>Treasurer of Safehouse,<br>Defendants. | : | |

| | | |
|---|---|---|
| SAFEHOUSE, a Pennsylvania nonprofit<br>Corporation, | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| Counterclaim Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| U.S. DEPARTMENT OF JUSTICE;<br>WILLIAM P. BARR, in his official capacity<br>as Attorney General of the United States;<br>and WILLIAM M. McSWAIN, in his official<br>capacity as U.S. Attorney for the Eastern<br>District of Pennsylvania, | : | |
| Third-Party Defendants. | : | |

McHugh, J.                                                                October 2, 2019

## MEMORANDUM

I.      The Relevant Factual Background.........................................4
II.     Procedural Posture ..............................................................5
III.    The Controlling Procedural Standard ...................................7
IV.     The Statutory Question .......................................................7
        a. The Absence of a Controlling Standard of Statutory
           Construction.......................................................................7

       b. Interpretation of 21 U.S.C. § 856(a)................................13
          i.  Authorization .................................................................15
          ii. Meaning of "unlawfully . . . using" .............................18
          iii.To whose purpose (a)(2) refers ....................................19
          iv.Meaning of "for the purpose of unlawfully . . . using a
             controlled substance" ....................................................34
V.     Application of (a)(2) to Safehouse.......................................49
VI.    Application of (a)(1) to Safehouse.......................................55
VII.   Religious Freedom Restoration Act.....................................55
VIII.  Conclusion ..........................................................................56

***** 

This is a declaratory judgment action brought by the United States seeking to enjoin the operation of a proposed safe injection site for opioid users in the City of Philadelphia. The Government contends that its operation is unlawful under the Controlled Substances Act (CSA). As an initial matter, it is useful to delineate what is not before the Court. The question is not whether safe injection sites are an appropriate means of dealing with the opioid crisis, either as a matter of public policy or a matter of public health. Nor does this Court have jurisdiction to address the concerns raised by residents of the beleaguered neighborhood of Kensington in Philadelphia as to the appropriate location for the operation of such a facility, if it is lawful. It is also helpful to observe that, although both parties globally invoke various aspects of the Controlled Substances Act, a sprawling statute amended many times over many years, this case focuses on a single narrow provision of the Act, 21 U.S.C. § 856(a)(2)—colloquially known as the "Crack House" statute—as the legal basis for the injunction sought by the Government.

This narrowness of focus reflects a fundamental underlying reality, which is that no credible argument can be made that facilities such as safe injection sites were within the contemplation of Congress either when it adopted § 856(a) in 1986, or when it amended the

statute in 2003.  And that baseline reality ultimately has substantive significance in determining whether this statute is properly applied to the safe injection site proposed by Safehouse.

Having examined the text and employed a number of tools of statutory construction, I conclude that the provision on which the Government relies is reasonably capable of more than one interpretation.  This supports a further conclusion that consideration of the legislative evidence surrounding passage of this provision is appropriate.  As discussed below, courts must exercise extreme care in discerning the objective sought by Congress in enacting a statute.  That said, having reviewed materials I consider appropriate in discerning what Congress sought to address in enacting § 856(a)(2), there is no support for the view that Congress meant to criminalize projects such as that proposed by Safehouse.  Although the language, taken to its broadest extent, can certainly be interpreted to apply to Safehouse's proposed safe injection site, to attribute such meaning to the legislators who adopted the language is illusory.  Safe injection sites were not considered by Congress and could not have been, because their use as a possible harm reduction strategy among opioid users had not yet entered public discourse.  Particularly in the area of criminal law, it is the province of Congress to determine what is worthy of sanction. A line of authority dating back to Chief Justice John Marshall cautions courts against claiming power that properly rests with the legislative branch.[1]  A responsible use of judicial power under those circumstances is to decline to expand the scope of criminal liability under the statute and allow Congress to address the issue.

---

[1] *United States v. Davis*, 139 S. Ct. 2319, 2333 (2019) (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (Marshall, C.J.)).

I.      **The Relevant Factual Background**

Safehouse seeks to open an "Overdose Prevention Site," which will offer a variety of services aimed at preventing the spread of disease, administering medical care, and encouraging drug users to enter treatment.  According to Safehouse's representations about its protocol,[2] when one arrives at Safehouse, they will first go through a registration process.  The participant will provide certain personal information and receive a physical and behavioral health assessment.  Safehouse staff will then offer a variety of services, including medication-assisted treatment, medical care, referrals to a variety of other services, and use of medically supervised consumption and observation rooms.  There is nothing in the protocol that suggests Safehouse will specifically caution against drug usage.

Participants who choose to use drugs in the medically supervised consumption room will receive sterile consumption equipment as well as fentanyl test strips once they enter the room.  At no point will Safehouse staff handle or provide controlled substances.  Staff members will supervise participants' consumption and, if necessary, intervene with medical care, including reversal agents to prevent fatal overdose.  Before leaving the room, participants will dispose of used consumption equipment.  After participants finish in the medically supervised consumption room, staff will direct them to the medically supervised observation room.  Nothing in the Safehouse protocol appears to require that a participant remain in the observation room for a specified period of time.  In the observation room, certified peer counselors, as well as recovery

---

[2] I base this summary of Safehouse's proposed operation and protocol only on the facts presented in the pleadings, including Exhibit A to the Government's Amended Complaint, which is a printout of a previous version of Safehouse's website.  I have disregarded all witness testimony presented at the evidentiary hearing held on August 19, 2019.

specialists, social workers, and case managers will be available to offer services and encourage treatment. The same services will again be offered for the third time at check out.

## II.     Procedural Posture

After Safehouse announced its plans, the Government engaged in some correspondence with Safehouse's leadership. The parties could not reach agreement, and the United States then initiated this action against Safehouse and its President and Treasurer, Jose Benitez.[3] *See* Pl.'s Compl., ECF No. 1; Pl.'s Am. Compl., ECF No. 35. The Government seeks a declaratory judgment that the medically supervised consumption rooms violate 21 U.S.C. § 856(a)(2). I commend the Government for proceeding in this manner, rather than with criminal prosecution. Defendants answered the Government's Declaratory Judgment Complaint with several affirmative defenses, including an argument that application of the statute to their proposed site would be unconstitutional. Defs.' Answer to Compl., ECF No. 3; Defs.' Answer to Am. Compl., ECF No. 45. Safehouse also brought counterclaims and third-party claims, first seeking a declaratory judgment that its proposed operation will not violate § 856(a) and second seeking a declaratory judgment that the Department of Justice's efforts to enforce the statute, threats to prosecute Safehouse, and litigation against Safehouse violate 42 U.S.C. § 2000bb, the Religious Freedom Restoration Act. *Id.* The Government answered Safehouse's counterclaims and third-party complaint, Pl. & Third-Party Defs.' Answer, ECF No. 46, and then filed a Motion for

---

[3] The Government initially brought the action against Safehouse and Jeannette Bowles, whom it expected to be Safehouse's Executive Director. Pl.'s Compl., ECF No. 1. After it became clear that Jeannette Bowles had severed ties with Safehouse, the parties stipulated to her dismissal, Stipulation of Dismissal, ECF No. 30, and the Government amended its complaint, naming Jose Benitez instead. Pl.'s Am. Compl., ECF No. 35.

Judgment on the Pleadings as to its claim as well as the counterclaims and third-party claims.  Pl. & Third-Party Defs.' Mot. for J. on the Pleadings, ECF No. 47.[4]

After considering the pleadings, the Government's Motion for Judgment on the Pleadings, Safehouse's Response, ECF No. 48, and the Government's Reply, ECF No. 115, I have concluded that 21 U.S.C. § 856(a) does not prohibit Safehouse's proposed medically supervised consumption rooms because Safehouse does not plan to operate them "for the purpose of" unlawful drug use within the meaning of the statute.  Accordingly, I need not consider whether application of the statute to Safehouse's proposed conduct violates the Commerce Clause.  As to the Religious Freedom Restoration Act, Safehouse's claim that the Government's effort to enforce 21 U.S.C. § 856(a) violates the Religious Freedom Restoration Act is now moot, as Safehouse sought only prospective injunctive relief.  The Government's Motion will be denied as to its claim for declaratory judgment, as well as Safehouse's counterclaim for declaratory judgment.

---

[4] At the outset of the case, the Government represented that the issue was purely one of law that could be decided on a Motion for Judgment on the Pleadings.  Safehouse objected and requested a full trial.  I adopted the Government's view but sought more detail as to the protocol under which Safehouse was to operate.  Therefore, I requested an evidentiary hearing on a limited number of issues, with the goal of having the parties amend the pleadings to frame the issues.  Safehouse provided a summary of proposed testimony that broadly addressed issues of public policy and public health.  I declined to allow it such leeway, and attempted to provide the parties with clear guidance as to the narrow scope of the proposed hearing.  The hearing was held on August 19, 2019.  Safehouse presented substantial evidence that went well beyond the scope of my guidelines.  The Government raised no objection, however, and it became clear during cross-examination that the Government also sought to use the hearing to address a number of public policy and public health issues.

After considering the record, I held a telephone conference on August 23, 2019, and advised both parties that neither had abided by my ground rules for the hearing.  I then sought to secure agreement as to nine discrete factual items to be incorporated into the record by agreement.  The parties were able to reach agreement on eight of the nine points but had a vigorous dispute as to the ninth.  I then ruled that I would consider nothing beyond the pleadings. Ironically, during oral argument, the Government repeatedly invoked portions of the testimony from Mr. Benitez in an attempt to support is arguments.  Significantly, however, the Government has not withdrawn its Motion for Judgment on the Pleadings or altered its original position that no further record is necessary.  I have therefore proceeded to address the pending Motion for Judgment on the Pleadings without reference to the testimony presented at the evidentiary hearing, as originally requested by the Government.

### III.    The Controlling Procedural Standard

A Rule 12(c) motion for judgment on the pleadings "is analyzed under the same standards that apply to a Rule 12(b)(6) motion."  *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010).  This well-established standard requires that I view the pleadings in the light most favorable to the non-moving party.  *Leamer v. Fauver*, 288 F.3d 532, 535 (3d Cir. 2002).  "A Rule 12(c) motion should not be granted unless the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgment in its favor as a matter of law."  *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 271 (3d Cir. 2014) (internal quotations and citations omitted).  I may consider all pleadings in ruling on a motion for judgment on the pleadings.  *Id.* (citing to Rule 12(c)).

### IV.    The Statutory Question

For purposes of this motion, the facts outlined above are undisputed, and the sole question is one of law.

### a.  The Absence of a Controlling Standard of Statutory Construction

District courts must faithfully apply the law Congress enacts.  Binding precedent usually dictates or substantially influences the way in which district courts apply the law.  But the Third Circuit has not yet considered the proper construction of 21 U.S.C. § 856(a), and although other courts of appeals have addressed that subsection, no court has yet considered its application to medically supervised consumption sites.[5]

When a district judge must address a novel question of statutory construction, part of the challenge is that "[s]tatutory interpretation does not have a defined set of predictable rules.  The

---

[5] The Third Circuit has considered the meaning of the word "maintained" under U.S.S.G. § 2D1.1(b)(12) and looked to other circuit courts' interpretations of the word "maintained" in § 856.  *United States v. Carter*, 834 F.3d 259, 262-63 (3d Cir. 2016).

doctrines of the field are not treated as law.  They do not have a theorized jurisprudence that legitimates their source, or even indicates what it might be."  Abbe R. Gluck, *Justice Scalia's Unfinished Business in Statutory Interpretation: Where Textualism's Formalism Gave Up*, 92 Notre Dame L. Rev. 2053, 2054 (2017).  There are instead competing models and schools of thought, and a judge's choice of methodology carries a risk of dictating the outcome of a case. For that reason, I first address the various methods available, both because I believe transparency is important, and because I am convinced that judges must be conscious of the inherent limitations in all the various methods employed.

The Third Circuit has noted that a court's "goal when interpreting a statute is to effectuate Congress's intent."  *S.H. ex rel. Durrell v. Lower Merion School Dist.*, 729 F.3d 248, 257 (3d Cir. 2013) (quoting *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 295 (3d Cir. 2012)). Stated differently, "[w]hen a court interprets a statute, the court articulates the meaning of the words of the legislative branch."  Robert A. Katzmann, *Judging Statutes* 8 (2014).  In this endeavor, the Third Circuit has, as recently as this past August, again emphasized that "words matter" and that interpreters must begin the process of statutory construction by looking to the text.  *Pellegrino v. Transp. Sec. Admin.*, 937 F.3d 164, 2019 WL 4125221, at *12 (3d Cir. Aug. 30 2019) (en banc) (Ambro, J.) (majority opinion); *id.* (Krause, J., dissenting).  Accordingly, where the meaning of a provision is clear, a court need not look beyond the statutory language.

To determine whether language is unambiguous, the Third Circuit has instructed that one should "read the statute in its ordinary and natural sense."  *In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010) (quoting *In re Harvard Indus., Inc.*, 568 F.3d 444, 451 (3d Cir. 2009)).  "A provision is ambiguous only where the disputed language is 'reasonably susceptible of different interpretations.'"  *Id.* (quoting *Dobrek v. Phelan*, 419 F.3d 259, 264 (3d Cir. 2005)).

In application, however, reliance on the plain meaning of the text is hardly as simple as its proponents contend, as evidenced by cases where both the majority and dissent claim that the language of a statute is clear and unambiguous while reaching opposite results.  *See, e.g.*, *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ*, 550 U.S. 81 (2007).  I find substantial merit to the observation that "[p]lain meaning is a conclusion, not a method."  Victoria Nourse, *Misreading Law, Misreading Democracy* 5, 66, 68-69 (Harvard Univ. Press 2016) (hereinafter Nourse, *Misreading Law*).

