**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><center>Plaintiff,</center><br><br>v.<br><br>SAFEHOUSE, a Pennsylvania nonprofit corporation; JOSE BENITEZ, as President and Treasurer of Safehouse,<br><center>Defendants.</center> | Civil Action No.: 2:19-cv-00519<br><br>(Honorable Gerald A. McHugh) |
| SAFEHOUSE, a Pennsylvania nonprofit corporation,<br><center>Counterclaim Plaintiff,</center><br><br>v.<br><br>UNITED STATES OF AMERICA,<br><center>Counterclaim Defendant,</center><br><br>U.S. DEPARTMENT OF JUSTICE; WILLIAM P. BARR, in his official capacity as Attorney General of the United States; WILLIAM M. MCSWAIN, in his official capacity as U.S. Attorney for the Eastern District of Pennsylvania,<br><center>Third-Party Defendants.</center> | |

**<u>SAFEHOUSE'S MEMORANDUM OF LAW IN OPPOSITION TO THE
GOVERNMENT'S MOTION FOR STAY PENDING APPEAL</u>**

**<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

INTRODUCTION ....................................................................................................................1

ARGUMENT .........................................................................................................................3

    I.     A Stay Is an Extraordinary Remedy Not Applicable to the Court's
          Determination of this Pure Question of Federal Law .....................................................3

    II.    The Government Has Not Met Its Burden of Showing a Stay Is Warranted................7

         A.    The Government Has Not Demonstrated Likelihood of Success on the
               Merits; It Merely Rehashes the Legal Arguments Already Rejected by
               this Court.................................................................................................................7

         B.    Neither the Government's Nor the Public's Interests Will Be Harmed
               Absent a Stay, Whereas a Stay Would Disserve the Public Interest
               and Cause Significant Irreparable Harm...............................................................9

               i.    The Government Has Not Shown Any Irreparable Harm to Its
                     Interests or the Public Interest...................................................................10

               ii.    A Stay Would Cause Irreparable Harm to Safehouse
                     Participants and the Community..................................................................14

         C.    A Stay Would Irreparably Harm Safehouse and Its Founders............................19

CONCLUSION....................................................................................................................21

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.*,
  No. CIV.A.08-4369 (JLL), 2008 WL 4951239 (D.N.J. Nov. 18, 2008) ............................9, 10

*Adams v. Freedom Forge Corp.*,
  204 F.3d 475 (3d Cir. 2000)......................................................................................................12

*Deposit Bank of Frankfort v. Board of Councilmen of City of Frankfort*,
  191 U.S. 499 (1903)....................................................................................................................4

*Eastern Greyhound Lines v. Fusco*,
  310 F.2d 632 (6th Cir. 1962) ....................................................................................................11

*Elrod v. Burns*,
  427 U.S. 347 (1976)..................................................................................................................20

*Golden Gate Restaurant Ass'n v. City & Cty. of San Francisco*,
  512 F.3d 1112 (9th Cir. 2008) ....................................................................................................9

*Hilton v. Braunskill*,
  481 U.S. 770 (1987)............................................................................................................7, 8, 9

*Huron Holding Corp. v. Lincoln Mine Operating Co.*,
  312 U.S. 183 (1941)....................................................................................................................3

*In re Revel AC, Inc.*,
  802 F.3d 558 (3d Cir. 2015)...................................................................................7, 8, 9, 10, 11

*Innovative Health Sys., Inc. v. City of White Plains*,
  931 F. Supp. 222 (S.D.N.Y. 1996) ...........................................................................................18

*Jolly v. Coughlin*,
  76 F.3d 468 (2d Cir 1996)........................................................................................................20

*Kikumura v. Hurley*,
  242 F.3d 950 (10th Cir. 2001) ..................................................................................................20

*Little Sisters of the Poor v. Sebelius*,
  134 S.Ct. 1022 (2014)...............................................................................................................20

*Markva v. Haveman*,
  168 F. Supp. 2d 695 (E.D. Mich. 2001).....................................................................................18

*New Directions Treatment Servs. v. City of Reading*,
    490 F.3d 293 (3d Cir. 2007)................................................................................11, 18

*Nixon v. Richey*,
    513 F.2d 430 (D.C. Cir. 1975) ...................................................................................4

*Nken v. Holder*,
    556 U.S. 418 (2009)...........................................................................3, 4, 5, 7, 8, 9

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*,
    389 F.3d 973 (10th Cir. 2004) ..................................................................................10

*Ortho Pharm. Corp. v. Amgen, Inc*,
    799 F. Supp. 450 (D.N.J. 1992) .........................................................................17, 18

*Oxford House, Inc. v. Twp. of Cherry Hill*,
    882 F.2d 806 (3d Cir. 1989)...............................................................................17, 18

*Pa. Democratic Party v. Republican Party of Pa.*,
    Civ. No. 16-5664, 2016 WL 6582659 (E.D. Pa. Nov. 7, 2016) .................................8

*Planned Parenthood Greater Memphis Region v. Dreyzehner*,
    853 F. Supp. 2d 724 (M.D. Tenn. 2012)...................................................................18

*Republic of Philippines v. Westinghouse Elec. Corp.*,
    949 F.2d 653 (3d Cir. 1991).......................................................................................9

*Sullivan v. City of Pittsburgh, Pa.*,
    811 F.2d 171 (3d Cir. 1987).............................................................................17, 18

*Swartzwelder v. McNeilly*,
    297 F.3d 228 (3d Cir. 2002).....................................................................................20

*Teleflex Indus. Prod., Inc. v. Brunswick Corp.*,
    294 F. Supp. 256 (E.D. Pa. 1968) ............................................................................11

*Tenafly Eruv Ass'n v. Borough of Tenafly*,
    309 F.3d 144 (3d Cir. 2002).....................................................................................20

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*,
    163 F.3d 341 (6th Cir. 1998) ....................................................................................10

