**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SAFEHOUSE, a Pennsylvania nonprofit corporation, | |
| Counterclaim Plaintiff, | |
| v. | |
| UNITED STATES OF AMERICA, | |
| Counterclaim Defendant, | |
| U.S. DEPARTMENT OF JUSTICE; MERRICK B. GARLAND, in his official capacity as Attorney General of the United States; JACQUELINE C. ROMERO, in her official capacity as U.S. Attorney for the Eastern District of Pennsylvania, | |
| Third-Party Defendants. | |
| | |
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action No.: 2:19-cv-00519 |
| SAFEHOUSE, a Pennsylvania nonprofit corporation; JOSÉ BENITEZ, as President and Treasurer of Safehouse, | (Honorable Gerald A. McHugh) |
| Defendants. | |

**<u>SAFEHOUSE'S MEMORANDUM OF LAW IN OPPOSITION TO THE
GOVERNMENT'S MOTION TO DISMISS</u>**

## **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................1

FACTUAL BACKGROUND .....................................................................................2

PROCEDURAL HISTORY......................................................................................10

LEGAL STANDARDS ...........................................................................................12

ARGUMENT ..........................................................................................................13

I.   SAFEHOUSE'S PLEADING DEMONSTRATES SAFEHOUSE IS MOTIVATED
     BY SINCERELY HELD RELIGIOUS BELIEFS TO PROVIDE ITS LIFESAVING
     SUPERVISED CONSUMPTION SERVICES ..............................................15

     A.   Safehouse's Calling to Shelter and Provide Lifesaving Care to those at Risk
          of Overdose Death Carries Out the Core Religious Beliefs of Its Board .............15

     B.   DOJ May Not Question Safehouse's "True Motivations" or the Sincerity
          of Safehouse's Religious Beliefs—Fact Questions—through a Motion to
          Dismiss.................................................................................................18

     C.   The Sincerity of Safehouse's Professed Religious Beliefs Is Not Diminished
          Because Those Beliefs Are Effectuated by Means of Sound Medical Science
          and in Accordance with Public-Health Evidence ...................................20

          1.   DOJ Mischaracterizes Safehouse's Pleaded Religious Beliefs ................20

          2.   Case Law Has Recognized that Sanctuary, Shelter, and Lifesaving
               Care Are Manifestations of Religious Exercise and Beliefs.....................22

II.  SAFEHOUSE PROPERLY ASSERTS A RFRA CLAIM BASED ON THE
     RELIGIOUS COMMITMENTS OF ITS BOARD MEMBERS......................................24

III. SAFEHOUSE'S RELIGIOUS EXERCISE IS SUBSTANTIALLY BURDENED
     BY THE GOVERNMENT'S THREATENED PROSECUTION....................................27

IV.  SAFEHOUSE HAS ASSERTED A VIABLE FIRST AMENDMENT CLAIM..............34

     A.   DOJ's Policy of Enforcing Section 856(a) Is Not Generally Applicable .............35

     B.   DOJ Has *Never* Prosecuted Section 856(a) Based on Only Simple Possession
          or Use of Controlled Substances Except by Targeting Safehouse's Religiously
          Motivated Overdose-Prevention Services.....................................................36

     C.   DOJ Has Announced a Policy of Selective "District by District"
          Authorization of Section 856 Against Supervised Consumption Services,
          But It Has Not Allowed Safehouse to Proceed......................................37

D. The CSA Expressly Creates Multiple Mechanisms for DOJ To Grant Individualized Exemptions, But It Will Not Consider Safehouse's Claim for a Religious Exemption ...................................................................................39

    1. Registration Waiver and Regulatory Exemption from DEA Enforcement...............................................................................................39

    2. The Research Exemption ........................................................................42

    3. The Peyote Exemption for the Native American Church .........................44

    4. Authority to Remit Penalties for Simple Possession ................................44

E. DOJ's Has Not Met Its Burden of Establishing that Its Policy of Enforcing Section 856(a) Withstands Strict Scrutiny............................................................46

V. IF THE COURT GRANTS DOJ'S MOTION, IT SHOULD DO SO WITHOUT PREJUDICE AND WITH LEAVE TO AMEND .............................................................46

CONCLUSION.......................................................................................................................47

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
  143 S. Ct. 2298 (2023) ................................................................................................... 25, 27

*Abdul-Aziz v. Lanigan*,
  2020 WL 3287229 (D.N.J. June 18, 2020) .................................................................... 29

*Adams v. Gould, Inc.*,
  739 F.2d 858 (3d Cir. 1984) ........................................................................................... 13, 47

*Africa v. Pennsylvania*,
  662 F.2d 1025 (3d Cir. 1981) ......................................................................................... 16, 19

*Arthur v. Maersk, Inc.*,
  434 F.3d 196 (3d Cir. 2006) ........................................................................................... 13, 46

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................ 12

*Babul v. Relmada Therapeutics, Inc.*,
  2016 WL 233699 (E.D. Pa. Jan. 20, 2016) ................................................................... 12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................ 2, 12

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) ................................................................................................... *passim*

*Castleberry v. STI Grp.*,
  863 F.3d 259 (3d Cir. 2017) ........................................................................................... 13

*Caviezel v. Great Neck Pub. Sch.*,
  701 F. Supp. 2d 414 (E.D.N.Y. 2010) ........................................................................... 19

*Check v. N.Y.C. Dep't of Educ.*,
  2013 WL 121136791 (E.D.N.Y. 2013) ........................................................................... 19

*Chosen 300 Ministries, Inc. v. City of Philadelphia*,
  2012 WL 3235317 (E.D. Pa. Aug. 9, 2012) .................................................................. 17

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
  508 U.S. 520 (1993) ........................................................................................................ 34, 46

*Clark v. Gov. of N.J.*,
  53 F.4th 769 (3d Cir. 2022) ............................................................................................ 35, 36, 38

*Connelly v. Steel Valley Sch. Dist.*,
  706 F.3d 209 (3d Cir. 2013) ........................................................................................... 12

*Cutter v. Wilkinson*,
544 U.S. 709  (2005)................................................................................ 19

*Dahl v. Bd. of Trustees of W. Michigan Univ.*,
15 F.4th 728 (6th Cir. 2021) ..................................................................... 37

*Davis v. Wigen*,
__ F. 4th __, 2023 WL 4986493 (3d Cir. Aug. 4, 2023) ................................. *passim*

*Detwiler v. Mid-Columbia Medical Center*,
2022 WL 19977290 (D. Or. Dec. 20, 2022) ............................................... 24

*Earley v. JMK Assocs.*,
2018 WL 11305388 (E.D. Pa. Sept. 5, 2018) ............................................. 12

*Employment Div., Dept. of Human Resources of Ore. v. Smith*,
494 U.S. 872 (1990)........................................................................... 34, 37

*Fifth Ave. Presbyterian Church v. City of New York*,
293 F.3d 570 (2d Cir. 2002)...................................................................... 17

*Finkbeiner v. Geisinger Clinic*,
623 F. Supp. 3d 458 (E.D. Pa. 2022) ......................................................... 24

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009)...................................................................... 12

*Fulton v. City of Phila.*,
141 S. Ct. 1868 (2021) ............................................... 35, 36, 37, 38, 44

*Geerlings v. Tredyffrin/Easttown Sch. Dist.*,
2021 WL 4399672 (E.D. Pa. Sept. 27, 2021) ...................................... 19, 23

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
546 U.S. 418 (2006)........................................................... 15, 28, 41, 44

*Harbor Missionary Church Corp. v. City of San Buenaventura*,
642 F. App'x 726 (9th Cir. 2016) .............................................................. 17

*Henderson v. Kennedy*,
253 F.3d 12 (D.C. Cir. 2001) .................................................................... 32

*Holt v. Hobbs*,
574 U.S. 352 (2015)............................................... 27, 29, 31, 32, 33

*Jackson v. Patzkowski*,
468 F. Supp. 3d 1328 (E.D. Wash. 2019) ................................................. 29

*Kennedy v. Bremerton Sch. Dist.*,
142 S. Ct. 2407 (2022).............................................. 32, 34, 35, 46

*Korte v. Sebelius*,
   735 F.3d 654 (7th Cir. 2013) ................................................................. 18

*LeBoon v. Lancaster Jewish Community Association*,
   503 F.3d 217 (3d Cir. 2007)............................................................. 26, 27

*Mack v. Warden Loretto FCI*,
   839 F.3d 286 (3d Cir. 2016)................................................................. 13

*Mason v. Gen. Brown Cent. Sch. Dist.*,
   851 F.2d 47 (2d Cir. 1988)................................................................... 19

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*,
   138 S. Ct. 1719 (2018)................................................................... 25, 27

*Oyler v. Boles*,
   368 U.S. 448 (1962)............................................................................ 38

*Patrick v. LeFevre*,
   745 F.2d 153 (2d Cir. 1984)........................................................... 16, 19

*Pryor v. NCAA*,
   288 F.3d 548 (3d Cir. 2002)................................................................. 12

*Rigdon v. Perry*,
   962 F. Supp. 150 (D.D.C. 1997) .......................................................... 22

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020)........................................................................... 38

*Snodgrass v. Robinson*,
   2015 WL 4743986 (W.D. Va. Aug. 10, 2015) ...................................... 29

*Sutton v. Rasheed*,
   323 F.3d 236 (3d Cir. 2003)................................................................. 19

*Tandon v. Newsom*,
   141 S. Ct. 1294 (2021)............................................................. 35, 36, 38

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)............................................................................ 12

*The Jesus Ctr. v. Farmington Hills Zoning Bd. of Appeals*,
   544 N.W.2d 698 (Mich. App. 1996) .................................................... 17

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
   450 U.S. 707 (1981)..................................................................... 20, 30

*Trippett v. Pennsylvania*,
   2017 WL 4347662 (E.D. Pa. Sept. 29, 2017) ...................................... 12

*Tyco Fire Prod. LP v. Victaulic Co.,*
  777 F. Supp. 2d 893 (E.D. Pa. 2011) ................................................................ 2

*Ulrich v. Lancaster General Health,*
  2023 WL 2939585 (E.D. Pa. Apr. 13, 2023) ................................................... 24

*United States v. Akinyoyenu,*
  199 F. Supp. 3d 106 (D.D.C. 2016) ........................................................... 41, 42

*United States v. Armstrong,*
  517 U.S. 456 (1996) ....................................................................................... 38

*United States v. Batchelder,*
  442 U.S. 114 (1979) ....................................................................................... 38

*United States v. Betancourt,*
  734 F.2d 750 (11th Cir. 1984) ....................................................................... 41

*United States v. Epstein,*
  91 F. Supp. 3d 573 (D.N.J. 2015) .................................................................. 33

*United States v. Hoffman,*
  436 F. Supp. 3d 1272 (D. Ariz. 2020) ...................................................... 22, 23

*United States v. Meyers,*
  95 F.3d 1475 (10th Cir. 1996) ....................................................................... 19

*United States v. Safehouse,*
  985 F.3d 225 (3d Cir. 2021)........................................................................... 11

*United States v. Seeger,*
  380 U.S. 163 (1965)........................................................................................ 17

*United States v. Sineneng-Smith,*
  140 S. Ct. 1575 (2020).................................................................................... 33

*Visels Drug Store, Inc. v. Drug Enf't Agency,*
  593 F. App'x 12 (2d Cir. 2014) ...................................................................... 41

*W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.,*
  862 F. Supp. 538 (D.D.C. 1994) .......................................................... 7, 17, 21

*Washington v. Klem,*
  497 F.3d 272 (3d Cir. 2007)............................................................................ 31

*Wayte v. United States,*
  470 U.S. 598 (1985)........................................................................................ 38

*Welsh v. United States,*
  398 U.S. 333 (1970)........................................................................................ 22

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972)................................................................................ 19, 28

*Yellowbear v. Lampert,*
    741 F.3d 48 (10th Cir. 2014) ................................................................ 28, 30

*Zimmer v. Gruntal & Co.,*
    732 F. Supp. 1330  (W.D. Pa. 1989)............................................................ 12

## Statutes and Regulations

21 C.F.R. § 1307.03 ................................................................................ 39, 40

21 C.F.R. § 1307.31 .......................................................................... 39, 41, 44

21 C.F.R. § 1316.24 ...................................................................................... 43

28 C.F.R. § 76.2(h) ...................................................................................... 45

21 U.S.C. § 822(d) .................................................................................. 39, 40

21 U.S.C. § 841(a)(1) .................................................................................... 41

21 U.S.C. § 844 ...................................................................................... 42, 44

21 U.S.C. § 844a .................................................................................... 39, 45

21 U.S.C. § 844a(f) ...................................................................................... 45

21 U.S.C. § 856(a) ................................................................................ *passim*

21 U.S.C. § 872(e) .................................................................................. 39, 42

26 U.S.C. § 501(c)(3) .................................................................................. 3, 27

42 U.S.C. § 2000bb–1 ...................................................................... 2, 13, 15, 29

42 U.S.C. § 2000cc-3(g) ................................................................................ 15

42 U.S.C. § 2000cc-5(7)(A)................................................................ 15, 29, 32

## Rules

Federal Rule of Civil Procedure 12(b)(6) ........................ 2, 12, 23, 31, 39, 43

Federal Rule of Civil Procedure 15(a)(2) .............................................. 13, 46

## Other Authorities

National Institutes of Health, Project No. 1R01DA058277-01, *A comparative evaluation of overdose prevention programs in New York City and Rhode Island* ...................................... 43

Sharon Otterman, *Federal Officials May Shut Down Overdose Prevention Centers in Manhattan*, N.Y. TIMES (Aug. 8, 2023).................................................................... 9, 37

## INTRODUCTION

Since 2017, more than 7,200 people have died of preventable opioid overdoses in Philadelphia.  Tens of thousands of others continue to suffer in the grips of opioid addiction and substance use disorder.  Safehouse's board members grieve for every life lost to overdose.  They believe, based on their deeply held religious convictions, that they have a duty to do everything possible to keep those individuals alive, even for one more day.  They thus seek to open an overdose-prevention center in Philadelphia, which will employ evidence-based public-health interventions, including medically supervised consumption, to save lives threatened by the opioid crisis.

