IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 19-0519 |
| | : | |
| SAFEHOUSE, a Pennsylvania nonprofit corporation; | : | |
| | : | |
| JOSE A. BENITEZ, as President and Treasurer of Safehouse; | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |
| | : | |
| SAFEHOUSE, a Pennsylvania nonprofit corporation; | : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Counterclaim Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| U.S. DEPARTMENT OF JUSTICE; MERRICK B. GARLAND, in his official capacity as Attorney General of the United States; and JACQUELINE C. ROMERO, in her official capacity as U.S. Attorney for the Eastern District of Pennsylvania, | : | |
| | : | |
| Third-Party Defendants. | : | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF MOTION TO DISMISS**

# TABLE OF CONTENTS

ARGUMENT ........................................................................................................ 3

I.   Safehouse Fails to State a Plausible Claim for Relief under RFRA. ................ 3

   A.   Safehouse Cannot Assert RFRA or Free Exercise Claims Because, as it
        Concedes, it is Not a Religious Organization. ................................................ 4

   B.   Even Construing the Pleadings in Safehouse's Favor, this Court Can Rule
        that Safehouse's Belief that It Must Operate a Supervised Injection Facility
        Is Secular. .................................................................................................... 13

   C.   Safehouse Cannot Plausibly Plead a Substantial Burden Where Alternative
        Means of Charitable Practice Are Available to Its Founders and Board
        Members......................................................................................................... 18

II.  Safehouse Fails to Assert a Viable Free Exercise Claim. ............................... 24

   A.   The CSA Does Not Provide a Mechanism for Individualized Exemptions
        from Section 856. .......................................................................................... 25

   B.   Section 856 Is Generally Applicable on Its Face, and Safehouse's Efforts to
        Challenge the Federal Government's Discretionary Prosecutorial
        Determinations Is a Back-Door Selective Prosecution Claim....................... 32

CONCLUSION................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*303 Creative, LLC v Elenis,*
  143 S. Ct. 2298 (2023) ........................................................................................... 5
*303 Creative, LLC v Elenis,*
  385 F. Supp. 3d 1147 ............................................................................................... 5
*Abdul-Aziz v. Lanigan,*
  WL 3287229 (D.N.J. June 18, 2020) .................................................................... 20
*Ashcroft v. Iqbal,*
  556 U.S. 662, 678 (2009). ....................................................................................... 3
*Barker v. Conroy,*
  282 F. Supp. 3d 346 (D. D.C. 2017) .................................................................... 23
*Blackwell v. Lehigh Valley Health Network,*
  2023 WL 362392 (E.D. Pa. Jan. 23, 2023) .......................................................... 17
*Burwell v. Hobby Lobby,*
  573 U.S. 682 (2014) ............................................................................................ 4, 7
*Cheffer v. Reno,*
  55 F.3d 1517 (11th Cir. 1995) ............................................................................. 23
*Clark v. Gov. of N.J.,*
  53 F.4th 769 (3d Cir. 2022) .................................................................................. 32
*Curto v. A Country Place Condo. Ass'n,*
  921 F.3d 405 (3d Cir. 2019) ............................................................... 11, 12, 13
*Davis v. Wigen,*
  __ F.4th ___, WL 4986493  (3d Cir. Aug. 4, 2023) .................................... 3, 15-16
*EEOC v. Kamehameha Sch./Bishop Estate,*
  990 F.2d 458 (9th Cir. 1993) .............................................................................. 6, 7
*Ferguson v. Owen,*
  WL 4652337 (W.D. Pa. Sept. 8, 2022) ........................................................... 22, 24
*Fulton v. City of Phila.,*
  141 S. Ct. 1868 (2021) ...................................................................... 24, 30, 33, 35
*Fund Democracy, LLC v. SEC,*
  278 F.3d 21 (D.C. Cir. 2002) .............................................................................. 11
*Geerlings v. Tredyffrin/Easttown School Dist.,*
  WL 4399672 (E.D. Pa. Sept. 27, 2021) ............................................................... 16
*Geneva College v. Sec'y U.S. HHS,*
  778 F.3d 422 (3d Cir. 2015) ............................................................................... 24
*Harris v. McRae,*
  448 U.S. 297 (1980) ............................................................................................ 12
*Hasbajrami v. Blankenship,*
  WL 5436163 (W.D. Pa. July 26, 2023) ............................................................... 21
*Henderson v. Kennedy,*
  253 F.3d 12 (D.C. Cir. 2001) .............................................................................. 19

*Holt v. Hobbs,*
  574 U.S. 352, 361-62 (2015) ................................................................. *20*

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
  219 F. Supp. 2d 57 (D. D.C. 2002) ......................................................... 11

*Kaemmerling v. Lappin,*
  553 F.3d 669 (D.C. Cir. 2008) ................................................................ 23

*Korte v. Sebelius,*
  735 F.3d 654 (7th Cir. 2013) .................................................................. 16

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,*
  503 F.3d 217 (3d Cir. 2007) .................................................................. 6-7

*M4 Holdings, Ltd. Liab. Co. v. Lake Harmony Estates Prop. Owners' Ass'n,*
  237 A.3d 1208 (Pa. Commw. Ct. 2020) .................................................... 9

*Masterpiece Cakeshop Ltd. v. Colorado C.R. Comm'n,*
  138 S. Ct. 1719 (2018) ........................................................................... 5

*Oklevueha Native Am. Church of Hawaii, Inc. v. Holder,*
  WL 2129955 (9th Cir. May 18, 2011) ..................................................... 26

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.,*
  280 F.3d 278 (3d Cir. 2002) .................................................................. 10

*Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.,*
  836 F.2d 173 (3d Cir. 1988) ........................................................... 10, 33

*Pevia v. Hogan,*
  443 F. Supp. 3d 612 (D. Md. 2020) ........................................................ 21

*Planned Parenthood Ass'n v. Walton,*
  949 F. Supp. 290 (E.D. Pa. 1996) .......................................................... 23

*Powers v. Ohio,*
  499 U.S. 400 (1991) .............................................................................. 12

*Reed v. Chambersburg Area School Dist.,*
  951 F. Supp. 2d 706 (M.D. Pa. 2013) ..................................................... 34

*Tillman v. Allen,*
  187 F. Supp. 3d 664 (E.D. Va. 2016) ...................................................... 22

*Turner v. Safley,*
  482 U.S. 78 (1987) ................................................................................ 20

*United States v. Armstrong,*
  517 U.S. 456 (1996) ................................................................... 32-33, 35

*United States v. Batchelder,*
  442 U.S. 114 (1979) .............................................................................. 32

*United States v. Houck,*
  WL 144117 (E.D. Pa. Jan. 10, 2023) ...................................................... 33

*United States v. Khanu,*
  664 F. Supp. 2d 28 (D. D.C. 2009) ......................................................... 32

*United States v. Lewis,*
  517 F.3d 20 (1st Cir. 2008) ................................................................... 32

*United States v. Malka,*
  602 F. Supp. 3d 510 (S.D.N.Y. 2022) ..................................................... 32

*United States v. Rashwan,*
    WL 4471687 (E.D. Pa. July 11, 2023) ................................................... 32
*United States v. Safehouse,*
    985 F.3d 225 (3d Cir. 2021) ........................................................ 1,27, 33
*United States v. Stimler,*
    864 F.3d 253 (3d Cir. 2017) ........................................................... 3, 19
*United States v. Washington,*
    869 F.3d 193 (3d Cir. 2017) .......................................................... 32, 33
*Victaulic Co. v. Tieman,*
    499 F.3d 227 (3d Cir. 2007) ............................................................... 10
*W. Presbyterian Church v. Bd. of Zoning Adj. of Dist. of Columbia,*
    862 F. Supp. 538 (D. D.C 1994) ....................................................... 22
*Washington v. Klem,*
    497 F.3d 272 (3d Cir. 2007) .......................................................... 20, 33
*Zampogna v. Law Enf't Health Bens., Inc.,*
    151 A.3d 1003 (Pa. 2016) ................................................................... 8

