**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SAFEHOUSE, a Pennsylvania nonprofit** | : | |
| **corporation; JOSE BENITEZ, as President** | : | |
| **and Treasurer of Safehouse,** | : | **CIVIL ACTION** |
| **Defendants,** | : | **No. 19-519** |
| | : | |
| **SAFEHOUSE, a Pennsylvania nonprofit** | : | |
| **corporation,** | : | |
| **Counterclaim Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| **Counterclaim Defendant.** | : | |

**McHUGH, J.**                                                                     **April 3, 2024**

### MEMORANDUM

This is a declaratory judgment action in which the federal government sought and ultimately won a ruling from the Third Circuit Court of Appeals that it could criminally prosecute Safehouse, a non-profit organization, under 18 U.S.C. § 856 if Safehouse proceeded with its plans to open a safe injection site for persons struggling with opioid abuse.  Safehouse's response included two counterclaims, alleging a violation of the Religious Freedom Restoration Act, and a violation of its First Amendment right to free exercise of religion.  Safehouse contends that its work is inspired and informed by classic Judeo-Christian beliefs about the need to "preserve life, provide shelter to our neighbors, and do everything possible to care for the sick," and that the threat of prosecution chills its exercise of religious rights.  Second Am. Countercl. ¶ 129 (ECF 209).

After the Court of Appeals established the Government's right to prosecute, I granted the parties a lengthy stay of proceedings to explore whether they could find common ground. Despite their good faith efforts, negotiation has not produced an agreement to allow Safehouse to operate as intended. Consequently, I must address the Government's motion to dismiss the counterclaims. Because I am persuaded that Safehouse is not a religious entity, I will grant the motion to dismiss.

## I.    Standard of Review

Within the Third Circuit, motions to dismiss under Fed. R. Civ. P. 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## II.    Discussion

Safehouse asserts two counterclaims. First, it relies on the Religious Freedom Restoration Act (RFRA), which provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)." 42 U.S.C. § 2000bb-1(a). Second, it invokes the Free Exercise Clause of the First Amendment, arguing the threat of prosecution has burdened its "sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). But a threshold for both claims is that Safehouse establish its proposed activities would constitute an exercise of religion, and it cannot plausibly do so.

Safehouse's Articles of Incorporation do not set forth any religious mission or activity. (ECF 211-1). Article IV provides that "[t]he Corporation is a nonprofit organization organized and operated exclusively for charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986 . . . specifically for the purposes of reducing the harms associated with drug use by providing a range of public health and social services." *Id.* Safehouse also

2

maintains a website that includes a section for "Frequently Asked Questions." (ECF 35-1). In response to the question "What is Safehouse?" there is an explicit reference to the underlying religious motivation of its founders and leaders, but the description of its activities does not set forth any apparent religious practices or behavior. Instead, the website describes Safehouse as a provider of public health services. Specifically, it states:

> Safehouse is one element of a much-needed comprehensive plan to address a public health crisis. The organization seeks to open the first safe injection site in the U.S. providing a range of overdose preventions services, including safe consumption and observation rooms staffed by a medical staff prepared to administer overdose reversal if needed. Additional services would include on-site initiation of Medically Assisted Treatment (MAT), recovery counseling, education about substance use treatment, basic medical services, and referrals to support services such as housing, public benefits, and legal services.

(ECF 35-1 at 2-3). Nor does Safehouse's Form 1023 applying for tax-exempt status from the Internal Revenue Service set forth any religious activity or purpose and makes no reference to religion. (ECF 235)

This distinguishes Safehouse from other organizations that have successfully claimed the protections conferred by RFRA. In *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418 (2006), for example, the plaintiff was a religious sect with origins in the Amazon rainforest, which sought to use tea brewed from a hallucinogenic substance as part of sacramental practice.[1] Similarly, the plaintiff that prevailed in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), was a church in the Santeria religion, which employs animal sacrifice as a form of devotion. The ritualistic practices at issue in these cases all fit well within the Third Circuit's "guideposts" for identifying a religion:

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it

---

[1] The facts in *O Centro Espírita* closely track the facts in *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872 (1990), the case that inspired RFRA, where the Court previously upheld a ban on the use of peyote as part of religious practice.

consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.

*Africa v. Pennsylvania*, 662 F.2d 1025, 1032 (3d Cir. 1981).