Where plain meaning proves elusive or "a statute is unclear on its face," the Court of Appeals has recently reaffirmed that "good arguments exist that materials making known Congress's purpose 'should be respected, lest the integrity of legislation be undermined.'" *Pellegrino*, 2019 WL 4125221 at *11 (quoting Robert A. Katzmann, *Judging Statutes* 4 (2014)). In fact, respecting Congress's purpose is necessary to preserve both the legislative and judicial roles, and legislative materials often provide helpful insight into what Congress meant to accomplish with a given statute.  Among the criticisms leveled at courts' use of legislative materials is that they are cited selectively and cited indiscriminately without recognition that different sources are entitled to different weight.[6]  Judges must therefore consider legislative materials with an accurate understanding of Congress's rules and procedures.  Katzman, *supra* at 49; Richard A. Posner, *Statutory Interpretation—in the Classroom and in the Courtroom*, 50 U. Chi. L. Rev. 800, 802-05 (1983) (hereinafter Posner, *Statutory Interpretation*).

---

[6] Indeed, the Government at oral argument voiced the oft-repeated criticism that using legislative history is like looking over the heads of guests at a cocktail party and choosing one's friends.  *See* Tr. at 12; *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993).  In reality, the same potential problem also pervades the realm of judicial canons of statutory construction, as judges choose which canons to employ, Anita S. Krishnakumar, *Dueling Canons*, 65 Duke L.J. 909 (2016), and the realm of textual analysis, as judges select the specific words on which to focus, Victoria Nourse, *Picking and Choosing the Text: Lessons for Statutory Interpretation from the Philosophy of Language*, 60 Fla. L. Rev. 1409 (2017).  Whatever tools judges employ, it must be with an awareness of their limitations.

Recently, Georgetown Law Professor Victoria Nourse[7] articulated five guiding principles to facilitate a disciplined, objective use of legislative history—which she prefers to call "legislative evidence"—in statutory interpretation.  Nourse, *Misreading Law*, *supra* at 68-69; *see also* Victoria Nourse, *A Decision Theory of Statutory Interpretation: Legislative History by the Rules*, 122 Yale L.J. 70 (2012).  First, she observes that "Statutes Are Elections."  By that she means that the legislature makes choices, and one side prevails.  Accordingly, statements of a law's opponents should never be cited for the authoritative meaning of the law, much in the way that a dissenting opinion would not be cited as authority without explanation.  Nourse, *Misreading Law*, *supra* at 68.  Nourse's second principle emphasizes the sequential nature of how laws develop.  Just as subsequent appellate decisions trump trial court decisions, later text or legislative evidence can trump earlier legislative evidence.  *Id.* at 69.  One should therefore read legislative history in reverse, beginning with the last point in the decision-making process related to the text at issue.  *Id.* at 79-80.  The third principle recognizes that Congress's own rules can provide meaningful interpretive guidance when used as legislative canons.  *Id.* at 85-88.  Nourse's fourth principle rejects the view that any particular "type" of legislative history will always be the most reliable.  Any type of legislative history may mislead the interpreter absent an understanding of the realities of legislative conflict, sequence, and congressional rules.  *Id.* at 88-90.  Finally, the fifth principle recognizes that Congress operates with different institutional expectations and incentives than the courts, which may cause courts to misunderstand the

---

[7] I am indebted to Judge Michael Boudin, of the First Circuit, for first acquainting me with Professor Nourse's work. I note as well that he has cited her scholarship in his own opinions.  *See, e.g.*, *United States v. Acosta-Joaquin*, 894 F.3d 60, 63 (1st Cir. 2018) (citing Victoria Nourse, *Misreading Law, Misreading Democracy* (Harvard Univ. Press 2016)).

significance of certain congressional language.  *Id.* at 91-94.  To the extent that I consider legislative context, it is with these principles in mind.

Necessarily, statutory construction also requires consideration of the "canons" of construction given new life by the late Justice Scalia, and now widely used.  *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* (2012).  Indeed, a critical case relied upon by the Government based its holding on the application of a canon.  *See United States v. Chen*, 913 F.2d 183 (5th Cir. 1991).  But like legislative evidence, judicial canons need to be employed with an awareness of their limitations.  *See, e.g.*, Katzmann, *supra* at 51-53; Posner, *Statutory Interpretation*, *supra* at 805-17.  Two criticisms in particular resonate with me. First, many canons are premised on unrealistic assumptions about how Congress creates law. Katzmann, *supra* at 52-53; Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation and the Canons: Part I*, 65 Stan. L. Rev. 901 (2013); Posner, *Statutory Interpretation*, *supra* at 806.  Second, the manipulability of canons carries the potential for judges to rewrite statutes based on personal preferences under the guise of adherence to objective rules.  Nourse, *Misreading Law*, *supra* at 105-06; Posner, *Statutory Interpretation*, *supra* at 816 ("Vacuous and inconsistent as they mostly are, the canons do not constrain judicial decision making but they do enable a judge to create the appearance that his decisions are constrained.").  Canons' prevalence in the case law requires their consideration, but with the same caution that accompanies use of the legislative record.

The challenge of statutory construction is such that fidelity to method must often yield to the need to answer a specific, complex question.  For example, textualists are fond of praising Justice Frankfurter's admonition to "(1) Read the statute; (2) read the statute; (3) read the statute!"  Judge Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, *in*

*Benchmarks*, 196, 202 (1967).  But Justice Frankfurter more broadly recognized that "there is no table of logarithms for statutory construction.  No item of evidence has a fixed or even average weight.  One or another may be decisive in one set of circumstances, while of little value elsewhere."  Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 543 (1947), *in Judges on Judging: Views from the Bench* 221, 229 (David M. O'Brien ed., 1997).  In practice, therefore, most judges do not subscribe to purely one method.  Katzman, *supra* at 55; Abbe R. Gluck & Richard A. Posner, *Statutory Interpretation on the Bench: A Survey of Forty-Two Judges on the Federal Courts of Appeals*, 13 Harv. L. Rev. 1298, 1313-14 (2018); *see also* Morell E. Mullins, Sr., *Tools, Not Rules: The Heuristic Nature of Statutory Interpretation*, 30 J. Legis. 1 (2003).  Instead, they draw upon multiple tools with the goal being to interpret the statute in question "in a way that is faithful to its meaning."  Katzmann, *supra* at 29.  Although both parties to this case claim the statute is clear, to resolve the question here requires the use of multiple tools as well.

I employ these tools of statutory construction to illuminate the statute's ordinary meaning.  I take a statute's "ordinary meaning" to refer to the meaning consistent with the undisputed, prototypical examples of circumstances in which the statute applies—those to which legislators and members of the public would have expected the statute to apply at the time of enactment.  *See* Lawrence Solan, *The New Textualists' New Text*, 38 Loy. L.A. L. Rev. 2027, 2040-42, 2044 (2005).  Expressing a preference for a statute's ordinary meaning is not to say that the statute *only* applies to those examples.  But just as courts should not interpret the law in a way that excludes the ordinary examples to which it undisputedly applies, courts should hesitate to extend a statute far beyond its ordinary meaning.

Such principles reflect appropriate respect for the role of Congress.  Justice Gorsuch, writing for a majority of the Court, observed that it is fundamental that "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences.  Until it exercises that power, the people may rely on the original meaning of the written law."  *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018).  Absent binding precedent or some compelling rationale, courts should hesitate to expand the reach of a statute—particularly a criminal statute—far beyond the ordinary meaning conceived of at the time of enactment.

### b.  Interpretation of 21 U.S.C. § 856(a)

The sole question in this case is one of statutory construction.  Specifically, the Court is tasked with construing 21 U.S.C. § 856(a), the most relevant portion of which makes it unlawful for any person to "manage or control any place . . . and knowingly and intentionally . . . make available for use, with or without compensation, the place for the purpose of unlawfully . . . using a controlled substance."  § 856(a)(2).  I must then determine whether Safehouse's planned activity, specifically the operation of the consumption room, falls within the scope of the statute's criminal prohibition.[8]

Section 856(a) was enacted in 1986 as part of the Anti-Drug Abuse Act and subsequently amended in 2003 as part of the PROTECT Act.  The full text reads:

Except as authorized by this subchapter, it shall be unlawful to--

> (1)  knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance;

---

[8] Neither party disputes that the other aspects of Safehouse's operation—providing sterile consumption equipment, naloxone, respiratory support, medical care, and addiction treatment referrals—do not violate the CSA.  *See* Pl.'s Reply at 10.  In fact, the Government conceded at oral argument that even mobile vans parked near public places to provide the same services offered inside Safehouse would not violate the statute.  Tr. at 38.

(2) manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

Some aspects of the statute's application to these facts are clear.  Safehouse will manage or control a place and make that place available to participants.  Safehouse participants undisputedly will use drugs on Safehouse's property.  The remaining question is whether Safehouse will knowingly and intentionally make its property available "for the ***purpose*** of unlawfully . . . using drugs" within the meaning of the statute.  In the parties' view, this is a simple question.  I disagree.

The impetus for § 856(a) initially was a concern about crack houses, and a similar concern about drug-fueled raves motivated the 2003 amendment.  The question is how far beyond those undisputedly covered activities the statute reaches.  While I agree that, taking each of the statute's words literally, it might be possible to read § 856(a) to apply to Safehouse, I am not convinced that a plain or ordinary reading of the statute allows that application.

The Government argues that (a)(2) prohibits Safehouse's medically supervised consumption rooms because the purpose requirement there applies to the third party using the property, not the actor charged with violating the statute.  That is, in the Government's view, only the third party must act "for the purpose of unlawfully . . . using drugs."  The Government further contends that, even if the relevant purpose under the statute is that of Safehouse, Safehouse is necessarily acting for the purpose of unlawful drug use.  Safehouse disagrees, arguing that the relevant purpose is the purpose for which the property itself is used and contending that its site is not "for the purpose of unlawfully . . . using drugs."  Safehouse also

14

asserts that § 856(a) does not prohibit safe consumption rooms because the CSA authorizes their operation and because the statute does not define "unlawfully . . . using."

I reject Safehouse's latter two arguments for reasons explained more fully below. With respect to the purpose requirement, I conclude that the relevant purpose is that of the *actor*, not the third party or the property. However, "for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance" remains ambiguous, susceptible to multiple interpretations. Consistent with the common understanding of purpose to refer to one's end or goal, along with the statutory scheme and legislative context, I interpret that provision to require that the actor have a significant, but not sole, purpose to facilitate drug activity. Because Safehouse does not plan to make its facility available "for the purpose of" facilitating unlawful drug use, I ultimately conclude that § 856(a) does not criminalize Safehouse's proposed conduct.

### i. Authorization

Safehouse contends that its proposed conduct is "authorized by" the Controlled Substances Act (CSA) and therefore falls within the "[e]xcept as authorized by this subchapter" exemption of § 856(a). According to Safehouse, this follows not from any express authorization, but from the fact that medically supervised consumption sites constitute a legitimate medical practice "which the CSA does not regulate and Section 856 does not prohibit." Defs.' Resp. to Pl.'s Mot. J. on the Pleadings at 28, ECF No. 48 (hereinafter Safehouse Response). As a logical matter, Safehouse advances an argument that is both simplistic and circular: because the proposed conduct is not prohibited or regulated by the CSA, it is therefore necessarily authorized by the statute and excluded from the reach of § 856 of the CSA. I reject the premise that Congress's failure to prohibit activity constitutes an affirmative authorization. Rather, I am confident that the statute neither expressly prohibits nor authorizes the sites for the same reason—the legislature simply never contemplated them when enacting the law. Granted, if

§ 856 does not prohibit Safehouse's medically supervised consumption sites—a matter explored further below—additional express authorization would of course be unnecessary.  That may make the sites "authorized" in the colloquial sense that they are not illegal, but it does not render them "authorized by this subchapter" within the meaning of the statute.

Safehouse relies heavily on *Gonzales v. Oregon*, 546 U.S. 243 (2006), in support of its contention that the Controlled Substances Act allows for safe consumption sites.  *See* Safehouse Response at 30; Transcript of Oral Argument, ECF No. 131, at 49-50.  Specifically, Safehouse contends that its medically supervised consumption rooms are authorized because the Attorney General lacks the power to "promulgate rules 'based on his view of legitimate medical practice'" and the CSA does not regulate the legitimate practice of medicine.  Safehouse Response at 30 (quoting *Gonzales*, 546 U.S. at 260, 270).  *Gonzales* involved a federal challenge to an Oregon statute, passed through a voter ballot initiative, allowing physicians to assist with suicide.  546 U.S. at 250.  The statute in question established a detailed protocol for physicians to follow under the supervision of the Oregon Department of Human Services.  Or. Rev. Stat. § 127.800 *et seq.* (2003).  The Attorney General of the United States later published an "Interpretative Rule" that physician-assisted suicide was not a legitimate medical purpose, with the result that prescribing, dispensing, or administering drugs to facilitate it could be deemed a violation of federal law and lead to the suspension or revocation of a physician's registration under the CSA.  546 U.S. at 254.

Although the Supreme Court ruled against the Government, *Gonzales* does not control on the facts of the current case for several reasons.  As a preliminary matter, the proposed activities of Safehouse here are not analogous to the detailed state-regulated scheme at issue in *Gonzales*.  Safe injection sites are recognized as a legitimate harm reduction strategy among some public

health experts and recognized medical authorities such as the American Medical Association, *see* Defs.' Answer at 31, but as Safehouse concedes, no state medical board has issued standards governing their operation.  Tr. at 52.  It is clear that the Supreme Court in *Gonzales* was also concerned with issues of federalism, which are not present in a case where the conduct in question is not formally endorsed by any state or local governmental entity.[9]  *See* 546 U.S. at 270.