*United States v. C.I.O.*,
    355 U.S. 106 (1968) .................................................................................................13

*United States v. Judicial Watch, Inc.*,
    241 F. Supp. 2d 15 (D.D.C. 2003) .............................................................................8

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................................9

**Statutes**

18 U.S.C. § 843(f).......................................................................................................12

21 U.S.C. § 856(a) .......................................................................................... *passim*

Comprehensive Addiction and Recovery Act of 2016, Pub. L. No. 114-198, 130
    Stat. 695, §§ 101, 107, § 303(a)(l)(C)(v)-(iv) .............................................16

Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*......................2, 19, 20

**Other Authorities**

18A Fed. Prac. & Proc. Juris...........................................................................................4

CATO Institute, *Needle Exchange Programs: Benefits and Challenges* (Jan. 15,
    2020), .................................................................................................................16

Dep't of Justice Press Release, *Statement of U.S. Attorney William M. McSwain
    Regarding Proposed Drug Injection Site in South Philadelphia* (Feb. 27,
    2020) .....................................................................................................................6

Fed. R. Civ. P. 57 ..........................................................................................................3

Sharon Larson et al., *Supervised Consumption Facilities – Review of the Evidence*
    (2017) ..................................................................................................................17

Steven Ross Johnson, Modern Healthcare, *Surgeon General Urges ER Docs to
    Advocate for Evidence-Based Opioid Treatment* (May 23, 2018)...........................16

## INTRODUCTION

The government seeks to stay this Court's ruling on its own declaratory judgment action, which it brought to resolve its uncertainty as to whether 21 U.S.C. § 856(a) applies to Safehouse's overdose prevention model, which includes supervised consumption.  Safehouse's counterclaim asked for a declaratory judgment on the same issue.  This Court decided the issue and correctly ruled that Section 856(a), does not prohibit Safehouse's proposed overdose prevention service model, including supervised consumption.  That declaratory judgment, which is binding on the parties pending appeal, provides the legal clarity each party sought when it submitted the federal statutory question to this Court.  The government's motion for stay of that Judgment pending appeal should be denied.

First, a "stay" is inapplicable to this judgment because, irrespective of any "stay," the Court's purely legal determination collaterally estops a contrary interpretation pending appeal.  A "stay" in this circumstance has no practical effect.  In other words, having sought and received a judgment resolving the statutory question, the government cannot "undo" it and return to the pre-litigation state of uncertainty.

Even if the judgment could be "stayed," it makes no sense to leave the parties in legal limbo for months, or even years, while the government attempts to appeal.  The government's motion does not come close to satisfying its heavy burden of demonstrating that a stay is warranted.  A stay is an extraordinary remedy; the government has satisfied none of the stay factors, and almost entirely ignores them in its motion.  To the extent the government touches on the stay factors, it relies only on speculation and conjecture about public opinion and purported public harm, rather than adducing evidence required to justify a stay.

Meanwhile, countervailing considerations weigh heavily on Safehouse's side of the balance. Philadelphia is in the midst of an unprecedented public health crisis. This crisis is not abating—the unfortunate fact is that in 2019, while this case was being litigated, more than 1,100 people in this City died from overdoses, a projected increase from 2018. Safehouse offers an evidence-based intervention that aims to reduce this staggering death toll and to address the grave medical and public health harms associated with the opioid crisis. A federal order that puts Safehouse at risk of prosecution pending appeal is not in the interest of public health and will cause irreparable harm to Safehouse and to those Safehouse seeks to serve. A stay would also burden Safehouse's exercise of its religious beliefs, which call its founders and board members to do everything possible to protect our neighbors at risk of overdose death. Accordingly, if a stay were granted, this Court would need to address Safehouse's counterclaim under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq.*, which would be put back at issue during the pendency of the appeal.

Although this Court's Judgment resolves one crucial legal question respecting Safehouse's proposed operation, the difficult work of effectuating Safehouse's life-saving mission is now upon it. Safehouse will continue to work closely with the City of Philadelphia and engage with its neighbors in implementing its model to ensure public order and safety.[1] Many people in our community have been touched deeply and feel passionately about solutions to the opioid crisis and supervised consumption in particular. The community debate—however vigorous—is not "disorder" or "chaos," as the governments suggests. This is a democratic process at work. It is neither the federal government's nor this federal court's role to intervene in

---

[1] *See* Ex. A, Declaration of B. Abernathy ¶¶ 5–8.

these intensely local issues.  This Court has discharged its constitutional duty to interpret federal

law; a "stay" of that judgment is not appropriate.

## ARGUMENT

**I.     A Stay Is an Extraordinary Remedy Not Applicable to the Court's Determination of this Pure Question of Federal Law**

"A stay [pending appeal] is an intrusion into the ordinary processes of administration and

judicial review."  *Nken v. Holder*, 556 U.S. 418, 427 (2009); *see* Gov't Stay Mot. at 4, ECF No.

145 (citing *Nken*).  That principle has particular force with respect to this Court's declaratory

judgment.  The declaratory judgment remedy is designed to provide a vehicle for resolving

unclear legal questions.  *See* Fed. R. Civ. P. 57.  In fact, it was the *government* that brought this

suit seeking *clarification* from this Court whether Safehouse's proposed overdose prevention

model is lawful.  *See* Complaint for Declaratory Judgment, ECF No. 1.  This Court answered that

question.  Dissatisfied with the answer, the government now seeks to nullify the effect of this

Court's judgment merely because no "appellate court" has "issue[d] a ruling on the legality of

such an operation."  Gov't Stay Mot. at 16.[2]

The government's stay request flies in the face of the usual rule that declaratory

judgments are binding on the parties pending appeal.  Thus, while courts will, at times, stay

certain *enforcement* of a declaratory judgment by, for example, staying payment of money

judgments that flow from the court's determination, it is well established that the *preclusive*

*effect* of that judgment cannot be stayed pending appeal.  *See, e.g.*, *Huron Holding Corp. v.*

---

[2] That is certainly not the position that the government took at the outset of this litigation.  The government's current position is one of convenience, not principle.  If this Court had concluded that Safehouse's proposed overdose prevention services *did* violate federal law, the government surely would reject out of hand the very argument it is making here—namely, that Safehouse is entitled to operate its proposed supervised consumption until the Third Circuit affirmed that decision.  And the *amici* supporting a stay have no support for their assertions that non-parties to this case have a "right to appellate review."  Amicus Br. in Support of Stay at 3, ECF No. 148.