When Safehouse began its efforts, the Department of Justice (DOJ) responded by threatening Safehouse and its Board President, José Benitez, with civil and criminal enforcement of 21 U.S.C. § 856(a).  This threat sought to bar Safehouse and its board members from fulfilling their deeply held religious obligations to provide those suffering from addiction with shelter and critical lifesaving care at the time of consumption, when those individuals are at the greatest risk of overdose death.  Instead of allowing people at risk to remain under Safehouse's care and supervision at the critical moment of consumption, DOJ demands that Safehouse and its board members either cast these vulnerable individuals outside or risk criminal prosecution for allowing them to remain sheltered and within immediate reach of critical medical treatment.  DOJ has confronted Safehouse and its board members with a heart-wrenching choice: to either risk federal prison for exercising their religious beliefs or refrain from religious exercise while people continue to die each year of preventable overdose, often just out of reach of the medical care that Safehouse would provide.

DOJ's selective threat of enforcement against Safehouse—when it has *never* in Section 856's decades-long history prosecuted a property owner or operator based solely on use or simple possession at the property—violates both the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb, *et seq.*, and the Free Exercise Clause of the First Amendment.  This Court should accordingly deny DOJ's motion to dismiss.

## FACTUAL BACKGROUND[1]

*The Opioid Epidemic.*  Philadelphia is in the midst of a severe public-health emergency due to the opioid epidemic and overdose crisis.  (Second Am. Counterclaim ¶¶ 17-19, 25-27, Dkt. No. 209.) Since 2017, more than 7,200 people in Philadelphia have suffered a fatal overdose, and tens of thousands of others continue to be afflicted by opioid addiction and substance use disorder. (*Id.* ¶ 132.)

*Naloxone and Overdose Prevention.*  Every second counts when responding to an opioid overdose, particularly given the recent, widespread proliferation of fentanyl—a powerful and fast-acting opioid that is 50-to-100 times more potent than heroin.  (*Id.* ¶¶ 22-23.) In the event of a fentanyl overdose, a person may stop breathing within minutes of consumption. (*Id.* ¶ 22.)  Absent intervention, serious injury or death can occur as quickly as 3-to-5 minutes.  (*Id.*)  The more time that elapses, the greater the risk of serious injury and death.  (*Id.* ¶¶ 22-23, 69.)

An overdose can be reversed with timely medical intervention.  If immediately available, the administration of Naloxone or similar opioid receptor antagonists provides lifesaving treatment that will resuscitate and keep a person alive with medical certainty.  (*Id.* ¶¶ 23, 46, 68.)  Because a person experiencing an overdose (and thus losing consciousness) cannot self-administer

---

[1] Because DOJ has moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), the facts at issue are those pleaded in Safehouse's counterclaim.  *See, e.g.*, *Tyco Fire Prod. LP v. Victaulic Co.*, 777 F. Supp. 2d 893, 898 (E.D. Pa. 2011) (noting that *Twombly* applies to counterclaims).

Naloxone, however, it can work only if someone is close by to administer it.  (*Id.* ¶ 69.)  Ensuring proximity to medical care (and Naloxone) at the time of consumption is therefore a critical component of efforts to prevent fatal opioid overdose.  (*Id.* ¶¶ 22-23, 34, 68-69.)  It allows those at high risk of overdose death to stay within immediate reach of urgent, lifesaving medical care at the critical moment of consumption.[2]  (*Id.* ¶ 46.)

*Formation of Safehouse.*   Safehouse is a non-profit established in 2018 to provide overdose-prevention services in Philadelphia.  (*Id.* ¶ 29.)  Motivated by the shared tenet of the religious faith of its board that makes paramount the preservation of human life, Safehouse's purpose is to provide lifesaving medical treatment, primary care, initiation of drug treatment, and wraparound services to the vulnerable population at high risk of overdose death and complications from opioid use disorder.  (*Id.* ¶¶ 33-36, 124-32.)[3]  To achieve this purpose, Safehouse plans to open an overdose-prevention site that will employ evidence-based public-health interventions,

---

[2] For these reason, the medical and public-health measures that Safehouse proposes have been recognized and endorsed by prominent national and international medical and public-health associations including the American Medical Association, the American Public Health Association, AIDS United, the European Monitoring Center for Drugs and Drug Addiction, the Infectious Diseases Society of America, the HIV Medical Association, the International Drug Policy Consortium, and scores of public health experts, physicians, and addiction researchers. *See* Dkt. Nos. 89, 90, 92, 95. Philadelphia's Public Health Commissioner and its Commissioner of the Department of Behavioral Health and Intellectual disAbility Services have each announced that overdose prevention, including supervised consumption, is a critical medical and public-health intervention to mitigate Philadelphia's overdose crisis.  *See* Dkt. No. 101

[3] Article IV of Safehouse's Articles of Incorporation (Exhibit 1 to DOJ's Motion, Dkt. No. 211-1) states that Safehouse "is a nonprofit organization organized and operated exclusively for charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, . . . specifically for the purposes of reducing the harms associated with drug use by providing a range of public health and social services."  Since its formation in 2018, Safehouse's mission statement has announced that "[t]he leaders and organizers of Safehouse are motivated by the Judeo-Christian beliefs ingrained in us from our religious schooling, our devout families and our practices of worship. At the core of our faith is the principle that preservation of human life overrides any other considerations." Dkt. No. 35-1, at 6 (Exhibit A to DOJ's Amended Complaint).

including medically supervised consumption, to mitigate the catastrophic losses associated with the opioid epidemic and overdose crisis in Philadelphia.  In particular, Safehouse "will offer a variety of services" to participants "aimed at preventing the spread of disease, administering medical care, and encouraging drug users to enter treatment."  Dkt. No. 133 at 4 (Oct. 2, 2019 Order).

*Safehouse's Proposed Overdose-Prevention Site.*  This Court has previously (and accurately) summarized the operation of Safehouse's proposed overdose-prevention site as follows:

> [W]hen one arrives at Safehouse, they will first go through a registration process.  The participant will provide certain personal information and receive a physical and behavioral health assessment.  Safehouse staff will then offer a variety of services, including medication-assisted treatment, medical care, referrals to a variety of other services, and use of medically supervised consumption and observation rooms.  There is nothing in the protocol that suggests Safehouse will specifically caution against drug usage.
>
> Participants who choose to use drugs in the medically supervised consumption room will receive sterile consumption equipment as well as fentanyl test strips once they enter the room.  At no point will Safehouse staff handle or provide controlled substances.  Staff members will supervise participants' consumption and, if necessary, intervene with medical care, including reversal agents to prevent fatal overdose.  Before leaving the room, participants will dispose of used consumption equipment.  After participants finish in the medically supervised consumption room, staff will direct them to the medically supervised observation room.  Nothing in the Safehouse protocol appears to require that a participant remain in the observation room for a specified period of time.  In the observation room, certified peer counselors, as well as recovery specialists, social workers, and case managers will be available to offer services and encourage treatment.[4]  The same services will again be offered for the third time at check out.

*Id.* at 4-5; *see* Stipulation of Facts ¶¶ 7-23, Dkt. No. 137-1.  And as this Court previously recognized, Safehouse's overdose-prevention site "ultimately seeks to reduce unlawful drug use."

---

[4] Safehouse believes that supervised consumption aids potential treatment in that its participants are more likely to engage in counseling and accept offers of medical care after they have consumed drugs and are not experiencing withdrawal symptoms.  Dkt. No. 137-1 ¶ 22.

Dkt. No. 133 at 49 (Oct. 2, 2019 Order).  Given the urgent need for these services—and the staggering number of overdose fatalities in Philadelphia—Safehouse "plans to open at least one facility in Philadelphia as soon as possible."  Stipulation of Facts ¶ 24, Dkt. No. 137-1.  "[W]hen Safehouse does open," moreover, "the demand for illegal drugs will decrease because some of its participants will seek and be provided with drug treatment."  (Second Am. Counterclaim ¶ 151, Dkt. 209; *see id.* ¶ 38 (citing study estimating that an overdose-prevention site could reduce overdose deaths annually by 30% in the site's immediate vicinity).)

    ***Safehouse's Board and Religious Beliefs.***  At present, Safehouse exists entirely through its board of directors, which is led by José Benitez—Safehouse's Board President.  Mr. Benitez and other board members are adherents of religions in the Judeo-Christian tradition and are motivated by their religious beliefs:

> (i)    Board President Mr. Benitez was raised and educated as a Roman Catholic and has spent his entire professional life, including as Director of Prevention Point Philadelphia,[5] living out that faith and those teachings.

> (ii)    Board member Dr. Frank A. James III is the past President of Missio Seminary (formerly known as Biblical Theological Seminary), a non-sectarian Protestant graduate and professional institution.

> (iii)    Board member Reverend Erica Poellot is a Minister of Harm Reduction and Overdose Prevention Ministries of the United Church of Christ.

> (iv)    Board member Pastor Adarrel Omar Fisher is a Philadelphia Police Chaplain and the pastor of Geiger Memorial Church of the Brethren.

(*Id.* ¶ 124.)  These board members' religious beliefs have been ingrained in them by their religious schooling and their practices of worship.  (*Id.* ¶ 125.)  Although Safehouse is not itself a religious

---

[5] Prevention Point Philadelphia (PPP) has been in operation for over 31 years.  "PPP offers clean syringe exchange services, primary medical care, an HIV clinic, a Hepatitis C clinic, wound care and education on safer injection techniques, overdose prevention education, overdose reversal kits and distribution, housing, meals, mail services, Medication-Assisted Treatment, and drug recovery and treatment services.  PPP does not permit the use of controlled substances at its facility."  Stipulation of Fact ¶ 5, Dkt. No. 137-1.

entity or organization, its board members' beliefs are those of the corporation, and the pursuit of its mission and conduct of its business will implement those beliefs. (*Id.* ¶ 126.)

At the core of their faith is the principle that the preservation of human life is paramount and overrides any other considerations. (*Id.*) This principle arises, in part, from the sincerely held religious belief that human life has inherent value because God created all living things. (*Id.* ¶ 128.) Based on that principle, these Safehouse's board members sincerely believe that the provision of overdose-prevention services effectuates their religious obligation to preserve life, provide shelter to our neighbors, and to do everything possible to care for the sick. (*Id.* ¶ 129.) These beliefs are rooted in scripture and appear throughout the Old and New Testaments. (*Id.* ¶ 127.) For example:

- In the Gospel of John, Jesus refused to condemn to death a woman who had sinned, and cautioned fellow believers, "[l]et any one of you who is without sin be the first to cast a stone." John 8:7-11

- The Gospel of John also counsels Christians: "The way we came to know love was that [Jesus] laid down his life for us; so we ought to lay down our lives for our brothers. If someone who has worldly means sees a brother in need and refuses him compassion, how can the love of God remain in him? Children, let us love not in word or speech but in deed and truth." 1 John 3:16-18.

- Matthew 25:34-40 directs believers to take in and care for the sick: "Then the king [*i.e.*, Jesus Christ] will say to those on his right, 'Come, you who are blessed by my Father. Inherit the kingdom prepared for you from the foundation of the world. For I was . . . ill and you cared for me. . . . Amen, I say to you, whatever you did for one of the least brothers of mine, you did for me.'"

- In his Epistle to the Galatians, Paul the Apostle instructs Christians to "[b]ear one another's burdens, and so fulfill the law of Christ." Galatians 6:2.