## Statutes

15 Pa. C.S. §  5301 ................................................................................ 8
15 Pa. C.S. § 5306 ................................................................................ 8
15 Pa. C.S. § 5504 ................................................................................ 8
15 Pa. C.S. § 5505 ................................................................................ 8
15 Pa. C.S. §§ 5721 ............................................................................... 8
15 Pa. C.S. §§ 5727 ............................................................................... 8
21 C.F.R. § 1307.03 ............................................................................. 25
21 C.F.R. § 1307.31 ............................................................................. 29
21 U.S.C. § 822 ............................................................................... 26, 27
21 U.S.C. § 844 ............................................................................... 30, 31
21 U.S.C. § 856 ....................................... 1, 2, 24, 25, 26, 27, 28, 29, 30, 31, 32, 34, 35
21 U.S.C. § 872 ............................................................................... 28, 29

Safehouse asserts that its founders and board members, although practitioners of different faiths, share a common religious belief that they must act to preserve life, provide shelter, and care for the sick. Safehouse proposes to effectuate this belief in numerous ways, including by distributing clean syringes, fentanyl test strips, and naloxone; providing wound care and other primary care services; making referrals to drug treatment; and facilitating access to wraparound services, such as housing and legal resources. (ECF No. 209, at ¶ 33). If done within prescribed limits, all of these are ways in which Safehouse's founders and board members may effectuate their shared religious beliefs that are entirely consistent with the law.

But one aspect of what Safehouse proposes is not consistent with the law. As the Third Circuit has explicitly held, maintaining a place where Safehouse would invite drug users to consume illegal drugs would violate 21 U.S.C. § 856(a)(2). *See United States v. Safehouse*, 985 F.3d 225 (3d Cir. 2021).[1]

---

[1] Safehouse's "consumption room" also faces potential hurdles under state and local law. Last week, the Philadelphia City Council passed a bill—on a 13 to 1 vote—that would ban any supervised injection site from opening in most Philadelphia districts absent special permission from a zoning board. *See* Orso, Anna, *Philadelphia lawmakers vote to prohibit supervised injection sites in most of the city* (Sept. 14, 2023), available at https://www.inquirer.com/news/philadelphia/supervised-injection-site-ban-philadelphia-city-council-20230914.html (last viewed Sept. 15, 2023). In May, the Pennsylvania State Senate passed a bipartisan bill—on a 41 to 9 vote—proposing to ban supervised injection sites statewide. McGoldrick, Gillian and Whelan, Aubrey, *State Senate approves ban of supervised injection sites in Pa.* (May 1, 2023), available at https://www.inquirer.com/politics/pennsylvania/safe-injection-sites-opioid-safehouse-20230501.html (last viewed Sept. 15, 2023). Pennsylvania Governor Josh Shapiro has publicly reported that, if passed by the state House, he would sign the bill into law. *Id.* If either of these measures are enacted, this case

To be clear, this statute does not prohibit Safehouse from supervising drug use altogether. It would not violate the Controlled Substances Act ("CSA"), for example, if Safehouse employees remained in close proximity to illegal drug use in the public places in Philadelphia where such use has for decades occurred. The only restriction is that it may not invite drug use inside its own facility.

Safehouse is not a religious organization and thus cannot plausibly assert a RFRA or Free Exercise claim on behalf of the corporation itself. Moreover, Safehouse's professed "belief" in facilitating illegal drug use is not a "religious" one, but rather a socio-political belief informed by harm-reduction principles. Even if it were religious, Safehouse cannot plausibly allege that enforcement of § 856 poses a substantial burden on its free exercise of religion when, by its own acknowledgment, there are a multitude of alternative means by which its beliefs may be expressed. And because § 856 is neutral and generally applicable on its face and does not contain a mechanism of individualized exemptions, its enforcement against Safehouse does not run afoul of the Free Exercise Clause. Accordingly, Safehouse's Amended Counterclaims must be dismissed.

---

would likely be rendered moot for lack of redressability. The government reserves all rights to seek dismissal on such grounds at an appropriate juncture.

## ARGUMENT

### I.    Safehouse Fails to State a Plausible Claim for Relief under RFRA.

At the outset, Safehouse contends that the Third Circuit's recent decision in *Davis v. Wigen* "clarified the pleading standards for civil RFRA claims." (ECF No. 215 at 21 (citing __ F.4th ___, 2023 WL 4986493, at *7 (3d Cir. 2023)). But *Davis* kept intact the three prima facie elements of a RFRA claim: that a claimant must plead that it has a belief that is (1) sincerely held, (2) religious in nature, and (3) substantially burdened by government action. *Compare Davis*, at *7 *with United States v. Stimler*, 864 F.3d 253, 268 (3d Cir. 2017). While *Davis* refers specifically to civil pleading standards, it incorporates the *Iqbal* requirement that each element of the prima facie RFRA case must be plausibly alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Safehouse has failed to do that here.

According to its pleadings, Safehouse is not a religious entity or organization, so it cannot assert religious freedom claims on its own behalf. Similarly, Safehouse's amended counterclaims make clear that it seeks to operate a supervised injection facility for secular reasons, not religious ones. Safehouse has also failed to allege that its board members' religious belief in saving lives, caring for the sick, or sheltering their neighbors is *substantially* burdened where there are multiple alternative ways to satisfy this religious belief, which Safehouse itself enumerates. Even accepting its well-pleaded allegations as true, Safehouse has failed to plausibly plead a prima facie RFRA claim, and this claim must be dismissed.

## A.   Safehouse Cannot Assert RFRA or Free Exercise Claims Because, as it Concedes, it is Not a Religious Organization.

RFRA applies to "a person's exercise of religion." While nonprofit corporations are among the entities that can qualify as a "person" in this context, *see Burwell v. Hobby Lobby*, 573 U.S. 682, 717 (2014), the question before the Court is whether a non-religious entity can engage in an "exercise of religion." Safehouse concedes that it is not itself a religious organization (ECF No. 209, at ¶ 126), but nevertheless asks this Court to recognize that it has religious rights.

Safehouse's position would work an unsupported expansion of *Hobby Lobby*, which held that a closely held corporation could assert religious rights where the corporation's owners were all members of the same family who explicitly incorporated their religion into the form and operation of their business. *Hobby Lobby*, 573 U.S. at 717. Because Safehouse pleads that it is not a religious organization and advances no plausible allegations that it was organized or is operated with a religious purpose, this Court should rule that it cannot assert religious rights on its own behalf.

The two cases cited by Safehouse in support of its position to the contrary are readily distinguishable. Neither case discusses what factors a court should consider in weighing whether a corporation can assert a religious right. Moreover, in each case the corporate form was a single-member LLC, and in each case the LLC's owner-operator was *also* a party to the case and his or her religious beliefs were analyzed by the Court.

*Masterpiece Cakeshop* involved a single-owner bakery where the owner refused to bake a wedding cake for a gay couple. *Masterpiece Cakeshop Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719 (2018). The Supreme Court did not analyze whether the company could assert a religious right, nor did it need to because the baker, the person who asserted the religious right, was also a party. *Id.* at 1725. Accordingly, the Court noted that the reason and motive for *the baker's* refusal to bake the wedding cake were based on *his sincere religious beliefs and convictions*. The Court thus framed the case as involving whether "the *baker*, in his capacity as the owner of a business serving the public, might have his right to the free exercise of religion limited by generally applicable laws." *Id.* at 1723-24; *see also id.* at 1726 (describing the individual baker's claims regarding his exercise of religion). The bakery was included as a defendant at the state level because it was the place of public accommodation to which Colorado's anti-discrimination law applied.