RFRA defines "exercise" but, understandably, does not attempt to define "religion." In applying Title VII, which exempts religious organizations, once again without attempting to define religion, the Third Circuit has endorsed a series of criteria for courts to consider in determining whether an entity is engaged in religious activity, including:

> (1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,* 503 F.3d 217, 226 (3d Cir. 2007).[2]

Applying that test, the Court in *LeBoon* concluded that a Jewish community center was religious in nature where its articles of incorporation and bylaws stated that its mission was to enhance and promote Jewish life, identity, and continuity; three rabbis from local synagogues played an advisory role in the center's management; synagogues and local Jewish organizations gave the center financial support; the center kept a kosher kitchen; and it hosted Jewish events and observed holy Jewish holidays. *Id.* at 227-29. In comparison, aside from its non-profit status, Safehouse does not embody any of the other characteristics of a religious institution recognized in *LeBoon.*

---

[2] Safehouse summarily argues that a case defining religious activity for Title VII purposes has no applicability here but offers no rationale for that argument.

Significantly, a non-profit corporation organized under Pennsylvania law has no individual owners.  The statutory provision which addresses "ownership of assets" requires the non-profit corporation to designate the trusts and funds it controls as assets, and those assets "shall not be deemed to have individual ownership."  15 Pa. C.S.A. § 5589.  As observed by two commentators on non-profit governance when comparing the differences between non-profit and for-profit corporations, "[n]onprofits, however, have no traditional owners, and by extension no shareholders."  Peter Molk & D. Daniel Sokol, *The Challenges of Nonprofit Governance*, 62 B.C. L. Rev. 1497, 1509 (2021).  Consequently, the actions of a non-profit are governed by its stated purpose, not the preferences of individual owners.  Here, the organizers and leaders of Safehouse profess religious motivation, but the work of Safehouse itself is in no respect religious.

Safehouse is correct that corporations can be considered "persons" acting with a religious purpose, but the case on which it relies, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), involved closely held corporations controlled by families who explicitly embraced religious values and practices in the operation of the business.  In the case of Hobby Lobby and its affiliated company, Mardel, the corporate statement of purpose required "operating the company in a manner consistent with Biblical principles."  *Id*. at 703.  Both companies closed on Sundays despite the expectation that millions of dollars in sales would be lost.  *Id.*  Each family member signed a pledge to run the businesses in accordance with the family's religious beliefs and to use the family's assets to support Christian ministries.  *Id.*  The businesses also contributed profits to Christian missionaries and ministries and bought hundreds of full-page newspaper ads inviting people to the Christian faith.  *Id.*  As far as Conestoga Wood Specialties, the other business considered in *Hobby Lobby*, the Supreme Court found that "[t]he company's 'Vision and Values Statements' affirms that Conestoga endeavors to ensure a reasonable profit in a manner that reflects the [owners']

5

Christian heritage," and its owners defined the company's mission as requiring it "to operate in a professional environment founded upon the highest ethical, moral, and Christian principles." *Id.* at 701.  In contrast, Safehouse has no "owners," and its purpose is necessarily defined by its articles of incorporation, which set forth no religious purpose.

When the decision was issued, *Hobby Lobby* seemed to embrace an extraordinarily expansive definition of "religious" activity.  Even so, the Court, in its opinion, surmised that there would likely be few corporations that could claim to be organized for an explicit religious purpose. *Id.* at 717.  In fact, in the ten years since *Hobby Lobby* was decided, there is a dearth of precedent applying – let alone extending – its core holding, and certainly no case that would support deeming Safehouse a religious enterprise.

As an entity unaffiliated with any specific faith or religious institution, Safehouse claims protection for its non-religious *actions,* based solely upon the religious *motivation* of its founders. Neither RFRA nor the free exercise clause extends that far, as religion cannot provide a "limitless excuse for avoiding all unwanted obligations."  *Africa*, 662 F.2d at 1030 (citation omitted).  That is necessarily so, because "'the very concept of ordered liberty precludes allowing' [a plaintiff], or any other person, a blanket privilege 'to make his own standards on matters of conduct in which society as a whole has important interests.'"  *Id.* at 1031 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972)).[3]  The noble intentions of Safehouse and its founders are self-evident, and the public health crisis they seek to address continues unabated, but their religious inspiration does not provide a shield against prosecution for violation of a federal criminal statute barring its operation.

---

[3] It should be noted that even if Safehouse were a religiously affiliated entity, its counterclaims would face other daunting obstacles.

### III.    Conclusion

For the reasons set forth above, the Government's motion to dismiss Safehouse's counterclaims must be granted, and this case will be dismissed.

 /s/ Gerald Austin McHugh
United States District Judge