Furthermore, an important concern of the Court in *Gonzales* was the Attorney General exceeding the bounds of his authority by interpreting a specific regulation governing the issuance of prescriptions by physicians.  546 U.S. at 266 (interpreting 21 C.F.R. § 1306.04).  Similar concerns do not exist here where the Government seeks no more than direct enforcement of the statute.

Finally, as to Safehouse's argument that because "Congress does not regulate the legitimate practice of medicine" under *Gonzales*, the CSA does not prohibit safe consumption sites, Tr. at 49, I again find the facts of this case distinguishable.  Although medication-assisted treatment, which requires the involvement of a physician, is part of the Safehouse protocol, medical practitioners are not directing that participants make use of safe consumption rooms as part of any formal course of treatment.  Even if they were, *Gonzales* cannot be read so broadly as to exempt all legitimate medical practices from all provisions of the CSA.  *Gonzales* may shed some light on the proper interpretation of the statute—a matter I address further below—but it does not by itself prohibit a criminal prosecution simply because the conduct in question is related to medical practice.[10]

---

[9] I do not recognize the support of individual public officials as the formal support of a governmental entity.

[10] Safehouse also cites several cases for the proposition that, to convict a practitioner, the Government must prove the practitioner acted outside the course of professional practice and without a legitimate medical purpose.  But the

## ii. Meaning of "unlawfully . . . using"

Safehouse also suggests that, because the statute does not offer a technical definition of "unlawfully . . . using," the meaning of that phrase is indecipherable, and § 856 cannot apply where the drug activity in question is consumption or use. With this argument, Safehouse advocates a problematic isolationist approach to statutory interpretation that can lead courts to conclusions far from the legislature's meaning. I decline to isolate "using" and read that term out of the text when the statutory and legislative context easily clarify the meaning of "unlawfully . . . using." Although the CSA does not criminalize "use" alone, the statute criminalizes possession, which, as the Government points out, is a necessary predicate to use.[11] By definition, a person cannot lawfully use or consume[12] a substance that the person cannot even lawfully possess. In the context of the statute, a reader can fairly understand "unlawfully . . . using" to refer to use of a substance the person cannot lawfully possess. This view is consistent with the legislative evidence, which refers to "using illegal drugs." *See* Joint Explanatory Statement of the Committee of Conference, H.R. Conf. Rep. No. 108-66, 108th Cong., 1st Sess. 49, at 68 (2003) (hereinafter Joint Explanatory Statement).[13] In a case where the illegality of the

---

cases cited exclusively concern distribution under 21 U.S.C. § 841(a) and its implementing regulation concerning prescriptions, 21 C.F.R. § 1306.04. These cases might be relevant if the Government were accusing Safehouse of distributing medication, but they offer no insight into the question about § 856(a)(2)'s applicability to the facts at hand.

[11] The hypothetical used by Safehouse to advance its position at oral argument—one who unlawfully consumes a prescription they initially lawfully possessed for another, Tr. at 55, simply has no relevance to the issues here.

[12] Neither party seems to dispute that the term "using" unambiguously refers to consumption in this context.

[13] The joint explanatory statement to a conference report offers explanations of how conferees resolved disputes between the House and Senate versions of a bill or why any new language was added to the final bill text, which is embodied in the conference report. *See* Nourse, *Misreading Law*, *supra* at 80; Christopher M. Davis, *Conference Reports and Joint Explanatory Statements*, Congressional Research Service (2015). The statements are therefore helpful and proximate evidence of the meaning of text, particularly text added or modified in conference committees.

controlled substances involved is undisputed, the use of the term "unlawfully using" is not ambiguous.  The question remains whether Safehouse plans to knowingly and intentionally make a place available for the purpose of unlawfully using drugs.

### iii.   To whose purpose (a)(2) refers

With respect to the purpose requirement, the first dispute concerns *whose* purpose is at issue.  The text of (a)(2) requires that the actor charged with violating the statute "knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance."  21 U.S.C. § 856(a)(2).  The Government contends that the actor in (a)(2) simply needs to have knowingly made a place available to *others who have the purpose* of engaging in drug activity.  Pl. & Third-Party Defs.' Mot. for J. on the Pleadings at 9.  Safehouse argues that the relevant purpose is that of the place itself.  I reject both constructions and conclude that the statute requires that the *actor* have acted for the proscribed purpose.

A natural reading of the text indicates that, for a person to knowingly and intentionally make a place available for use for the purpose of unlawful drug activity, *that person*—the actor—must make the place available with the proscribed purpose.  Section 856(a)(2) applies only when a person knowingly and intentionally makes a place available for use or rents the place "for the purpose of" unlawful drug activity, not when he knowingly makes it available for use or rents it to others who have the purpose of engaging in drug activity.  In the most natural reading of the sentence, the "for the purpose of" clause refers to the mental state of the actor.

The context of the whole statute supports this reading.  Sections 856(a)(1) and (a)(2) both contain the requirement that one engage in the prohibited conduct "for the purpose of" drug activity.  No party—and no court, for that matter—disputes that the actor in (a)(1) must act "for the purpose of" drug activity.  The same requirement exists in (a)(2) structured in precisely the

same way.  Both provisions have the same subject, identified in § 856(b) as "any person."  Both further identify a knowledge requirement—"knowingly" or "knowingly and intentionally"—followed by a set of verbs and a direct object—"place"—and conclude with the "for the purpose of" clause.  In both provisions, the purpose requirement applies to the person who acts knowingly—an elaboration of the requisite mental state.  The text suggests no reason to read the requirement differently in (a)(2) than in (a)(1).[14]

The substantive difference between the two provisions, as the Government agrees, Tr. at 9, and as many courts have recognized, is that (a)(1) targets actors who themselves use or maintain the place in question to engage in drug activity, whereas (a)(2) encompasses actors who manage or control a space and then make the place available *to others* who engage in drug activity.  The legislative context confirms as much.  Joint Explanatory Statement at 68 (explaining that the 2003 amendment to § 856 aimed to make "clear that anyone who knowingly and intentionally uses their property, or allows another person to use their property, for the purpose of distributing or manufacturing or using illegal drugs will be held accountable").  But that distinction does not mean that in (a)(2) the actor need not have the proscribed purpose.  One can still make a place available to others for the purpose of those people manufacturing, distributing, or using illicit substances there.[15]  Reading § 856(a) naturally, the purpose

---

[14] The Government at oral argument made much of the fact that (a)(2) begins with "manage and control" as opposed to "knowingly open" in (a)(1) and that "knowingly and intentionally" appears later in (a)(2).  Tr. at 24-27.  But the introductory clause in (a)(2) simply adds that one must first "manage and control" the place *and then* "knowingly and intentionally" make it available for use for the purpose of drug activity.  Although "knowingly and intentionally" appears later in (a)(2), it precedes several verbs and the "for the purpose of" clause, just as in (a)(1).  Moreover, the verbs in (a)(1) and (a)(2) share the same subject—"any person," as indicated in § 856(b).  At no point has the Government presented a compelling textual reason why the structure of (a)(2) dictates that the purpose requirement must refer to the purpose of the third party.

[15] At oral argument, the Government referred to this reading of the statute as "nonsensical and self-defeating" because it would allow "a stone-cold crack dealer" to claim a benign purpose of making money to support his family.  Tr. at 19.  That argument erroneously merges two distinct issues.  *Whose* purpose is at issue is a distinct question from whether the proscribed purpose must be the sole purpose.  I address the latter question below and conclude that the proscribed purpose may be one of multiple purposes for which the actor makes the space available.

requirement applies to the actor in both (a)(1) and (a)(2) on its face, and absent evidence that it should apply differently in each, I decline to assign (a)(2) a lower mental state than its text requires.

Legislative evidence confirms that the purpose requirement applies to the actor in both provisions. When Congress most recently considered § 856, in 2003, it amended the statute, including (a)(2).[16] The amendment to § 856, originally introduced as the Illicit Drug Anti-Proliferation Act, was added to the PROTECT Act in the Conference Committee, an Act aimed at preventing child abuse and facilitating prosecution of crimes against children. Then-Senator Joseph Biden sponsored the Illicit Drug Anti-Proliferation Act and was a conferee at the Conference Committee on the PROTECT Act.[17] His remarks during the subsequent debate on the Conference Report offer strong evidence that § 856's meaning requires the actor or defendant to act with the purpose of drug use. The remarks were made just prior to Congress's collective decision to agree to the Conference Report, which represented the final decision about the text at issue. Because these comments were made by a sponsor of the original bill containing the amendment, who was also a conferee to the Conference Committee, they carry weight as

---

Because one of the primary purposes of the "stone-cold crack dealer" is undoubtedly facilitating drug use, his purpose of facilitating drug activity would assure he did not "get off scot free," as the Government laments. *See id.* at 19, 20. Moreover, the Government's hypothetical profoundly underestimates the capacity of federal judges to avoid being duped by criminal defendants engaging in wordplay.

[16] Although the "for the purpose of" language was also in the original version of § 856, the legislative evidence from 2003 carries no less weight simply because the language was not entirely new in 2003. Congress revisited the language in question in 2003 and decided to enact the modified provision with the "for the purpose of" language. The context surrounding that decision constitutes evidence of the most recent legislative decision about the relevant text and can therefore shed light on its meaning. *See* Nourse, *Misreading Law*, at 69, 80.

[17] In the Senate, a conferee is also called a "manager" and is appointed to serve on a conference committee, typically from the committee or committees that reported the legislation. Conferees "are expected to try and uphold the Senate's position on measures when they negotiate with conferees from the other body" about the text of a bill. *Conferees*, United States Senate Glossary, *available at* https://www.senate.gov/reference/glossary_term/conferees.htm (last visited Oct. 1, 2019).

evidence of the text's meaning.  *See* Nourse, *Misreading Law*, *supra* at 69.  Biden stated

explicitly that the actor must make the place available for the purpose of drug activity:  "My bill

would help in the prosecution of rogue promoters who **not only know** that there is drug use at

their event but also **hold the event for the purpose of illegal drug use** or distribution.  That is

quite a high bar."  149 Cong. Rec. 9384 (emphasis added).  He further commented that "[t]he bill

is aimed at the defendant's predatory behavior," which points to the requirement of purposeful

action on the part of the person accused of violating the statute.  149 Cong. Rec. 9383.  Coupled

with the text of the statute, the legislative context makes clear that, to be liable under (a)(2), an

actor must make the place in question available for the specific purpose of drug activity.

A deeper textual analysis, tested by application of judicial canons, leads to the same

conclusion.  On the face of (a)(2), "for the purpose of" modifies the preceding verbs (rent, lease,

profit from, make available for use), the subject of which is the actor accused of violating the

statute.[18]  The "grammar canon" therefore supports the view that the purpose applies to the actor,

rather than an unspecified third party.  *See* Scalia & Garner, *supra* at 140.  The "presumption of

consistent usage" likewise encourages this view.  That canon holds that, if a phrase has a clear

meaning in one portion of a statute, but the meaning is less clear in a related section, courts

should presume that the phrase carries the same meaning in both.  *Id.* at 170; *see Si Min Cen v.*

*Attorney General*, 825 F.3d 177, 193 (3d Cir. 2016).  Though canons must be applied with

caution, the presumption of consistent usage carries inherent logical force where, as here, the two

provisions in question are part of the same subsection, were enacted together, and use the phrase

---

[18] Safehouse asks the Court to read "for the purpose of" to modify the place itself rather than any person's action
with respect to the place.  As a technical matter, I read "for the purpose of" to modify the verbs, rather than the
direct object.  One *acts* for a purpose; a place does not carry an inherent purpose separate from a person's intentions
for its use.  Because any "purpose" of a place is simply the purpose a person or group has given it, there is little
meaningful difference between referring to the purpose of a place and the purpose of the actor controlling it.

in the same way.  In that regard, the presumption of consistent usage canon is one that directs the court to focus on how *Congress* used terms within the structure of a statute, reducing the risk of judges importing a meaning of their own.  "For the purpose of" in (a)(1) clearly and undisputedly refers to the purpose of the actor accused of violating the provision.  Although the implication in (a)(2) that third parties will use the place in question may make the purpose clause there less clear to some readers than in (a)(1), courts should presume—absent context indicating otherwise[19]—that the clause carries the same meaning.  That is, courts should presume that (a)(2) requires that the *actor* act "for the purpose of" drug activity.