*Lincoln Mine Operating Co.*, 312 U.S. 183, 189 (1941) ("[I]n the federal courts the general rule has long been recognized that while appeal with proper supersedeas stays execution of the judgment, *it does not—until and unless reversed—detract from its decisiveness and finality*." (emphasis added)); 18A Fed. Prac. & Proc. Juris. (Wright & Miller) § 4433 (3d ed.) ("The Supreme Court long ago seemed to establish the rule that a final judgment retains all of its res judicata consequences pending decision of the appeal, apart from the virtually nonexistent situation in which the 'appeal' actually involves a full trial de novo." (citing *Deposit Bank of Frankfort v. Board of Councilmen of City of Frankfort*, 191 U.S. 499 (1903)). That is why courts have held that "[t]he prior judgment will support a claim of collateral estoppel *even where it has been stayed pending appeal*." *Nixon v. Richey*, 513 F.2d 430, 438 (D.C. Cir. 1975) (emphasis added). Given these well-established principles, it is unsurprising that the government is unable to cite a single case in which a stay was granted in even remotely similar circumstances.

Having determined that Section 856(a) does not apply to Safehouse, that *legal* determination is now binding upon the parties. A stay cannot return the parties to the legal limbo they were in before participating in this declaratory judgment action. Lingering uncertainty benefits no one and is contrary to the purpose of a declaratory judgment and the entire premise of the government's own lawsuit, which was to obtain a legal ruling that clarified whether Section 856(a) applies to Safehouse's overdose prevention services. A grant of a "stay" would not be consistent with finality of judgments, the role District Courts play in the judicial process, and the function of appellate review. *See Nken*, 556 U.S. at 427.

The onus is on the government, as the party seeking relief, to identify the practical effect of the relief it is requesting. The government's motion is silent on this issue, likely because a stay is simply inapplicable to this declaratory judgment. For example, the government cannot

treat a "stay" as license to prosecute Safehouse staff for engaging in lawful, life-saving conduct during the months-to-years long appeals process based on the government's unfounded—and at times internally inconsistent—interpretation of Section 856(a).  *See* Oct. 2, 2019 Order, ECF No. 133 at 53 (explaining that "the law does not default to criminalization"); *Nken*, 556 U.S. at 429 (explaining that, "instead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself. . . . by halting or postponing some portion or the proceeding, or by temporarily divesting an order of enforceability").  In addition, the government cannot use a "stay" to effectively enjoin Safehouse from opening, which would put the government in *a better position* than before filing this lawsuit, and would be plainly unwarranted in light of the Court's determination that Section 856(a) does not cover Safehouse's proposed services.  *See Nken*, 556 U.S. at 428 ("An injunction and a stay have typically been understood to serve different purposes. The former is a means by which a court tells someone what to do or not to do."); *cf. Turner Broadcasting Sys., Inc. v. FCC*, 507 U.S. 1301, 1302 (1993) (Rehnquist, C.J., in chambers) ("By seeking an injunction, applicants request that I issue an order *altering* the legal *status quo*").

The government further ignores these principles when it suggests that, absent a stay, the parties' efforts to litigate this case "in a dignified and rational fashion" would "go to waste."  Ex. B, Ltr. from W. McSwain to J. McHugh at 3 (Feb. 26, 2020).  Seeking a final judgment by this Court and abiding by that determination is not a "waste"—it is the quintessential purpose of a declaratory judgment proceeding.  There is nothing undignified or irrational about a party's reliance on a federal district court's declaratory judgment following a year-long litigation.[3]

---

[3]  To be clear, Safehouse did not "carefully plan[] its surprise opening to evade appellate review," as *amici* suggests.  Amicus Br. in Support of Stay at 8.  Safehouse has been transparent with the Court and the government about its intention to identify a location for its overdose

Moreover, in conjuring speculative concerns about "literal street fights" and "chaos in the streets," the government seeks to foment public opinion, but it also improperly urges this Court to go well beyond the limited statutory question presented by the parties, and instead asks this Court to resolve purely local questions of public policy. Gov't Stay Mot. at 12-15. As this Court explained, federal courts lack "jurisdiction to address the concerns raised by residents of . . . Philadelphia as to the appropriate location for the operation of such a facility." Oct. 2, 2019 Order at 2. Nor does this Court have authority to consider whether supervised consumption sites are sound public policy. *Id.* Those structural limitations apply with equal force to the Executive Branch, which is tasked by the U.S. Constitution only with *enforcing* federal law, not *making* local or public policy. Philadelphians hold strong opinions about solutions to the opioid crisis. But the strength of neighborhood sentiment does not authorize an unelected federal prosecutor to insert himself into a *local* debate over the implementation of a medical and public-health intervention—especially one that does not violate federal law—simply because he believes that the democratic process is too "chaotic" or "radical" for his liking. Ex. B, Ltr. from W. McSwain to J. McHugh at 1, 4 (Feb. 26, 2020).[4]

This Court has determined the scope of Section 856(a) as applied to Safehouse's overdose prevention model. Having entered final declaratory judgment, a "stay" cannot undo that binding legal ruling. The stay should be denied for that reason alone.

prevention site and to become operational as soon as it received a declaratory judgment. Despite this knowledge, the government refused to take a position as to whether it would seek this stay less than a week before this Court's declaratory judgment was entered.