- According to the Shulchan Aruch, the Code of Jewish Law, "the Torah has granted the physician permission to heal, and it is a religious duty which comes under the rule of saving an endangered life. If he withholds treatment, he is regarded as one who sheds blood." Shulchan Aruch, Yoreh De'ah 336:1.

- The Book of Leviticus contains the clear commandment:  "You shall not go up and down as a talebearer among your people; neither shall you stand idly by the blood of your neighbor: I am the Lord."  Leviticus 19:16.

- In Deuteronomy, Moses conveys God's commandment:  "You shall open wide your hand to your brother, to the needy and to the poor, in your land."  Deuteronomy 15:11.

- The Talmud teaches:  "It was for this reason that man was first created as one person [Adam], to teach you that anyone who destroys a life is considered by Scripture to have destroyed an entire world; and anyone who saves a life is as if he saved an entire world."  Mishnah Sanhedrin 4:5.

- Mark 12:28:31, Jesus Christ responds as follows to the question of which "commandment is the most important of all?":  "The most important is, 'Hear, O Israel:  The Lord our God, the Lord is one.  And you shall love the Lord your God with all your heart and with all your soul and with all your mind and with all your strength.'  The second is this:  'You shall love your neighbor as yourself.'  There is no other commandment greater than these."[6]

(*Id.* ¶ 127.i–ix.)

The religious beliefs described above compel and motivate these board members to take action to save lives in the current overdose crisis.  Establishing and running Safehouse in accordance with these tenets is an expression of their faith.  (*Id.* ¶¶ 128-132.)

**Threatened Prosecution.**  DOJ has asserted that Safehouse's overdose-prevention services model violates the federal "crack house" statute, 21 U.S.C. § 856(a), which provides as follows:

Except as authorized by this subchapter, it shall be unlawful to—

(1) *knowingly open, lease, rent, use, or maintain any place*, whether permanently or temporarily, *for the purpose* of manufacturing, distributing, or *using* any controlled substance;

---

[6] To be clear, these are just examples. As courts have recognized, "[T]he concept of acts of charity as an essential part of religious worship is a central tenet of all major religions." *W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*, 862 F. Supp. 538, 544 (D.D.C. 1994) (citing and discussing examples from the Bible, "the five Pillars of Islam," Hinduism, and Judaism).

(2) *manage or control any place*, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, *and knowingly and intentionally* rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or *using a controlled substance*.

*See* 21 U.S.C. § 856(a) (emphasis added).[7]  DOJ has threatened to commence civil and criminal enforcement proceedings to prevent Safehouse from opening and becoming operational.  (Second Am. Counterclaim ¶¶ 7-8, 39-41.)  As a predicate to enforcement proceedings, DOJ brought the underlying declaratory judgment action against Safehouse and Mr. Benitez, resulting in Safehouse's counterclaims. Dkt. Nos. 1, 35. Safehouse, its leaders, board members, and personnel are threatened with federal civil and criminal enforcement unless Safehouse refrains from following religious obligations to provide shelter and lifesaving treatment to those at risk of overdose at the time they are most vulnerable—the moment of consumption.  (Second Am. Counterclaim ¶¶ 39-41, 124-32.)

**Burden on Religious Exercise.**  DOJ's threats of civil and criminal enforcement burden religious exercise by forcing Safehouse to choose between the exercise of its board members' religions and conformity with DOJ's interpretation of Section 856.  (*Id.* ¶ 130.)  Indeed, because of DOJ's threats, Safehouse and its board members have been unable to offer the lifesaving overdose-prevention services that Safehouse seeks to provide.  (*Id.* ¶ 131.) Safehouse and its board members have been threatened with prosecution if they allow those suffering from addiction to remain under their care and supervision and within their shelter at the time of consumption of opioids, when those individuals are at greatest risk of overdose death.  (*Id.* ¶¶ 7-8, 39-41, 131.)

---

[7] In light of the Third Circuit's ruling, Safehouse acknowledges—for purposes of this motion—that Section 856(a) prohibits Safehouse's contemplated overdose-prevention services model. Safehouse reserves the right to challenge that conclusion in subsequent proceedings in the Third Circuit or the U.S. Supreme Court.

Contrary to their sincere religious beliefs, Safehouse and its board members have been compelled to cast these vulnerable individuals outside of their facilities and have been unable to fulfill their deeply held religious obligation to do everything possible to provide them with critical lifesaving care, including by providing them with shelter and medical supervision at the time of consumption to prevent overdose death. (*Id.* ¶¶ 131-132)

***DOJ's Policy of Selective Enforcement of Section 856(a).*** DOJ has threatened to enforce Section 856(a) against Safehouse and its religiously motivated Board President. But it has not identified "a single § 856(a) case predicated solely on use" at the penalized location since the statute's inception. Dkt. No. 133 at 40 n.39 (emphasis added). "Instead, it exempts these offenses from prosecution as a matter of course and on an individualized basis. Indeed, in the 33 years since Section 856 was first enacted, the government has cited no examples of a criminal prosecution under Section 856 involving only simple possession or use—much less prosecutions involving public health interventions similar to Safehouse." (Second Am. Counterclaims ¶ 145.) Nor has it identified a single case in which Section 856(a) was enforced in similar circumstances. DOJ "has never sought to use Section 856 to prosecute or enjoin any public health measure or legitimate medical activity remotely analogous to Safehouse's proposed overdose prevention model." (*Id.* ¶ 81.)

Shortly after DOJ moved to dismiss, DOJ announced for the first time that it was implementing a policy of selectively enforcing Section 856(a) against providers of supervised consumption services on a "district-by-district basis."[8] Specifically, DOJ declared that "supervised consumption sites were being evaluated on a district-by-district basis, in discussion

---

[8] Sharon Otterman, *Federal Officials May Shut Down Overdose Prevention Centers in Manhattan*, N.Y. Times (Aug. 8, 2023), https://www.nytimes.com/2023/08/08/nyregion/drug-overdoses-supervised-consumption-nyc.html.

with local leaders, to determine 'appropriate regulatory guardrails.'"   And throughout these proceedings, DOJ has made exceptions to an unyielding interpretation of Section 856(a) by arguing that the statute permits some forms of supervised consumption, such as supervised consumption in a public space, in a mobile van, or in the home of loving parents who invite their adult child to stay home, under their care and watchful eye, "then instruct the child to inject drugs there, in the parents' presence, to allow for resuscitation" with Naloxone."   *See* DOJ Mot. at 13 n.6 (vaguely asserting that Safehouse could supervise consumption "in a public space" and "in many private spaces"); DOJ Opening Third Circuit Appeals Brief at 45 n.11, 54-55. While contemplating exemptions from prosecution for similar secular services, DOJ has nevertheless persisted in its effort to enforce Section 856(a) against Safehouse if it provides these same services in accordance with the religious faith of its board.

## PROCEDURAL HISTORY

*DOJ's Initial Complaint, and Safehouse's Initial Counterclaims.*   On February 5, 2019, DOJ filed a complaint for a declaratory judgment against Safehouse and Safehouse's then–Executive Director, seeking a declaration that Safehouse's provision of supervised consumption services would violate 21 U.S.C. § 856(a)(2).   Dkt. No. 1.   DOJ subsequently amended its complaint to name Mr. Benitez as a defendant given his role as Safehouse's Board President.   Dkt. No. 35.   Safehouse brought a two-count counterclaim against DOJ seeking declaratory and injunctive relief.   Dkt. No. 3; *see also* Dkt. No. 45.   Safehouse's first counterclaim sought a declaratory judgment that, as a matter of statutory interpretation, Section 856(a) does not apply to Safehouse's proposed overdose-prevention site.   Safehouse's second counterclaim sought a declaration that application of Section 856(a) to Safehouse would violate the Commerce Clause of the U.S. Constitution by criminalizing entirely local, noncommercial activities and would violate

RFRA by subjecting Safehouse and its founders to criminal penalties for exercising their sincerely held religious beliefs.  In other words, Safehouse argued that Section 856(a) does not apply to Safehouse and that it cannot apply to Safehouse even if the court were to adopt DOJ's interpretation of the statute.

*Proceedings in this Court.*  DOJ moved for judgment on the pleadings, and Safehouse opposed the motion.  Dkt. Nos. 47, 48, 115.  This Court denied DOJ's motion and subsequently granted summary judgment in Safehouse's favor, concluding that Section 856(a) does not prohibit Safehouse's proposed conduct because "Safehouse does not plan to make its facility available 'for the purpose of' facilitating unlawful drug use."  Dkt. Nos. 133, 134, 141, 142.  In light of that conclusion, this Court rightly concluded that "there is no need to reach" the merits of Safehouse's RFRA counterclaim, deemed the counterclaim "preserved," and dismissed it without prejudice. Dkt. No. 141 at 2-3 n.1 (Opinion); *see* Dkt. No. 142 ¶ 2 (Order).

*The Appeal.*  DOJ appealed.  The Third Circuit reversed in a split panel decision, concluding that Safehouse's proposed overdose-prevention services model would violate Section 856(a)(2) and that application of that statute to Safehouse would not violate the Commerce Clause of the U.S. Constitution.  *United States v. Safehouse*, 985 F.3d 225 (2021).  The Third Circuit remanded to this Court for consideration of Safehouse's RFRA counterclaim.  *Id.* at 243. Safehouse's petition for en banc review was denied by a divided Third Circuit, over the dissent of Judge Theodore McKee, joined by Judges L. Felipe Restrepo and Jane R. Roth.  On October 12, 2021, Safehouse's petition for a writ of certiorari to the United States Supreme Court was denied. *See* 142 S. Ct. 345 (2021) (No. 21-276).

*The Amended Counterclaims.*  On remand, Safehouse amended its pleadings to: (i) include an additional counterclaim for violations of the Free Exercise Clause of the First

Amendment to the U.S. Constitution, and (ii) amend factual allegations reflecting changes to the composition of Safehouse's board.  Dkt. No. 209 (Second Am. Counterclaim).

## LEGAL STANDARDS

The government has moved to dismiss Safehouse's counterclaims under Federal Rule of Civil Procedure 12(b)(6).  Their motion fails under the standards applicable to that Rule.

"To prevail on a motion to dismiss, accepting all well-pleaded facts as true and construing the complaint in the light most favorable to the plaintiff, a defendant must demonstrate that the plaintiff has failed to state a claim as a matter of law." *Earley v. JMK Assocs*., 2018 WL 11305388, at *1 (E.D. Pa. Sept. 5, 2018) (McHugh, J.) (citing *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  In analyzing such a motion, this Court "must assume all of Plaintiff's factual allegations are true, draw all inferences in his favor, 'and then determine whether they plausibly give rise to an entitlement for relief.'"  *Babul v. Relmada Therapeutics, Inc*., 2016 WL 233699, at *4 (E.D. Pa. Jan. 20, 2016) (McHugh, J.) (quoting *Connelly v. Steel Valley Sch. Dist*., 706 F.3d 209, 212 (3d Cir. 2013)).  "A complaint need not present 'detailed factual allegations' to survive a motion to dismiss." *Trippett v. Pennsylvania*, 2017 WL 4347662, at *2 (E.D. Pa. Sept. 29, 2017) (McHugh, J.) (quoting *Twombly*, 550 U.S. at 555).  Instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).[9]

---

[9] This Court may properly consider "documents which are attached to or submitted with the complaint, as well as . . . documents whose contents are alleged in the complaint and whose authenticity no party questions." *Pryor v. NCAA*, 288 F.3d 548, 560 (3d Cir. 2002).  In addition, judicially noticeable facts may be invoked, *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 322 (2007), and any unambiguous admissions properly attributable to the adverse party. *Zimmer v. Gruntal & Co.*, 732 F. Supp. 1330, 1334 n.9 (W.D. Pa. 1989).

If a complaint does not satisfy this standard, however, the Court "should freely give leave to amend when justice so requires." Fed. R. Civ. P. 15(a)(2). This "liberal amendment philosophy limits the [] court's discretion to deny leave to amend." *Adams v. Gould, Inc*., 739 F.2d 858, 864 (3d Cir. 1984). As a result, "[l]eave to amend must generally be granted unless equitable considerations render it otherwise unjust." *Arthur v. Maersk, Inc*., 434 F.3d 196, 204 (3d Cir. 2006).