Similarly, *303 Creative LLC* involved a website designer who did not want to create a website for weddings of gay couples, and it was the individual website designer, who also solely owned and operated the LLC, that claimed her exercise of religion was impacted by the same Colorado statute at issue in *Masterpiece Cakeshop. See 303 Creative, LLC v Elenis*, 143 S. Ct. 2298 (2023). At the district court level, the individual plaintiff asserted, and the court discussed at length, *her own* free speech and free exercise rights, not those of her LLC. *See* 385 F. Supp. 3d 1147, 1150-51, 1153, 1161 (D. Col. 2019). The Supreme Court did not address the issue of whether this single-member LLC could assert religious rights; in fact, it did

not address the designer's religious claim at all (other than noting that she objected to "promoting views inconsistent with *her* religious commitments"). 143 S. Ct. at 2317 (emphasis added). Instead, it resolved the case entirely on free speech grounds. *Id.* at 2310-18.

Moreover, in other contexts, courts have expressly held that non-religious corporations cannot assert religious freedom rights. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007); *EEOC v. Kamehameha Sch./Bishop Estate*, 990 F.2d 458, 461 (9th Cir. 1993).

*LeBoon* and *Kamehameha*, both Title VII cases, held that courts should consider several factors in determining whether a corporation is religious:

> (1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.

503 F.3d at 226; *see also Kamehameha Sch.*, 990 F.2d at 460-464 (considering a school's ownership and affiliation, purpose, faculty, student body and activities, and curriculum in determining the "general picture" of whether the schools had a "primarily secular rather than a primarily religious orientation"). As the government argued in its opening brief, applying those factors to this case compels the conclusion that Safehouse is not a religious organization.

Safehouse argues a corporation need not set out its religious foundations or purposes in its foundational documents or other authoritative sources. In *Hobby Lobby*, however, the Court primarily emphasized the closely held nature of the corporations and the fact that each was owned and controlled by members of a single family. Those facts are very different from Safehouse, which is purportedly controlled by over a dozen board members, with no family affiliation, who do not otherwise resemble the small groups of owners at issue in *Hobby Lobby*. Moreover, Safehouse has completely failed to demonstrate that it is religious by reference to any of the other factors set out in *LeBoon* and *Kamehameha*.

Similarly, the Supreme Court in *Hobby Lobby* examined and discussed the corporate form each entity took, how the corporation was structured, what each adopted as governing principles, and the ways in which each organization incorporated its owners' beliefs into its operations. *See Hobby Lobby*, 573 U.S. at 702-03. None of those factors suggests Safehouse was organized or operates as a religious entity.

Safehouse misreads *Hobby Lobby* when it suggests that the Supreme Court "rejected the argument that closely held corporations cannot hold religious beliefs because of possible disagreement between its owners as to certain religious issues." (ECF No. 215 at 33, n. 14). *Hobby Lobby* merely noted that courts could resolve questions pertaining to such disagreement in future cases by considering objective evidence of an entity's claimed religious beliefs. *Id.* at 719 ("State corporate law provides a ready means for resolving any conflicts by, for example, dictating how a

corporation can establish its governing structure.") The Court directed that district courts "turn to that structure and the underlying state law in resolving disputes." *Id.* Here, as explained, the complaint lacks any plausible allegation supporting the notion that Safehouse is religious.

Under Pennsylvania law, for example, nonprofit corporations can be incorporated for any lawful purpose, including religious purposes. 15 Pa. C.S. § 5301(a). Safehouse does not contend that it was incorporated for a religious purpose. A nonprofit corporation's articles of incorporation "shall set forth . . . [a] brief statement of the purpose or purposes for which the corporation is incorporated." 15 Pa. C.S. § 5306(a)(3); *see also Zampogna v. Law Enf't Health Bens., Inc.*, 151 A.3d 1003, 1012 (Pa. 2016) (noting that nonprofit corporations are required to be incorporated for a specified purpose, as opposed to for-profit corporations, which can be incorporated for "any lawful purpose"). Safehouse's Articles of Incorporation contain no mention of religious purpose. (*See* ECF No. 211-1, at 3-5).

Safehouse does not plead that its organizer, former Governor Ed Rendell, or its board of directors, has taken the kind of steps that reflect entity action under Pennsylvania law. For example, Safehouse does not allege that a majority of its directors have agreed that the religious beliefs of its board members constitute the religious beliefs of the organization. 15 Pa. C.S. §§ 5721, 5727 (describing the requirements for quorum of and action by directors). Nor does Safehouse contend that a religious purpose is incorporated into its bylaws, which may contain "any

provisions for managing the business and regulating the affairs of the corporation."
*See* 15 Pa. C.S. § 5504(a) (nonprofit corporations may act through bylaws), § 5505
(bylaws are binding on a nonprofit corporation's members, directors, and officers
with respect to its internal affairs); *see also M4 Holdings, Ltd. Liab. Co. v. Lake
Harmony Estates Prop. Owners' Ass'n*, 237 A.3d 1208, 1225 (Pa. Commw. Ct. 2020)
("[A] not-for-profit's board of directors is only permitted to take action as authorized
by the [Pennsylvania Nonprofit Corporation Law], the nonprofit's articles of
incorporation, and its bylaws."). Indeed, Safehouse's bylaws contain no mention of
any religious purpose and do not describe that Safehouse is formed to express and
vindicate certain religious beliefs of its directors.

What Safehouse refers to as its "Mission Statement" (*see* ECF No. 215, at 3
n.3, 15) is a paragraph posted on its website under the heading "FREQUENTLY
ASKED QUESTIONS." It reads:

> **WHAT IS SAFEHOUSE?**
>
> Safehouse is a privately funded Pennsylvania nonprofit corporation
> whose mission is to save lives by providing a range of overdose
> prevention services.
>
> The leaders and organizers of Safehouse are motivated by the Judeo-
> Christian beliefs ingrained in us from our religious schooling, our
> devout families and our practices of worship. At the core of our faith is
> the principle that preservation of human life overrides any other
> considerations.
>
> Safehouse is working with community partners to find a suitable
> location(s) to deliver those services.

(*See* ECF No. 3, at ¶ 9 (quoting *Frequently Asked Questions* on its website)).

As explained above, however, the fact that a corporation's leaders and organizers have religious motivations is not sufficient, standing alone, to make the corporation itself a religious entity. And the paragraph from Safehouse's website is not properly before the Court because it was not referenced in Safehouse's amended counterclaim complaint.[2] The "Mission" that Safehouse describes now is also not supported by, and is different than, the mission statement it provided to the IRS when it submitted its § 501(c)(3) application under penalty of perjury, which does not mention religion.[3]

Nor can Safehouse rely on a theory of associational standing to assert the rights of its board members. An association may bring suit in a representational capacity to assert the interests of members who have "join[ed] an organization . . . to create an effective vehicle for vindicating interests that they share with others." *Pa.*

---

[2] Safehouse cannot amend its counterclaims through its response to the government's brief. *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (citation omitted)). Additionally, Safehouse's website printout, which it casts as its "Mission Statement" is not subject to judicial notice and therefore cannot be considered by this Court in determining whether to dismiss Safehouse's counterclaims. *See Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007) (holding that it is improper for a court to take judicial notice of facts found on a company's website).

[3] In support of its § 501(c)(3) application, Safehouse asserted that its mission is "to stem the tide of drug deaths and overdoses in the City of Philadelphia by providing a safe environment to engage on a constant basis individuals who are suffering with a substance use disorder, thereby preventing overdoses and providing a critical link for referral and access to essential health care and other social services in order to save lives, and encourage and facilitate treatment and recovery." (Gov't's Ex. 3, Safehouse 501(c)(3) application materials at 57 (authenticated by President and Treasurer Jose Benitez during the Court's August 19, 2019 Hearing in this matter at Hrg. Tr. 173:23-175:4)).

*Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 283 (3d Cir. 2002) (quoting *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Brock*, 477 U.S. 274, 290 (1986)). But Safehouse is not a membership organization or anything resembling one, and it therefore cannot bring a suit in a representational capacity. *See Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002) (explaining that, to rely on associational standing, an entity must "actually ha[ve] . . . members," or at least be "the functional equivalent of a traditional membership organization").

Even if it could surmount that threshold barrier, Safehouse cannot satisfy other associational-standing requirements, namely, that:  "(1) individual members . . . have standing in their own right, (2) the interest asserted [is] germane to the purpose of the organization, and (3) neither the claim nor the relief requested [would] require the participation of the individual members in the lawsuit." *Curto v. A Country Place Condo. Ass'n*, 921 F.3d 405, 410 n.2 (3d Cir. 2019) (citing *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977)). Safehouse fails on the second prong because the entity does not have a religious purpose. (ECF No. 209, ¶ 125) ("Safehouse is not itself a religious entity or organization")). *See Curto*, 921 F.3d at 410, n.2 (opining that a condominium association would have lacked associational standing to assert the religious rights of its Orthodox Jewish members where the association did not itself have a religious purpose).

Safehouse also fails on the third prong of the associational standing test. As the Third Circuit has explained, "religious beliefs are highly personal, and in a

typical RFRA case the parties asserting a burden on their religion would provide personal testimony about their beliefs and the nature of the burden." *Curto*, 921 F.3d at 410 n.2; *see also Holy Land Found. For Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D. D.C. 2002) ("[T]he Supreme Court has stated that free exercise claims are precisely the type of claims that require individual participation in order to show the alleged burdensome effect of an enactment on an individual's religious practice." (citing *Harris v. McRae*, 448 U.S. 297, 321 (1980)).[4]

Here, Safehouse's RFRA and free exercise claims would require the participation of any board member who asserts religious rights in this context, and their personal testimonies about their religious beliefs and the nature of the alleged burden upon their religious exercises. *See Curto*, 921 F.3d at 410 n.2 (explaining that, if association had brought a RFRA claim, it would have lacked associational standing to do so). Because it does not assert an injury on its own behalf and it cannot invoke doctrines of associational standing, Safehouse's RFRA and Free Exercise claims must be dismissed. Furthermore, because Safehouse is not a religious entity, this Court can dismiss its counterclaims under RFRA and the Free Exercise clause on that basis alone and need go no further in addressing the remaining arguments.

---

[4] Safehouse also does not meet the requirements for third-party standing, as it has not asserted that *it* has suffered an "injury in fact" by virtue of an alleged burden on its directors' religious exercise, or that there is a hindrance to its directors' abilities to protect their own interests. *See Powers v. Ohio*, 499 U.S. 400, 411 (1991).

**B.      Even Construing the Pleadings in Safehouse's Favor, this Court Can Rule that Safehouse's Belief that It Must Operate a Supervised Injection Facility is Secular.**

This Court should take Safehouse at its word that it believes its proposed supervised consumption room is a "medical and public health measure," with endorsements from medical and public health associations and addiction researchers. (ECF No. 209, at ¶ 88).[5] On this basis, the Court should rule that Safehouse has failed to plausibly make out a prima facie showing that it seeks to operate a supervised injection facility for religious, rather than secular, reasons, where its pleading provides a host of secular health and policy reasons for its proposed plan, described as a "medical and public health response to the opioid crisis." (ECF No. 209, at ¶ 78.)

Safehouse contends that the government has "fail[ed] to distinguish Safehouse's practices and immediate goals (*e.g.*, supervised consumption sites and harm reduction) from its religious beliefs and commitments (*e.g.*, the sanctity of human life, duties of preservation of life, charity, sanctuary, provision of shelter and aid to the needy)." (ECF No. 215, at 28.  It contends that "only the latter are relevant to the question of whether Safehouse's efforts are protected expressions of religion." (*Id.*)

But this framing reinforces, rather than refutes, the government's argument; Safehouse concedes that supervised injection is not its "religious beliefs" or

---

[5] Safehouse describes its overdose prevention services as a "medical and public health" response to the opioid crisis at least six times throughout its counterclaims. (*See* ECF No. 209, at ¶¶ 78, 85, 88, 89, 94, 102).

"commitment." The government does not dispute that religious faiths emphasize the importance of and compel the exercise of charity, caring for the sick and needy, and preserving life as tenets of religious exercise. Those beliefs are not at issue. What this Court must decide instead is whether the *specific* activity in which Safehouse seeks to engage, *i.e.*, maintaining a place for illegal drug use, is the exercise of religion. As the government has explained, Safehouse's view that it should operate a supervised injection facility (its "immediate goal") is an individual-, medical- and public-health-based judgment. It is informed by Safehouse's view, and the views of advocates within the harm reduction community, regarding the best approach to assist and engage with those suffering from opioid addiction. (ECF No. 209, at ¶¶ 88-90).

While RFRA provides broad protection of the exercise of religion, it does not stand for the principle that all a claimant must do is assert that particular conduct is religiously motivated to claim RFRA's protection for the exercise of religion. As the government has explained, Safehouse's repeated assertions throughout its counterclaims reveal that its belief that it must exercise *this specific practice*—maintaining a place for supervised injection—is informed by secular viewpoints. (*See* ECF No. 209, at ¶¶ 31, 32, 63-65, 88 (explaining "harm reduction" principles and describing supervised injection as a "modest extension of already-endorsed harm reduction measures" that has the approval of various authorities within the medical community)).

14

In its responsive brief (but, significantly, not in its counterclaims), Safehouse now contends that there is no "no alternative means for Safehouse to effectively provide overdose-prevention services in a manner that aligns with the religious beliefs of Safehouse's board members." (ECF No. 215, at 30; 37 n.22). But this contention does not establish that operating a safe injection site is the exercise of religion. Rather, it reflects Safehouse's assertion that supervised injection is the most efficacious way to prevent overdose for a person who is using drugs. That judgment, as Safehouse phrases it, does not convert a fundamentally secular activity into religious exercise.

Citing *Davis v. Wigen*, __ F.4th ___, 2023 WL 4986493 (3d Cir. Aug. 4, 2023), Safehouse contends that, at the pleadings stage, the Court must accept Safehouse's allegation that operating a supervised injection facility is religious expression. (*See* ECF No. 215, at 18-19). But Safehouse misreads *Davis*.

In *Davis*, a federal inmate and his fiancée brought a RFRA challenge to a prison's denial of the inmate's request to marry. Some of the defendants challenged whether the plaintiffs had sufficiently pleaded that their request to marry constituted religious expression. *See Davis*, ECF No. 33, Br. of Appellees Donna Mellendick and David O'Neill, at 44-45. The Court held that the plaintiffs had adequately done so because they averred that marriage had "profound religious significance for them" and that they "viewed their marriage as an expression of that faith." *Davis*, 2023 WL 4986493, at *6-7.

Unlike in *Davis*, Safehouse's own description of its activities is secular. It describes its proposed overdose prevention services as a way to "combat the opioid crisis through the use of a comprehensive harm reduction strategy" that it asserts is part of a "medical and public health response to the opioid crisis." (ECF No. 209, at ¶¶ 32, 78.) Safehouse explains that its harm reduction strategy, including overdose prevention, is "necessary in light of the psychology of addiction and substance use disorder." (*Id.* at ¶31.)