The inclusion of "and intentionally" in (a)(2) further emphasizes that the actor allowing others to use the property must do so "for the purpose of" drug activity.  Unlike (a)(1), which requires only that the defendant act "knowingly," (a)(2) requires that the defendant have "knowingly *and intentionally*" made the place available for the proscribed purpose—expressly requiring not only knowledge of the drug-related circumstances but the intention that the proscribed purpose occur.  The Government concedes that the combination of "knowingly" and "for the purpose of" in (a)(1) unambiguously requires that the actor "open" or "maintain" the

---

[19] The close reader may notice that the terms "rent" and "lease" also appear in both provisions, but context clarifies that these terms carry different meanings in (a)(1) and (a)(2).  In (a)(2), the indication that the actor must "manage or control" the property as an owner or lessee *and then* rent, lease, or make it available, clarifies that "rent" and "lease" in that provision refer to renting and leasing a space to others.  In (a)(1), the same words refer to renting and leasing a space for one's own use.  The legislative context reinforces this interpretation.  When Congress added these terms to the statute in 2003, it did not change the primary distinction between (a)(1) and (a)(2)—that the former applies to use of one's own property and the latter to making a property one controls available to others.  *See* Joint Explanatory Statement at 68; 149 Cong. Rec. 1849 (Statement of Senator Grassley at introduction of the Illicit Drug Anti-Proliferation Act that the bill was "an important step, but a careful one").  Construing "rent" and "lease" to mean the same thing in both would run counter to the meaning the legislature gave the two sections.  Proponents of the "Latin canons" will also note that the *noscitur a sociis* canon, which holds that interpreters should give related meanings to words in a list, requires this interpretation.  *See* Scalia & Garner, *supra* at 195.  In (a)(1), "rent" and "lease" take on meanings related to "open," "use," and "maintain," and in (a)(2), their meaning must relate to "profit from" and "make available for use," both of which imply a third party using the property.  Nothing in the text counters the presumption that "for the purpose of" has consistent meaning in both provisions.  In fact, both the statutory and legislative context confirm that "for the purpose of" applies to the actor in both.

place in question "for the purpose of" drug activity.  The addition of "intentionally" to that combination cannot possibly signal a change in the purpose requirement from (a)(1)— particularly not a change that would *lower* the requisite mental state for an (a)(2) violation. Congress's addition of the term "intentionally" resolves any doubt over whether the actor must act with the proscribed purpose of fostering drug activity under (a)(2).[20]

The Government would have me read a combination of "knowingly," "intentionally," and "for the purpose of" to require mere knowledge of an unidentified third party's purpose.  Its requested interpretation would require judicial editing of the statutory text, ignore a critical term, read (a)(1) and (a)(2) inconsistently, and lower the requisite mental state of (a)(2) in a manner that directly contradicts the legislative context surrounding the provision.  I am compelled to reject the Government's view of whose purpose (a)(2) concerns and accept the interpretation that, as in (a)(1), the purpose requirement applies to the actor charged with violating the statute.

The Government correctly points out that more than one circuit court has adopted the interpretation the Government advocates.  But these circuit courts do not include the Third Circuit, and upon closer review, all of those decisions rest upon *United States v. Chen*, 913 F.2d 183 (5th Cir. 1991), adopting its conclusion without critical analysis.  This is not said as a criticism of those other circuits; the cases before them did not require rigorous analysis of *Chen*. This case does, and though it may seem presumptuous for a lone district judge to look behind so many circuit decisions, the unique facts of this case require me to do so, and judges must not shirk from their responsibility to follow where reason and logic take them.

---

[20] Depending on the context, "intentionally" can mean either "purposely"—having the conscious object to cause a specific result, or "knowingly"—being practically certain that one's conduct will cause a result.  *See* 3d Cir. Model Crim. Jury Instructions § 5.03 cmt. (2018).  In this context, it would be redundant to treat "knowingly" and "intentionally" as synonymous when they appear together in (a)(2).

In *Chen*, the Fifth Circuit analyzed the 1986 version of 21 U.S.C. § 856(a) to determine whether the trial court had erred in giving a deliberate ignorance instruction as to the knowledge requirement in both (a)(1) and (a)(2).  The *Chen* court concluded that "for the purpose of" in (a)(1) referred to the purpose of the actor charged with violating the statute, making the deliberate ignorance instruction inappropriate, but that in (a)(2) the actor need not have the purpose that drug activity take place.  In reaching this conclusion, the Court spent little time analyzing the text of (a)(2).  Rather, most of its analysis focused on (a)(1), specifically concluding that, in combination with "knowingly," "for the purpose of" unambiguously applies to the actor who opens or maintains the place in question—a proposition with which I agree.[21]  I accept the *Chen* court's conclusion that the actor in (a)(1) must act for the purpose of drug activity.  But I see no reason why the court's reasoning should not extend to (a)(2).

Rather than analyze (a)(2) as it did (a)(1), however, the *Chen* court stated in an almost offhand way that reading (a)(1) differently would make it superfluous in relation to (a)(2).  This conclusion was, according to the Court, simply "[b]ased on [its] reading" of (a)(2)—a reading that involved little to no analysis of the text.  *Chen*, 913 F.2d at 190.  Under the Fifth Circuit's reading, "§ 856(a)(2) is designed to apply to the person who may not have actually opened or maintained the place for the purpose of drug activity, but who has knowingly allowed others to engage in those activities by making the place 'available for use . . . for the purpose of unlawfully' engaging in such activity."  *Id.* at 190.  Without elaboration, the court then concluded that in (a)(2), "the person who manages or controls the building and then rents to

---

[21] In that regard, the Government's assertion that the *Chen* court found (a)(2) unambiguous is inaccurate.  Notably, the court only remarked that the statute was unambiguous in its discussion of (a)(1).  *Chen*, 913 F.2d at 190.

others, need not have the express purpose in doing so that drug related activity take place; rather such activity is engaged in by others (*i.e.*, others have the purpose)."

Five concerns lead me to decline to follow *Chen*. First, I cannot read (a)(1) and (a)(2) as redundant. Second, the *Chen* court's interpretation of (a)(2) is inconsistent with its analysis of (a)(1). Third, the court unnecessarily applied the rule against surplusage to address a redundancy that in my view does not exist, and then violated it by failing to give meaning to the term "intentionally." Fourth, the court selectively applied statutory canons, invoking the rule against surplusage but violating the presumption of consistent usage by giving "purpose" one meaning in (a)(1) but a different meaning in (a)(2). Fifth, legislative evidence directly refutes the Fifth Circuit's construction of the statute.

First, the baseline premise of *Chen*, that (a)(1) and (a)(2) overlap, is not one I can accept. Read naturally, (a)(1) addresses circumstances where the actor uses their property for their own unlawful drug activity, whereas (a)(2) addresses circumstances where the actor makes the property available to others for the purpose of those individuals engaging in unlawful drug activity. As I have described above, a violation of (a)(1) requires that "any person" "knowingly open, lease, rent, use, or maintain any place . . . for the purpose of" drug activity. §§ 856(a)(1), (b).[22] Section (a)(2) then makes it unlawful for "any person" to "manage or control any place," in one of a variety of capacities, "and knowingly and intentionally . . . make available for use, with or without compensation, the place for the purpose of" unlawful drug activity. §§ 856(a)(2), (b). I find it clear from the face of subsection (a) that (a)(1) and (a)(2) are different: (a)(1) refers to one's use of their property for their own drug activity, and (a)(2) refers to one

---

[22] Section 856(b) delineates the criminal penalties for "[a]ny person who violates subsection (a)." "Any person" therefore can be fairly understood as the subject associated with the verbs in subsection (a).

making property available for the purpose of others engaging in drug activity.  I do not see the redundancy that concerned the *Chen* court.

Second, as to the inconsistency between the court's interpretation of (a)(2) and its analysis of (a)(1), the court offered no textual reason why the terms "for the purpose of" should apply to a different person in (a)(2) than (a)(1).  In its analysis of (a)(1), the court emphasized that the combination of "knowingly" and "for the purpose of" clearly signified that the relevant purpose was that of the actor—the person controlling the property.  To hold otherwise would "twist the clear and plain language of the statute."  *Id.* at 190.  In support of that conclusion, the court noted that, in sixteen other federal statutes combining the terms "knowingly" and "for the purpose of," the purpose clearly referred to that of the actor.  *Id.* at 190 n.9.  The problem with this analysis is that the *same* combination of "knowingly" and "for the purpose of" appears in (a)(2), *reinforced* by the addition of the term "intentionally."  Yet the court offered no explanation why its reasoning as to whose purpose matters in (a)(1) should not apply equally if not with greater force in (a)(2).[23]

Third, the court unnecessarily altered the meaning of the statute.  As discussed above, the court did not need to change the purpose requirement to retain the key distinction that (a)(2) involves *others* engaging in drug activity.  It reached that result applying a statutory canon, the rule that "a statute should be construed so that each of its provisions is given its full effect," *id.* at 190 (citation omitted), also known as the rule against surplusage.  Ironically, that same cannon

---

[23] One portion of the court's opinion even seemed to contradict this conclusion.  The court initially noted that "[t]he government agrees both that the offense requires two mental elements—knowledge and purpose—and that the jury had to find that Chen maintained (§ 856(a)(1)) or operated (§ 856(a)(2)) the motel with the *specific purpose* of unlawfully using, storing, or distributing a controlled substance, and not merely that she 'operated a motel where drug activity was rampant.'"  *Chen*, 913 F.2d at 188.  Although the *Chen* court seemed to accept the Government's concession that *the actor* must have the specific purpose of drug activity under both paragraphs, the court then inexplicably interpreted the purpose requirement as pertaining to a third party.

requires that *every* word in a statute be given meaning when possible.  *See Bastardo-Vale v. Attorney General*, 934 F.3d 255, 261-62 (3d Cir. 2019) (en banc) (Schwartz, J.) (majority opinion); *id.* at 271-72 (McKee, J., dissenting); Scalia & Garner, *supra* at 174-79.  Yet the *Chen* court read "intentionally" out of the statute.[24]  Earlier in its opinion, the *Chen* court noted that "intention" is a synonym for purpose, *id.* at 189, and quoted the trial court jury instruction stating that "[a]n act is done 'willfully' or 'intentionally' if done voluntarily and purposely with the intent to do something the law forbids."  *Id.* at 187.[25]  Yet the court failed to examine the implication of the inclusion of "intentionally" in (a)(2) before concluding that (a)(2) requires a person to act with a significantly lower mental state than (a)(1).

The *Chen* court's use of the rule against surplusage brings me to my fourth point about the selective application of the canons of construction and underscores one of the risks of their use.[26]  The rule against surplusage generally presumes that Congress is not redundant.  But it applies in different ways.  When a court deems two provisions of a statute redundant, it is *the court* who then proceeds to supply meaning by means of inference.  Necessarily, there is a risk that the meaning supplied by the court is different from that of Congress.  In contrast, when a court invokes the rule for the purpose of giving meaning to every word of a statutory provision,

---

[24] The Government concedes the responsibility of a judge to give meaning to every word in a statute, Tr. at 28, but its briefing, like the *Chen* court, simply ignores the term "intentionally," and it offered no insight at argument as to how this term should be construed.

[25] Confusingly, the trial court's "knowingly" instruction also said that "[a]n act is done 'knowingly' if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason."  *Chen*, 913 F.2d at 187.  This is consistent with the Fifth Circuit's current model instruction for "knowingly."  *See* 5th Cir. Model Crim. Jury Instructions § 1.37 (2015).  But, in context, the suggestion that "intentionally" is akin to "voluntarily" conflicts with the court's immediately preceding suggestion that "intentionally" is a synonym for "willfully," which requires one act with a specific purpose.  *Chen*, 913 F.2d at 187.

[26] As indicated above, Judges and academics alike have offered various criticisms of the canons.  Katzmann, *supra* at 52-53; Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation and the Canons: Part I*, 65 Stan. L. Rev. 901 (2013); Nourse, *Misreading Law*, *supra* at 105-06; Posner, *Statutory Interpretation*, *supra* at 806.

the focus is on the actual term employed by Congress, reducing the risk of legislating from the bench.  In failing to assign any meaning to the term "intentionally," but deeming (a)(1) and (a)(2) redundant save for the court's inferred meaning, *Chen* applied the rule against surplusage selectively.

Moreover, when statutory canons are applied, what is the standard for choosing *which* to apply?  *See* Richard A. Posner, *The Federal Courts: Crisis and Reform* 277 (1985) ("[T]here is no canon for ranking or choosing between canons; the code lacks a key.")  Along with the rule against surplusage, a separate canon is the presumption of consistent usage, which provides that "[a] word or phrase is presumed to bear the same meaning throughout a text."  Scalia & Garner, *supra* at 170.  Absent some reason, and I can identify none, the phrase "for the purpose of" should be interpreted consistently, particularly when it appears in contiguous paragraphs of the statute.  The same sixteen federal criminal statutes supporting the Fifth Circuit's construction of (a)(1) would apply equally to (a)(2).  Yet the *Chen* court neglected this canon in favor of a selective application of the rule against surplusage, claiming redundancy on the one hand, while simply ignoring the term "intentionally."[27]

Finally, as reviewed above, legislative evidence directly contradicts the *Chen* court's interpretation.  The court gave life to the precise interpretation that the sponsor of the 2003 amendment expressly rejected.  Then-Senator Biden rejected the concern that the law might allow prosecution of businesses that knew individuals would come onto their property and use drugs.  He specifically stated that the provision would allow for prosecution of those who "**not**

---

[27] This graphically illustrates Professor Llewellyn's classic critique of statutory canons, the observation that for almost every canon, there is a counter-canon. Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons about How Statutes Are to Be Constructed*, 3 Vanderbilt L. Rev. 395, 400 (1949-1950); *see also* Anita S. Krishnakumar, *Dueling Canons*, 65 Duke L.J. 909 (2016).

**only know** that there is drug use at their event but also **hold the event for the purpose of illegal drug use** or distribution.  That is quite a high bar."  149 Cong. Rec. at 1847, 9384.  Biden further remarked that "[t]he bill provides federal prosecutors the tools needed to combat the manufacture, distribution or use of any controlled substance at any venue **whose purpose is to engage in illegal narcotics activity**."  149 Cong. Rec. at 9383 (Apr. 10, 2003).  These statements make clear that the event-holder or the venue—in practice the venue operator—must have the proscribed purpose.