[4] The U.S. Attorney's unsubstantiated and vaguely threatening claim that "a *literal* street fight" will transpire if this Court does not stay its ruling—which he reiterated in a DOJ press release— has no place in this proceeding. *Id.* at 1 (emphasis added); Dep't of Justice Press Release, *Statement of U.S. Attorney William M. McSwain Regarding Proposed Drug Injection Site in South Philadelphia* (Feb. 27, 2020). If anything, the duty of the federal executive is to prevent any private interference, particularly violent interference, with the prevailing parties' right to proceed in conformity with a federal court judgment.

## II.     The Government Has Not Met Its Burden of Showing a Stay Is Warranted

Even if a stay had any meaningful application in this case, the government has failed to carry its heavy burden of showing that the "extraordinary" remedy of a stay pending appeal is warranted under the applicable stay factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 426, 433-34 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see also In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015).[5]   Since the government fails to engage those stay factors—much less acknowledge the irreparable harm suffered by those who have lost their lives to overdose death under the status quo, including while this litigation has been pending—its motion for a stay pending appeal should be denied.

### A.     The Government Has Not Demonstrated Likelihood of Success on the Merits; It Merely Rehashes the Legal Arguments Already Rejected by this Court.

This Court's October 2 Order and subsequent Judgment were correctly decided and should be affirmed on appeal.   This Court properly declared that "the establishment and operation of [Safehouse's] overdose prevention services model, including supervised consumption in accordance with the parties' stipulated facts does not violate 21 U.S.C. § 856(a)." ECF No. 142.   That well-reasoned determination is based on a faithful application of principles of statutory interpretation and is consistent with time-tested principles of federalism.

---

[5] While the first two factors are necessary to warrant a stay, applying these factors, the Third Circuit applies a "sliding-scale" approach under which "the necessary level or degree of possibility of success will vary according to the court's assessment of the other stay factors." *In re Revel AC, Inc.*, 802 F.3d at 568 (internal alterations, brackets, and quotation marks omitted).

Safehouse fully intends to defend that judgment on appeal and likely will be successful in doing so.[6]

By contrast, the government has not made any showing that it will succeed on appeal, let alone the "strong showing" required to obtain a stay. *Hilton*, 481 U.S. at 776; *Nken*, 556 U.S. at 427. Such a showing requires a "probability" of winning on appeal. *Pa. Democratic Party v. Republican Party of Pa.*, Civ. No. 16-5664, 2016 WL 6582659, at *5 (E.D. Pa. Nov. 7, 2016) (quoting *In re Revel AC, Inc.*, 802 F.3d at 568). To win on appeal, a party must demonstrate prejudicial error in the trial court's decision. Yet the government simply rehashes arguments that this Court already rejected, Gov't Stay Mot. 6-10, without even *mentioning*—much less engaging and showing why the Third Circuit might find reversible error in this Court's decision.

District courts should not grant stays pending appeal where the motion "fail[s] to provide any reason for the Court to change its conclusion." *United States v. Judicial Watch, Inc.*, 241 F. Supp. 2d 15, 16 (D.D.C. 2003). The government has not provided the Court with any basis to question that reasoning or to conclude that a reversal is probable. *Id*. Its apparent strategy of ignoring this Court's persuasive reasoning is unlikely to be successful on appeal. Because the government has failed to actually grapple with this Court's interpretation of Section 856(a), it failed to show it is likely to succeed on appeal or that a stay is warranted.

The government is incorrect that a stay is warranted because the legal question is "novel" or "important." Gov't Stay Mot. at 6-8. According to the government, "[b]ecause this case involves an issue of first impression concerning a legal issue of national importance, [it] has at

---

[6] Because the Court is familiar with its own legal and factual bases for this conclusion and the parties' respective statutory arguments, Safehouse does not repeat those arguments here. Safehouse incorporates its merits briefs by reference here, including the alternative statutory and constitutional arguments raised in opposition to the government's motions for judgment on the pleadings and summary judgment and in Safehouse's motion for declaratory judgment. *See* ECF Nos. 48, 137, 140.

least a reasonable chance of prevailing on appeal." *Id.* at 6.  That does not follow.[7]  Indeed, the fact that a legal issue has been seldom litigated or is high-profile says nothing about the merits of the Court's resolution of that issue.  If seldom litigated or high-profile were the standard, both sides could equally claim a probability of success.  The government accordingly has failed to show a probability of success on the merits.

**B.    Neither the Government's Nor the Public's Interests Will Be Harmed Absent a Stay, Whereas a Stay Would Disserve the Public Interest and Cause Significant Irreparable Harm**

The thrust of the government's public interest argument is to claim it is better for the Court to preserve the "status quo"—by which it apparently means the uncertain *status quo ante*—than to have resolved the statutory question before it.  As a threshold matter, the government lacks a freestanding interest in preserving the status quo—particularly where it is undisputed that the government has *never* prosecuted anyone for violations of Section 856(a) in any remotely analogous circumstances.[8]  All stays preserve the status quo in some sense, but that alone does not make one appropriate.  Instead, "the focus always must be on prevention of injury

---

[7] That argument also misstates the applicable legal standard, which is *probability* of success on the merits, not a mere "possibility."  *In re Revel AC, Inc.*, 802 F.3d at 568; *Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.*, No. CIV.A.08-4369 (JLL), 2008 WL 4951239, at *4 (D.N.J. Nov. 18, 2008) ("A colorable issue, however, is not what is required for a stay pending appeal. The party arguing for the stay must demonstrate a substantial likelihood of success." (citing *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991)).  In misstating the applicable legal standard, the government relies upon pre-*Nken* case law.  In *Nken*, the U.S. Supreme Court expressly rejected the "possibility" standard.  *Compare* Gov't Stay Mot. at 7 (collecting pre-*Nken* cases), *with Nken*, 556 U.S. at 434 ("As the Court pointed out earlier this term, 'the 'possibility' standard is too lenient.'" (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008)).