## ARGUMENT

RFRA prohibits the "Government [from] substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless the "Government . . . demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb–1(a), (b). Earlier this month—after DOJ filed its motion—the Third Circuit in *Davis v. Wigen* clarified the pleading standards for civil RFRA claims. *See* __F. 4th__, 2023 WL 4986493, at *7 (3d Cir. Aug. 4, 2023) (precedential) (reversing dismissal of civil RFRA claim). "To state a prima facie RFRA claim, a plaintiff 'must allege that the government (1) substantially burdened (2) a sincere (3) religious exercise.'" *Id.* at *4 (quoting *Mack v. Warden Loretto FCI*, 839 F.3d 286, 304 (3d Cir. 2016)). "At the pleadings stage," however, "a court asks only whether the plaintiff has plausibly alleged each element of his prima facie case." *Id.* at *5 (citing *Castleberry v. STI Grp*., 863 F.3d 259, 266 (3d Cir. 2017)).[10]

---

[10] "On a summary judgment motion or at trial"—but *not* at the pleading stage—"if the plaintiff makes an initial showing that the defendant substantially burdened his sincere religious exercise, then the burden shifts to the defendant to show that the offending policy is the least restrictive means of achieving a compelling government interest." *Id.* at *5.

Although DOJ does not directly question the sincerity of Safehouse's religious beliefs, DOJ asserts that Safehouse has failed to plead a prima facie RFRA claim because it contends (1) Safehouse's "true motivation" is not religious in nature; (2) Safehouse, as a non-profit corporation, cannot assert religious rights based on the beliefs of its board; and (3) a threat of criminal prosecution for engaging in religiously motivated conduct does not constitute a "substantial burden" when there are "multiple legal alternatives" available.  DOJ Mot. 11.  DOJ's motion fails on all three grounds.

DOJ mischaracterizes Safehouse's religious convictions, inappropriately contests Safehouse's motivations and the sincerity of its religious beliefs, and improperly asks this Court to ignore the allegations and resolve fact-bound questions at the pleading stage.  Safehouse has pleaded a religious liberty claim because it has asserted that its sincerely held religious beliefs, and the beliefs of its board members, call Safehouse to provide shelter and critical medical care to those at risk of overdose death at the moment they are most vulnerable—the time of consumption.  There can be little doubt that DOJ's threat of criminal prosecution has substantially burdened Safehouse's exercise of these beliefs; it has prohibited Safehouse from expressing its religious commitment by providing lifesaving supervised consumption services.  The stark facts of the opioid and overdose crises make clear, moreover, that the ill-defined alternatives to supervised consumption suggested by DOJ—such as providing medical care to those suffering from addiction outdoors or in haphazard private locations—do not alter Safehouse's conviction that it must do everything possible to stop the tragic loss of life to overdose.  Only immediate access to medical care prevents overdose death with certainty.  Nor do DOJ's "alternatives" address Safehouse's religious belief that it should provide not only lifesaving care, but also shelter to those suffering from addiction, by allowing its participants to stay inside the protection of its facility while

receiving care, including at the time of consumption.  The Court should promptly deny DOJ's

motion.

I.   **SAFEHOUSE'S PLEADING DEMONSTRATES SAFEHOUSE IS MOTIVATED BY SINCERELY HELD RELIGIOUS BELIEFS TO PROVIDE ITS LIFESAVING SUPERVISED CONSUMPTION SERVICES**

   A.   **Safehouse's Calling to Shelter and Provide Lifesaving Care to those at Risk of Overdose Death Carries Out the Core Religious Beliefs of Its Board**

   To state a RFRA claim, a plaintiff must allege that the conduct at issue is a "sincere exercise

of religion."  *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430-31

(2006) ("*O Centro*"); 42 U.S.C. § 2000bb-1(a).  As set out in the statute, "RFRA protects religious

exercise whether or not it is 'compelled by, or central to, a system of religious belief.'"  *Davis*, No.

2023 WL 4986493, at *4 (quoting 42 U.S.C. § 2000cc-5(7)(A)).  Practices are protected where

they have "profound religious significance" or are an "expression of [someone's] faith."  *Id.* at *6.

The Supreme Court has declared that "RFRA was designed to provide very broad protection for

religious liberty."  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014).  In fact, RFRA

"*must* be 'construed in favor of a broad protection of religious exercise, to the maximum extent

permitted by the terms of th[e statute] and the Constitution."  *Davis*, 2023 WL 4986493, at *5

(emphasis added) (quoting 42 U.S.C. § 2000cc-3(g)).

   The religious commitments expressed in Safehouse's mission address fundamental and

ultimate questions about one's duties to God and are part of religious belief systems dating back

millennia.  The mission statement of Safehouse announces, "The leaders and organizers of

Safehouse are motivated by the Judeo-Christian beliefs ingrained in us from our religious

schooling, our devout families and our practices of worship."  Mission Statement, Dkt. No. 35-1,

at 6 (Exhibit A to DOJ's Amended Complaint); Second Am. Counterclaim ¶ 125; *see Hobby

Lobby*, 573 U.S. at 703 ("Hobby Lobby's statement of purpose commits the Greens to '[h]onoring

15

the Lord in all [they] do by operating the company in a manner consistent with Biblical principles.'").  Safehouse has further alleged that its Board President, José Benitez, and its board members are followers of religious faiths (Second Am. Counterclaims ¶ 124); that the board members share the religious belief—rooted in scriptures and their sacred texts—that they are obligated to "preserve life, provide shelter to [their] neighbors, and to do everything possible to care for the sick" (*id.* ¶¶ 126-29); and that the provision of supervised consumption facilities would effectuate that obligation.  (*Id.* ¶ 129.)  Safehouse board members believe in the existence of God, and in the scripture of their respective faiths.  (*See id.* ¶¶ 124, 126, 129 (describing the religious practices of the board).)  The positive commandment to save lives animating the Safehouse mission—"the core of all board members' faith" (*id.* ¶ 126)—derives from the members' sacred texts.  (*Id.* ¶ 127 (listing examples of Jewish and Christian scripture that impose a religious obligation to value and preserve human life).)

Preservation of life and provision of shelter for the vulnerable are central religious beliefs for many of the world's faiths.  These beliefs are at the very core of the Judeo-Christian traditions of Safehouse's board members.  (*Id.* ¶¶ 124-127.)  And the provision of lifesaving medical care and shelter to those at risk of overdose death is a manifestation of this central religious belief.  (*Id.* ¶¶ 129-32.)  These beliefs are "religious" within the meaning of RFRA because they "address[] fundamental and ultimate questions having to do with deep and imponderable matters," and are carrying out core tenets of Safehouse board member's Judeo-Christian traditions that elevate preservation of life as a central (if not *the* central tenet) of their "belief-system as opposed to an isolated teaching." *Africa v. Pennsylvania*, 662 F.2d 1025, 1032 (3d Cir. 1981); *see also Patrick v. LeFevre*, 745 F.2d 153, 156 (2d Cir. 1984) (emphasizing that judicial expertise is limited to determining "whether the beliefs professed by a [claimant] are sincerely held and whether they

are, in his own scheme of things, religious." (quoting *United States v. Seeger*, 380 U.S. 163, 185 (1965)).

Safehouse's calling to care for those in need—when those people are most vulnerable—has long been recognized as an integral and central part of religious practice. Safehouse's beliefs about provision of care to the vulnerable are neither novel nor unusual. Judeo-Christian religious beliefs have led the faithful to provide aid to the sick and poor for centuries, often by providing shelter to the accused or unfortunate even in the face of governments hostile to religious offers of sanctuary.

Case law has similarly recognized "the concept of acts of charity as an essential part of religious worship is a central tenet of all major religions." *W. Presbyterian Church*, 862 F. Supp. at 544; *see also Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574-75 (2d Cir. 2002) (holding that Christian scripture directing believers "to care for the least, the lost, and the lonely of this world" provided the religious basis for the provision of sleeping space to the homeless to constitute religious exercise); *Harbor Missionary Church Corp. v. City of San Buenaventura*, 642 F. App'x 726, 729 (9th Cir. 2016) (holding that provision of shelter to the homeless effectuated plaintiff's belief in "Christian compassion towards the oppressed, poor, and hungry"); *Chosen 300 Ministries, Inc. v. City of Philadelphia*, 2012 WL 3235317, at *17 (E.D. Pa. Aug. 9, 2012) (Yohn, J.) ("Acts of charity are central to Christian worship."); *The Jesus Ctr. v. Farmington Hills Zoning Bd. of Appeals*, 544 N.W.2d 698, 704 (Mich. App. 1996) (observing that "providing shelter or sanctuary to the needy [] has been part of the Christian religious tradition since the days of the Roman Empire"). In fact, DOJ has itself recently recognized as much in closely analogous contexts. *See* DOJ Statement of Interest, *Micah's Way v. City of Santa Ana*, No. 23-cv-183 (C.D. Cal. May 9, 2023), Dkt. No. 25 at 8-9 (asserting that providing food and drinks

to homeless individuals is a "religious exercise" under RLUIPA and citing cases for the proposition that "courts have routinely found that providing charity to homeless individuals . . . can constitute 'religious exercise' under RLUIPA").

These cases each recognize that providing shelter and care for vulnerable people, even when that care is not sanctioned by the prevailing law, is an exercise of religious faith. Safehouse's proposed overdose-prevention services model implements core religious values. Religious commitments compel Safehouse to provide shelter and care to those suffering from addiction in our community in a manner that will prevent overdose deaths—by allowing those at risk of overdose to remain within immediate reach of critical medical care and to benefit from services to alleviate the opioid and overdose crises. (Second Am. Counterclaim ¶¶ 46-47, 62, 124-132.)

### B. DOJ May Not Question Safehouse's "True Motivations" or the Sincerity of Safehouse's Religious Beliefs—Fact Questions—through a Motion to Dismiss

DOJ's speculation about Safehouse's "true motivation[s]" has no place in a motion to dismiss. DOJ Mot. 11, 19-21; *see Davis*, 2023 WL 4986493, at *7. The only inquiry before the Court right now is whether Safehouse has pleaded sincere exercise of religious beliefs. At this stage of the litigation, the Court must credit Safehouse's allegations as true and treat Safehouse's mission as an exercise of its religious convictions. Indeed, earlier this month, the Third Circuit reversed the pleading-stage dismissal of a civil RFRA claim. *Davis*, 2023 WL 4986493, at *4-7. In doing so, the Court rejected both the government's "challenge [to] the sincerity of Plaintiffs' beliefs" and the government's argument "that Plaintiffs did not actually want to marry *for religious reasons*" because those arguments were inconsistent with the pleading standards, which require courts to "accept Plaintiffs' plausible allegations as true and draw all inferences in their favor." *Id.* at *7 (emphasis added); *see also id.* ("If Defendants wish to challenge Plaintiffs' sincerity, they may do so at a later stage in the proceedings."); *see also Korte v. Sebelius*, 735 F.3d 654, 683 (7th

Cir. 2013) (explaining that "sincerity and religiosity . . . are factual inquiries"); *Patrick*, 745 F.2d at 157 ("[A]ssessing a claimant's sincerity of belief demands a full exposition of facts"). The Third Circuit's recent decision in *Davis* removes any doubt that DOJ's motion is based on misguided efforts to controvert pleaded facts, which is improper. *Davis*, 2023 WL 4986493, at *6-7 (holding that RFRA protects "non-mandatory" forms of religious exercise and that questions about whether beliefs are sincere and religiously motivated are fact question that must be resolved by "accept[ing] Plaintiffs' plausible allegations and true and draw[ing] all inference in their favor").

Far from showing that the Court may resolve disputes over what constitutes "religious belief" in the face of well-pleaded allegations, the cases cited by DOJ assessed that question on a developed record and are thus in accord with *Davis*. *See Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972) (appeal following bench trial upholding the religious nature of Amish plaintiffs' objection to compulsory secondary education); *Sutton v. Rasheed*, 323 F.3d 236, 240 (3d Cir. 2003) (appeal from grant of summary judgment finding prisoners stated protected religious claim for access to Nation of Islam texts); *Africa*, 662 F.2d at 1026 (appeal from preliminary injunction following an evidentiary hearing and detailed factual findings allowing the court to conclude that the collection of beliefs advanced by "MOVE" are secular and political rather than religious).[11]

---

[11] *See also United States v. Meyers*, 95 F.3d 1475, 1479 (10th Cir. 1996) (appeal following jury trial); *Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 50 (2d Cir. 1988) (appeal following bench trial); *Geerlings v. Tredyffrin/Easttown Sch. Dist.*, 2021 WL 4399672, at *1 (E.D. Pa. Sept. 27, 2021) (ruling on a motion for a preliminary injunction following evidentiary hearing); *Check v. N.Y.C. Dep't of Educ.*, 2013 WL 12113679, at *1 (E.D.N.Y. 2013) (same); *Caviezel v. Great Neck Pub. Sch.*, 701 F. Supp. 2d 414, 416 (E.D.N.Y. 2010) (same). The same result was reached in *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005), which noted that "the parties' conflicting assertions" about religiosity "are not before us" on an appeal from a decision granting a motion to dismiss.