Safehouse's Amended Counterclaims do not allege that each of Safehouse's directors sincerely believe that there is no activity short of serving on the board of a supervised injection facility that can satisfy their religious beliefs. Instead, Safehouse alleges that the activity that *is* the exercise of its founders' and directors' religious beliefs is its "lifesaving mission." (ECF No. 209, at 27 (Section V)). Thus, unlike the claimants in *Davis*, Safehouse does not contend that operating a supervised injection site *is* its religious exercise, but only that it "effectuates" a religious belief—namely, its board members' "religious obligation to preserve life, provide shelter to [their] neighbors, and do everything possible to care for the sick." (*Id.* at ¶ 129). Safehouse's averment that operating a supervised injection facility would further its broad religious belief does not shield it from the inquiry at the pleadings stage into whether doing so would constitute religious expression. "Religious adherents often profess that faith inspires much of their secular lives, but those activities are still secular." *Geerlings v. Tredyffrin/Easttown School Dist.*, Civ. No. 21-4024, 2021 WL 4399672, at *7 (E.D. Pa. Sept. 27, 2021) (Goldberg, J.).

Safehouse also cites *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013), in support of the proposition that questions of sincerity and whether activity is religious in nature are factual inquiries beyond the purview of a court's review at the pleadings stage. (ECF No. 215, at 18-19). However, in *Korte*, sincerity and religiosity were not at issue. As the court explained, "[n]o one questions [the plaintiffs'] sincerity or the religiosity of their objection." *Id.* at 683. Accordingly, the Seventh Circuit did not opine on whether the question of religiosity could be addressed at the pleadings stage.

The medical and philosophical rationale for Safehouse's plans is explained throughout its amended counterclaims. Safehouse pleads that its proposed overdose prevention services are "a legitimate medical and public health measure that have been recognized and endorsed by prominent national and international medical and public health associations." (ECF No. 209, at ¶ 88).  Safehouse further contends that overdose prevention "has been endorsed and encouraged by Philadelphia's previous and current acting Public Health Commissioner," adding that "overdose prevention, including supervised consumption, is a critical medical and public-health intervention." (*Id.* at ¶ 89).

Safehouse argues that the medical and philosophical rationale it pleads in its counterclaims should not affect this Court's analysis because courts have afforded protection to a belief that shares both religious and philosophical components. However, as a necessary limiting corollary, it is not the case that once a person asserts a sincere religious belief that *anything* they deem to further that religious

belief is necessarily protected activity. This would amount to "a blanket privilege" and a "limitless excuse for avoiding all unwanted . . . obligations." *Blackwell v. Lehigh Valley Health Network*, Civ. No. 22-3360, 2023 WL 362392, at *7 (E.D. Pa. Jan. 23, 2023) (internal marks and citation omitted). This Court still must parse whether Safehouse's proposed activity is religious exercise.

Examining Safehouse's example of a religious hospital is instructive for this principle. Safehouse contends that the mere fact that a religious hospital's medical care is rooted in public health and medical science does not mean that the hospital lacks religious conviction or that its provision of medical care is not religious exercise. (ECF No. 215, at 21). But if Safehouse's argument were adopted, then *every element* of the hospital's provision of medical care could be considered the exercise of religion, *e.g.*, providing prescription drugs, making dosing decisions, scheduling surgeries and surgical staff, and providing surgery and other medical treatments. Would the hospital's exercise of religion then be substantially burdened by the withdrawal from the market of a particular drug; guidelines limiting the dispensing of opiates; regulations on the working hours, working conditions, and pay that govern its staffing; a determination that a previously accepted practice was no longer medically sound, *etc.*?  That is not what the law provides.

## C.   Safehouse Cannot Plausibly Plead a Substantial Burden Where Alternative Means of Charitable Practice Are Available to Its Founders and Board Members.

The government's enforcement of the CSA does not substantially burden the religious exercise of Safehouse's board members. Safehouse pleads that its board

members and directors sincerely believe they must "preserve life, provide shelter to [] neighbors, and do everything possible to care for the sick." (ECF No. 209, at ¶129). Because Safehouse's board members may preserve life, provide shelter, and care for the sick through many methods, in this case a prohibition on *one* discrete activity that effectuates their religious beliefs does not create a substantial burden. *See United States v. Stimler*, 864 F.3d 253, (3d Cir. 2017) (district court properly weighed whether a burden on religious exercise was "substantial" by considering acceptable alternative means of religious practice that remained available); *Henderson v. Kennedy*, 253 F.3d 12, 15 (D.C. Cir. 2001).

Despite Safehouse's assertions, the Third Circuit's controlling decision in *Stimler* remains good law, including its holding that "the District Court properly analyzed whether [a] burden [on religious exercise] was 'substantial' by looking to acceptable alternative means of religious practice that remained available to the defendants." (*See* ECF No. 215, at 31-32 (citing *Stimler*, 864 F.3d 253 at 268)). Safehouse's arguments that this Court should depart from *Stimler's* holding are unavailing.

As previously argued, the *Stimler* opinion and the government's argument are consistent with *Holt*. Under *Stimler* and *Holt*, in evaluating substantial burden, it is improper to consider whether a religious claimant can engage in other aspects of their faith (such as by rejecting a Jewish claimant's argument that he must keep Kosher by asserting he may still read the Torah). But it is appropriate to evaluate whether the *specific religious exercise* in which a party seeks to engage (here

charitable acts, lifesaving measures, and providing care and shelter to the needy)

can be met through alternative means.

This is evident by the discussion in *Holt*. There, the Supreme Court noted

that a line of cases involving a prisoner's First Amendment rights improperly

incorporated the question of whether a claimant could engage in other aspects of

religion (*e.g.*, whether refusal to provide a religious diet could be excused by

providing the prisoner opportunities for prayer). *Holt*, 574 U.S. at 361-62 (citing,

*e.g.*, *Turner v. Safley*, 482 U.S. 78, 90 (1987)).[6] *Holt* disavowed that analysis, noting

that RLUIPA provides greater protection than the Free Exercise Clause in the

prison context. *Id.* This is consistent with the Third Circuit's framework in *Stimler*,

where it did not consider whether the RFRA claimants had other ways of exercising

their Jewish faith, but evaluated whether other means existed by which they could

engage in the specific religious exercise they asserted (*i.e.*, that they must help

women get divorces from recalcitrant husbands).

The other case cited by Safehouse on this point, *Washington v. Klem*, is

distinguishable. 497 F.3d 272 (3d Cir. 2007). Rather than rejecting an alternative

means analysis, *Klem* endorsed it, but only insofar as the alternative measure

would also satisfy the claimant's religious requirements. *Klem* involved a prisoner

whose religious beliefs required a daily reading of four books, which he said was

---

[6] *See also Abdul-Aziz v. Lanigan*, Civ. No. 17-2806, 2020 WL 3287229, at *13 (D. N.J. June 18, 2020) (describing *Holt* as concluding that "prison officials' allowance of a Muslim inmate to have a prayer rug and access to a religious advisor did not alleviate the substantial burden on his religious exercise they imposed by barring him from growing a beard").

burdened by a prison policy allowing him only ten books in his cell. *Id.* at 281. The Third Circuit rejected the argument that the presence of a prison library satisfied the prisoner's four-books-a-day religious exercise, but only because the prisoner did not have sufficient access to the library to obtain the books, suggesting that, if he did have sufficient library access, then he would not need to keep them in his cell. *See id.* at 282 (noting that recognizing a substantial burden for any incidental impact of government action would read "substantial" out of the statute).

Safehouse asserts that "medically supervised consumption" is *part* of its overdose prevention model. But its "overdose prevention services [also] include the assessment of an individual's physical and behavioral health status, provision of sterile consumption equipment, provision of drug testing (*i.e.*, fentanyl test strips), . . .wound care and other primary care services, on-site education and counseling, on-site MAT and recovery counseling, distribution of Naloxone, and access to wraparound services such as housing, public benefits, and legal services." (ECF No. 209, at ¶ 33). This description illuminates that there are numerous specific activities that would further Safehouse's religious belief to provide medical treatment to a vulnerable population.