Biden's remarks were directed at criticisms that the mental state required to support conviction was too low and would allow prosecution of legitimate businesses for knowingly allowing others to use drugs on their property without some greater involvement in the unlawful conduct.  *Id.*  Earlier in the debate, Senator Leahy, who ultimately voted for the Act, had voiced concerns about the Government using the existing crack house statute, or any expanded version, to pursue legitimate business owners.  132 Cong. Rec. 9378 (addressing reports of the Government using the statute to prosecute business owners who take precautions against drug use rather than "solely against property owners who have been directly involved in committing drug offenses" and contending that business owners' worries "about being held personally accountable for the illegal acts of others" warranted a fuller hearing).[28]  Senator Leahy's

---

[28] Senator Leahy noted that these concerns were raised in a prior House Judiciary Hearing.  The previous Congress's House Judiciary Committee hearing on the RAVE Act—the prior version of the Illicit Drug Anti-Proliferation Act—is not properly considered as legislative evidence of the meaning of the statute.  However, Senator Leahy's citation to the hearing gives it some relevance.  At that hearing, a witness raised concerns about what he considered "a frightening interpretation of the law" expressed in *United States v. Tamez*, 941 F.2d 770 (9th Cir. 1991), a case that relied on *Chen* to conclude that "the person who manages and controls the building and then rents it to another need not have the express purpose in doing so that drug-related activity is engaged in by others."  *Reducing Americans' Vulnerability to Ecstasy Act of 2002: Hearing Before the Subcomm. on Crime, Terrorism, & Homeland Security of the House Comm. on the Judiciary*, 107th Cong. 56 (2002) (statement of Graham Boyd, Director, Drug Policy Litigation Project, American Civil Liberties Union); *see also id.* at 58 (statement of Boyd noting the Fifth Circuit's interpretation in *Chen*).  This appeared to surprise and confuse some members of Congress.  *See id.* at 56-58.  Even the representative from the DEA at the hearing said he was unfamiliar with the *Tamez* case but "would be flabbergasted if that was the majority opinion."  *Id.*  He proceeded to indicate that the "knowingly" requirement sufficiently protects an innocent owner because it requires one act "purposely and deliberately."  *Id.* at 60.  During

comments draw attention to a risk that law enforcement could improperly apply the statute to actors without a purpose of unlawful drug activity. Senator Biden's subsequent comments then confirm that the statute means to subject to punishment only those who act for the purpose of drug activity, and Senator Leahy supported the conference report that included the amendment. This exchange reinforces the view that only actors who make their space available for the purpose of drug activity were meant to face criminal liability for the activity of others on their property.[29]

Of course, the *Chen* court—and most of the cases following *Chen* for that matter—did not have the benefit of this 2003 legislative evidence, nor did it look to the 1986 legislative record. That is no reason, however, for this Court to ignore a clear explanation of the meaning of the most recent congressional decision as to the text.[30] The legislative evidence demonstrates

---

comments on the PROTECT Act, Senator Leahy shared the alarm expressed at the House Judiciary Committee hearing in the previous Congress about a *Tamez*-like interpretation allowing the government to criminally prosecute property owners and managers for drug use that occurred on their property even if they did not act for the purpose of permitting drug use.

[29] Notably, the only statement arguing that § 856 requires an affirmative effort by business owners to prevent drug use—and implying that they need not act "for the purpose of" unlawful activity to be liable—came from an opponent, Representative Kilpatrick, who voted against the bill, in a statement inserted into the record after debate. 132 Cong. Rec. 9093. To take as authoritative the meaning attributed to a provision after debate by an opponent who voted against the bill would give legal effect to the minority view that lost the debate. Nourse, *Misreading Law, supra* at 74; *see also* Parliamentarian of the House Thomas J. Wickham, Jr., *House Practice*, U.S. House of Representatives, 383-84 (2017) (providing that extraneous materials, including extensions of remarks, submitted on the day of a bill's consideration or later are inserted into the congressional record *after* the general debate on the bill and identified by a distinct typeface), *available at* http://clerk.house.gov/legislative/legprocess.aspx.

[30] As noted above, Congress revisited the statutory text in 2003 and decided to enact the modified provision, with the original "for the purpose of" language included. The context surrounding that decision constitutes evidence of the most recent legislative decision about the relevant text and sheds light on its meaning. *See* Nourse, *Misreading Law, supra* at 69, 80. To the extent one might argue that Congress incorporated *Chen* and related decisions in 2003, the legislative record reveals no evidence that *Chen*'s interpretation of (a)(2) was debated or considered by the 108th Congress prior to the enactment of the PROTECT Act. It is true that courts often employ the so-called prior-construction canon. That canon presumes that Congress, if it adopts language used in an earlier version of the act, must also be considered to have adopted "judicial interpretations [that] have settled the meaning of an existing statutory provision." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998); *see also Berardelli v. Allied Servs. Inst. Of Rehab. Med.*, 900 F.3d 104, 117 (3d Cir. 2018). Judicial interpretations are "settled" only if a word or phrase has been authoritatively interpreted by the jurisdiction's highest court or has been given a uniform interpretation by the lower courts. *See id.* Neither has occurred here. At the time of the 2003 amendment, the Supreme Court had not interpreted the meaning of (a)(2)'s "purpose" clause. Nor had the courts of appeals produced anything close to a

31

that *Chen* misinterpreted whether the actor in (a)(2) must act for the purpose of drug activity. For this and the four other reasons described above, I decline to follow *Chen*'s interpretation.

The other Circuits that have endorsed *Chen*'s interpretation have largely done so without question, simply citing the rule against surplusage and choosing not to engage in independent analysis of the statute. The first case to address § 856(a)(2) after *Chen* was *United States v. Tamez*, 941 F.2d 770 (9th Cir. 1991). Although faced with an argument from the appellant "that the statute require[d] that he *intend* to use the building for a prohibited purpose under section 856(a)(2)," the *Tamez* court never addressed the implication of the word "intentionally" in the statute. *Id.* at 774. The court rejected the appellant's argument as to § 856(a)(2) exclusively "on the logic of *Chen*," finding that, because (a)(1) "applies to purposeful activity," it follows that "if illegal purpose is . . . a requirement of 856(a)(2), the section would overlap entirely with 856(a)(1)." *Id.* at 774. The Court did not explain why this was so but simply concluded that "§ 856(a)(2) requires only that proscribed activity was present, that [the actor] knew of the activity and allowed that activity to continue." *Id.* at 774. Inexplicably, the Ninth Circuit noted that § 856(a)(1), which does *not* include the word "intentionally," "requires purpose or intention" to engage in drug activity, *id.*, without paying heed to the addition of intentionally in (a)(2).

Since *Tamez*, several other circuit courts have reached the same conclusion on the authority of *Chen*, but the facts of the cases before them did not require that they engage in any independent interpretation of the text. *See United States v. Banks*, 987 F.2d 463, 466 (7th Cir. 1993) (accepting *Chen*'s conclusion without question or elaboration); *United States v. Wilson*, 503 F.3d 195, 196-97 (2d Cir. 2007) (relying on *Chen* and *Tamez* to reach the same conclusion

---

"uniform body of . . . judicial precedent." *See Bragdon*, 524 U.S. at 645. To be sure, *Chen* (in the Fifth Circuit) and *Tamez* (in the Ninth Circuit) were on the books, but no other court of appeals had sought to interpret (a)(2), and as discussed below, *Tamez* relied exclusively "on the logic of *Chen*." 941 F.2d at 744.

without elaboration, despite appellant's argument that § 856(a)(2) required that "she herself intended that the premises would be used for the unlawful purpose"); *United States v. Tebeau*, 713 F.3d 955, 959-61 (8th Cir. 2013) (relying on the aforementioned cases to reach the same conclusion without question or elaboration[31]); *see also United States v. Ramsey*, 406 F.3d 426, 429 (7th Cir. 2005) (relying on *Chen*, *Tamez*, and *Banks* to conclude that deliberate ignorance satisfies the knowledge requirement and approving of removal of the word "intentionally" from jury instructions on § 856(a)(2) because the "'intentionally' element can be satisfied by the government proving . . . the defendant intentionally permitted another person to use the property at issue and that the other person used it for an illicit purpose about which the defendant knew").[32]  Given the importance of close analysis of the statute on the facts of this case, I cannot simply rely upon other circuits' uncritical embrace of *Chen* when the cases before them did not require critical reflection on its analysis.

The Government has cited only one Third Circuit case, a non-precedential decision that, ironically, does not support its position.  In *United States v. Coles*, 558 F. App'x 173, 181 (3d Cir. 2014), a panel of the Court considered an appeal where a defendant convicted under § 856(a)(2) argued the Government had failed to establish his knowledge of drug activity at an apartment he rented but allowed his cousin to live in.  The Court reviewed the record, including evidence that the defendant had coached his cousin to cook crack, and concluded that "the jury was entitled to infer [the defendant] intended that the property be used for manufacturing and

---

[31] The Eighth Circuit also cited their own model jury instructions on § 856(a)(2), but those instructions simply relied on the authority of *Chen* and *Banks*.  *Tebeau*, 713 F.3d at 961.

[32] The Government further cites *United States v. Bilis*, 170 F.3d 88, 92 (1st Cir. 1999), as a case that supports its interpretation of "for the purpose of."  But the First Circuit in that case did not address the "for the purpose of" clause, nor did it discuss the implication of "intentionally."  It simply evaluated whether a willful blindness instruction was appropriate based only on a test recognized in the First Circuit.

33

storing controlled substances."  *Id.*  In short, this panel of the Third Circuit appears to have read the purpose requirement of (a)(2) as I do, referring to the purpose of the actor in control of the property.  The Government is certainly correct that this case is not binding, and that non-precedential decisions of our Circuit are not meant to involve the same depth of analysis as precedential decisions.  But in a case where ordinary meaning is the question, I give at least some weight to the fact that no ambiguity arose in the minds of these jurists applying the statute to a trial record.[33]

Absent any instruction from the Third Circuit to follow *Chen* and its progeny, I cannot do so in good conscience, given my own analysis of § 856(a).  For the foregoing reasons, I conclude that the actor charged with violating § 856(a)(2)—in this case Safehouse—must have acted "for the purpose of unlawfully . . . using a controlled substance."  I turn next to the meaning of that phrase.

### iv.  Meaning of "for the purpose of unlawfully . . . using a controlled substance"

Having determined *who* must act "for the purpose of" unlawful drug activity under (a)(2)—that the actor who manages or controls the place must make it available "for the purpose of unlawfully . . . using a controlled substance"—does not end the inquiry.  There remains a question of what it means to make a space available "for the purpose of unlawfully . . . using a controlled substance"—and whether Safehouse is acting for that purpose.[34]  I begin with the

---

[33] I have reviewed the briefs from *Coles* and take note that neither side advanced arguments rooted in the text of the statute.

[34] Setting aside the dispute resolved in the preceding section about whether the actor must have the purpose in question, the parties seem to accept that the conduct (a)(2) addresses involves making a space available to *others* who use, manufacture, distribute, or store drugs.  In contrast, cases brought under § 856(a)(1), at least in this circuit, typically center on drug activity in which the defendant is directly involved.  *See, e.g.*, *United States v. Sawyers*, 2019 WL 3816940, at *1 (M.D. Pa. Aug. 14, 2019) (defendant charged under § 856(a)(1) stemming from his "selling drugs from [his residence]"); *United States v. Fuhai Li*, 2019 WL 1126093, at *1 (M.D. Pa. Mar. 12, 2019) (defendant "charged [with] violations of 21 U.S.C. § 856(a)(1)" for "maintaining locations . . . for the purpose of

observation that, by its very nature, the phrase "for the purpose of" can be assigned many different meanings and can operate on multiple levels.

In the Government's view, Safehouse plans to make safe consumption rooms available for the purpose § 856(a)(2) proscribes. It argues in part that even an ultimately lawful purpose does not suffice to avoid liability if unlawful drug use is required to accomplish that purpose. In that regard, the Government cites a number of cases that can accurately be described as civil disobedience cases. Common among those cases is a defendant deliberately violating a law to achieve some higher moral purpose. *See, e.g.*, *United States v. Romano*, 849 F.2d 812, 816 n.7 (3d Cir. 1988) (defendant broke into naval air station and damaged government property but argued that his conduct was justified because it would save lives). I do not find these cases instructive. Unlike the civil disobedience cases the Government cites, Safehouse does not concede that it is violating § 856(a) or any other law.[35] Safehouse has not argued that its ultimate purpose justifies an intermediate purpose of unlawful drug use. Rather, Safehouse argues that it will not unlawfully make a place available "for the purpose of . . . using a controlled substance" as that clause is properly understood under § 856(a)(2).

To determine whether Safehouse is acting with the proscribed purpose, I must examine the scope of the purpose requirement—what it means to act "for the purpose of unlawfully . . . using a controlled substance." Faced with these differing interpretations, I again begin with the text, and where the text remains unclear, I turn to a variety of contextual sources for guidance as

---

unlawfully distributing controlled substances"); *United States v. Rice*, 2017 WL 6349372, at *1 (W.D. Pa. Dec. 13, 2017) (defendant charged under § 856(a)(1) stemming from discovery of "grow operation" at defendant's residence and commercial building used by defendant).

[35] Technically, certain defendants in *Romano* asserted they lacked the requisite mens rea or that their actions were "necessary" and, in those ways, did not concede illegality. But there was no dispute whether the defendants broke into the military installation and damaged government property.

to the meaning of "for the purpose of unlawfully . . . using a controlled substance."  I note that even in the course of determining whether the text is clear on its face, the Third Circuit has relied on an array of extra-textual sources.  *See, e.g.*, *Pellegrino*, 2019 WL 4125221, at *5-6, *11 (citation omitted) (considering dictionaries, the broader statutory and regulatory scheme, and Fourth Amendment case law to determine the meaning of "execute searches" before concluding that the statutory text was clear).  Where the evidence points toward multiple interpretations, an interpretation consistent with the law's original, ordinary meaning is the most responsible course to take in an effort to avoid unwarranted judicial expansion of the statute.