[8] The Supreme Court has made clear that the preservation of the status quo is not the deciding factor—let alone a necessary factor—to consider in issuing a stay.  *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (enumerating stay factors and excluding preservation of status quo, noting, "[s]ince the traditional stay factors contemplate individualized judgments in each case, the formula cannot be reduced to a set of rigid rules"); *Golden Gate Restaurant Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008) ("Maintaining the status quo is not a talisman.").

by a proper order, not merely on preservation of the status quo." *See Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 814 (3d Cir. 1989); *see also O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1002 (10th Cir. 2004) (en banc) (Seymour, J., concurring in part and dissenting in part) (citing cases); *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998).

The government, moreover, must demonstrate irreparable harm through *evidence*; and it has offered *none*. It instead falls back on a plea to maintain the "status quo." As described above, a "stay" would not preserve the "status quo"—it would merely throw the parties back into pre-litigation uncertainty over the application of Section 856(a). In any event, the "status quo" is a public health crisis declared by the Mayor of Philadelphia, the Philadelphia Public Health Commissioner, the Governor of Pennsylvania, and the President of the United States, and recognized by Mr. McSwain himself. People are dying of overdoses every day in Philadelphia, and Safehouse's intervention can help at least some of them. An order that "stays" this Court's Judgment in a manner that precludes that intervention would irreparably harm the public and the people Safehouse seeks to serve.

### i. The Government Has Not Shown Any Irreparable Harm to Its Interests or the Public Interest

The government has not made any showing of irreparable harm, much less to "demonstrate that irreparable injury is *likely*, not merely possible, in the absence of a stay." *In re Revel AC, Inc.*, 802 F.3d at 569 (internal alterations omitted, emphasis added). The government's irreparable harm argument relies on a few news articles, conjecture, speculation, and misrepresentations or misinterpretations of federal law, not evidence. "A court may not grant injunctive relief based on harm that is purely speculative, and courts have applied the same rule to the granting of stays." *Ace Am. Ins. Co.*, 2008 WL 4951239, at *6 (citing cases). Thus, in

the seminal Third Circuit case on the standard for stays pending appeal, the Court admonished that a party does not "come close" to tilting "the balance in its favor with its own showing of irreparable harm" by relying only "on its counsel's hollow representations of harm rather than record evidence." *In re Revel AC, Inc.*, 802 F.3d at 575.

Instead of adducing credible evidence, the government offers only speculation that Safehouse will subject the citizens of this City to the risk of "increased drug use and drug dealing." Gov't Stay Mot. at 15. The data, of course, show precisely the opposite. *See* ECF No. 48 at 7–17; *see also* Tr. of Evid. Hr'g, Aug. 19, 2019, ECF No. 127. Perhaps for that reason, the government does not even attempt to contend with the opinions of world-renowned experts, local public health officials, and the scores of peer-reviewed scientific, public health, and medical publications, which all agree that supervised consumption services save lives, improve access to medical care, decrease transmission of communicable diseases, increase acceptance of drug rehabilitation treatment, and benefit the surrounding community. Surely if it had any evidence of likely harm, the government would have introduced it by now.[9] Of course, fear of the unknown is not evidence. *See, e.g.*, *Teleflex Indus. Prod., Inc. v. Brunswick Corp.*, 294 F. Supp. 256, 258 (E.D. Pa. 1968) ("The equitable relief of a stay pending appeal will not be entertained 'against something merely feared as liable to occur at some indefinite time in the future.'" (quoting *Eastern Greyhound Lines v. Fusco*, 310 F.2d 632, 634 (6th Cir. 1962)).

The *amici* who support a stay are presumably well-intentioned. But they, too, lack any evidence to support their speculative assertions of irreparable harm. *New Directions Treatment*

---

[9] Safehouse would welcome the opportunity to prove through expert testimony and evidence that its intervention saves lives, improves medical outcomes, encourages treatment, and improves conditions in the community, and that it will *not* increase either "drug use" or "drug dealing." As this Court noted, the government, by contrast, has "strenuously resisted" development of the factual record prior to Judgment, and conspicuously avoids reliance on facts and evidence in its stay motion. ECF No. 141.

*Servs. v. City of Reading*, 490 F.3d 293, 303–04 (3d Cir. 2007) (requiring evidence, not speculation). Indeed, by the *amici*'s own account, they are relying on "[c]ommon sense," about the potential for neighborhood harms (which is contradicted by the available evidence), and in any event, is legally insufficient. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000) ("[C]ommon sense is no substitute for evidence.").[10]  *See generally* Ex. A, Declaration of B. Abernathy.

The government tries to avoid its burden by asserting that the "government's interest is the public interest." Gov't Stay Mot. at 10. The existence of some overlap between the government's and the public's interests does not mean that the government may unilaterally decide what is in the public interest. That is particularly true here. This Court has determined that Section 856(a) is inapplicable; the federal government has *no* valid interest in prosecution of legal conduct. For the same reason, the government gains nothing from the fact that Section 856(a) "provid[ed] for injunctive relief upon showing a violation of the statute." Gov't Stay Mot. at 12–13 (citing 18 U.S.C. § 843(f)). After all, the government cannot seek an injunction for conduct that does not violate that provision. Nor can it establish harm to the public by relying on the already-rejected premise that Safehouse's overdose prevention service model violates federal law.

---

[10] Throughout this litigation, Safehouse has established solid reasons to anticipate that harm to the community will not result from its proposed services, and that instead, substantial benefits will result. In particular, relying on testimony and declarations of experts in the relevant fields, Safehouse has established: allowing those suffering from substance abuse disorder to remain in close proximity to naloxone will reduce overdoses deaths; allowing consumption to occur inside will reduce public consumption and drug-related waste; and providing additional pathways to drug treatment before and after the time of consumption will increase entry into drug treatment programs, and Medication-Assisted Treatment. *See, e.g.,* Ex. C, Declaration of T. Farley ("Farley Decl.") ¶¶ 8–11; ECF No. 127, Tr. of Evid. Hr'g at 35:18–37:14; 44:9-14, 205:4–206:4, 207:1–211:6, 214:16–216:3, 218:4–220:25 (testimony of Dr. Jeanmarie Perrone and Dr. Laura Bamford).