These cases therefore offer no support for resolving factual disputes about Safehouse's religious beliefs at this stage of the proceeding.

> **C.** **The Sincerity of Safehouse's Professed Religious Beliefs Is Not Diminished Because Those Beliefs Are Effectuated by Means of Sound Medical Science and in Accordance with Public-Health Evidence**

DOJ also wrongly contends that Safehouse cannot exercise its religion by recasting Safehouse's religious beliefs about saving human lives as "secular" because Safehouse seeks to exercise those beliefs by applying medical and public-health evidence to provide medical aid to the sick and unfortunate. DOJ cannot dismiss Safehouse's religious liberty claim by mischaracterizing its pleadings as asserting "a social or moral philosophy grounded in secular views" or by second-guessing Safehouse's sincerity and asserting that "the driving rationale for its proposal to maintain a site for the supervised use of drugs is socio-political medical, and philosophical." DOJ Mot. 21-23.

> *1. DOJ Mischaracterizes Safehouse's Pleaded Religious Beliefs*

At the outset, DOJ's argument fails to distinguish Safehouse's practices and immediate goals (*e.g.*, supervised consumption sites and harm reduction) from its religious beliefs and commitments (*e.g.*, the sanctity of human life, duties of preservation of life, charity, sanctuary, provision of shelter and aid to the needy). Only the latter are relevant to the question of whether Safehouse's efforts are protected expressions of religion.

DOJ also wrongly assumes that if something can be secular, then it cannot also be religious in nature. To take one classic example, the Supreme Court has held that someone who refuses to work on tank turrets due to his religious faith was entitled to protection for the expression of his religious faith. *See Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 710, 720 (1981). The Court in *Thomas* recognized that religious rights claim even though the plaintiff also might refuse to work on weapons because of political objections. *Id.* Likewise, here the question the Court

must decide, based on Safehouse's pleadings, is whether there is a religious motivation underlying Safehouse's efforts.  The coincidence with other secular motivations, including ethical, moral and public health concerns, does not deprive Safehouse of its religious claim.

Safehouse's religious motivation is supported, not impugned, by the fact that multiple religious faiths share beliefs about the sanctity of human life and the duty to provide shelter and charity.  The prevalence of secular notions of charity does not show a *lack* of religiosity; rather, it is evidence of the widespread *adoption* of these Judeo-Christian beliefs about charity.  Safehouse's religious beliefs about providing shelter and charity to the poor cannot be construed as non-religious simply because many individuals and institutions in secular society share similar beliefs about charity.

Nor is it material that Safehouse effectuates its religious commitments by employing evidence-based medical and public-health measures.  Courts have never required the faithful to ignore the world around them.  Faith-based action certainly may be informed by social, medical, and economic evidence.  *See, e.g.*, *W. Presbyterian Church*, 862 F. Supp. at 546 (feeding program was "[u]nquestionably . . . in every respect [a] religious activity and form of worship" even though "[i]t also happen[ed] to provide, at no cost to the city, a sorely needed social service").  In fact, religious and medical beliefs are often in harmony with one another—for instance, religious hospitals regularly provide medical care that is rooted in public-health and medical science, but that does not mean that those hospitals lack religious conviction or that their provision of needed medical care is not religious exercise under RFRA.

Safehouse's commitment to saving lives does not lose its religious nature because it is effectuated through the provision of medical care, because it is based on evidence that such measures would improve public health, or because it coincides with political views about the

appropriate way to combat the opioid epidemic.  *See Welsh v. United States*, 398 U.S. 333, 342 (1970) (a person's beliefs may be religious even if they also contain a "substantial political dimension"); *Rigdon v. Perry*, 962 F. Supp. 150, 164 (D.D.C. 1997) (noting, in the context of a priest's sermons that advocated political action, that "it is not the role of th[e] Court to draw fine distinctions between degrees of religious speech and to hold that religious speech is protected but religious speech with so-called political overtones is not").  DOJ's insistence that these are only socio-political views does not make them so.  At this stage of the litigation, the Court must credit Safehouse's allegations as true and treat Safehouse's mission as an exercise of its religious convictions.[12]

> 2.  *Case Law Has Recognized that Sanctuary, Shelter, and Lifesaving Care Are Manifestations of Religious Exercise and Beliefs*

The case law nationwide recognizes that religious exercise protected by RFRA encompasses religiously motivated acts to provide sanctuary, shelter, and lifesaving services to those in need, and even to those who are themselves engaged in prohibited conduct.  For example, the court in *United States v. Hoffman* found that RFRA protections applied to members of "No More Deaths," a faith-based humanitarian aid organization dedicated to aiding undocumented immigrants by leaving lifesaving food and water in the Arizona desert.  436 F. Supp. 3d 1272, 1279-89 (D. Ariz. 2020).  The organization's members could not be prosecuted where the government failed to demonstrate that prosecution was the least-restrictive means of achieving its environmental interests, even where the defendants "[did] not profess belief in any particular

---

[12] DOJ also criticizes Safehouse for not claiming that the medical providers staffing its proposed overdose-prevention site would also be exercising their religious beliefs.  DOJ Mot. 23.  The Supreme Court's guidance indicates that this is completely immaterial.  *See Hobby Lobby*, 573 U.S. at 702 ("There are now 500 Hobby Lobby stores, and the company has more than 13,000 employees.").  Similarly, a Catholic hospital would certainly not lose its religious mission by hiring qualified Muslims, Jews, Protestants, Hindus, or atheists as nurses, doctors, or lab technicians.

established religion." *Id.* at 1283 (citing *Fraze v. Ill. Dep't of Emp. Sec.*, 489 U.S. 829, 834 (1989)). Having found that the government's interests in controlling the border by preventing water and food from being left there was tantamount to "claim[ing] a compelling interest in preventing Defendants from interfering with a border enforcement strategy of deterrence by death," the *Hoffman* court concluded that the defendants were entitled to a religious defense in their criminal case under RFRA. *Id.* at 1289;[13] *see also United States v. Warren*, No. 17-00341, Dkt. No. 146 (D. Ariz. Nov. 21, 2019) ("Defendant was obliged to leave water jugs because of his religious beliefs, and the Government's regulation imposes a substantial burden on this exercise of his religion."). Religious commitments do not lose their protection when adherents step out of the cloisters and into the world.

Safehouse's claims are entirely different from the handful of cases cited by DOJ declining to recognize various objections to COVID-19 policies. DOJ makes much of Judge Mitchell Goldberg's *Geerlings* decision (DOJ Mot. 22), which denied plaintiffs' request for a temporary restraining order against a school district's mask mandate for the plaintiffs' children because the plaintiffs provided no evidence to demonstrate how masks offended *religious* as opposed to other beliefs. *See* 2021 WL 4399672, at *4-*10. The facts and procedural posture here could not be more different: Safehouse has pleaded in detail the nature of its religious beliefs, and any factual inquiry into whether those beliefs are Safehouse's "true motivation" is far outside the scope of a Rule 12(b)(6) motion. *Davis*, 2023 WL 4986493, at *7.

The string of Title VII cases DOJ cites (at 23-24) involved objections by hospital employees challenging the implementation of COVID-19 policies as a form of religious

---

[13] DOJ voluntarily dismissed its appeal in early 2020. *See United States v. Hoffman*, No. 20-10087, Dkt. No. 6 (9th Cir. Mar. 13, 2020).

discrimination.  None of these plaintiffs could articulate why their objections were religious.  And, therefore, none of these cases is analogous.  For example, *Ulrich v. Lancaster General Health*, involved a registered nurse who asserted that COVID-19 testing would cause her anxiety because she asserted vaccination intruded on her body as a "temple" and was also improperly "ritualistic" and based off a "secular religion."  2023 WL 2939585, at *6 (E.D. Pa. Apr. 13, 2023).  The court found these allegations were legally insufficient because the plaintiff "clearly state[d] medical concerns" and that "COVID-19 testing does not rely on faith or a mystical belief" and thus did not intrude on the plaintiff's religious liberty.  *Id.*  The other cases cited by DOJ were just as attenuated.  *See Detwiler v. Mid-Columbia Medical Center*, 2022 WL 19977290 (D. Or. Dec. 20, 2022) (dismissing a claim of religious discrimination where the belief at issue was "COVID-19 antigen tests are carcinogenic"); *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458 (E.D. Pa. 2022) (dismissing claims brought by former hospital employees who lost their jobs after refusing to vaccinate due to beliefs such as "testing is toxic").

In short, all of DOJ's attacks on the religious character of Safehouse's claims do not support disregarding Safehouse's pleaded allegations at this stage of the litigation.

## II.   SAFEHOUSE PROPERLY ASSERTS A RFRA CLAIM BASED ON THE RELIGIOUS COMMITMENTS OF ITS BOARD MEMBERS

In *Hobby Lobby*, the Supreme Court observed that "Congress . . . included corporations within RFRA's definition of 'persons.'  But it is important to keep in mind that the purpose of this fiction is to provide protection for human beings.  A corporation is simply a form of organization used by human beings to achieve desired ends."  573 U.S. at 706.  Time and again, the Supreme Court has upheld that principle and found that a corporate entity may assert a religious liberty claim under RFRA or the First Amendment based on the commitments of its owners.  *See, e.g.*, *id.* at 701-703, 713-18 (allowing closely held for-profit corporation with more than 13,000 employees

to assert a RFRA claim based on the beliefs of the family that "control its board of directors and hold all of its voting shares"); *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1724 (2018) (allowing a for-profit bakery established as a "limited company" to assert a First Amendment claim based on the religious beliefs of the bakery's owner); *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2308 (2023) (allowing a for-profit website design "limited liability company" to assert a First Amendment claim based on the beliefs of its owner).  Indeed, in *Hobby Lobby*, the Court explicitly rejected the contention that a "corporation cannot engage in the 'exercise of religion' within the meaning of RFRA."  573 U.S. at 713.  These authorities plainly foreclose DOJ's contention that Safehouse cannot assert a claim based on the religious beliefs of its Board President and board members.  (Second Am. Counterclaim ¶ 126.)[14]

The Supreme Court has also flatly rejected DOJ's argument that an organization may only raise claims under RFRA or the First Amendment if it is a church, arm of a religious organization, or a group with an explicit religious purpose.  The for-profit entities in *Hobby Lobby*, *Masterpiece Cakeshop*, and *303 Creative* did not fit into any of those categories but were still entitled to assert religious liberty claims based on the religious beliefs of its owners.  As a non-profit corporation organized to carry out a faith-based mission, Safehouse is plainly entitled to seek RFRA's religious protections.

Safehouse has pleaded that its board members' religious rights are central to the organization's purpose and operations.  Safehouse's Counterclaim explains that "at the core of all board members' faith is the principle that the preservation of human life is paramount and

---

[14] Safehouse's board members subscribe to different faiths or denominations.  But their shared religious beliefs entitle Safehouse to invoke the protections of RFRA.  *Hobby Lobby*, 573 U.S. at 717-19 (rejecting the government's argument that closely held corporations cannot hold religious beliefs because of possible disagreement between its owners as to certain religious issues).

overrides any other considerations." (Second Am. Counterclaim ¶ 126.)  Safehouse has asserted

that this principle, which is rooted in scripture, "obligate[s]" the board members "to establish and

run Safehouse in accordance with these tenets." (*Id.* ¶¶ 129.)  Safehouse has also alleged that "the

pursuit of its mission and conduct of its business will implement those beliefs." (*Id.* ¶ 126.)  As

such, Safehouse has plausibly alleged that its board members' sincerely held religious beliefs are

crucial to the organization's anticipated operations, which permits Safehouse to assert these claims

on its own behalf as a matter of law. *See*, *supra*, Section I.A (citing case law).  That conclusion is

particularly fitting here because, at present, Safehouse currently exists entirely through its board.

Rather than engage with these facts, DOJ attempts to narrow the protections of RFRA to

only entities with religious sentiment expressed in their corporate-governance documents, but that

is not the law. *See, e.g.*, *Hobby Lobby*, 573 U.S. at 703 (focusing on the corporate owners' religious

practices when analyzing the beliefs of a closely held corporation).  There is no requirement in

RFRA itself or the case law interpreting it that the Articles of Incorporation or other corporate-

governance documents include an explicit statement of faith or religious values for an entity to

avail itself to the protections of RFRA.  DOJ relies on *LeBoon v. Lancaster Jewish Community*

*Association* to argue that Safehouse is not a religious organization because it has not stated an

explicit religious purpose or expressed religious belief in its corporate documents.  503 F.3d 217

(3d Cir. 2007); DOJ Mot. at 6, 9.  But *LeBoon* is inapposite.  It addresses standards applicable to

requests for religious accommodations under Title VII, not civil actions for violations of RFRA.