As it describes in its counterclaims, Safehouse's proposed services to Philadelphians struggling with opioid use have many counterparts—all alternatives that Safehouse's directors may use to satisfy their religious obligations, and that can be considered by this Court. *See Hasbajrami v. Blankenship*, Civ. No. 22-0166, 2023 WL 5436163, at *4-5 (W.D. Pa. July 26, 2023) (granting Rule 12(b)(6) motion

for failure to plead substantial burden where prisoner was able to satisfy his specific religious practice through other means), *adopted by* 2023 WL 5432328 (W.D. Pa. Aug. 23, 2023); *Pevia v. Hogan*, 443 F. Supp. 3d 612, 638 (D. Md. 2020) ("[C]ourts properly consider whether the inmate retains other means for engaging in *the particular religious activity* . . . in assessing whether a denial of the inmate's preferred method for engaging [in] that religious exercise imposes a substantial burden." (quoting *Tillman v. Allen*, 187 F. Supp. 3d 664, 673 (E.D. Va. 2016) (emphasis added)); *Ferguson v. Owen*, Civ. No. 21-2512, 2022 WL 2643539, at *10 (D. D.C. July 8, 2022) (the restriction of one among several means of fulfilling a religious belief does not rise to the level of substantial burden).

Safehouse's contention that it faces criminal prosecution for exercising its religious belief in providing charitable services is particularly inapposite in a multitude-of-means case like this. The government does not propose to burden Safehouse from exercising religious beliefs to preserve human life, care for the sick, provide shelter, or engage in other charitable acts.[7] Safehouse asserts that saving

---

[7] The government takes no issue with Safehouse's assertion that "acts of charity as an essential part of religious worship is a central tenet of all major religions." (ECF No. 215, at 17 (quoting *W. Presbyterian Church v. Bd. of Zoning Adj. of Dist. of Columbia*, 862 F. Supp. 538, 544 (D. D.C 1994)). Indeed, as Safehouse observes, the federal government has supported plaintiffs asserting religious freedom claims based on charitable acts in some cases, such as in *Micah's Way v. City of Santa Ana*, Civ. No. 23-0183 (C.D. Cal. May 9, 2023), at ECF No. 25. But the facts of that case are not "closely analogous to this one." *Micah's Way* involved a church that distributed food and drinks, allegedly in violation of a city zoning ordinance. 2023 WL 4680804 (C.D. Cal. June 8, 2023). There, the Court *considered* whether Micah's Way had alternatives readily available to distribute food. It ruled that the local government had substantially burdened the church because no viable alternatives existed hat would not entail "substantial uncertainty, delay, or expense." *Id.* at *16.

lives is religious exercise and that the religious beliefs of its board members "call [it] to provide lifesaving medical treatment to a vulnerable population."

Given the breadth of the belief in performing acts of charity, and the myriad ways that Safehouse has listed that it seeks to effectuate the same beliefs, this Court must consider whether a prohibition of *one* such method is a *substantial* burden on religious exercise, or only an incidental burden on a preferred method of carrying out particular religious beliefs. A RFRA claimant does not allege a substantial burden merely by asserting that one particular activity best serves their religious beliefs, particularly where other alternatives would also serve those beliefs. *See Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir. 1995) (no substantial burden in Act restricting access to abortion clinics where plaintiffs did not allege that their religion required them to physically obstruct clinic areas and the plaintiffs otherwise had "ample avenues open" by which they could express their deeply held beliefs); *Planned Parenthood Ass'n v. Walton*, 949 F. Supp. 290, 296 (E.D. Pa. 1996) (same).

Finally, Safehouse contends that the alternative means argument is inappropriate at the motion to dismiss stage. But discovery is not required to understand the innumerable ways in which a person or entity can take actions to preserve life and provide shelter. Safehouse describes many of these ways itself, in outlining the scope of its planned overdose prevention services. (ECF No. 209, at ¶ 33). Whether Safehouse has plausibly pleaded a substantial burden can and should be determined at this stage. *See, e.g., Kaemmerling v. Lappin*, 553 F.3d 669,

679 (D.C. Cir. 2008) (affirming dismissal for failure to state a claim where plaintiff failed to plead a substantial burden under RFRA); *Ferguson v. Owen*, Civ. No. 20-0084, 2022 WL 4652337 (W.D. Pa. Sept. 8, 2022) (dismissing RFRA case for failure to state a claim where plaintiff did not plead a substantial burden); *Barker v. Conroy*, 282 F. Supp. 3d 346 (D. D.C. 2017) (dismissing RFRA claim for failure to state a substantial burden), *aff'd* 921 F.3d 1118. This Court can and should rule as a matter of law that Safehouse has not pleaded a prima facie RFRA case because the issue of substantial burden is a legal determination. *See Geneva College v. Sec'y U.S. HHS*, 778 F.3d 422, 436 (3d Cir. 2015).

## II.     Safehouse Fails to Assert a Viable Free Exercise Claim.

Safehouse also fails to plead a plausible claim for relief under the First Amendment's Free Exercise Clause. Safehouse correctly concedes that, "[i]f a government policy or law is 'neutral' and 'generally applicable,' . . . the policy is subject only to 'rational basis' scrutiny.'" (ECF No. 215, at 34 n. 21). As the Supreme Court has held, "[a] law is not generally applicable if it [1] invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," or (2) "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interest in a similar way." *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1877 (2021). Safehouse does not plausibly contend that this case requires strict scrutiny under either of those prongs.

**A.      The CSA Does Not Provide a Mechanism for Individualized Exemptions from Section 856.**

Safehouse continues to argue that other sections of the CSA constitute "mechanisms for individualized exemptions," *Fulton*, 141 S. Ct. at 1877, that bring § 856 within the ambit of strict scrutiny. But Safehouse's opposition brief confirms that none of the scattered provisions it identifies constitutes a mechanism for an individualized exemption from § 856.[8]

*1.      Registration Waiver and Regulatory Exemption from DEA Enforcement*

In its search for a "mechanism[] for individualized exemptions" from § 856(a)'s prohibitions, Safehouse first turns to 21 C.F.R. § 1307.03. (ECF No. 215, at 40). This provision states that "[a]ny person may apply for an exception to the application of any provision of this chapter;" *i.e.*, Chapter II of Title 21 of the Code of Federal Regulations. 21 C.F.R. § 1307.03. Under this provision, any person may apply for an exception to particular CSA regulations (as opposed to compliance with the CSA writ large). It does not, however, provide substantive authority for granting an exemption to § 856, which is a statute.

Nor does Safehouse identify any provision of Chapter II of Title 21 that covers the "unlawful acts" of "[m]aintaining drug-involved premises," 21 U.S.C. § 856, which the statute prohibits. And while Safehouse cites a number of examples

---

[8] Notably, Safehouse does not affirmatively argue that any of these provisions "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interest in a similar way," *Fulton*, 141 S. Ct. at 1877, and thus should be understood to bring its challenge only under *Fulton*'s first prong. (*See* ECF No. 215, at 39-45).

of exemptions provided under 21 C.F.R. § 1307.03 (*see* ECF No. 215, at 40-41), the exceptions granted under this provision are to regulations, not statutory proscriptions. *See, e.g.*, *Registration Requirements for Narcotic Treatment Programs with Mobile Components*, 86 Fed. Reg. 33861-01, at *33,867 (June 28, 2021) (providing for a "waiver *of the regulation*" under certain circumstances) (emphasis added); ECF No. 215, at 41 (discussing "individual waivers of a *regulatory provision*" (emphasis added)).