The text itself does not specify the scope of § 856(a)(2)'s purpose requirement, let alone address the legal status of public health projects that would make property available for drug use to facilitate the administration of treatment.  Safehouse knows and intends that some drug use will occur on its property, but it does not necessarily follow that the organization will knowingly and intentionally make the place available *for the purpose of* unlawful drug activity.  That is so because, as noted above, the purpose requirement in (a)(2) is susceptible of multiple meanings. The condition that one act "for the purpose of" unlawful drug activity could refer to any purpose (however insignificant), to one's sole purpose, or to one's ultimate purpose.

Although I am certain the parties would each claim "plain meaning" on the face of the text, both their interpretations implicitly add some meaning to the language of the statute.  The Government argues that "for the purpose of unlawfully . . . using" drugs plainly includes *any* intended allowance of drug use on one's property, even as part of an effort to administer medical treatment.  Safehouse, on the other hand, argues that "for the purpose of unlawfully . . . using" drugs plainly does not extend to a purpose that would allow drug use on-site only to provide life-saving treatment to drug users.  Safehouse reads the statute to require a *primary* purpose to

*encourage* drug use, not just any purpose that involves allowing drug use and certainly not a purpose aimed at stopping drug use.

To determine the scope of the purpose requirement, I must initially examine whether the proscribed purpose must be the primary or principal purpose of the actor, as Safehouse contends, or whether it may be one of multiple purposes, as the Government argues. I next address whether any purpose involving the allowance of drug use satisfies the purpose requirement or whether the purpose requirement must be applied in a more discerning way.

I turn first to whether the proscribed purpose must be the primary purpose of the actor or whether it may be one of many purposes. To answer that question, I consider the dictionary definition of "purpose." Both the Supreme Court and the Court of Appeals cite to dictionaries as a tool of statutory construction, observing that "[o]rdinarily, a word's usage accords with its dictionary definition." *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015); *Pellegrino*, 2019 WL 4125221, at *3. Dictionary definitions offer substantial support to Safehouse's view, as neither party seems to dispute that, as a definitional matter, "purpose" refers to one's objective, goal, or end. Safehouse Response at 21; Tr. at 31; *see Purpose*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("[S]omething set up as an object or end to be attained."); *Purpose*, Black's Law Dictionary (7th ed. 1999) ("An objective, goal, or end."); *Purpose*, Oxford English Dictionary (1986) ("That which one sets before oneself as a thing to be done or attained; the object which one has in view.").[36] Based on this definition, Safehouse insists that the only relevant purpose under § 856(a) is the *primary* or principal purpose, because the term "purpose"

---

[36] The definitions in earlier editions of the same authorities are essentially the same. *Purpose*, Webster's Deluxe Unabridged Dictionary (2d ed. 1983) ("[T]hat which a person sets before himself as an object to be reached or accomplished; aim; intention; design."); *Purpose*, Black's Law Dictionary (5th ed. 1979) ("That which one sets before him to accomplish; an end, intention, or aim, object, plan, project.").

would ordinarily refer to one's ultimate objective.  If one literally reads the dictionary definitions

into the statute—"for the [objective, goal, end] of unlawfully using a controlled substance"—

Safehouse's interpretation would appear to be correct, for the dictionary definitions do in fact

consider purpose as referring to one's ultimate end, goal, or objective, rather than an

intermediate step.  Those who find dictionaries sufficient to determine the ordinary meaning of

statutory language might stop here.[37]  But it remains conceivable that an intermediate purpose

could be relevant under the statute or that one could act with more than one ultimate purpose.  I

therefore decline to adopt Safehouse's position merely on the authority of Webster or Black.

Looking beyond the dictionary definitions of "purpose," I agree with the Government

that requiring a *sole* purpose of unlawful drug use would render § 856(a)(2) inapplicable to the

undisputed examples of behavior it targets.  If the drug-related purpose for which the place was

made available had to be the sole purpose of the actor, the statute would fail to reach rave

promoters who encourage dancing *and* drugs and crack house operators who live in the house

*and* use it as a crack house.  Neither party disputes that the statute targets those individuals.  The

conclusion that the proscribed purpose in § 856(a)(2) need not be the actor's sole purpose thus

reflects the "prototypical" meaning of the statute.  *See* Solan, *supra* at 2040-42, 2044.  Multiple

---

[37] In modern practice appellate courts have made extensive use of dictionaries, making it necessary for district courts to employ the same tool.  This was not always the case.  Learned Hand famously noted:

> It is not enough for a judge just to use a dictionary.  If he should do no more, he might come out with a result which every sensible man would recognize to be quite the opposite of what was really intended; which would contradict or leave unfulfilled [the statute's] plain purpose.

Learned Hand, *How Far Is a Judge Free in Rendering a Decision?*, in The Spirit of Liberty 103, 106 (Irving Dilliard ed., 1952); *see McBoyle v. United States*, 283 U.S. 25 (1931) (Holmes, J.).  As modern scholars increasingly conduct empirical research into how Congress actually operates, there is also reason to question whether the drafters of legislation rely on dictionaries to the same degree as the courts.  *See* Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I*, 65 Stan. L. Rev. 901, 938-939 (2013) (noting that more than fifty percent of legislative staffers either rarely or never consult dictionaries when drafting, and awareness of judicial citation to dictionaries has not changed staff practice.)

courts have reached this conclusion when interpreting § 856(a)(1). *United States v. Gibson*, 55 F.3d 173, 181 (5th Cir. 1995); *United States v. Church*, 970 F.2d 401, 406 (7th Cir. 1992). It follows logically that the proscribed purpose in (a)(2) may also be one of multiple purposes for which the property is made available. That is not to say, however, that any drug-related purpose would satisfy the statute's purpose requirement. In fact, the Government agreed at oral argument that an incidental purpose would be insufficient. Tr. at 34-35.

I conclude that the proscribed purpose must be a "significant" purpose or "one of the primary" purposes. *See United States v. Soto-Silva*, 129 F.3d 340, 346 n.4 (5th Cir. 1997); *United States v. Verners*, 53 F.3d 291, 296 (10th Cir. 1995) (finding that the purpose must be "at least one of the primary or principal uses to which the house is put").[38] This view is consistent with the proposition which multiple courts of appeals have endorsed that the "'casual' drug user does not run afoul of § 856 because he does not maintain his house for the purpose of using drugs but rather for the purpose of residence, the consumption of drugs therein being merely incidental to that purpose." *United States v. Russell*, 595 F.3d 633, 642-43 (6th Cir. 2010) (citation omitted); *see also United States v. Johnson*, 737 F.3d 444, 449 (6th Cir. 2013); *United States v. Shetler*, 665 F.3d 1150, 1161 (9th Cir. 2011); *Verners*, 53 F.3d at 296; *United States v. Robinson*, 997 F.2d 884, 896 (D.C. Cir. 1993). Although the user maintains and uses the residence and has, at the time of the use, the purpose of unlawfully using drugs—all within the strict language of § 856(a)(1)—courts have found no violation of § 856(a)(1). As a matter of logic, then, it would seem that one who makes a place available to another for a purpose other than drug use does not necessarily violate § 856(a)(2) even if they know some consumption of

---

[38] By finding that the drug-related purpose must be *one of the* significant or primary purposes, I do not endorse Safehouse's view that the proscribed purpose must be the *singular* primary or principal purpose. This is a subtle, but important distinction.

drugs therein occurs in addition to that other lawful purpose.  Although such a limitation has not been expressly articulated in cases considering (a)(2), it is implicit in the analysis of those circuit courts and is reflected in practice by the fact that cases brought under (a)(2) typically have not involved individuals who allowed casual drug use in their homes.[39]  I therefore accept that there is a limitation on the scope of the purpose requirement in that the proscribed purpose must bear a significant relationship to the conduct that Congress sought to prohibit.

The statutory context supports the view that the purpose must be a significant, not incidental, purpose.  Looking to the whole statute, a requirement that the purpose be significant enables the statutory scheme to make sense.  The severity of the sentence permitted by § 856(a)(2)—up to 20 years in prison—strongly favors such a conclusion.  Those who knowingly and intentionally allow use secondary to another lawful purpose would be subject to a far harsher penalty than opioid users whose possession is undisputedly criminal but who would be subject to at most three years if prosecuted for possession under 21 U.S.C. § 844.  Such disparity would be inconsistent with the overall statutory scheme, particularly where courts agree that a user in his own home could not be punished under § 856(a)(1).  *See Russell*, 595 F.3d at 642-43.  I also find this interpretation consistent with the legislative background's focus on *predatory* actors rather than casual users or friends of users.  *See* 149 Cong. Rec. 9383 (2003).  The drug-related purpose in § 856(a)(2) must therefore be a significant purpose, even if not the sole purpose, of the actor.

There is the additional question of whether a purpose of unlawful drug use includes any purpose that involves allowing drug use or only purposes to encourage, promote, or facilitate

---

[39] Indeed, Safehouse represented at oral argument that, since the statute's inception, the Government has not brought a single § 856(a) case predicated solely on use.  Transcript at 58.  This is consistent with the Court's own research.

drug use.  Safehouse assumes the latter view, while the Government's briefing embraces the former.  But the Government conceded an important limitation on the scope of the purpose requirement when, at oral argument, it recognized that not every allowance of drug use on one's property would constitute a purpose of unlawful drug use within the meaning of the statute.

The Government was presented with a hypothetical of parents whose adult child is using drugs, leading the parents to have them move back home.  Tr. at 35.  The parents then instruct the child to inject drugs there, in the parents' presence, to allow for resuscitation.  *Id.*  The United States Attorney responded that (a)(2) would not apply, because it was not the parents' "purpose for their son, their adult son or adult daughter to be in the home [] to use drugs."  *Id*.  As an initial matter, it should be noted that the Government's response to the hypothetical was inconsistent with its embrace of *Chen*, because it invoked the purpose of the parents as the owners of the property.  I do not raise this as a judicial admission, but only to point out that the Government's instinctive response to a specific factual scenario underscores that (a)(2) is most naturally and logically read as I have analyzed it above, and as a panel of the Third Circuit did in *Coles*.  It also illustrates how reading (a)(2) as *Chen* did would lead to an absurd result.

The Government's answer is further instructive because it admits there are limitations on the scope of (a)(2) that turn on the actor's purpose vis-à-vis the user.  Specifically, the Government replied that, where the actor does not want the drug use to occur or has the goal of "trying to stop that person from using drugs," the statute does not prohibit their actions.  *Id.* at 35.  In fairness to the Government, it should be noted that the Court's hypothetical also included a statement by the parents that they would prefer the child not use drugs, a fact the Government emphasized because the Safehouse protocol does not reflect that participants will be actively

discouraged from use before entering the consumption room.[40]  But that fact's relevance pertains to the statute's specific application to Safehouse, a matter I take up below.  I raise the Government's response to the hypothetical at this juncture as I consider the *scope* of the statute's purpose requirement.  Its response supports a conclusion that a purpose involving some known and intended drug use may nonetheless fall outside the reach of the statute, at least where the actor aims to stop drug use.  In short, both parties agree that there is some limit to the scope of the purpose requirement; I now look to the usual tools of statutory interpretation to define that limit.

Returning to dictionaries, the definition of "purpose" as an objective, goal, end, aim, or intention indicates that a purpose is something one seeks to advance, "something set up as an object or end to be attained."  *Purpose*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003); *see also Purpose*, Black's Law Dictionary (7th ed. 1999) (similar); *Purpose*, Oxford English Dictionary (1986) (similar).  An action taken "for the purpose of" unlawful drug use would therefore refer to a purpose of facilitating drug use, not an effort to reduce drug use. Again, those who deem dictionary definitions sufficient to determine a statute's ordinary meaning might stop here, but in my view an analysis that ends here would be superficial.  I will therefore consider the Government's view that an intermediate purpose of allowing drug use on one's property, even as one component of an overall effort to combat drug use, could fall within the scope of the statute, and test it through the prism of § 856(a)(2)'s statutory and legislative context.

---

[40] In the final analysis, the specific details of Safehouse's model only go so far in answering the statutory question. Whether to approach opioid users confrontationally or empathetically is a therapeutic decision.  If the delivery of a lecture on the hazards of opioid abuse would render Safehouse's facility legal, I am confident that Safehouse would even allow the Government to supply its content.

The context of the larger statutory scheme, something the Supreme Court deemed relevant in *Gonzalez v. Oregon*, provides support for both parties' interpretations, albeit to different degrees.  On the one hand, as Safehouse points out, the statutory scheme largely permits medical practice and treatment efforts.  No provision in the CSA contains a broad exemption from its prohibitions for all legitimate medical practices, nor did *Gonzales* create any such exemption.  But the Supreme Court emphasized that the CSA generally does not regulate medical practice.  546 U.S. at 270.  With respect to medical harm reduction efforts in particular, federal law expressly permits a number of tactics that aim to reduce harm and increase access to treatment for drug abuse.  *See* Appropriations Act of 2016 § 520, 129 Stat. 2652 (permitting federal funding to be used for syringe exchange programs that address risk of HIV or hepatitis outbreaks); Comprehensive Addiction and Recovery Act of 2016 § 911(e)(1), 130 Stat. 759 (requiring that the Secretary of Veterans Affairs "maximize the availability of opioid receptor antagonists, including naloxone, to veterans"); Support for Patients and Communities Act § 3201, 130 Stat. 3894 (allowing for greater flexibility with respect to medication-assisted treatment for opioid use disorders).[41]

On the other hand, the Government emphasizes that § 812 of the CSA expresses a congressional judgment that Schedule I drugs have "no currently accepted medical use in treatment in the United States" and that "[t]here is a lack of accepted safety for use of the drug or other substance under medical supervision."  21 U.S.C. § 812(b).  Similarly, Schedule II reflects a congressional judgment that covered drugs, including fentanyl, cannot be used safely without a prescription.  21 U.S.C. § 812(b).  The Government goes on to cite *United States v. Oakland*

---

[41] Although one might then question why Congress has not specifically authorized safe injection sites, congressional failure to act is generally not considered a reliable tool for statutory construction.  *See In re Visteon Corp.*, 612 F.3d 210, 230 (3d Cir. 2010).