This Court may also readily reject the government's assertion of public harm based on the false premise that Safehouse—and this Court's Order—"threatens to overturn Congress's determination that there is no legal use for heroin." Gov't Stay Mot. at 11. Neither Safehouse nor this Court's Judgment suggests that heroin possession or use is legal. Safehouse will not possess heroin or facilitate heroin possession by its participants. Thus, this Court properly found that, "by any objective measure, what Safehouse proposes is not some variation on a theme of drug trafficking or conduct that a reasonable person would instinctively identify as nefarious or destructive." October 2 Order at 53. The government's argument is contrary to its own statement that this Court's "decision addressed only Safehouse itself and not the issue of the visitors' possession and use of illegal drugs at the site." *See, e.g.*, ECF No. 137-2 (Oct. 11, 2019 Ltr. from W. McSwain to I. Eisenstein).

The government also gets nowhere in arguing that the public will be somehow harmed because Safehouse has not received "the formal approval of a governmental legislative body" or other Executive Branch or municipal officials. Gov't Stay Br. at 13. Once again, that reasoning is completely backward and ignores this Court's persuasive reasoning:

> A consistent theme in the Government's case is what it describes as the "hubris" of Safehouse in seeking to open its safe injection site without first securing some form of official approval from federal authorities. There is, however, no mechanism under the CSA for seeking review from any governmental entity for the activity that Safehouse proposes, which the Government conceded at oral argument. . . . In the Government's view, Safehouse literally needs an Act of Congress to proceed. But that begs the question. The question is whether current law criminalizes Safehouse's proposed conduct. As Justice Rutledge memorably phrased a core tenet of federal law, "[b]lurred signposts to criminality will not suffice to create it." *United States v. C.I.O.*, 355 U.S. 106, 143 (1968) (Rutledge, J., concurring).

ECF No. 133 at 54. The government points to no license or other governmental "approval" that Safehouse lacks, but which a private medical facility requires. The government cannot establish

harm—much less irreparable harm—by complaining that Safehouse should have gotten "approval" to engage in wholly lawful conduct.

Finally, the government tries to establish a harm to the public interest by highlighting news coverage of neighborhood opposition to Safehouse's proposed overdose-prevention service model and its proposed locations.  Gov't Stay Mot. at 13-15.  Whatever debates occur over the implementation of Safehouse's model are of *local*, not federal, concern.  Safehouse understands that there are some who strongly oppose its proposed intervention, but also that many others strongly support, and even ardently hope for Safehouse to begin operations.  The fact that neighbors may have varied and strong viewpoints is not evidence of harm to the public interest— it is evidence of democracy at work.  As this Court has recognized, these competing viewpoints, held by concerned citizens, demonstrate "there is a vibrant debate to be had about the possible advantages, risks, and costs of safe consumption sites."  ECF No. 133 at 54.  A stay would disserve the public interest by allowing the government to short circuit that debate among Philadelphians with misguided threats of federal prosecution.

### ii.    A Stay Would Cause Irreparable Harm to Safehouse Participants and the Community

While the Government establishes no likelihood of irreparable harm from *denial* of a stay, Safehouse, its participants, and members of the community will surely suffer irreparable harm if a stay is granted.  Safehouse's participants will be our friends, neighbors, patients, fellow congregants, loved ones, and family members.  The value of human life is sacrosanct, and every life matters.  *See* Ex. C, Declaration of Jose Benitez ¶¶ 4–6; ECF No. 127, Tr. of Evid. Hr'g, Aug. 19, 2019, 156:6–158:9, 166:10-14 (testimony of Jose Benitez).  Each of the lives lost to the opioid crisis is by definition an irreparable harm, and it is in the public interest to save those lives.  Balancing the benefits and harms of a stay, without accounting for this preventable loss of

life, is no balance at all.  The government's failure even to acknowledge the thousands of lives

lost—and its attempts to dehumanize Safehouse's potential participants by referring to them as

"drug addicts," "users," or "criminals"—speaks volumes.

The Safehouse model provides those at highest risk of an opioid overdose with

immediate access to overdose reversal agents during and immediately after the time of use.[11]

Naloxone only works if someone else is *immediately* available to administer it.  By offering

supervised consumption, Safehouse can offer assurance, to a medical certainty, that people

within its care will not die of a drug overdose.  Ex. D, Farley Decl., ¶ 12; ECF No. 127, Tr. of

Evid. Hr'g at 28:10-16, 224:4-10 (testimony of Dr. Perrone and Dr. Bamford).  Out of millions

of encounters over the last thirty years, *not a single overdose death* has occurred in *any*

supervised consumption facility *in the world*.  ECF No. 127, Tr. of Evid. Hr'g at 220:9-25

(testimony of Dr. Bamford).  In addition, Safehouse's comprehensive services will encourage

entry into drug treatment, reduce the burden on emergency services and first responders, prevent

the transmission of infectious diseases, and create a safer community by reducing public

consumption of illicit drugs and discarded needles and other consumption equipment.  *See, e.g.,*

ECF No. 48 at 7–17.