Title VII standards—which arise out of a statutory exemption for "religious entities" that does not

exist under RFRA—do not apply here.  RFRA provides that "government shall not burden *a*

*person*'s exercise of religion," not a "religious entity's exercise."[15]   Moreover, since *Hobby Lobby*, governing precedent has examined the beliefs of the owners of the entity in cases involving corporate entities, rather than parsing articles of incorporation.   Nothing in *Hobby Lobby*, *Masterpiece Cakeshop*, or *303 Creative* supports such a formalistic approach to the exercise of the broad rights of religious liberty enshrined in RFRA and the First Amendment.   Accepting DOJ's formalistic focus on Safehouse's corporate formation documents would itself run afoul of RFRA.

Safehouse has lawfully incorporated as a not-for-profit entity and sought and obtained 26 U.S.C. § 501(c)(3) status.   Its board members share religious commitments, and Safehouse has announced them as part of the mission of the organization.   It is entitled to the benefits that accompany corporate status *and* to assert religious liberty claims based on the fundamental beliefs of its board members.

## III.   SAFEHOUSE'S RELIGIOUS EXERCISE IS SUBSTANTIALLY BURDENED BY THE GOVERNMENT'S THREATENED PROSECUTION

Enforcing Section 856(a) against Safehouse would substantially burden Safehouse's religious exercise.   A substantial burden exists where, as here, the plaintiff is subjected to "serious disciplinary action" for exercising their sincere religious beliefs.   *Holt v. Hobbs*, 574 U.S. 352, 361 (2015); *see Davis*, 2023 WL 4986493, at *5 (holding that a "substantial burden" exists where "the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs").   "[T]he inquiry here isn't into the merit of the plaintiff's religious beliefs or the relative importance of the religious exercise . . . .  Instead, the inquiry focuses only on the

---

[15] Even if *LeBoon* were applicable (and it is not), the Third Circuit in *LeBoon* explained that consideration into whether an organization was a religious entity is not based on a *formalist* analysis—as DOJ suggests—but rather is based on a fact-bound, *functionalist* analysis made by weighing nine factors.   503 F.3d at 226.

coercive impact of the government's actions." *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014) (Gorsuch, J.).

The threat of criminal sanctions for exercising a religious belief constitutes a substantial burden. *See Yoder*, 406 U.S. at 218 (effect of law mandating, "under threat of criminal sanction," conduct at odds with Amish beliefs was "not only severe, but inescapable"); *O Centro*, 546 U.S. at 426 (government conceded that prosecution under the Controlled Substances Act would constitute a substantial burden). Indeed, "[t]here can hardly be a more substantial burden on a religious practice or exercise than its outright prohibition." *Davis*, 2023 WL 4986493, at *6. Fines may also substantially burden a religious exercise. For example, in *Hobby Lobby*, the Court "ha[d] little trouble concluding" that a potential fine of $800,000 substantially burdened the plaintiff corporation's religious exercise. 573 U.S. at 719-20, 726; *see also Yoder*, 406 U.S. at 208, 218 (explaining that a $5 fine for violating compulsory school attendance laws was a "grave interference" with defendants' religious tenets).

DOJ's present actions squarely fit the definition of "substantial burden." In response to Safehouse's announcement that it was planning to open an overdose-prevention shelter, the U.S. Attorney's Office threatened criminal and civil sanctions for a purported Section 856(a) violation, and commenced this lawsuit. (Second Am. Counterclaims ¶¶ 39-41.) Successful prosecution of Safehouse under Section 856(a) carries fines of up to $2,000,000, plus a risk of property forfeiture. *See* 21 U.S.C. § 856(b). The threat of prosecution under Section 856(a)—which subjects individuals to up to twenty years' imprisonment—also places substantial pressure on Safehouse's officers to refrain from operating a supervised consumption site or face "serious disciplinary

action" for exercising their religious beliefs.  *Hobbs*, 574 U.S. 352, 361.  There should be no dispute as to substantial burden.[16]

DOJ attempts to get around this clear result by claiming Safehouse has "alternative means" of exercising its religious beliefs.  But DOJ cannot disclaim the burden on Safehouse based on its own conjecture about how Safehouse could exercise its religious beliefs without violating the CSA.  First, the Supreme Court in *Holt* squarely rejected DOJ's assertion that religious beliefs are burdened only where they are mandated or compelled by the system of belief.  In so doing, the Court rejected the argument that "the availability of alternative means of practicing religion is a relevant consideration" under RFRA.  574 U.S. at 361-62.  Rather, as the Court held, the "'substantial burden' inquiry asks whether the government has substantially burdened religious exercise . . . , not whether the . . . claimant is able to engage in other forms of religious exercise."  *Id.* at 362.[17]  That is because when Congress amended RFRA by enacting RLUIPA, it expressly rejected prior First Amendment case law and adopted a broad definition of "exercise of religion" that does not require the protected exercise of religion to be "compelled by or central to, a system of religious belief."  *Hobby Lobby*, 573 U.S. at 696 (citing 42 U.S.C. §§ 2000bb-2(4) and 2000cc-5(7)(A));  *Davis*, 2023 WL 4986493, at *4 (same).  This broad statutory protection of both mandatory and non-mandatory forms of religious exercise is irreconcilable with DOJ's contention that an "alternative means" test is embedded somewhere within RFRA's substantial burden inquiry.

---

[16] *See* Memorandum from Att'y Gen. to All Exec. Dep'ts & Agencies, *Federal Law Protections for Religious Liberty* 4 (Oct. 6, 2017), https://www.justice.gov/crt/page/file/1006786/download ("In general, a government action that bans an aspect of an adherent's religious observance or practice . . . will qualify as a substantial burden on the exercise of religion").

[17] *See also Abdul-Aziz v. Lanigan*, 2020 WL 3287229, at *13 (D.N.J. June 18, 2020) (applying *Holt*); *Jackson v. Patzkowski*, 468 F. Supp. 3d 1328, 1340 (E.D. Wash. 2019) (same); *Snodgrass v. Robinson*, 2015 WL 4743986, at *7 n.11 (W.D. Va. Aug. 10, 2015) (same).

Second, DOJ's speculation about "alternative" ways for Safehouse to perform its religious obligations is clearly inappropriate at the pleadings stage. Safehouse has pleaded that its "board members' religious beliefs obligate them to take action to save lives in the current overdose crisis," that they are obligated to "preserve life, provide shelter to [their] neighbors, and to do everything possible to care for the sick"; and that the provision of supervised consumptions services would effectuate that obligation. (Second Am. Counterclaims ¶¶ 128-29.) And even if DOJ were right that there are "alternative" ways of accomplishing some of their aims, Safehouse has sufficiently pleaded that the establishment of a lifesaving overdose-prevention shelter "has profound religious meaning" and is "an expression of their faith." *Davis*, 2023 WL 4986493 at *6; *see Yellowbear*, 741 F.3d at 55 ("When a sincere religious claimant draws a line ruling in or out a particular religious exercise, 'it is not for us to say that the line he drew was an unreasonable one.'" (quoting *Thomas*, 450 U.S. at 716)).

In fact, there are no alternative means for Safehouse to effectively provide overdose-prevention services in a manner that aligns with the religious beliefs of Safehouse's board members. Safehouse has pleaded that it and its board members are called by their religious beliefs to do everything possible to provide those suffering from addiction with shelter and critical lifesaving care. (Second Am. Counterclaim ¶¶ 46-47, 62, 124-132.) The lack of alternatives to supervised consumption is tragically underscored by the cruel facts of the opioid and overdose epidemic, fueled by the widespread prevalence of fentanyl, which causes respiratory depression within *seconds* of consumption—making any measure short of direct supervision of opioid consumption inadequate to prevent opioid overdose death. (*Id.* ¶¶ 22-24.) It is hard to conceive of a greater burden on Safehouse's deeply held religious beliefs than for Safehouse, and its board members, to be forced to cast vulnerable individuals outside—knowing there is a considerable risk

of overdose shortly after their departure—or risk criminal prosecution for allowing them to remain sheltered and within their care. *See, e.g.*, *Davis*, 2023 WL 4986493, at *5 (holding that there "can hardly be a more substantial burden on a religious practice or exercise than its outright prohibition"). Safehouse grieves deeply for the thousands of lives lost in our community to preventable overdose—tragically, in some instances, just out of reach of the medical care that would have saved them. DOJ's suggestion that Safehouse has alternative means of religious exercise is, at best, willfully blind to the terrible realities of the opioid epidemic and the factual allegations demonstrating a pressing need for medical supervision at the time of consumption. And its substantial burden arguments ignore that DOJ's threats of prosecution are preventing Safehouse and its board from saving lives that could be saved to a medical certainty.

Even assuming an "alternative means" inquiry remains permissible following *Holt* and *Davis* (which it is not), the Third Circuit has only assessed such questions in civil litigation on a developed record. *See Washington v. Klem*, 497 F.3d 272, 282 (3d Cir. 2007) (rejecting argument that the availability of a prison library was an adequate alternative to a religious command to read four books a day). DOJ asks the Court to assess the factual question of whether its threatened prosecution of Safehouse is insubstantial because of alleged alternatives, such as "travel[ing] to areas of the City where drug use is prevalent." DOJ Mot. 18. This is a factual question beyond the scope of a Rule 12(b)(6) motion, and DOJ cites no authority indicating that a plaintiff is required to plead that it lacks alternatives to proceed with a RFRA claim.[18]

---

[18] Again, DOJ has recently recognized as much itself. *See* DOJ Statement of Interest, *Micah's Way v. City of Santa Ana*, No. 23-cv-183 (C.D. Cal. May 9, 2023), Dkt. No. 25 at 14 n.7 (arguing "the City cites no case where a RLUIPA plaintiff was *required* to plead that it lacked adequate alternative locations to withstand a motion to dismiss").

DOJ is also misguided in suggesting any parallel exists between this case and *Henderson v. Kennedy*, 253 F.3d 12 (D.C. Cir. 2001), or *United States v. Stimler*, 864 F.3d at 259. *See* DOJ Mot. at 13-17.

*Henderson* is plainly inapposite. There, on appeal from a summary judgment decision made on a record of dueling declarations, the D.C. Circuit found that plaintiffs were not substantially burdened when they did not claim that their religious beliefs required them to *sell*—as opposed to hand out—t-shirts on the National Mall in order to spread the word of God. *Id.* at 312-13 ("Plaintiffs can still distribute t-shirts for free on the Mall"). Safehouse's religious commitment compels it to help and provide refuge for the most vulnerable, and Safehouse has pleaded that alternatives do not suffice to effectuate its board members' religious beliefs. And to the extent DOJ relies on *Henderson* for its analysis on "alternatives," that decision pre-dates *Holt* and, in any event, is flatly inconsistent with RFRA (and the Third Circuit's recent decision in *Davis* applying RFRA at the pleading stage) because it permitted inquiry into what a religious belief "demand[s]" by probing whether an activity is "central" or "important" to a religion. *Id.* at 312-13; *see, e.g.*, *Davis*, 2023 WL 4986493, at *4 (holding that "RFRA extends to non-mandatory religious conduct and expression, i.e., conduct or expression not "compelled by, *or central to*, a system of religious belief" (quoting 42 U.S.C. § 2000cc-5(7)(A)) (emphasis added).

*Stimler* does not command a different conclusion either. The Third Circuit there rejected a RFRA defense to a violent felony charge, holding that the burden on defendants' religious exercise was not substantial because—even if compelled by religious belief to aggressively aid "chained" women unjustly denied divorces from abusive husbands—"none of the defendants argue[d] that they [we]re unable to participate in [this religious practice] without engaging in

kidnapping." *Stimler*, 864 F.3d at 268.[19]  In stark contrast, Safehouse has alleged facts establishing

that there is no adequate, alternative means to exercising Safehouse's beliefs in a manner that

ensures the effectiveness of Safehouse's overdose-prevention services at the moment of

consumption—when every second counts and a failure to act can lead to preventable overdose

death.  (Second Am. Counterclaims ¶ 22-24, 46.)  Beyond the obvious dissimilarities between this

case and *Stimler*, the court in *Stimler* did not consider—and the parties did not address in their

briefs—whether *Holt* undermined the vitality of the "alternative means of practice" analysis that

the Third Circuit previously employed.[20]  Moreover, the question of whether a substantial burden

can be assessed by reference to alternative means did not come before the Third Circuit on appeal

from a motion to dismiss a civil RFRA claim; rather, it arose from the denial of the criminal

defendants' motion to dismiss the indictment that was accompanied by the defendants' own

evidentiary submissions, some of which *conceded* that non-violent means could be used to effect

Jewish divorce.  *See United States v. Epstein*, 91 F. Supp. 3d 573, 581 (D.N.J. 2015) (*Stimler* case

in the trial court).

In short, Safehouse has adequately alleged that enforcing Section 856(a) against it would

substantially burden Safehouse's religious exercise.