Moreover, while Safehouse states that "DOJ has itself cited this provision as the mechanism for persons or entities seeking RFRA exceptions for use and possession of controlled substances" (ECF No. 215, at 41), that cited provision, too, makes clear that § 1307.03 applies only to DEA regulations. *See* Brief of the United States, *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, No. 10-17687, 2011 WL 2129955, at *4 (9th Cir. May 18, 2011) ("The DEA has promulgated various regulations related to controlled substances in Title 21, Chapter II of the Code of Federal Regulations. 28 C.F.R. 1300-1316. These regulations provide that '[a]ny person may apply for an exception to the application of any provision of [the DEA regulations]' by filing a written request with the Administrator of the DEA, who has discretion to grant any exception. 21 C.F.R. 1307.03.") (alteration in original).

Safehouse's arguments that § 822(d) or § 856(a) provide an applicable exemption also fail.  Starting with § 822(d), Safehouse does not appear to dispute that 21 U.S.C. § 822(d) applies only to the "requirement for registration of certain manufacturers, distributors, or dispensers," and Safehouse does not contend that it

26

would be a manufacturer, distributor, or dispenser. (ECF No. 215, at 41; *see also* ECF No. 211 (Gov't motion to dismiss), at 34-35 (explaining that 21 U.S.C. § 822(d) does not apply to 21 U.S.C. § 856(a)). Safehouse does not qualify for a § 822(d) exception because it is not a manufacturer, distributor, or dispenser subject to the registration requirement.

Safehouse asserts that "[i]t makes no sense that DOJ can exempt people from engaging in the manufacture, dispensation, and possession of controlled substances, but cannot exempt Safehouse from allowing people already engaged in one of those activities (possession) to do so while sheltered in a facility." (ECF No. 215, at 41).

This is doubly wrong. First, "possession" is *not* one of the activities that the Attorney General may waive under section 822(d); rather, that provision applies only to *registration* requirements that are not at issue here. *See* 21 U.S.C. § 822(d). Second, there is no illogic in the government's interpretation: the government can waive certain requirements, under certain circumstances, but not *every* requirement, given the plain limitations of the applicable statutory and regulatory text. Nor is the government's construction inconsistent with the purposes of the law: the registration exemption ensures that the federal government is aware of, and can regulate, those involved in the manufacturing, distributing, and dispensing of controlled substances. Section 856 regulates entirely different conduct and serves the different purpose of preventing facilities where illegal drugs are used and/or distributed without such regulation, and where "[illegal] drug activities are likely to flourish," *Safehouse*, 985 F.3d at 241.

27

Finally, Safehouse points to the fact that § 856(a) states that its requirements would apply "[e]xcept as authorized by this subchapter." (ECF No. 215, at 41 (citing 21 U.S.C. § 856(a)). According to Safehouse, "[i]n light of this broad language, Section 856 necessarily incorporates the Attorney General's authority to authorize the predicate activities of 'manufacturing, storing, distributing, or using.'" (*Id.* at 42). This does not follow. To be sure, § 856(a) does not apply if another subchapter affirmatively authorizes the relevant activity; however, Safehouse does not identify any such provision. Nor does it point to any statutory provision that grants the Attorney General the authority to "authorize the predicate activities of manufacturing, storing, distributing, or using." (*Id.*).[9]

## 2.  *Research Exemption*

Safehouse next attempts to rely on the CSA's research exemption, 21 U.S.C. § 872(e). It does not dispute that § 872(e) sets out extensive scientific and regulatory controls that are altogether separate from authorizing the unregulated use of illegal drugs without proper scientific or medical guardrails. (ECF No. 211, at 32-33; ECF

---

[9] In passing, Safehouse asserts that "Section 856(a) therefore contemplates both direct exceptions to its application—*e.g.*, authorizing a property owner/manager who maintains a place for the purpose of one of the enumerated activities to do so—or by authorization of the predicate conduct, *e.g.*, permitting supervision of simple possession or 'use' within the facility." (ECF No. 215, at 42). But § 856(a)'s text, which simply notes "except as authorized by this subchapter," cannot support the tremendous weight Safehouse places on it. Again, this provision provides no independent weight; Safehouse must identify a separate provision that affirmatively *authorizes* a direct exception to § 856(a) or *authorizes* the "predicate conduct" that § 856(a) prohibits. Safehouse does not—because it cannot—point to any such provision.

No. 215, at 42-43). Rather, it first argues that the government "does not identify any regulations that *categorically* precludes Safehouse from complying with those [research] regulations or qualifying for this [research] exception." (ECF No. 215, at 43). But this is a red herring. Safehouse must plead that it either qualifies for a research exemption or that the exemption it seeks is comparable to the research exemption in all relevant respects. It makes no attempt to show either.

Moreover, while Safehouse suggests that it "could readily contribute data" to ongoing research (*id*. at 43), it never claims that is actually seeking to avail itself of the research exemption, which, as discussed, imposes significant scientific and regulatory constraints on those who seek to possess, distribute, and dispense controlled substances. 21 U.S.C. § 872. The fundamental differences between the research exemption scheme and the activities Safehouse seeks to engage in make *Fulton* inapplicable.[10]

### 3.   *Peyote Exemption*

In its opening brief, the government acknowledged the existence of the peyote exemption, 21 C.F.R. § 1307.31, which exempts from registration requirements one drug (*i.e.*, peyote), in limited circumstances (*i.e.*, "nondrug use of peyote in bona fide religious ceremonies of the Native American Church"), by specific persons (*i.e.*, "members of the Native American Church"). (ECF No. 211, at 36-37 (citing  21 C.F.R. § 1307.31)). The government further explained that this

---

[10] Safehouse asserts that there are unspecified "fact-bound questions" involved in this inquiry but also seems to note that those issues are only relevant if this court decides that strict scrutiny applies. (ECF No. 215, at 43).

provision does not constitute an individualized exemption for behavior covered *by section 856(a)*, nor does it call into question the interests articulated by the exemption. (*Id*.).

Safehouse contests none of these points in its opposition. It makes no attempt to plead that this exemption satisfies either of *Fulton*'s two prongs. (*See* ECF No. 215, at 44). Nor are the claims it does put forward meritorious. Safehouse states that "[t]he fact that DOJ has recognized the religious rights of certain individuals . . . through a regulatory exemption to CSA enforcement demonstrates that it has afforded case-specific exemptions in certain instances *and thus has the authority to do so here*, but has nonetheless declined to exercise that authority in a manner that accommodates Safehouse's religious exercise." (*Id*. (emphasis added)). The premise of the italicized text is wrong. Safehouse assumes that the government has the authority to provide it with an exemption, just like the peyote exemption, but identifies no such location for that authority. As discussed earlier, § 856(a) does not implicate the registration requirement at issue with the peyote exemption. Nor does Safehouse identify another source of "authority." Rather, its premise seems to be that the ability to provide exemptions to some legal requirements necessitates the ability to provide exemptions to *all* legal requirements. That is not the law.[11]

---

[11] Nor is it accurate to state that the government has declined to accommodate "Safehouse's religious exercise." (ECF No. 215, at 44). Safehouse itself has no religious views. Rather, by its own assertion, its founders and board members are motivated by religious views.

4.      *Remitting Penalties for Simple Possession*

Finally, Safehouse states that "the Attorney General's express discretion to remit any penalty for [simple] possession [under 21 U.S.C. § 844] should apply, *a fortiori*, to allow the Attorney General to provide a case-specific exemption to Safehouse." (ECF No. 215, at 45). This conclusion does not follow.

It is true that § 844(a) provides that "[i]t shall be unlawful for any person knowingly or intentionally to possess a controlled substance," and that "[a]ny person who violates this subsection may be sentenced to a term of imprisonment of not more than 1 year." 21 U.S.C. § 844(a). It is also true that under certain circumstances a violation of that provision for personal use may be punished with a civil penalty, and that the Attorney General may "compromise, modify, or remit" that penalty. *Id.* § 844a(a), (f). But § 844a does *not* give the Attorney General the authority to compromise a violation of § 856(a), rather it only applies to a violation of § 844. This provision is simply inapplicable. Nor is the possession of a controlled substance for personal use by a single person comparable to operating a place "for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance." *Id.* at § 856(a)(2). Safehouse seems to state that the "predicate for purported Section 856(a) liability" is the "simple possession of personal use quantities" (ECF No. 215, at 45), but § 856(a) liability is not so predicated; and the Attorney General's ability to settle a claim under § 844 does not extend to § 856.