*Cannabis Buyers' Coop.*, which held that medical necessity could not be a defense to the CSA prohibition on distribution of marijuana because Congress had made a judgment that marijuana has no medical use.  532 U.S. 483, 490-91 (2001).  But unlike the defendant in *Oakland Cannabis Buyers' Cooperative*, Safehouse does not propose to provide or administer any prohibited substance.  In that case, there was no dispute about whether the defendants had directly violated the CSA by engaging in distribution.  *Id.* at 487.  The Court refused to recognize a medical necessity defense because it would require a rejection of Congress's judgment that marijuana has no therapeutic purpose.  *Id.* at 491-95.  I do not understand Safehouse in any respect to contradict Congress's conclusion that, even under medical supervision, heroin use remains unsafe.  Rather, I understand Safehouse to assert that, when drug users engage in the undisputedly unsafe behavior of consuming Schedules I and II drugs, providing a space to facilitate immediate medical intervention, although insufficient to make that behavior safe, does not violate § 856(a) of the CSA.  At best, § 812 offers limited support for the Government's position, and can hardly be read to criminalize harm reduction strategies like the one proposed by Safehouse.

A review of the legislative evidence confirms that the reach of § 856(a)(2) is limited to purposes to facilitate drug use, which would in turn exclude a purpose to curb or combat drug use that may involve some allowance of use.  I begin with the last decision-making point related to the text in question:  the 2003 agreement to the Conference Report including the amendment to the crack house statute.[42]  The 2003 amendment, originally called the Illicit Drug Anti-

---

[42] A conference committee report contains the final proposed text of a bill, which emerges from the conference committee, where members of both houses have resolved differences between versions of the bill passed by the House and the Senate.  Davis, *supra* at 1.  Each chamber then votes on whether to agree to the conference report. Christopher M. Davis, *The Legislative Process on the House Floor: An Introduction*, Congressional Research Service 9 (2019).  The decision to agree to the conference report is therefore the final legislative act with respect to

Proliferation Act and incorporated into the PROTECT Act, aimed to expand the crack house statute to address events, such as raves, at which promotors encourage use of "club drugs" and other controlled substances by children and teens.  *See* 149 Cong. Rec. 9383.  In determining the scope of the amendment, is important to recognize the significance of the amendment being inserted in conference.  Under both Senate and House Rules, any addition to a bill in conference must be germane to the subject of the legislation, in this case the protection of children. *See* Senate Rule XXVIII; House Rule XXII.[43]  It is for that reason that the joint explanation to the Conference Report emphasized the amendment's goal of protecting children.  Joint Explanatory Statement at 68.  Prior to the vote on the Conference Report, then-Senator Biden, sponsor of the original bill, expressly noted that "[t]he bill is aimed at the defendant's **predatory behavior**, regardless of the type of drug or the particular place in which it is being used or distributed." 149 Cong. Rec. 9383 (2003) (emphasis added).  This evidence makes clear that, when Congress decided to amend the statute, it expanded the meaning of the law to include a larger category of "predatory behavior" that involved increasing access to illicit drugs at a variety of events, particularly those attracting young people.  It broadened the meaning of the statute from targeting crack houses to targeting events, like raves, that encourage drug use and prey on potential drug users.

---

the text, and the debate prior to the vote on whether to agree offers proximate evidence of the legislature's decision. *See* Nourse, *Misreading Law*, *supra* at 80.

[43] Both Houses' rules require that any changes made in conference be germane to the matters committed to conference.  *Id.*  It bears mention that the addition of an entirely new provision in conference pushes the limits of the matters properly before the conferees under the rules of both Houses.  Senate Rule XXVIII, ¶ 3; House Rule XXII, cl. 9.  Nonetheless the § 856 amendment was included in the Protect Act without objection.  *See* Senate Rule XXVIII, ¶ 3 (providing members with recourse to raise a point of order in objection to non-germane additions); House Rule XXII, cl. 10 (same).  Both Houses then agreed to the conference report, and the legislative evidence pertaining to debate on that decision is therefore relevant.

Although the Government is correct that Congress expanded the statute, that expansion was minimal.  The change to the statute clarified that single events as well as ongoing operations were included, that the place involved need not be a building or enclosure, and that renters and lessees could also be liable.[44]  *See* Conference Report to S. 151 at 43; 149 Cong. Rec. 9383 (statement of then-Senator Biden).  At the introduction of the Illicit Drug Anti-Proliferation Act, co-sponsor Senator Grassley commented on the limited nature of the change.  149 Cong. Rec. 1849.  He described the amendment as an effort to "update our laws so they can be used effectively against drug dealers who are pushing drugs on our kids."  149 Cong. Rec. 1848.  His comments specifically focused on raves and other temporary events.  One statement, which referred to "illegal drug use in any location," could lend support to the Government's position, but the remainder of his remarks do not support such a broad interpretation.  Senator Grassley referred to "cover activity" created to hide drug transactions and emphasized that the amendment was not designed to hamper "legitimate" activities.  *Id.*  He noted that § 856 would be a means for law enforcement to target events at which dealers "push their product," and addressed the party drug Ecstasy at length.  *Id.* at 1848-49.  He specifically referred to drug reduction efforts as an example of conduct that would be inconsistent with criminal intent.  *Id.* at 1849.  He closed his remarks by characterizing the amendment as a "careful step," with a recognition that drug abuse must be addressed "not only through law enforcement but education and treatment as well."  *Id.* at 1849.  Similarly, although the legislative evidence includes a description of the statute applying to "any type of event for the purpose of drug use or distribution," 149 Cong.

---

[44] The Government also references the change in title to "maintaining drug-involved premises."  I do not reject looking to titles for guidance, but in this instance the wording is not particularly enlightening.  The statute cannot possibly apply to *all* "drug-involved premises," just as under the previous title it could not have applied *only* to "manufacturing operations."

Rec. 9384 (statement of then-Senator Biden), nothing in the legislative record reveals an

expansion of the statute's meaning beyond events and operations to facilitate drug use, and

certainly not an expansion to reach activities designed to stop drug use.[45]

---

[45] The Government cites a statement from Senator Biden in which he said, "section 856 has always punished those who knowingly and intentionally provide a venue for others to engage in illicit drug activity." 149 Cong. Rec. 20539. Safehouse cites to another portion of the same statement in support of its position. The statement in question was made in July 2003, several months *after* the April passage of the PROTECT Act.

Courts generally reject such "post hoc" statements as unreliable tools for construing a statute. *See, e.g.*, *Blanchette v. Connecticut General Ins. Corps.*, 419 U.S. 102, 132 (1974); *Pa. Med. Soc. v. Snider*, 29 F.3d 886, 898 (3d Cir. 1994). In part this is because they were not part of the consideration or debate in which the legislature engaged prior to voting to enact the law in question. *See* James J. Brudney & Lawrence Baum, *Oasis or Mirage: The Supreme Court's Thirst for Dictionaries in the Rehnquist and Roberts Eras*, 55 Wm. & Mary L. Rev. 483, 568 (2013); Nourse, *Misreading Law*, *supra* at 155 (arguing that to the extent "group process determines the legitimacy of legislative evidence . . . evidence incapable of influencing the group, should be rejected"). Statutory interpreters largely agree that "post-enactment history" is therefore minimally helpful in determining the meaning of legislative decisions. *See* John F. Manning, *Separation of Powers as Ordinary Interpretation*, 124 Harv. L. Rev. 1939, 2035 (2011) (suggesting that a rule considering post-enactment evidence authoritative would be unconstitutional); Jonathan R. Siegel, *The Use of Legislative History in a System of Separated Powers*, 53 Vanderbilt L. Rev. 1457, 1522-23 (2000) (describing general agreement that post-enactment legislative history deserves less weight); *see also* § 48:20. Post-enactment history, 2A Sutherland Statutory Construction § 48:20 (7th ed.). In part, this is a recognition that legislators are also politicians, whose statements after a bill becomes law may serve other purposes.

But to the extent that the Government focuses on this specific comment, it must be reviewed in the context of Biden's immediately preceding remarks clarifying that his amendment to § 856 in the PROTECT Act did not greatly expand that statute. He sought to emphasize the point that the crack house statute has always been used, not only against traditional crack houses, but also against "seemingly 'legitimate businesses' used as a front for drug activity," such as motels, car dealerships, and bars. 149 Cong. Rec. 20539. Later in his remarks he referred to the same venues as "non-traditional crack house[s]." *Id.* What Safehouse proposes, whether within the scope of the statute or not, is certainly different from a "non-traditional crack house."

The remainder of these post-hoc remarks would lend no support to the Government. First, Senator Biden clarified the limited effect of the bill's changes to the statute, contradicting the Government's assertions that the amendment significantly broadened § 856. *Id.* Next, Biden repeatedly emphasized that the amended statute only targets those who intentionally hold or promote events for the purpose of unlawful drug activity. *Id.* Third, during a lengthy discussion of the "'knowledge' and 'intent'" requirement and the "requirement that the defendant make their property available 'for the purpose' of illicit drug activity," Biden made no distinction between how the purpose requirement should be understood in (a)(1) and (a)(2), undercutting the Government's argument for a lower mental state requirement in (a)(2). *Id.* at 20539. In a discussion clearly considering (a)(2), given references to the "knowingly and intentionally" requirement and the language about making a property available, Biden cited the *Chen* court's discussion of (a)(1)'s purpose requirement, evidently assuming it applied to (a)(2) as well. *Id.* Specifically, he noted that a purpose is "that which one sets before him to accomplish; an end, intention, or aim, object, plan, project" and that "it is strictly incumbent on the government to prove beyond a reasonable doubt that a defendant knowingly maintained a place for the specific purpose of distributing or using a controlled substance." *Id.* (quoting *Chen*, 913 F.2d at 189). In discussing knowledge and intent, he clarified that actual knowledge is required and referred to the portion of *Chen* in which the court quoted the trial court's instructions, including the instruction that an act is done "'intentionally' if done voluntarily and purposely with the intent to do something the law forbids." *Id.* (quoting *Chen*, 913 F.2d at 187). These statements indicate that Biden understood the purpose requirement to refer to the actor's purpose and to set a high bar for the Government to clear. Fourth, in a point that Safehouse emphasizes as part of its analysis, Biden explicitly endorsed the view that the purpose must be the

The 1986 legislative record related to the provision reveals that the original meaning of the statute, prior to any expansion in 2003, contemplated only purposes to facilitate drug use. The 1986 act focused specifically on crack houses.  For instance, the section-by-section description read:  "Outlaws operation of houses or buildings, so-called 'crack houses,' where 'crack' cocaine and other drugs are manufactured and used."  132 Cong. Rec. 26474.  The original meaning of places made available "for the purpose of unlawfully . . . using a controlled substance" referred to spaces designed to facilitate drug use.

The legislative focus on making places available for such illicit purposes does not limit the provision's applicability to only crack houses and raves, but it does caution against extending the statute too far beyond similar circumstances.  The evidence indicates that the statute targets exploitive behavior like that of crack house operators, rave promoters, and others creating spaces to facilitate drug use and access to drugs.  A common denominator among the actions of these individuals is the goal of enabling drug use and supporting the market for unlawful drugs.  To read § 856(a)(2) to apply to medical purposes and efforts to combat drug abuse would take the statute well beyond what it aimed to criminalize.  As employed by Congress, the words "for the purpose of unlawfully . . . using a controlled substance" in § 856(a) are properly understood as referring to significant purposes to facilitate, rather than reduce, unlawful drug use.

---

primary purpose of the place in question, *id.* at 20538, 20539, quoting a DEA memo that likewise stated that the activity on the property must be "primarily for the purpose of drug use."  *Id.* at 20538.  Finally, the remarks expressed that the bill's only goal was to "deter illicit drug use and protect kids" and made repeated references to crack houses, "non-traditional crack houses," raves, and other events that perpetuate illicit drug activity.  *Id.* at 20538-39.

Thus, even if properly considered, nothing about this post-hoc statement suggests contemplation of efforts to facilitate medical care and access to drug treatment.

V.       **Application of (a)(2) to Safehouse**

I cannot conclude that Safehouse has, as a significant purpose, the objective of

facilitating drug use.  Safehouse plans to make a place available for the purposes of reducing the

harm of drug use, administering medical care, encouraging drug treatment, and connecting

participants with social services.  None of these purposes can be understood as a purpose to

facilitate drug use.

The Government contended at oral argument that Safehouse's purpose cannot be to stop

or reduce drug use.  Tr. at 32-34.  But its own Complaint belies that argument.  It acknowledges

that Safehouse will offer all its participants treatment referrals and on-site initiation of

medication-assisted treatment.  Pl.'s Am. Compl. at 4.  Treatment, along with a variety of other

services, will be offered during at least three stages of Safehouse's protocol.  Pl.'s Am. Compl.

Ex. A at 4-5; *see also* The Safehouse Model, https://www.safehousephilly.org/about/the-

safehouse-model (last visited Oct. 1, 2019).  One offer of services will be made before any

participant enters the consumption room.  *Id.*  Any participant who then chooses to use the

medically supervised consumption room will, in the subsequent medically supervised

observation room, meet with peer specialists, recovery specialists, social workers, and case

managers who will specifically encourage treatment.  *Id.*  The Court is hardly being "anti-

factual," as the Government accuses, Tr. at 34, when it construes the pleadings as describing a

program that ultimately seeks to reduce unlawful drug use.