For these reasons, the medical and public health measures that Safehouse provides have

been recognized and endorsed by prominent national and international medical and public health

---

[11] This Court is familiar with the specifics of Safehouse's proposal to combat the opioid crisis through the use of a comprehensive harm reduction strategy to mitigate the catastrophic losses resulting from the opioid epidemic and overdose crisis in Philadelphia.  In particular, Safehouse's overdose prevention services include the assessment of an individual's physical and behavioral health status, provision of sterile consumption equipment, provision of drug testing (*i.e.*, fentanyl test strips), medically supervised consumption and observation, overdose reversal, wound care and other primary care services, on-site education and counseling, on-site medication-assisted treatment (MAT) and recovery counseling, and access to wraparound services such as housing, public benefits, and legal services.  *See* ECF No. 139-1.  Providing these services will reduce the harms that the opioid crisis have inflicted on this City.

associations including American Medical Association, the American Public Health Association, AIDS United, the European Monitoring Center for Drugs and Drug Addiction, the Infectious Diseases Society of America, the HIV Medical Association, the International Drug Policy Consortium, and innumerable public health experts, physicians, and addiction researchers. Safehouse's overdose prevention model has been endorsed and encouraged by Philadelphia's Public Health Commissioner and its Commissioner of the Department of Behavioral Health and Intellectual disAbility Services, who have announced that overdose prevention, including supervised consumption, is a critical medical and public health intervention. Additionally, local officials, including Philadelphia's Mayor and District Attorney, support Safehouse's efforts to mitigate the opioid crisis.[12] Safehouse's services, moreover, will directly promote the objectives of not only the local government, but also the federal government, which has recognized in acts of Congress that the federal government seeks to expand access to clean syringes and access to naloxone. *See, e.g.*, Comprehensive Addiction and Recovery Act of 2016, Pub. L. No. 114-198, 130 Stat. 695, §§ 101, 107, § 303(a)(l)(C)(v)-(iv).

---

[12] The government waves off the opinions of these experts and public-health and government officials and instead relies on a 2018 news article in "Modern Healthcare" magazine reporting that the U.S. Surgeon General's spokesman "clarified" a prior report that he actively supported supervised consumption sites. Gov't Stay Mot. at 14. *Compare* Steven Ross Johnson, Modern Healthcare, *Surgeon General Urges ER Docs to Advocate for Evidence-Based Opioid Treatment* (May 23, 2018) ("Correction: A previous version of this article said the surgeon general supports safe injection sites."), *available at*: https://www.modernhealthcare.com/article/20180523/NEWS/180529976/surgeon-general-urges-er-docs-to-advocate-for-evidence-based-opioid-treatment.

Congress has not delegated to the Department of Health and Human Services authority to issue regulations on this issue, but even if it had, such off-hand comments in the news media (which were later amended in a subsequent version of that same article, and further qualified by the current U.S. Surgeon General's recent address to the Cato Institute in which he encouraged access to naloxone, needle exchange, and MAT), do not constitute evidence of harm to the public interest. *See* CATO Institute, *Needle Exchange Programs: Benefits and Challenges* (Jan. 15, 2020), *available at*: https://www.cato.org/events/needle-exchange-programs-benefits-challenges (comments made by U.S. Surgeon General at 22:00).

By providing these services, Safehouse will save lives by preventing overdose deaths—as evidence, similar overdose prevention efforts, including supervised consumption sites, have proved to be effective in other countries, and are backed by clinically sound data.  A review of the evidence estimates that an overdose prevention site like Safehouse could reduce overdose deaths annually by 30% in the site's immediate vicinity.[13]  The same review estimates that a single site could save between 25-to-75 lives.  These services will benefit the public; delaying them for months will mean that these lives will be needlessly lost.  Nothing is more irreparable than death.  By bringing drug consumption indoors, the communities plagued by open-air drug use, the spread of infectious diseases, and discarded drug-related refuse will be improved, not harmed.  This *evidence* strongly demonstrates that there will be irreparable harm to the public interest if a stay is entered.

The irreparable harm to Safehouse and its potential participants is analogous to *Sullivan v. City of Pittsburgh*, 811 F.2d 171, 183-84 (1987), where the Third Circuit affirmed a preliminary injunction that enjoined efforts to close alcoholic treatment centers.  In so holding, the Court ruled that the delay or denial of medical care and recovery services for individuals struggling with addiction constitutes irreparable harm for purposes of determining whether a stay or injunction is warranted.  *Id.* at 183; *see, e.g.*, *Oxford House, Inc. v. Twp. of Cherry Hill*, 799 F. Supp. 450, 463 (D.N.J. 1992) ("This Circuit has already held that an action that jeopardizes the recovery process for a group of alcoholics and threatens to push them into relapse causes just the kind of irreparable harm that justifies preliminary injunctive relief." (citing *Sullivan*, 811 F.2d at

---

[13] Sharon Larson et al., *Supervised Consumption Facilities – Review of the Evidence* 20 (2017), https://dbhids.org/wp-content/uploads/2018/01/OTF_LarsonS_PHLReportOnSCF_Dec2017.pdf ("*Supervised Consumption Facilities*").

179)).[14]  As the Court explained, "[w]ithout proper care, supervision and peer support," people struggling with addition are at risk of "not only a potentially irremediable reversion to chronic alcohol abuse but immediate physical harm or death." *Sullivan*, 811 F.2d at 179-80.  There, as here, "it is difficult to conceive of many facts which would more compellingly argue for" a finding of irreparable harm. *Id.*

Sullivan is consistent with a long line of decisions holding that a delay in medical care constitutes considerable and irreparable harm for purposes of granting or denying injunctive relief. *See, e.g.*, *Innovative Health Sys., Inc. v. City of White Plains,* 931 F. Supp. 222, 240 (S.D.N.Y. 1996) (citing cases for the proposition that "[c]ourts have held that the deprivation of treatment needed to recover from addiction or prevent relapse constitutes irreparable injury"); *Planned Parenthood Greater Memphis Region v. Dreyzehner*, 853 F. Supp. 2d 724, 738-39 (M.D. Tenn. 2012) ("Absent an injunction, Plaintiffs' clientele and communities will lose important public health services on matters of grave public health concerns."); *Markva v. Haveman*, 168 F. Supp. 2d 695, 718–19 (E.D. Mich. 2001) (explaining that "denial or delay in benefits which effectively prevents plaintiffs from obtaining needed medical care constitutes irreparable harm"), *aff'd,* 317 F.3d 547 (6th Cir. 2003).[15]  These cases weigh strongly against a stay.