---

[19] The defendants in *Stimler* were convicted of kidnapping for the tactics they employed in pressuring recalcitrant male members of their own ultra-Orthodox Jewish religious community to allow their wives a religiously sanctioned divorce.

[20] DOJ's argument that *Stimler* cited *Holt*, and was thus "clearly aware" of its import (DOJ Mot. 17), ignores that the Third Circuit, like any federal court, is not at liberty to raise arguments not raised by the parties.  *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("In our adversarial system, we follow the principle of party presentation.").  Rabbi Stimler only cited *Holt* for the proposition that RFRA applies to him as an "individual defendant."  No. 15-4053, Aug. 5, 2016 Appellant Br. at 30 (3d. Cir.). And the sole reference to *Holt* in the government's papers was in a footnote to its opposition brief on appeal, arguing that RFRA had not been successfully invoked for violent offenses.  *See* 15-4053, Nov. 2, 2016 Gov. Br. at 44 & n.8 (3d Cir.).

## IV.     SAFEHOUSE HAS ASSERTED A VIABLE FIRST AMENDMENT CLAIM

DOJ has violated the First Amendment by: (i) refusing to accommodate Safehouse's religious beliefs even though the CSA affords multiple avenues for DOJ to provide secular exceptions, and (ii) targeting Safehouse for enforcement to stop its religiously motivated services, despite having *never* prosecuted any other secular entity for a Section 856 violation based solely on "unlawful use," and after announcing a policy of selectively enforcing Section 856(a) on a "district-by-district basis."   The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.   While the Clause protects the right to harbor religious beliefs secretly, it does most of its work by "protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'"   *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877 (1990)).   If it did not, the Free Exercise Clause would add nothing to the constitutional protection for freedom of speech, which already protects all beliefs.

To plead a free exercise violation, the plaintiff must plausibly allege "that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"   *Id*. at 2422 (quoting *Smith*, 494 U.S. at 879-81).   If the plaintiff satisfies this pleading burden, then a court must "find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest."[21]   *Id*. (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)).   This is "the most rigorous of scrutiny."   *Lukumi*, 508 U.S. at 546.

---

[21] If the government policy or law is "neutral" and "generally applicable," however, the policy is subject to only "rational basis" scrutiny.   *Id.*

As explained above, Safehouse has already demonstrated that DOJ's enforcement of Section 856(a) "has burdened [Safehouse's] sincere religious practice." *Id.*; *see*, *supra*, Sections I & III. And, as explained below, Safehouse has pled facts establishing both that DOJ is enforcing Section 856(a) against Safehouse pursuant to a policy that is not "generally applicable," thereby subjecting DOJ's enforcement policy and its refusal to accommodate Safehouse's religious exercise to strict scrutiny.

### A.    DOJ's Policy of Enforcing Section 856(a) Is Not Generally Applicable

There are two ways to demonstrate a law or policy is not generally applicable and thus subject to strict scrutiny. *First*, a law or policy lacks general applicability "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1877 (2021). Indeed, as the Third Circuit has recognized, the Supreme Court in *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) emphasized that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Clark v. Gov. of N.J.*, 53 F.4th 769, 780 (3d Cir. 2022) (quoting *Tandon*, 141 S. Ct. at 1296); *Kennedy*, 142 S. Ct. at 2422. S*econd*, a policy is not generally applicable "if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 ("[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason."). Although either will suffice, both Free Exercise theories apply here.

**B.      DOJ Has *Never* Prosecuted Section 856(a) Based on Only Simple Possession or Use of Controlled Substances Except by Targeting Safehouse's Religiously Motivated Overdose-Prevention Services**

Strict scrutiny applies because DOJ has implemented a policy of enforcing Section 856(a) in a manner that treats "comparable secular activity more favorably than religious exercise." *Clark*, 53 F.4th at 780 (quoting *Tandon*, 141 S. Ct. at 1296).  DOJ has threatened to enforce Section 856(a) against Safehouse and its religiously motivated Board President.  But it has not identified "a single § 856(a) case predicated solely on use" at the penalized location since the statute's inception.  Dkt. No. 133 at 40 n.39 (emphasis added).  Nor has it identified a single case in which Section 856(a) was enforced in similar circumstances.  (Second Am. Counterclaim ¶¶ 81, 145.) Rather, in the decades since Section 856 was first enacted, and nearly five years of litigation with Safehouse, DOJ has cited no example of a criminal prosecution under Section 856 involving only simple possession or use, rather than distribution or manufacture of a controlled substance—much less prosecutions involving public-health interventions similar to Safehouse.  (*Id.*)

DOJ cannot claim that it generally prosecutes Section 856 where controlled substances are simply possessed or used, but not stored, distributed, or manufactured, at the penalized location; instead, it exempts these offenses from prosecution as a matter of course and on an individualized basis.  Viewed in that light, it does not matter whether the "CSA does not otherwise authorize secular conduct in a manner comparable to the conduct prohibited in section 856."  DOJ Mot. 29-40.  DOJ has adopted an enforcement policy that does, in fact, tolerate secular conduct in a manner comparable to Safehouse's proposed religiously motivated services.  DOJ's vague assertion that Safehouse can exercise its religious beliefs by "supervising illegal drug use in a public space . . . . and in many private spaces" (DOJ Mot. at 13 n.6) simply confirms that DOJ will allow some ill-defined set of secular private actors to engage in conduct that is akin to Safehouse's proposed conduct and thus "undermines the government's asserted interests in a similar way."  *Fulton*, 141

S. Ct. at 1877; *see* DOJ Opening Third Circuit Appeals Brief at 45 n.11, 54-55 (arguing that Section 856(a) would not prohibit a supervised consumption mobile van, nor would it prevent parents from inviting their adult child to use drugs at their home "in the parents' presence, to allow for resuscitation" with Naloxone).[22]

### C. DOJ Has Announced a Policy of Selective "District-by-District" Authorization of Section 856 Against Supervised Consumption Services, But It Has Not Allowed Safehouse to Proceed

Section 856(a) is not generally applicable "if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877. Although DOJ argues that no such mechanism exists, that is plainly incorrect: after moving to dismiss, DOJ announced to news organizations that it was implementing a policy of selectively enforcing Section 856(a) against providers of supervised consumption services on a "district-by-district basis."[23] Where the government creates exemptions from a law for those engaged in non-religious activity, as here, it "may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id.* at 1878 (quoting *Smith*, 494 U.S. at 884). Because DOJ has created an individualized, district-by-district exemption from enforcement, its enforcement policy as applied to Safehouse is subject to strict scrutiny. *Id.*; *see also Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728, 733 (6th Cir. 2021) (holding that,

---

[22] While these purported alternative options are undefined and unclear, they do not enable Safehouse to effectuate its religiously motivated lifesaving mission because DOJ's stated limitations deprive Safehouse and its participants of shelter, protection from the elements, and the assurances of safety and privacy that accompany the use of a *facility* (rather than a van or a public space) to provide these services.

[23] Sharon Otterman, *Federal Officials May Shut Down Overdose Prevention Centers in Manhattan*, N.Y. TIMES (Aug. 8, 2023), https://www.nytimes.com/2023/08/08/nyregion/drug-overdoses-supervised-consumption-nyc.html.

under *Fulton*, "where a state extends discretionary exemptions to a policy, it must grant exemptions for cases of 'religious hardship' or present compelling reasons not to do so").

DOJ cannot invoke prosecutorial discretion to justify its unequal and unconstitutional application of the law. DOJ Mot. at 38-40. While DOJ "retains 'broad discretion' to enforce the Nation's criminal laws," that discretion is "subject to constitutional constraints." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985) & *United States v. Batchelder*, 442 U.S. 114, 125 (1979)). For instance, "the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, *religion*, or other arbitrary classification.'" *Id*. (emphasis added) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). Such prohibited discrimination encompasses not only treating one religious belief better than another, but also treating secular activities "more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296; *Clark*, 53 F.4th at 780. As Safehouse has alleged, DOJ's policy of selectively enforcing Section 856(a) against Safehouse—but not secular providers of the same services—does precisely that. DOJ's demand for Safehouse to identify at the pleading stage "evidence . . . that the United States has in any way unconstitutionally targeted religion in exercising its prosecutorial discretion in Controlled Substances Act matters" (DOJ Mot. at 39), ignores its selective enforcement of Section 856(a) and overlooks that the circumstances surrounding and the reasons for DOJ's enforcement policy is a fact issue not susceptible to resolution at the pleading stage.[24]

---

[24] Insofar as DOJ argues that Safehouse must prove the existence of a systemic pattern of selective enforcement of Section 856(a) against religious providers of supervised consumption services, that is not the law. Indeed, the Supreme Court has held that a government policy is "not neutral and generally applicable" whenever it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296 (emphasis included) (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67-68 (2020)).

**D.**     **The CSA Expressly Creates Multiple Mechanisms for DOJ to Grant Individualized Exemptions, But It Will Not Consider Safehouse's Claim for a Religious Exemption**

In any event, as explained in detail in Safehouse's pleading, Section 856(a) is not generally applicable for the additional reason that the Controlled Substances Act (CSA) contains discretionary and highly individualized exemptions from enforcement of the CSA, including (a) in promulgating regulations that permit DOJ to grant broad-reaching waivers and exceptions to the CSA's requirements pursuant to 21 C.F.R. § 1307.03; *see also* 21 U.S.C. § 822(d); *id.* § 871(b) (statutory authorization for DOJ to create such regulatory exceptions); (b) for "persons engaged in research," 21 U.S.C. § 872(e); (c) for religious use of peyote by certain Native Americans, 21 C.F.R. § 1307.31; and (d) for possession offenses, for the Attorney General to decide in his discretion to "compromise, modify, or remit, with or without conditions, any civil penalty" imposed for simple possession, 21 U.S.C. § 844a.  (Second Am. Counterclaim ¶¶ 137-145.)

To avoid strict scrutiny, DOJ attempts to disclaim the existence of any of these mechanisms for individualized exemptions from CSA enforcement.  DOJ Mot. at 29-40.  DOJ's attempts to do so are unavailing.  And to the extent DOJ's argument on this point raises questions of fact, they cannot prevail at the 12(b)(6) stage.[25]  Numerous such exemptions are available under the CSA.

*1.     Registration Waiver and Regulatory Exemption from DEA Enforcement*

The CSA permits the Attorney General to "promulgate and enforce any rules, regulations, and procedures which he may deem necessary and appropriate for the efficient execution of his functions" under the CSA.  21 U.S.C. § 871(b).  And elsewhere the CSA permits the Attorney

---

[25] DOJ's arguments about how these exemptions are applied in practice—and whether Safehouse would further the purported governmental interests underlying them—turn on fact issues beyond the scope of a Rule 12(b)(6) motion.  Safehouse intends to propound discovery on the use of the exemptions, and resolution of DOJ's arguments about their inapplicability would be more appropriately resolved with a fully developed record.

General to "waive the requirement for registration of certain manufacturers, distributors, or dispensers if he finds it consistent with the public health and safety."  21 U. S. C. § 822(d).

Pursuant to this statutory authority, DOJ has promulgated regulations implementing the CSA, including regulations allowing for waivers and exemptions from the requirements of the CSA.  These regulations include 21 C.F.R. § 1307.03, which DOJ does not address in its brief even though the regulation explicitly allows anyone to request an exemption from existing DEA regulations in the Agency's discretion:

> Any person may apply for an exception to the application of any provision of this chapter[26] by filing a written request with the Office of Diversion Control, Drug Enforcement Administration, stating the reasons for such exception. . . . The Administrator may grant an exception in his discretion, but in no case shall he/she be required to grant an exception to any person which is otherwise required by law or the regulations cited in this section.

DOJ has therefore already concluded that the CSA grants it broad authority to create case-specific exceptions from the CSA and its implementing regulations, and thus could provide similar case-specific accommodation to Safehouse.