31

**B.     Section 856 Is Generally Applicable on Its Face, and Safehouse's Efforts to Challenge the Federal Government's Discretionary Prosecutorial Determinations Is a Back-Door Selective Prosecution Claim.**

Safehouse does not contest—nor can it—that § 856 is neutral and generally applicable on its face. (ECF No. 211, at 27-29; ECF No. 215, at 35-38). Instead, Safehouse argues that the government has a *policy* of enforcing this criminal prohibition in a way that discriminates against religion. (ECF No. 215, at 36 ("Strict scrutiny applies because DOJ has implemented a policy of enforcing Section 856(a) in a manner that treats 'comparable secular activity more favorably than religious exercise.'" (quoting *Clark v. Gov. of N.J.*, 53 F.4th 769, 780 (3d Cir. 2022)).

As the Government explained in its opening brief, however, Safehouse's attempt to apply Free Exercise Clause strict scrutiny to prosecutorial discretion fails in the face of the Supreme Court's decision in *United States v. Armstrong*, 517 U.S. 456, 465 (1996). (*See* ECF No. 211, at 38-39). In a selective prosecution case, the Supreme Court has instructed that "'a prosecutor's discretion is 'subject to constitutional constraints,' 'such that the decision whether to prosecute may not be based on an 'unjustifiable standard such as race, religion, or other arbitrary classification.'" *Armstrong*, 517 U.S. at 465 (first quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979), and then quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)).

"Courts evaluate substantive claims for selective prosecution and enforcement under the same standard: a defendant bears the burden of 'provid[ing] 'clear evidence' or 'discriminatory effect and discriminatory intent' or purpose.'"

*United States v. Rashwan*, Crim. No. 22-118, 2023 WL 4471687, at *3 (E.D. Pa. July 11, 2023) (quoting *United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017)). *Armstrong*'s standard applies to claims alleging prosecutions based on religious discrimination. *See, e.g.*, *United States v. Lewis*, 517 F.3d 20 (1st Cir. 2008); *United States v. Malka*, 602 F. Supp. 3d 510, 543-44 (S.D.N.Y. 2022); *United States v. Khanu*, 664 F. Supp. 2d 28, 33-34 (D. D.C. 2009).

Safehouse cannot satisfy *Armstrong*'s  selective prosecution standard. It has not established discriminatory effect, and it certainly has not pleaded facts meeting the high standard of showing discriminatory intent. This Court should reject its efforts to claim that a generally applicable, neutral law such as this violates *Fulton*. *See United States v. Houck*, Crim. No. 22-0323, 2023 WL 144117, at *5 (E.D. Pa. Jan. 10, 2023) (rejecting argument that application of neutrally applicable law violates *Fulton*, instead concluding that such an argument was a "restating of [defendant's] selective prosecution claim."). Indeed, Safehouse even quotes the selective prosecution standard (ECF No. 215, at 38 (citing *Armstrong*, 517 U.S. at 464)), but then argues for the application of *Fulton*, thereby conflating *Armstrong* and *Fulton* in a way unsupported by precedent.

Moreover, the premise of Safehouse's argument is that DOJ has never enforced § 856(a) in "similar circumstances." (ECF No. 215, at 36). But it does not plead such inconsistent treatment in its complaint, and it cannot amend its complaint through an opposition. *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988). And this differential enforcement claim is, as

discussed above, a selective prosecution argument. *See Washington*, 869 F.3d at 216 (applying *Armstrong* standard in "selective enforcement" cases).

But even if it were not, Safehouse's entire proposition is that it "wants to open America's first safe-injection site in Philadelphia." *Safehouse*, 985 F.3d at 229; *see also id.* at 231 ("The parties have stipulated to the key facts: Safehouse wants to try a new approach to combat the opioid crisis. It plans to open the country's first safe-injection site."). Endeavoring to do something that has never been done before, Safehouse cannot then credibly claim that there are "similar circumstances" to its novel activity that could support such a selective enforcement claim. Nor has Safehouse identified, much less pleaded, any similar circumstances to those presented here, *i.e.*, where an entity affirmatively and openly would make its property available for drug activity, as Safehouse seeks to do, and yet the government has not taken or (as in the case of New York) suggested any enforcement actions against it.

Finally, Safehouse asserts in its opposition that, "[a]fter moving to dismiss, DOJ announced to news organizations that it was implementing a policy of selectively enforcing Section 856(a) against providers of supervised consumption services on a 'district-by-district basis.'" (ECF No. 215, at 37 (citing Sharon Otterman, *Federal Officials May Shut Down Overdose Prevention Centers in Manhattan*, N.Y. Times (Aug 8, 2023) [hereinafter "NYT Article"])). At the outset, these allegations—which are not in the complaint—must be disregarded at this stage because a "complaint may not be amended by the briefs in opposition to a

motion to dismiss." *Reed v. Chambersburg Area School Dist.*, 951 F. Supp. 2d 706, 720 (M.D. Pa. 2013) (citation omitted).

Moreover, the *Times* article that Safehouse cites does not discuss a "district-by-district authorization of Section 856" (ECF No. 215, at ¶ 37); rather, it says that such sites are "being evaluated on a district by district basis." NYT Article. This is consistent with DOJ policy that all prosecutorial decisions must be made on a case-by-case basis, considering individualized needs in individualized circumstances. *See* Department of Justice Manual § 9-27.001 ("A determination to prosecute represents a policy judgment that the fundamental interests of society require the application of federal law to a particular set of circumstances."); *id.* § 9-27.300 (charging "decisions should be informed by an individualized assessment of all the facts and circumstances of each particular case."); *see also Armstrong*, 517 U.S. at 465 ("The Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws."). Again, Safehouse attempts to transform prosecutorial discretion—which is given the widest latitude, *Armstrong*, 518 U.S. at 465—into something constrained by strict scrutiny, which imposes the most restrictive constraints. There is no basis in the pleadings or the case law for such a conclusion.

In sum, § 856(a) is neutral and generally applicable on its face. Safehouse has not shown that it contains "a mechanism for individualized exemptions" *for the conduct prohibited by Section 856(a)*, nor does Safehouse make any effort to show in its opposition that the reasons for exemptions to *other* provisions of the CSA

"undermine the government's asserted interest." *Fulton*, 141 S. Ct. at 1877.

Accordingly, its First Amendment claim must be dismissed.

## CONCLUSION

For the foregoing reasons, the United States requests that its motion be

granted, and that Safehouse's Second Amended Counterclaims be dismissed with

prejudice.

Dated: September 20, 2023                Respectfully submitted,

                                         JACQUELINE C. ROMERO
                                         United States Attorney

                                         */s/ Gregory B. David*
                                         GREGORY B. DAVID
                                         Assistant United States Attorney
                                         Chief, Civil Division

                                         */s/ Erin E. Lindgren*
                                         BRYAN C. HUGHES
                                         ERIN E. LINDGREN
                                         Assistant United States Attorneys
                                         Eastern District of Pennsylvania
                                         615 Chestnut Street, Suite 1250
                                         Philadelphia, PA 19106-4476

                                         *Counsel for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I caused a true and correct copy of the foregoing Reply Memorandum of Law in Further Support of Motion to Dismiss, which was filed electronically and is available for viewing and download from the court's CM/ECF system, to be served upon all counsel of record.

/s/ Erin E. Lindgren<br>ERIN E. LINDGREN<br>Assistant United States Attorney

Dated: September 20, 2023