Within the consumption rooms themselves, Safehouse will engage in the legal acts of

providing sterile injection equipment and administering emergency medical care.  The

Government has not contended that the provision of medical treatment facilitates or advances

drug use.  In fact, other federally supported initiatives recognize that such services prevent

fatalities from drug use.  The use that will occur is subsidiary to the purpose of ensuring

proximity to medical care while users are vulnerable to fatal overdose.  The Government has

conceded that similar harm reduction strategies would be lawful if executed through mobile vans

or if Safehouse personnel monitored drug use in public places.  The Government seeks to

distinguish consumption rooms from the ways in which other entities currently engage in harm

reduction (and ways that they could, such as through use of a mobile van) by observing that in

those efforts no real property is used, and "what matters [is] the statutory language."  Tr. at 39.

This is myopic textualism that seeks to avoid the central issue.  The statutory language that

matters most is "purpose," and no credible argument can be made that a constructive lawful

purpose is rendered predatory and unlawful simply because it moves indoors.  Viewed

objectively, what Safehouse proposes is far closer to the harm reduction strategies expressly

endorsed by Congress than the dangerous conduct § 856(a) seeks to prohibit.  Safehouse

therefore is not making a place available "for the purpose of unlawfully . . . using a controlled

substance" within the meaning of § 856(a)(2).

When pointedly asked—twice—whether Safehouse was promoting drug use, the

Government could only respond obliquely.  Tr. at 36-37.  It replied that because Prevention

Point, an existing program run by Safehouse's President and Treasurer, Jose Benitez, is already

successfully moving some of its clients into treatment, in the absence of proof that Safehouse

will accomplish more, the net effect of Safehouse will simply be more drug use.  *Id.* at 37.

Specifically, the Government replied that "the logical implication of setting up Safehouse is

there's going to be more drug use. So yes, they are promoting drug use."  *Id*.  In a case that turns

on "purpose," the nature of the Government's response is revealing.  Rather than attribute any

unlawful purpose to Safehouse, it pointed instead to what it presumes will be a deleterious

*outcome*.[46]  And as observed at the beginning of this opinion, the wisdom or effectiveness of

safe injection sites is not the issue before me.  One might criticize the Safehouse model from the

standpoint of therapeutic soundness or effectiveness, but again that is not the issue before me.

It would be an issue for Congress, but there can be no question that Safehouse's approach

to harm reduction and increasing access to treatment was not within the contemplation of

Congress when it enacted or amended this statute.  The records of Congress are now searchable

electronically, and a global search of the legislative record prior to the statute's amendment in

2003 reveals a single passing reference to a 1998 article in *Foreign Affairs* magazine discussing

safe injection facilities as a potential harm reduction strategy.  *See The Decriminalization of*

*Illegal Drugs: Hearing Before the Subcomm. on Criminal Justice, Drug Policy, and Human*

*Resources of the H. Comm. on Gov't Reform*, 106th Cong. 8 (1999) (statement of Thomas A.

Constantine, Former Administrator, Drug Enforcement Administration (citing Ethan A.

Nadelmann, *Commonsense Drug Policy*, Foreign Affairs, Jan.–Feb. 1998)).  Even then, the

article cited by the witness discussed safe injection facilities as a "[h]arm reduction innovation

. . . to stem the spread of HIV," not in relation to an opioid crisis.  *Id.*

Aside from the legislative record, there is an additional governmental source to consult

that sheds light on when safe injection sites became a subject of public debate.  The National

Center for Biotechnology Information, in collaboration with the United States National Library

of Medicine and National Institutes of Health, maintains a searchable database of medical

literature, PubMed, which includes articles that cut across multiple disciplines, including public

---

[46] For the sake of completeness, it must be mentioned that the Government's rebuttal was not as carefully nuanced.
Referring to Safehouse's description of its program, counsel derided it as "Bizarro World," urged the Court to "be
real," and seemingly rejected any therapeutic purpose, stating, "They're not inviting people onto their property just
to get treatment or whatever other services they're offering.  The whole purpose here is for people to use drugs."  Tr.
at 71-72.  My inclination is to discount these remarks as a moment of overly zealous advocacy.  But in any case, no
plausible reading of the pleadings before me supports such a caricature of what Safehouse proposes.

health.  The statute here was last amended in April 2003.  If one conducts a search using the term "safe injection sites," multiple publications appear, none having to do with management of opioid addiction prior to 2003.[47]  If one adds the limiting term "opioid," there are still no relevant results.  A search for the related term "supervised injection" through the end of 2003 reveals only two relevant articles published within five months of the amendment, both in a Canadian specialty law review focusing on HIV and AIDS prevention efforts.  Simply put, supervised injection sites as a harm reduction strategy for opioid abuse were not a subject of public discourse when the statute was last amended.

At argument, the Government was invited multiple times to point to any legislative evidence that supervised injection programs were specifically considered by Congress, but counsel skillfully avoided giving a direct answer to the question.  Tr. at 7-12.  The most the Government could offer as to a specific focus on safe injections sites was for the Court to go back in time to reconstruct what Congress *might* have thought had the subject actually been considered at the time.  Tr. at 7.  This method is mentioned in the scholarly literature and termed "imaginative reconstruction."  Posner, *Statutory Interpretation*, *supra* at 817.  Such an approach is inherently speculative and has not been endorsed by case law.[48]  As Justice Gorsuch has noted, although new applications of statutes may arise, "every statute's meaning is fixed at the time of enactment."  *Wisconsin Central, Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018).

---

[47] Judges are rightly cautioned to limit internet research.  I am not concerned with doing so here because the exercise is akin to judicial notice.  The search conducted can be objectively replicated by anyone, with the results speaking for themselves. And the purpose is not to garner substantive input for the Court to consider without the perspective of the litigants, but simply to test what resources were publicly available at the time Congress was deliberating.

[48] To adopt the Government's suggestion would fly in the face of the admonition that courts should "not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended."  *Ladner v. United States*, 358 U.S. 169, 214 (1958); *accord Reno v. Koray*, 515 U.S. 50, 65 (1995) (Rehnquist, C.J.).

Accordingly, I confine myself to the documented evidence of what Congress did, in fact, mean to accomplish at the time of enactment.

The Government's refusal to concede that there was not specific consideration by Congress reveals its concern over a core weakness in its position.  It urges me to hold that even though harm reduction efforts like safe consumption facilities were indisputably beyond the contemplation of Congress, I should apply the language of the statute in the broadest possible way, leaving it to Congress to clarify if it does *not* wish to criminalize safe consumption facilities.  But the law does not default to criminalization, requiring Congress to clarify when it wishes not to incarcerate citizens.  Rather, as Chief Justice John Marshall explained, "penal laws are to be construed strictly" because "the power of punishment is vested in the legislative, not the judicial department.  It is the legislature, not the Court, which is to define a crime, and ordain its punishment."  *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820).  Modern cases echo those same principles:  "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity."  *United States v. Bass*, 404 U.S. 336, 348 (1971).

Congress here determined that making places available to facilitate drug use, supporting the drug market as crack houses and raves do, warranted moral condemnation and punishment.  Congress has not had the opportunity to decide whether such moral condemnation and punishment should extend to consumption facilities that are components of medical efforts to facilitate drug treatment.  By any objective measure, what Safehouse proposes is not some variation on a theme of drug trafficking or conduct that a reasonable person would instinctively identify as nefarious or destructive.  Even if one believes it to be misguided, the nature and character of what it proposes is not prototypically criminal.

A consistent theme in the Government's case is what it describes as the "hubris" of Safehouse in seeking to open its safe injection site without first securing some form of official approval from federal authorities.  There is, however, no mechanism under the CSA for seeking review from any governmental entity for the activity that Safehouse proposes, which the Government conceded at oral argument.  Tr. at 43.  Physicians and researchers can seek exemptions from the prohibition against administering Schedule I and Schedule II drugs.  Safehouse does not seek to administer prohibited drugs but rather to ameliorate the harm from their unlawful use.  In the Government's view, Safehouse literally needs an Act of Congress to proceed.  But that begs the question.  The question is whether current law criminalizes Safehouse's proposed conduct.  As Justice Rutledge memorably phrased a core tenet of federal law, "[b]lurred signposts to criminality will not suffice to create it."  *United States v. C.I.O.*, 355 U.S. 106, 143 (1968) (Rutledge, J., concurring).

Although irrelevant for the Court's purposes, the numerous policy arguments raised by the parties and amici indicate that there is a vibrant debate to be had about the possible advantages, risks, and costs of safe consumption sites.[49]  A narrow interpretation of § 856(a)(2)

---

[49] The Court received thirteen amicus briefs from various individuals and groups from around the nation. Brief of and by Professors of Religious Liberty Law as Amici Curiae; Brief of Amici Curiae Harrowgate Civic Association, Bridesburg Civic Association, Juniata Park Civic Association, Kensington Independent Civic Association, Port Richmond on Patrol and Civic, South Port Richmond Civic Association, and Fraternal Order of Police, Lodge 5; Brief of Amici Curiae Philadelphia-Area Community Organizations; Brief of Current and Former Prosecutors, Law Enforcement Leaders, And Former Department of Justice Officials and Leaders as Amici Curiae; Amicus Curiae Brief of Homeless Service Providers; Amicus Curiae Brief of Friends and Family of Victims of Opioid Addiction in Support of Defendant's Safehouse and Jose Benitez; Proposed Brief of Amici Curiae Aids United, Association for Multidisciplinary Education and Research in Substance Use and Addiction, Association of Schools and Programs of Public Health, California Society of Addiction Medicine, Drug Policy Alliance, Harm Reduction Coalition, National Association of State and Territorial Aids Directors, The Foundation for Aids Research, Positive Women's Network, Treatment Action Group, Vital; Amici Curiae Brief of Religious Leaders in the Philadelphia Community and Beyond; Amici Curiae Brief of Constitutional Law Scholar and Commerce Clause Expert Professor Randy Barnett; Brief of Amici Curiae King County, WA; New York, NY; San Francisco; Seattle, WA; Pittsburgh, PA; and Svante L. Myrick, Mayor of Ithaca, NY; Brief Amici Curiae of the American Civil Liberties Union and The American Civil Liberties Union of Pennsylvania; Brief of Amici Curiae Mayor Jim Kenney and Health Commissioner Dr. Thomas Farley.

appropriately defers to Congress to engage in this debate and determine whether and how it wants to criminalize the conduct of medical providers and recovery specialists who seek to manage safe consumption facilities. A narrow interpretation of § 856(a)'s purpose requirement and restrained application of that statute also protects the important separation of powers principles discussed above. Such principles are one of the foundations of the longstanding rule of lenity,[50] which Safehouse invokes here. I do not rely on the rule of lenity as the basis for this decision. Nonetheless, the separation of powers principles underlying the rule carry substantial weight in this case, where the Executive has invited the Judiciary to expand the reach of a criminal statute to include conduct that I am convinced was never contemplated by the Legislature.

## VI.     Application of (a)(1) to Safehouse

The Government has only brought this action under (a)(2), but in its Counterclaim Safehouse seeks a declaratory judgment as to § 856(a) as a whole. However, no motion for relief on that aspect of the Counterclaim is pending before me.

## VII.     Religious Freedom Restoration Act

Because I have determined that § 856(a)(2) does not apply to Safehouse's proposed conduct, I need not consider whether the Government's effort to enforce the statute violates Safehouse's rights under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb. In connection with that claim, Safehouse sought:  (1) a declaration that any prohibition or

---

[50] Another policy underlying the rule of lenity is that the law must provide fair notice of the punishment imposed "if a certain line is passed," and "[t]o make the warning fair, . . . the line should be clear." *Bass*, 404 U.S. at 348. This policy is somewhat less applicable here, where the Government seeks a declaratory judgment, which by definition will provide notice as to whether the law prohibits the conduct in question. It bears mention, however, that courts have applied the rule of lenity in declaratory judgment cases. *See, e.g.*, *Bingham, Ltd. v. United States*, 724 F.2d 921, 924-25 (11th Cir. 1984) (noting the rule of lenity applies "even though we construe the [statute] in a declaratory judgment action, a civil context").

penalization of Safehouse would violate RFRA and (2) an injunction permanently enjoining the Third-Party Defendants from enforcing or threatening to enforce 21 U.S.C. § 856 against Safehouse.  Defs.' Answer at 43-44.  Because I have concluded that § 856(a)(2) does not criminalize Safehouse's proposed actions, the RFRA claim is now moot.

## VIII.   Conclusion

Both sides skillfully argue that Congress's meaning in § 856 is consistent with their own, and further argue that to conclude otherwise would be a judicial usurpation of legislative power. Here, however, the Government asks the Court to apply statutory language to a set of facts beyond the comprehension of Congress when the bill was passed.  I find the most conservative, circumspect approach to favor the original, ordinary meaning of the statute.  On the record before me, having applied multiple tools of construction, I find that the purpose at issue under § 856 must be a significant purpose to facilitate drug use, and that allowance of some drug use as one component of an effort to combat drug use will not suffice to establish a violation of § 856(a)(2).  The ultimate goal of Safehouse's proposed operation is to reduce drug use, not facilitate it, and accordingly, § 856(a) does not prohibit Safehouse's proposed conduct.

The Government's Motion will be denied as to its claim for declaratory judgment as well as Safehouse's counterclaim for declaratory judgment.  I need not consider Safehouse's Religious Freedom Restoration Act claim, which is now moot.


\_\_\_\_/s/ Gerald Austin McHugh_____
United States District Judge