---

[14] Even a stay of a temporal duration runs an intolerable risk of irreparable harm.  *See, e.g.*, *Oxford House, Inc.*, 799 F. Supp. at 463 (holding that "a delay of even a few weeks in allowing the individual plaintiffs to move into the Oxford House would increase their chances of relapse and thus would be likely to cause irreparable injury").

[15] The Third Circuit's decision in *New Directions Services v. City of Reading*—a case involving efforts to prevent a methadone clinic from opening—likewise shows that the public interest and irreparable harm factors weigh against a stay in this case, not in favor of one.  390 F.3d 293 (3d Cir. 2007) (describing the case as one that "presents the familiar conflict between the legal principle of non-discrimination and the political principle of not-in-my-backyard").

### C.      A Stay Would Irreparably Harm Safehouse and Its Founders

The final stay consideration—whether Safehouse and the other defendant (one of its founders) will be irreparably injured absent a stay—weigh strongly against a stay.   The government hardly even considers—much less addresses—such harms, suggesting instead that "entering a limited stay pending the resolution of the appeal may well benefit Safehouse."  Gov't Stay at 16.  Safehouse disagrees.

Safehouse *cannot* wait any longer.  Safehouse, its board members, and its founders—in particular, Jose Benitez, a named defendant in this action—are compelled to act by their sincerely held religious beliefs.  *See generally* Ex. C, Declaration of Jose Benitez.  Because Safehouse and Mr. Benitez are religiously compelled to implement Safehouse's lifesaving overdose prevention services, they would be irreparably harmed by a stay.  Safehouse has claimed and argued at length that Section 856(a) *cannot* apply to Safehouse because doing so would violate RFRA.  To be sure, this Court dismissed Safehouse's RFRA claim as moot, in light of its holding that Section 856(a) does not prohibit Safehouse's planned conduct.  But if this Court stays its judgment and in doing so allows the government to apply Section 856(a) to Safehouse pending appeal, the stay would reintroduce an unacceptable and imminent risk of prosecution that unlawfully burdens Safehouse's religious exercise, in violation of RFRA.[16]  *See* ECF No. 137-2 (Oct. 11, 2019 Ltr. from W. McSwain to I. Eisenstein) (declaring the federal government's continued intent to use enforcement tools to effectively prevent Safehouse's operation).

---

[16] The government has not disputed either the sincerity or the religious nature of the beliefs asserted by Safehouse and its founders, or that their actions constitute an exercise of these beliefs.  If challenged, however, these propositions can and will be established at any evidentiary hearing on the government's motion for stay.

The burden a stay would impose on Safehouse's religious exercise constitutes irreparable harm that warrants denying a stay—even a short-duration administrative stay.  As the Supreme Court has held, "[t]he loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (emphasis added); *Swartzwelder v. McNeilly*, 297 F.3d 228, 241 (3d Cir. 2002).  The Third Circuit has confirmed that "[l]imitations on the free exercise of religion inflict irreparable injury." *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) (citing cases).  Courts have extended this *per se* rule to alleged abridgments of religious freedoms under RFRA.  *See, e.g., Little Sisters of the Poor v. Sebelius*, 134 S.Ct. 1022 (2014) (granting injunction pending appeal in favor of religious objectors in RFRA suit); *Kikumura v. Hurley,* 242 F.3d 950, 963 (10th Cir. 2001) ("[A] plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[A]lthough plaintiff's free exercise claim is statutory rather than constitutional, the denial of the plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately compensated monetarily.").  The harm—*established by law as irreparable*—is particularly acute in this case, where issues of life-or-death and religious conscious are at stake.  Safehouse and its founders' RFRA rights weigh in favor of denial of the government's motion for a stay.

## <u>CONCLUSION</u>

The government has not met its burden of showing a stay pending appeal is warranted, and Safehouse has made a contrary showing that each of the stay factors weighs against granting a stay.  Accordingly, this Court should deny the Defendants' motion for a stay pending appeal or for an administrative stay.

Dated:  March 10, 2020                           Respectfully submitted,

**DLA PIPER LLP (US)**

By:  */s/ Ilana H. Eisenstein*
Ilana H. Eisenstein
*ilana.eisenstein@dlapiper.com*
Courtney G. Saleski
*courtney.saleski@dlapiper.com*
Ben C. Fabens-Lassen
*ben.fabens-lassen@dlapiper.com*
Megan E. Krebs
*megan.krebs@dlapiper.com*
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, Pennsylvania 19103-7300
Tel:       215.656.3300

Thiru Vignarajah (admitted *pro hac vice*)
*thiru.vignarajah@dlapiper.com*
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland, 21209-3600

**AIDS LAW PROJECT OF
PENNSYLVANIA**

Ronda B. Goldfein
*goldfein@aidslawpa.org*
Yolanda French Lollis
*lollis@aidslawpa.org*
Adrian M. Lowe
*alowe@aidslawpa.org*
Jacob M. Eden
*eden@aidslawpa.org*
1211 Chestnut Street, Suite 600
Philadelphia, Pennsylvania 19107
Tel:       215.587.9377

**LAW OFFICE OF PETER GOLDBERGER**

Peter Goldberger
50 Rittenhouse Place
Ardmore, Pennsylvania 19003
Tel:      610.649.8200
*peter.goldberger@verizon.net*

**SETH F. KREIMER, ESQUIRE**

Seth F. Kreimer
3501 Sansom Street
Philadelphia, Pennsylvania 19104
Tel:      215.898.7447
*skreimer@law.upenn.edu*

*Attorneys for Defendants and Counterclaim Plaintiffs Safehouse and Jose Benitez*