DOJ has repeatedly relied on Section 1307.03 to permit a wide range of exceptions to the CSA and its implementing regulations.  For example, the DEA recently cited this regulation as a mechanism to authorize mobile narcotic treatment facilities.  *See Registration Requirements for Narcotic Treatment Programs with Mobile Components*, 86 Fed. Reg. 33861-01, at *33,867 (June 28, 2021) (providing that each mobile narcotics treatment facility be evaluated pursuant to Section 1307.03 "on a case-by-case basis" to determine whether they "warrant a waiver of the regulation" requiring treatment be provided from a single fixed location).  DOJ has further relied on this

---

[26] "This chapter" refers to the entirety of Chapter II of Title 21 of the CFR, which defines and covers the waterfront of every aspect of the DEA's implementation of the CSA, ranging from registration, scheduling, record keeping, prescribing, disposal, and enforcement.  *See* 21 C.F.R. §§ 1300.01–1321.01.

provision in granting individual waivers of a regulatory provision prohibiting a registered pharmacy from "employ[ing], as an agent or employee who has access to controlled substances, any person who has been convicted of a felony offense relating to controlled substances." *See, e.g.*, *Visels Drug Store, Inc. v. DEA*, 593 F. App'x 12, 13 (2d Cir. 2014).   And the DOJ has itself cited this provision as the mechanism for persons or entities seeking RFRA exceptions for use and possession of controlled substances.  *See* Brief of the United States, *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, No. 10-17687, 2011 WL 2129955, at *4 (9th Cir. May 18, 2011); *see also* 21 C.F.R. § 1307.31; *O Centro*, 546 U.S. at 432-33 ("The fact that the Act itself contemplates that exempting certain people from its requirements would be 'consistent with the public health and safety' indicates that congressional findings with respect to Schedule I substances should not carry the determinative weight, for RFRA purposes, that the Government would ascribe to them.").

DOJ argues that this exemption—and several others discussed below—do not apply because they refer to the possession, distribution, or dispensation of drugs, but "[t]he entire premise of Safehouse's proposed operation is that Safehouse will not possess, distribute, or dispense such substances—third parties will."  DOJ Mot. at 33.  It makes no sense that DOJ can exempt people from engaging in the manufacturer, dispensation, and possession of controlled substances, but cannot exempt Safehouse from allowing people already engaged in one of those activities (possession) to do so while sheltered in a facility.  That is confirmed by the statutory text.  The introductory clause of Section 856(a)—*i.e.*, "Except as authorized by this subchapter, it shall be unlawful to…"—explicitly contemplates that other CSA provisions may affirmatively authorize conduct that would otherwise violate Section 856(a).  *United States v. Betancourt*, 734 F.2d 750, 757 (11th Cir. 1984) ("The phrase 'except as authorized by this subchapter' [in 21 U.S.C. § 841(a)(1)] indicates that this law has certain exceptions."); *United States v. Akinyoyenu*, 199 F.

Supp. 3d 106, 113 (D.D.C. 2016) (interpreting the phrase "except as authorized by this subchapter" and concluding that "[a]ny section of the CSA, be it administrative or criminal in nature, can 'authorize' conduct").  In light of this broad language, Section 856 necessarily incorporates the Attorney General's authority to authorize the predicate activities of "manufacturing, storing, distributing, or using." Section 856(a)(1) is not expressly limited to activities that are "unlawful[]"—in contrast to Section 856(a)(2). Without the Attorney General's authority to authorize the predicate activities, even entities lawfully registered or permitted to possess controlled substances—such as pharmacies, hospitals, medical practitioners, researchers, or patients—would, by the literal terms of Section 856(a)(1), be in violation of that provision.

The availability of exceptions to Section 856(a) is particularly important because the CSA does not criminalize (or authorize) the "use" of controlled substances. Rather, the phrase "unlawfully . . . using a controlled substance" is left undefined. *See* 21 U.S.C. §§ 802, 841(a), 844 (defining and proscribing manufacture, storage, distribution, and possession of controlled substances but including no provision defining when the "use" of controlled substances is prohibited).  Section 856(a) therefore contemplates both direct exceptions to its application—*e.g.*, authorizing a property owner/manager who maintains a place for the purposes of one of the enumerated activities to do so—or by authorization of the predicate conduct, *e.g.*, permitting supervision of simple possession or "use" within the facility.

### 2.   The Research Exemption

The CSA itself provides that "[t]he Attorney General, on his own motion or at the request of the Secretary, may authorize the possession, distribution, and dispensing of controlled substances by persons engaged in research. Persons who obtain this authorization shall be exempt from State or Federal prosecution for possession, distribution, and dispensing of controlled substances to the extent authorized by the Attorney General." 21 U.S.C. § 872(e).  That exemption

would be vitiated if Section 856 penalized such persons for maintaining a place to engage in authorized activities.  Indeed, use of lawfully dispensed substances could not constitute "unlawful" use under Section 856.  *See also* 21 C.F.R. § 1316.24.

DOJ responds that the government's interest in carrying out drug-related research "is not the interest furthered by § 856" (DOJ Mot. at 31), but it does not explain why that is so *in the context of this case*.  Nor does it explain how fact-bound questions about whether Safehouse's conduct would advance governmental interests is susceptible to resolution at the pleading stage— especially given the Third Circuit's holding that, in the RFRA context, questions about whether DOJ's enforcement of section "is the least restrictive means of achieving a compelling government interest" is a question for "a summary judgment motion or at trial," not a motion to dismiss under Rule 12(b)(6).  *Davis*, 2023 WL 4986493, at *5.  In any event, Safehouse's goal in opening an overdose-prevention facility is entirely consistent with the ultimate goals of the CSA, which is to have fewer people use illegal drugs and fewer people die from opioid overdose.  Although DOJ cites various regulations governing the research exemption (DOJ Mot. at 32-33), it does not identify any regulation that *categorically* precludes Safehouse from complying with those regulations or qualifying for this exemption.  Nor could it, particularly where DOJ tellingly omits that the federal government (*i.e.*, the National Institutes of Health) is currently funding research to evaluate the impact of overdose-prevention centers in New York City and Providence, Rhode Island, over the next four years.[27]  Safehouse could readily contribute data to that research.

---

[27] National Institutes of Health, Project No. 1R01DA058277-01, *A comparative evaluation of overdose prevention programs in New York City and Rhode Island*, https://reporter.nih.gov/search/GnKjAqspAUe5MJeTcJj7vg/project-details/10629749.

### 3.    The Peyote Exemption for the Native American Church

The CSA itself contains a provision exempting certain drug use for religious purposes from prosecution.  Since 1970, "there has been a regulatory exemption for use of peyote—a Schedule I substance—by the Native American Church." *O Centro*, 546 U.S. at 433 (citing 21 C.F.R. § 1307.31).  The CSA's implementing regulations provide that "[t]he listing of peyote as a controlled substance in Schedule I does not apply to the nondrug use of peyote in bona fide religious ceremonies of the Native American Church, and members of the Native American Church so using peyote are exempt from registration.  Any person who manufactures peyote for or distributes peyote to the Native American Church, however, is required to obtain registration annually and to comply with all other requirements of law." 21 C.F.R. § 1307.31.[28]  The fact that DOJ has recognized the religious rights of certain individuals (not to mention granting a privileged status to one named religious body) through a regulatory exemption to CSA enforcement demonstrates that it has afforded case-specific exemptions in certain instances and thus has the authority to do so here, but has nonetheless declined to exercise that authority in a manner that accommodates Safehouse's religious exercise.  Strict scrutiny is triggered when the government adopts case-specific exemptions that advance the interests or beliefs of one religious group over another. *Fulton*, 141 S. Ct. at 1877.

### 4.    Authority to Remit Penalties for Simple Possession

Section 844 provides that simple possession (absent any prior convictions) is punishable by a "term of imprisonment of not more than 1 year." 21 U.S.C. § 844.  Such possession is the

---

[28] In addition, the government has, in the past, exercised authority to decline to prosecute other activities that technically violate the CSA, but do not "undermine federal enforcement priorities." *E.g.*, W. Ogden, Deputy Att'y Gen., Memorandum for Selected United States Attorneys: Investigations and Prosecutions in States Authorizing the Medical Use of Marijuana (Oct. 19, 2009).

only criminal act that is said to be necessarily implicated in the "unlawful use" potentially at issue here.  The CSA provides for alternative civil penalties for such offenses, moreover, permitting the government to impose a civil penalty of up to $10,000 instead of prosecuting criminally.  21 U.S.C. § 844a.  But the CSA then permits the Attorney General to "compromise, modify, or remit, with or without conditions, any civil penalty" imposed for simple possession.  21 U.S.C. § 844a(f). Federal regulations define personal use amounts of opioids consistent with the small amount of pre-obtained substances that individuals seeking care at Safehouse may possess.  *See* 28 C.F.R. § 76.2(h).   Given that simple possession of personal use quantities is the only predicate for purported Section 856(a) liability here, the Attorney General's express discretion to remit any penalty for that possession should apply, *a fortiori*, to allow the Attorney General to provide a case-specific exemption to Safehouse, which seeks to maintain a place where such simple possession occurs for the purpose of remaining proximate to urgently needed medical care.  A limited remission of penalties for simple possession during the course of seeking access to emergency medical treatment at Safehouse's facility would mean that no "unlawful" use occurs within the facility, taking the facility outside of the plain language of Section 856(a)(2).  This is yet another example of an individualized mechanism available to DOJ to exempt providers of supervised consumption services from enforcement on a case-specific basis.

*     *     *

Collectively and individually, the CSA and its implementing regulations contain a host of highly individualized exemptions from enforcement, which render DOJ's policies of enforcing Section 856(a) not "generally applicable" for purposes of the First Amendment.

45

**E.     DOJ's Has Not Met Its Burden of Establishing that Its Policy of Enforcing Section 856(a) Withstands Strict Scrutiny**

Because DOJ's enforcement policy is not "generally applicable," it is subject to strict scrutiny. *Kennedy*, 142 S. Ct. at 2421. That means Safehouse has stated a plausible First Amendment violation "unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest."[29] *Id*. at 2422 (quoting *Lukumi*, 508 U.S. at 546). This is DOJ's burden, not Safehouse's, but DOJ has not attempted to satisfy this standard—and it could not without a trial. Instead, DOJ included a single footnote in its brief reserving the right to raise those arguments later in the proceedings in the event "the Court determines that strict scrutiny review is appropriate here." DOJ Mot. at 40 n.14 ("If the Court determines that strict scrutiny review is appropriate here, the government reserves all defenses, including that it has a compelling interest, that § 856 is the least restrict means of furthering that compelling government interest, and that the statute otherwise satisfies strict scrutiny."). As a result, if this Court finds that strict scrutiny applies, it must deny DOJ's motion for failing to establish its entitlement to relief. Put differently, because Safehouse pled both that strict scrutiny applies and that it cannot be satisfied here—but DOJ addressed only whether it applies, not whether it is satisfied—the Court should deny the motion to dismiss the First Amendment claim if it concludes that strict scrutiny is appropriate.

**V.     IF THE COURT GRANTS DOJ'S MOTION, IT SHOULD DO SO WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**

Under Rule 15(a)(2), "[l]eave to amend must generally be granted unless equitable considerations render it otherwise unjust." *Arthur*, 434 F.3d at 204; Fed. R. Civ. P. 15(a)(2). This "liberal amendment philosophy" weighs heavily in favor of allowing Safehouse to amend its

---

[29] If the government policy or law is "neutral" and "generally applicable," however, the policy is subject to only "rational basis" scrutiny. *Id.*

RFRA and First Amendment counterclaims if this Court is inclined to grant DOJ's motion (which it should not). *Adams*, 739 F.2d at 864. While Safehouse has amended its counterclaims, neither this Court nor the Third Circuit has addressed them on the merits. Safehouse should accordingly be afforded the opportunity to amend to address and cure any defects this Court identifies in its pleading, including by pleading additional allegations supporting its standing, its and its board members religious beliefs, DOJ's selective enforcement policy regarding supervised consumption, and the burdens that policy imposes on Safehouse's religious exercise.

## CONCLUSION

For the foregoing reasons, the Court should deny DOJ's motion to dismiss. If the Court is inclined to grant the motion, however, it should dismiss the RFRA and First Amendment claims without prejudice and should afford Safehouse leave to amend.

August 15, 2023                    Respectfully submitted,


**DLA PIPER LLP (US**

By: */s/ Ilana H. Eisenstein*
Ilana H. Eisenstein
ilana.eisenstein@dlapiper.com
Ben C. Fabens-Lassen
ben.fabens-lassen@dlapiper.com
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, Pennsylvania 19103-7300
Tel:      215.656.3300

**AIDS LAW PROJECT OF PENNSYLVANIA**

Ronda B. Goldfein
goldfein@aidslawpa.org
Yolanda French Lollis
lollis@aidslawpa.org
Adrian M. Lowe
alowe@aidslawpa.org
Jacob M. Eden
eden@aidslawpa.org

1211 Chestnut Street, Suite 600
Philadelphia, Pennsylvania 19107
Tel:    215.587.9377

**LAW OFFICE OF PETER
GOLDBERGER**

Peter Goldberger
50 Rittenhouse Place
Ardmore, Pennsylvania 19003
Tel:    610.649.8200
*peter.goldberger@verizon.net*

**SETH F. KREIMER, ESQUIRE**

Seth F. Kreimer
3501 Sansom Street
Philadelphia, Pennsylvania 19104
Tel:    215.898.7447
*skreimer@law.upenn.edu*

*Attorneys for Defendants and Counterclaim
Plaintiffs Safehouse and José Benitez*