IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAFEHOUSE, a Pennsylvania nonprofit corporation, | : | |
| | : | |
| *Counterclaim Plaintiff,* | : | |
| | : | |
| v. | : | Civil Action No. 19-0519 |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Counterclaim Defendant,* | : | |
| | : | |
| and | : | |
| | : | |
| U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; and DAVID METCALF, in his official capacity as United States Attorney for the Eastern District of Pennsylvania, | : | |
| | : | |
| *Third-Party Defendants.* | : | |

## **ORDER**

Upon consideration of the Motion to Dismiss filed by Counterclaim Defendant United States of America and Third-Party Defendants United States Department of Justice, Acting Attorney General of the United States Todd Blanche, and United States Attorney for the Eastern District of Pennsylvania David Metcalf (collectively, "United States"), and any response thereto, it is this \_\_\_\_ day of _____, 2026, ORDERED that:

    1.    The United States' Motion to Dismiss is GRANTED;

2.      Safehouse's Third Amended Counterclaims for Declaratory and

Injunctive Relief, ECF No. 247, are hereby DISMISSED WITH PREJUDICE;

3.      A final judgment is hereby ENTERED in favor of the United States

and against Safehouse; and

4.      The Clerk of Court is directed to CLOSE this case.


GERALD A. McHUGH
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAFEHOUSE, a Pennsylvania nonprofit corporation, | : | |
| | : | |
| *Counterclaim Plaintiff,* | : | |
| | : | |
| v. | : | Civil Action No. 19-0519 |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Counterclaim Defendant,* | : | |
| | : | |
| and | : | |
| | : | |
| U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; and DAVID METCALF, in his official capacity as United States Attorney for the Eastern District of Pennsylvania, | : | |
| | : | |
| *Third-Party Defendants.* | : | |

## <u>MOTION TO DISMISS</u>

Counterclaim Defendant United States of America and Third-Party

Defendants United States Department of Justice, Acting Attorney General of the

United States Todd Blanche, and United States Attorney for the Eastern District of

Pennsylvania David Metcalf (collectively, "United States" or "government") move to

dismiss Safehouse's Third Amended Counterclaims for Declaratory and Injunctive

Relief pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the

reasons set forth in the attached memorandum of law, which is incorporated herein

by reference, *see* Local Rule 7.1(c), the United States requests that its motion be

granted, and that Safehouse's Third Amended Counterclaims for Declaratory and

Injunctive Relief be dismissed with prejudice.

Dated: May 29, 2026

Respectfully submitted,

DAVID METCALF
United States Attorney

/s/ *Gregory B. David*
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

/s/ *Bryan C. Hughes*
BRYAN C. HUGHES
ERIN E. LINDGREN
GREGORY B. in den BERKEN
Assistant United States Attorneys
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476

*Counsel for the United States*

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAFEHOUSE, a Pennsylvania nonprofit corporation, | : | |
| | : | |
| *Counterclaim Plaintiff,* | : | |
| | : | |
| v. | : | Civil Action No. 19-0519 |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Counterclaim Defendant,* | : | |
| | : | |
| and | : | |
| | : | |
| U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; and DAVID METCALF, in his official capacity as United States Attorney for the Eastern District of Pennsylvania, | : | |
| | : | |
| *Third-Party Defendants.* | : | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS

Factual and Procedural Background ....................................................................3

Legal Standards...................................................................................................6

    I.   Federal Rule of Civil Procedure 12(b)(1) ...........................................6
    II.  Federal Rule of Civil Procedure 12(b) (6) ..........................................7

Argument ............................................................................................................7

    I.   The Court Lacks Subject Matter Jurisdiction over Safehouse's
        Counterclaims.......................................................................................7

        A.  Safehouse Lacks Article III Standing..............................................8

            1. Safehouse's standing must be assessed as of April 13,
            2026, the date it filed its TAC................................................9
            2. Safehouse fails to allege a concrete, particularized,
            and imminent injury......................................................10
            3. Safehouse fails to satisfy traceability and
            redressability. ...............................................................14

        B.  Alternatively, the 2023 Zoning Ordinance Moots Safehouse's
            Counterclaims................................................................................18

    II.  Safehouse RFRA Claim Fails Because the CSA Does Not Impose a
        Substantial Burden on Safehouse and Safehouse is Motivated by
        Socio-Political or Philosophical Beliefs, Not Religious Ones. ..............18

        A.  Application of Section 856(a) to Safehouse Does Not Substantially
            Burden its Claimed Religious Belief. ............................................20

        B.  Safehouse Acknowledges that it Seeks to Engage in Activity that is
            Motivated by Socio-Political, Scientific Philosophical Beliefs,
            Not Religious Ones.......................................................................29

        C.  Safehouse's Corporate Organization Further Demonstrates
            that Its Beliefs are Not Religious. ................................................37

    III.  Because Section 856 Does Not Contain a Mechanism for
        Individualized Exemptions and Does Not Authorize Comparable
        Secular Conduct in the Manner Proscribed by *Fulton*, Its
        Enforcement Would Not Violate the Free Exercise Rights of
        Safehouse's Board Members.............................................................40

A.  Safehouse Has Not Demonstrated a Burden that Warrants Strict Scrutiny ...................................................................................41

B.  By Its Terms, Section 856 Is Generally Applicable and Does Not Contain Mechanisms for Individual Exemptions ..........................42

C.  The CSA Does Not Otherwise Authorize Secular Conduct in a Manner Comparable to the Conduct Prohibited by Section 856.................................................................................44

    1. The Research Exemption ...................................................46
    2. The Registration Exemption ............................................49
    3. The Peyote Exemption......................................................51
    4. The Civil Penalty Exemption ...........................................53
    5. The Regulatory Exemption ..............................................53

D.  Section 856 is Generally Applicable on Its Face, and Safehouse Efforts to Challenge the Federal Government's Discretionary Pros.........................................................................54

Conclusion.................................................................................................57

# TABLE OF AUTHORITIES

Cases                                                                                                    Page(s)

*Adams v. Comm'r*,
  170 F.3d 173 (3d Cir. 1999)................................................................................. 29
*Africa v. Pa.*,
  662 F.2d 1025 (3d Cir. 1981) ......................................................................... 30, 33
*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
  897 F.3d 314 (D.C. Cir. 2018) ............................................................................ 24
*Arizonans for Off. Eng. v. Arizona*,
  520 U.S. 43 (1997) ................................................................................................ 18
*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) ................................................................................................ 7
*Babbitt v. Farm Workers*,
  442 U.S. 289 (1979) .............................................................................................. 15
*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .......................................................................................... 7, 8
*Blackwell v. Lehigh Valley Health Network*,
  Civ. No. 22-3360, 2023 WL 362392 (E.D. Pa. Jan. 23, 2023) ............................... 35
*Buck v. Hampton Twp. Sch. Dist.*,
  452 F.3d 256 (3d Cir. 2006)................................................................................. 12
*California v. Texas*,
  593 U.S. 659 (2021) .............................................................................................. 15
*Callahan v. Woods*,
  658 F.2d 679 (9th Cir. 1981) ............................................................................... 31
*Campbell-Ewald Co. v. Gomez*,
  577 U.S. 153 (2016) .............................................................................................. 18
*Caviezel v. Great Neck Pub. Sch.*,
  701 F. Supp. 2d 414 (E.D.N.Y. 2010)................................................................... 31
*Check ex rel. MC v. N. Y. City Dep't of Educ.*,
  Civ. No. 13-0791, 2013 WL 2181045 (E.D.N.Y. 2013) .......................................... 31
*Cheffer v. Reno*,
  55 F.3d 1517 (11th Cir. 1995) ....................................................................... 22, 29
*Church of the Lukumi Babalu Aye, Inc. v. Hialeah*,
  508 U.S. 520 (1993) ........................................................................................ passim
*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .............................................................................................. 10
*Coastal Outdoor Advertising Group, LLC v. Twp. of East Hanover*
  397 F. App'x 794 (3d Cir. 2010) ...................................................................... 16, 17
*Cutter v. Wilkinson*,
  544 U.S. 709 (2005) .............................................................................................. 30
*Detwiler v. Mid-Columbia Med. Ctr.*,
  Civ. No. 22-1306, 2022 WL 19977290 (D. Or. Dec. 20, 2022)............................... 36

*Doe v. Pine Richland Sch. Dist.*,
No. 24-3348, 2026 WL 1103489 (3d Cir. Apr. 23, 2026) ........................................... 9

*EEOC v. Kamehameha Sch.*,
990 F.2d 458 (9th Cir. 1993) ........................................................................................ 39

*Employment Div., Dept. of Human Resources of Ore. v. Smith*,
494 U.S. 872 (1990) ............................................................................................... 42, 43

*Fallon v. Mercy Catholic Med. Ctr.*,
877 F.3d 487 (3d Cir. 2017) ................................................................................... 30, 34

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ..................................................................................................... 14

*Federoff v. Geisinger Clinic*,
No. 24-2844, 2026 WL 195416 (3d Cir. Jan. 26, 2026) .......................................... 35

*Ferguson v. Owen*,
Civ. No. 21-2512, 2024 WL 120099 (D.C. Cir. Jan. 11, 2024) ............................... 22

*Finkbeiner v. Geisinger Clinic*,
623 F. Supp. 3d 458 (M.D. Pa. 2022) ........................................................................ 35

*Fulton v. City of Philadelphia, Pa.*,
593 U.S. 522 (2021) ............................................................................................... passim

*Gatto v. Johnson & Johnson Servs., Inc.*,
No. 24-1992, 2025 WL 816732 (3d Cir. Mar. 14, 2025) .................................... 32, 35

*Geerlings v. Tredyffrin/Easttown Sch. Dist.*,
Civ. No. 21-4024, 2021 WL 4399672 (E.D. Pa. Sept. 27, 2021) ................. 31, 32, 33

*Geneva Coll. v. Sec'y U.S. HHS*,
778 F.3d 422 (3d Cir. 2015) ........................................................................................ 21

*Golden v. Zwickler*,
394 U.S. 103 (1969) ..................................................................................................... 12

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ..................................................................................................... 39

*Goodall v. Stafford Cnty. Sch. Bd.*,
60 F.3d 168 (4th Cir. 1995) ......................................................................................... 21

*Gould Elec. v. United States*,
220 F.3d 169 (3d Cir. 2000) ...................................................................................... 6, 7

*Greenberg v. Lehocky*,
81 F.4th 376 (3d Cir. 2023) ......................................................................................... 14

*Harp Adver. Ill., Inc. v. Village of Chicago Ridge*,
9 F.3d 1290 (7th Cir. 1993) ......................................................................................... 16

*Henderson v. Kennedy*,
253 F.3d 12 (D.C. Cir. 2001) .................................................................................. 22, 24

*Holt v. Hobbs*,
574 U.S. 352 (2015) ..................................................................................................... 27

*Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*,
565 U.S. 171 (2012) ..................................................................................................... 39

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
456 U.S. 694 (1982) ....................................................................................................... 6

*Kaemmerling v. Lappin,*
  553 F.3d 669 (D.C. Cir. 2008) ................................................................. 20
*Kokkonen v. Guardian Life Ins. Co. of Am.,*
  511 U.S. 375 (1994) ................................................................................. 6
*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,*
  503 F.3d 217 (3d Cir. 2007) ................................................................... 39
*Leeck v. Lehigh Valley Health Network,*
  Civ. No. 22-4634, 2022 WL 4147223 (E.D. Pa. June 23, 2023)
*Little Sisters of the Poor Home for the Aged v. Burwell,*
  794 F.3d 1151 (10th Cir. 2015) .............................................................. 20
*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ....................................................................... 9, 11, 13
*Lutter v. JNESO,*
  86 F.4th 111 (3d Cir. 2023) ..................................................................... 9
*Lyng v. NW Indian Cemetery Protective Ass'n,*
  485 U.S. 439 (1988) ................................................................................ 21
*Mack v. Warden Loretto FCI,*
  839 F.3d 286 (3d Cir. 2016) ................................................................... 21
*Mahoney v. Doe,*
  642 F.3d 1112 (D.C. Cir. 2011) .............................................................. 22
*Mason v. Gen. Brown Cent. Sch. Dist.,*
  851 F.2d 47 (2d Cir. 1988) ...................................................................... 31
*McDowell v. Bayhealth Med. Ctr., Inc.,*
  Nos. 24-1157, *et al.,* 2024 WL 4799870 (3d Cir. Nov. 15, 2024) ...................... 31, 35
*Morrison v. Olson,*
  487 U.S. 654 (1988) ................................................................................ 55
*Mortensen v. First Fed. Sav. and Loan Ass'n,*
  549 F.2d 884 (3d Cir. 1977) ..................................................................... 6
*Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey,*
  80 F.4th 215 (3d Cir. 2023) ..................................................................... 11
*O'Shea v. Littleton,*
  414 U.S. 488 (1974) ................................................................................ 12
*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,*
  998 F.2d 1192 (3d Cir. 1993) .................................................................... 8
*Planned Parenthood Ass'n v. Walton,*
  949 F. Supp. 290 (E.D. Pa. 1996) .......................................................... 23
*Real Alts., Inc. v. Sec'y of HHS,*
  867 F.3d 338 (3d Cir. 2017) ............................................... 20, 21, 29, 32
*Safehouse v. Dep't of Justice,*
  142 S. Ct. 345 (2021) ........................................................................... 4, 5
*Sherbert v. Verner,*
  374 U.S. 398 (1968) ................................................................................ 43

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ............................................................................................. 6

*Storino v. Borough of Point Pleasant Beach*,
322 F.3d 293 (3d Cir. 2003).............................................................................. 13

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .............................................................................. 10, 11, 12

*Sutton v. Rasheed*,
323 F.3d 236 (3d Cir. 2003).............................................................................. 30

*Toll Bros., Inc. v. Twp. of Readington*,
555 F.3d 131 (3d Cir. 2009).............................................................................. 16

*Trump v. New York*,
592 U.S. 125 (2020) .......................................................................................... 10

*Ulrich v. Lancaster Gen. Health*,
Civ. No. 22-4945, 2023 WL 2939585 (E.D. Pa. Apr. 13, 2023) ............................ 35

*United States v. Armstrong*,
517 U.S. 456 (1996) ..................................................................................... 54, 56

*United States v. Chemical Foundation, Inc.*,
272 U.S. 1 (1926) ............................................................................................. 54

*United States v. Christie*,
825 F.3d 1048 (9th Cir. 2016) ........................................................................... 55

*United States v. Epstein*,
91 F. Supp. 3d 573 (D.N.J. 2015)................................................................. 23, 24

*United States v. Friday*,
525 F.3d 938 (10th Cir. 2008) ........................................................................... 55

*United States v. Juvenile Male*,
564 U.S. 932 (2011) ..................................................................................... 17, 18

*United States v. Kelly*,
Crim. No. 18-0022, 2019 WL 5077546 (S.D. Ga. Apr. 26, 2019) ........................... 23

*United States v. Meyers*,
95 F.3d 1475 (10th Cir. 1996) ........................................................................... 30

*United States v. Safehouse*,
146 F.4th 315 (3d Cir. 2025) .................................................................... 1, 5, 37

*United States v. Safehouse*,
729 F. Supp. 3d 451 (E.D. Pa. 2024)............................................................. 37, 38

*United States v. Safehouse*,
985 F.3d 225 (3d Cir. 2021)........................................................................ passim

*United States v. Safehouse*,
991 F.3d 503 (3d Cir. 2021)................................................................................. 4

*United States v. Seeger*,
380 U.S. 163 (1965) .......................................................................................... 30

*United States v. Stimler*,
864 F.3d 253 (3d Cir. 2017)........................................................................ passim

*United States v. Thompson*,
Crim. No. 25-0013, 2025 WL 1689390 (E.D. Pa. June 16, 2025) .......................... 24

*Warth v. Seldin,*
   422 U.S. 490 (1975) ..................................................................................................... 16
*Washington v. Klem,*
   497 F.3d 272 (3d Cir. 2007) ......................................................................................... 27
*Whitmore v. Arkansas,*
   495 U.S. 149 (1990) ..................................................................................................... 10
*Wiggins v. Sargent,*
   753 F.2d 663 (8th Cir. 1985) ....................................................................................... 31
*Wilson v. James,*
   139 F. Supp. 3d 410 (D.D.C. 2015) ............................................................................ 25
*Wisconsin v. Yoder,*
   406 U.S. 205 (1972) ......................................................................................... 30, 32, 33
*Yarbrough v. Chance Saltzman,*
   Civ. No. 25-3526, 2026 WL 913085 (D.D.C. Apr. 3, 2026) ...................................... 25

Statutes

21 U.S.C. § 822(a)(1) ............................................................................................... 49, 50
21 U.S.C. § 822(b) .......................................................................................................... 50
21 U.S.C. § 822(d) .......................................................................................................... 49
21 U.S.C. § 823(b) .................................................................................................... 50, 51
21 U.S.C. § 844a ............................................................................................................. 53
21 U.S.C. § 856 ......................................................................................................... 15, 54
21 U.S.C. § 856(a)(2) ...................................................................................... 1, 3, 42, 44
21 U.S.C. § 872(a)(1)-(6) ......................................................................................... 46, 48
21 U.S.C. § 872(e) .................................................................................................... 46, 48
21 U.S.C. §§ 822 ....................................................................................................... 26, 50
28 U.S.C. § 2201 ............................................................................................................... 3
42 U.S.C. § 2000bb ........................................................................................................... 1
42 U.S.C. § 2000bb-1(a) ................................................................................................. 19

Regulations

21 C.F.R. § 1301.12 ......................................................................................................... 26
21 C.F.R. § 1304.21(a) .................................................................................................... 48
21 C.F.R. § 1307.03 .............................................................................................. 50, 53, 54
21 C.F.R. § 1307.31 .................................................................................................... 51, 52
21 C.F.R. § 1316.24 ......................................................................................................... 46
21 C.F.R. § 1316.24(b)(6) ............................................................................................... 48
21 C.F.R. §  1301.32(a) ................................................................................................... 47

Other Authorities

*Ending Crime and Disorder on America's Streets,* Exec. Order No. 14,321,
   90 Fed. Reg. 14,391 (July 24, 2025) .......................................................................... 56

The United States Court of Appeals for the Third Circuit has held that Safehouse's plan to open a supervised injection facility is illegal under 21 U.S.C. § 856(a)(2), which prohibits "mak[ing] available" a "place for the purpose of . . . using a controlled substance." *United States v. Safehouse*, 985 F.3d 225 (3d Cir. 2021). Following this ruling, the Third Circuit remanded to the district court for consideration of Safehouse's religious freedom arguments.

In 2023, the case returned to the Third Circuit, which held that Safehouse is a "person" under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq*., and at least eligible for protections under RFRA and the Free Exercise Clause of the First Amendment, even if it were a non-religious entity. *United States v. Safehouse*, 146 F.4th 315 (3d Cir. 2025). The Third Circuit remanded to this Court "to consider whether Safehouse has plausibly pleaded RFRA and Free Exercise counterclaims." *Id*. at 321.

It has not. This Court lacks subject-matter jurisdiction to consider Safehouse's Third Amended Counterclaims ("TAC"), which in any event fail to state a claim upon which relief can be granted.

First, the level of local and City support for Safehouse has changed significantly from the time of Safehouse's initial pleading, and changes in Philadelphia zoning laws have made its proposed opening in Philadelphia hypothetical at best. Thus, Safehouse cannot show that its claims are ripe insofar as there are many obstacles to it opening a supervised injection facility in

Philadelphia—its illegality under federal law being only one. Thus, this case is not justiciable given that its purported injury is not imminent.

Second, among the elements that must be pleaded to state a claim under RFRA is that the challenged provision substantially burdens religious exercise. Safehouse has not sufficiently alleged that here. There are many ways for Safehouse's board members to exercise their broadly stated religious beliefs that do not involve maintaining a facility for individuals to consume illegal drugs, including some that specifically enumerated in Safehouse's pleading.

In fact, the motivating belief Safehouse seeks to vindicate, that it must "do everything possible to care for the sick," ECF No. 247, ¶ 146, *by maintaining a place in which it will supervise drug injections by third parties*, is informed by Safehouse's socio-political opinion and belief about harm reduction policy. At base, it is not a "religious" belief at all; thus, it is not protected by RFRA or the First Amendment.

Safehouse's Free Exercise claim fares no better. Because there are no exemptions to § 856, and the statute does not invite consideration of the reasons for prohibited conduct, it does not run afoul of the standard set by the Supreme Court in *Fulton v. City of Philadelphia, Pa.*, 593 U.S. 522 (2021). Neither are the "secular exemptions" Safehouse cites under the Controlled Substances Act ("CSA") comparable under *Fulton* to the broad exemption Safehouse requests. For all these reasons, § 856 is neutral and generally applicable and Safehouse's Free Exercise claim fails. Accordingly, Safehouse's TAC should be dismissed, with prejudice.

## PROCEDURAL AND FACTUAL BACKGROUND

On February 5, 2019, the United States filed a Complaint for Declaratory Judgment against Safehouse. ECF No. 1. Subsequently, it filed an Amended Complaint naming Jose Benitez, Safehouse's president and treasurer, as a defendant. ECF No. 35. The Amended Complaint sought a declaration that Safehouse's proposed supervised injection facility would violate § 856(a)(2), which makes it unlawful to "manage or control any place . . . and knowingly and intentionally . . . make available for use, with or without compensation, the place for the purpose of unlawfully . . . using a controlled substance." *Id.*

Safehouse and Benitez answered, and Safehouse filed counterclaims seeking declarations under 28 U.S.C. § 2201 that its proposed supervised injection facility would not violate § 856, and that prohibiting Safehouse from operating a supervised injection facility would violate the Commerce Clause of the U.S. Constitution, as well as the rights of itself and its board members under RFRA. ECF No. 45.

The United Stats moved for judgment on the pleadings, ECF No. 47, which this Court denied, ECF Nos. 133, 134. The Court's ruling addressed whether § 856(a)(2) prohibited a supervised injection facility but did not reach Safehouse's counterclaims under the Commerce Clause and RFRA. *Id.* The Court subsequently entered judgment in favor of Safehouse and against the United States. ECF Nos. 141, 142.

On January 12, 2021, the Third Circuit reversed, holding that Safehouse's proposed injection site would violate § 856(a)(2). *United States v. Safehouse*, 985

F.3d 225, 229-30 (3d Cir. 2021). The Third Circuit also rejected Safehouse's affirmative defense under the Commerce Clause. *Id.* at 239-43. Safehouse subsequently petitioned for rehearing *en banc*, which the Third Circuit denied. *United States v. Safehouse*, 991 F.3d 503 (3d Cir. 2021). The Supreme Court denied certiorari. *Safehouse v. Dep't of Justice*, 142 S. Ct. 345 (2021).

The Third Circuit did not reach Safehouse's RFRA counterclaim, instead remanding that claim for this Court's consideration. Thereafter, Safehouse filed Amended Counterclaims, ECF No. 160, and Second Amended Counterclaims for Declaratory and Injunctive Relief, ECF No. 209, in which it reasserted its RFRA claim and added a new claim under the Free Exercise Clause of the First Amendment, alleging it was entitled to an exemption from the CSA to open its proposed facility, despite the Third Circuit's ruling.

The United States moved to dismiss Safehouse's Second Amended Counterclaims, contending that Safehouse failed to state a claim for relief because Safehouse conceded that it is not, itself, a religious organization, and failed to establish that it can assert the religious rights of its board members. ECF No. 211. Additionally, among the elements that must be pleaded to state a claim under RFRA is that the challenged provision substantially burdens religious exercise. The government contended that Safehouse failed sufficiently to allege that its religious exercise was substantially burdened. *Id.* The government further contended that Safehouse could not assert a Free Exercise claim on behalf of its board members,

4

and that, because Section 856 is neutral and generally applicable, Safehouse's Free Exercise claim should also be dismissed. *Id.*

This Court granted the government's motion, ruling that Safehouse could not plausibly claim that its proposed activities would constitute an exercise of religion, and holding that neither RFRA nor the Free Exercise Clause provide protections for "an entity unaffiliated with any specific faith or religious institution [that] claims protection for its non-religious actions, based solely upon the religious motivation of its founders." ECF No. 236, at 2, 6.

Safehouse appealed this Court's dismissal. The Third Circuit held that "RFRA's plain text and Free Exercise doctrine are clear that those statutory and constitutional protections extend to non-natural persons, including so-called non-religious entities." *United States v. Safehouse*, 146 F.4th 315, 319 (3d Cir. 2025). The appellate court "express[ed] no view about whether threatened prosecution of Safehouse substantially burdens its exercise of religion" and declined to determine whether Safehouse had plausibly pleaded RFRA and Free Exercise claims. *Id.* Rather, the Third Circuit remanded those claims to this Court for its consideration of "whether Safehouse has plausibly pleaded RFRA and Free Exercise counterclaims." *Id.* at 321.

After remand, Safehouse moved for leave to file Third Amended Counterclaims. ECF No. 242. This Court granted its motion, in part, allowing Safehouse to file its proposed Amended Counterclaims, but denying its request to add Jose Benitez as a counterclaim plaintiff. ECF No. 245. Safehouse then filed its

Third Amended Counterclaims for Declaratory and Injunctive Relief, ECF No. 247, which the United States now moves to dismiss.

## LEGAL STANDARDS

### I.    Federal Rule of Civil Procedure 12(b)(1)

Federal courts have limited jurisdiction, possessing only that power granted by the Constitution or authorized by Congress. *See generally Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Accordingly, a district court may hear a case only if it is authorized to do so by a congressional grant of subject matter jurisdiction. *See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982). "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94−95 (1998) (internal citation omitted).

If the Court lacks subject matter jurisdiction to hear a claim, the defendant may move to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(1). A court may treat a Rule 12(b)(1) motion as either a facial or factual challenge to jurisdiction. *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiffs. *Gould Elec. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). But in reviewing a factual attack, the court may

6

consider evidence outside the pleadings. *Id.* A plaintiff bears the burden of proving that jurisdiction exists. *Id.* at 178.

## II. Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the allegations set forth in the complaint. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 6738 (2009). Although federal courts ruling on a motion to dismiss "must take all of the factual allegations in the complaint as true, they are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up)).

## ARGUMENT

## I. The Court Lacks Subject-Matter Jurisdiction over Safehouse's Counterclaims.

Safehouse's counterclaims fail at the threshold because Safehouse lacks Article III standing to press them. Alternatively, a 2023 City of Philadelphia zoning ordinance—enacted nearly three years before Safehouse filed its operative pleading—has mooted its counterclaims. Either ground requires dismissal.

The City's zoning ordinance underpins both defects. On September 28, 2023, the City of Philadelphia enacted Bill No. 23-0410, codified at Phila. Code § 14-539, which creates a "Narcotics Injection Sites Overlay District" that applies to nine of

7

the City's ten Council Districts (omitting only the 3rd District).[1] The ordinance

defines a "Narcotic Injection Site" in a manner that tracks with Safehouse's

proposed operation: a "healthcare facility or establishment, with oversight provided

by one or more health care professionals, that provides space for any person to

inject, ingest, inhale, or otherwise introduce into the person's body an unprescribed

controlled substance." Phila. Code § 14-539(2). And it directs that "[a] Narcotic

Injection Site is a prohibited use" in the covered districts. *Id*. at § 14-539(3).[2]

Safehouse's TAC never mentions the ordinance. Yet the ordinance bars

Safehouse from operating in nine of ten City of Philadelphia Council Districts,

independently of § 856. The generalized allegations in Safehouse's Third Amended

Counterclaims and the changed landscape as of April 2026 render Safehouse's claim

---

[1] The sole Councilmember who declined to approve the ordinance—representing the City's 3rd Council District in West Philadelphia—publicly adopted a wait-and-see position for her district. Councilmember Jamie Gauthier's office released a statement that "[t]here are no plans to open an overdose prevention center in West and Southwest Philadelphia, and [the] decision not to include [the 3rd] council district in the blanket ban should not be mistaken as a sign [Councilmember Gauthier] will seek to open one." *See* Stephen Williams, *Some in the 3rd District Confused by Councilwoman's Stance on Injection Sites*, The Philadelphia Tribune (Sept. 18, 2023), https://www.phillytrib.com/news/local_news/some-in-the-3rd-district-confused-by-councilwomans-stance-on-injection-sites/article_5e84cda6-368b-5a85-ad45-83dd0597c850.html. Thus, even if Safehouse sought to operate in the City's 3rd council district – which is not averred in the TAC – it is uncertain whether Safehouse would be permitted to operate there.

[2] The Court may take judicial notice of the ordinance. A duly enacted municipal ordinance is a matter of public record, the contents of which can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b)(2); *see also Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (courts may consider "matters of public record" in deciding a motion to dismiss).

to Article III standing untenable. Despite its asserted desire to open and operate in Philadelphia, Safehouse no longer plausibly alleges an imminent injury when the zoning regime forbids Safehouse's proposed conduct. And even if standing existed at an earlier stage, the enactment of the zoning ordinance has now mooted Safehouse's counterclaims.

### A.   Safehouse Lacks Article III Standing

To establish standing, Safehouse must plausibly allege (1) a concrete and particularized injury that is actual or imminent rather than conjectural or hypothetical; (2) that is fairly traceable to the government's challenged conduct; and (3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Here, Safehouse falters on all three prongs.

### 1.   Safehouse's standing must be assessed as of April 13, 2026—the date it filed its TAC.

Standing is generally evaluated as of the date of a plaintiff's initial complaint, but a different rule applies if the plaintiff files an amended pleading that "adds or alters allegations, claims, or prayers for relief in the complaint based on events that occurred *after* the initiation of the lawsuit." *Lutter v. JNESO*, 86 F.4th 111, 125 (3d Cir. 2023). In that case, standing for "the claims and requested relief substantively affected by the alleged post-suit developments" is determined as of the date of the supplemental complaint. *Id.* at 125-26; *see also Doe v. Pine Richland Sch. Dist.*, No. 24-3348, 2026 WL 1103489, at *2 (3d Cir. Apr. 23, 2026) (applying *Lutter*). Here, Safehouse's TAC triggers *Lutter*'s rule—so Safehouse's standing must be assessed as of April 13, 2026.

9

*Lutter* applies here because Safehouse's TAC adds extensive post-2019 allegations that reshape and seek to bolster Safehouse's religious counterclaims. For example, Safehouse's TAC asserts that "[d]uring this litigation, the DOJ has called into question whether Safehouse's overdose prevention service model constitutes the sincere exercise of religion." ECF No. 247, ¶ 150. Safehouse's TAC also adds allegations about how Safehouse responded, namely that on *January 7, 2026*, Safehouse's Board adopted a formal "official mission statement" and amended Safehouse's Bylaws to declare that it "acts for charitable and religious purposes." *Id.* at ¶¶ 152-53.

These new allegations about Safehouse's January 2026 corporate-governance updates are not clarifications. They are post-suit factual supplementations directed at perceived pleading defects. *See also id.* at ¶¶ 45-47, 93, 171 (allegations spanning 2022 and 2023). Based on Safehouse's substantive supplementation of its pleading, *Lutter* requires that its standing be assessed as of April 13, 2026.

> **2.    Safehouse fails to allege a concrete, particularized, and imminent injury.**

To satisfy the injury-in-fact requirement, Safehouse must plausibly allege an injury that is "concrete, particularized, and imminent rather than conjectural or hypothetical." *Trump v. New York*, 592 U.S. 125, 131 (2020) (citation omitted). An allegation of *future* injury qualifies as imminent if the threatened injury is "certainly impending" or if there is "a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); *see also Whitmore v. Arkansas*,

10

495 U.S. 149, 158 (1990) ("Allegations of possible future injury do not satisfy the requirements of Art. III").

Safehouse's TAC fails to plausibly allege an imminent injury. To be sure, Safehouse broadly alleges that it plans to open a supervised-injection site "in the Philadelphia area as soon as feasible." ECF No. 247, ¶ 138; *see also id.* at ¶ 10 (Safehouse "remains committed to opening and operating a supervised consumption facility as soon as feasible once the legal barriers are removed"); *id.* ¶ 141 (Benitez is "committed to opening an overdose prevention center … once the legal barriers to doing so are removed"). But these "generalized allegations" do not satisfy the injury requirement for a pre-enforcement challenge. *Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*, 80 F.4th 215, 219 (3d Cir. 2023); *see also id.* at 219-20 (plaintiff failed to show pre-enforcement injury because its "intent to act" was "too general"). As the Supreme Court stressed in *Lujan*, mere "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [its] cases require." 504 U.S. at 564.

Additional Supreme Court precedent confirms that Safehouse's allegations fall short. In *Susan B. Anthony*, for example, the plaintiffs alleged a plausible pre-enforcement injury because they "pleaded specific statements they intend to make in future election cycles" that would violate the statute at issue. 573 U.S. at 161. They identified the content of the statements (positions on the Affordable Care Act), the targets (federal officials who had voted for the Act), and the timing of their

11

statements (upcoming election cycles). *Id.* at 153-55, 161-62. Thus, they sufficiently alleged specific (arguably proscribed) conduct to proceed with a pre-enforcement challenge. *Id.* at 162-65; *see also id.* at 162-63 (distinguishing *Golden v. Zwickler*, 394 U.S. 103 (1969), where "any threat of future prosecution was 'wholly conjectural'").

The opposite was true in *O'Shea v. Littleton*, 414 U.S. 488 (1974). There, the plaintiffs sought injunctive relief against future prosecution on the basis that they had been subjected to discriminatory prosecution and sentencing in the past. But the plaintiffs' complaint "allege[d] injury in only the most general terms." *Id.* at 495. The notion that any of the plaintiffs would be subjected to future harm was thus wholly speculative. As the Supreme Court noted, "attempting to anticipate whether and when these [plaintiffs] will be charged with crime and will be made to appear before either [defendant] takes us into the area of speculation and conjecture." *Id.* at 497.

Safehouse's vague assertions do not plausibly allege an adequate pre-enforcement injury. The TAC does not identify a planned site of operation.[3] It does not specify a relevant property interest, option contract, or lease for Safehouse's

---

[3] In fact, Safehouse's website confirms that it has no concrete plans for a location. https://www.safehousephilly.org/frequently-asked-questions#faqgeneral ("Safehouse locations will be determined by community and city input, as well as data that show the areas where the greatest need exists. Safehouse considers it a priority to be a good neighbor, so locations will be selected in consultation with local leaders, businesses and residents."). Safehouse relies on its website in its TAC, *see* ¶¶ 136, 139, which means it is appropriate to consider on a motion to dismiss. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (court may consider "matters incorporated by reference" in deciding motion to dismiss).

12

operation. It does not allege that Safehouse intends to open in the single Council District not subject to the City's Narcotics Injection Sites Overlay District or that Safehouse has taken steps to pursue a variance application in the other Council Districts [is this capitalized?] to avoid that bar. It does not mention funding, financial commitments, or any other concrete preparatory steps. Safehouse merely alleges a generalized commitment to open "in the Philadelphia area as soon as feasible." ECF No. 247, ¶ 138. That is insufficient. *See, e.g.*, *Lujan*, 504 U.S. at 564 n.2 (explaining that "imminence" is "stretched beyond the breaking point when . . . the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control"); *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 297-98 (3d Cir. 2003) (plaintiffs' asserted future harm was "conjectural" because they failed to allege "that they have immediate plans to undertake any projects" that would be subject to challenged ordinance).

To be clear, the government admits that Safehouse is subject to threatened enforcement by DOJ if Safehouse actually operates an injection site. After all, this case was originally filed in 2019 as an actual enforcement action by DOJ when it appeared that Safehouse was imminently preparing to open a supervised-injection site with the City's approval and support. *See* ECF No. 1. But the generalized allegations in Safehouse's TAC and the changed landscape as of April 2026 no longer make it plausible that Safehouse will actually open and thus be subject to enforcement by DOJ. Safehouse was established in 2018, ECF No. 247, ¶ 30,

13

against a backdrop of a mayoral administration that supported its efforts, *id*. at ¶ 129. But that mayor is no longer in office, and Safehouse's attempts to open in 2018 and 2019 pre-date the City's near-total zoning ban codified at Phila. Code § 14-539.[4] What's more, Safehouse has now been organized for eight years but has taken no concrete preparatory steps toward operation. Even with this litigation pending over the legality of supervised consumption, Safehouse could have taken steps to open without offering supervised injection services but has failed to do so.

"[T]he relevant standing inquiry ultimately focuses on the actual probability of an enforcement action." *Greenberg v. Lehocky*, 81 F.4th 376, 387 (3d Cir. 2023). That probability is wholly conjectural at this point. And Safehouse's generalized desire to operate "in the Philadelphia area as soon as feasible" is the kind of abstract future-intent allegation the Supreme Court has rejected for more than fifty years. Without a plausible and specific concrete plan for opening, Safehouse pleads no injury-in-fact.

### 3. Safehouse fails to satisfy traceability and redressability.

Article III's traceability and redressability requirements often turn on the same facts: whether the challenged government conduct caused the asserted injury such that judicial relief will fix it. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367,

---

[4] Current Philadelphia Mayor Cherelle Parker "has maintained opposition" to injection sites and "applauded City Council's passage" of the zoning overlay. Nicole Leonard, *Safehouse Fights to Keep Supervised Consumption Site Case Alive in Philly as DOJ Seeks Dismissal*, WHYY (Dec. 5, 2023), https://whyy.org/articles/philadelphia-safehouse-supervised-consumption-injection-site-overdose-prevention/.

380 (2024) (causation and redressability are "often 'flip sides of the same coin'" (citation omitted)). Safehouse fails both for the same reason. The injury that Safehouse pleads—its inability to operate in Philadelphia—is caused by an unchallenged independent legal barrier, not by 21 U.S.C. § 856. And the relief that Safehouse seeks here cannot remove that barrier.

Causation requires injury "that is the result of [the] statute's actual or threatened *enforcement*, whether today or in the future." *California v. Texas*, 593 U.S. 659, 670 (2021) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). Where independent statutory provisions cause the relevant injury, the causal chain to the challenged provision is broken. *Id.* at 678-79. In *California v. Texas*, the Supreme Court thus held that the state plaintiffs' alleged injuries were not traceable to the Affordable Care Act's minimum essential coverage provision because "other provisions" of the Act, "not the minimum essential coverage provision, impose[d] these other requirements." *Id.* at 678. Those other provisions "operate[d] independently of" the challenged provision. *Id.* at 679.

The same is true here. Safehouse asserts that it has been unable to "open[] and operat[e] a supervised consumption facility" because of "legal barriers" that it attributes to DOJ's enforcement of § 856. ECF No. 247, ¶ 10; *see also id.* ¶ 6 (attributing harm to "the actions and threatened actions of the DOJ"); *id.* ¶ 148 (same). But § 856 is not the main legal barrier now preventing Safehouse from operating in Philadelphia. The City's 2023 zoning ordinance prohibits Safehouse's exact proposed use in nine of the City's ten Council Districts regardless of § 856.

15

The two provisions operate independently of each other. Even if Safehouse prevailed on one or both of its counterclaims and were able to avoid § 856, Safehouse still cannot lawfully open or operate in most of the City. *See Warth v. Seldin*, 422 U.S. 490, 506 (1975) (plaintiffs failed to satisfy causation to challenge zoning ordinance because their allegations suggested that "their inability to reside in [the town] is the consequence of the economics of the area housing market, rather than of respondents' assertedly illegal acts").

The redressability requirement further illustrates the problem. To establish redressability, Safehouse must show "a substantial likelihood that the requested relief will remedy the alleged injury in fact." *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 143 (3d Cir. 2009). The Third Circuit has held that this requirement fails when an unchallenged regulation would independently bar the plaintiff's proposed conduct regardless of the federal relief sought. *Coastal Outdoor Advertising Group, LLC v. Twp. of East Hanover* held that a billboard company lacked standing to challenge a sign ordinance because the proposed billboard violated unchallenged secondary restrictions on size and height. 397 F. App'x 794, 795 (3d Cir. 2010). The panel observed that "[a]n injunction against the portions of the ... codes that [the plaintiff] has challenged would not let it erect the proposed sign; the village could block the sign simply by enforcing another, valid, ordinance already on the books." *Id.* (quoting *Harp Adver. Ill., Inc. v. Village of Chicago Ridge*, 9 F.3d 1290, 1292 (7th Cir. 1993)) (alteration in original). And the panel rejected the suggestion that nominal damages or facial-challenge relief could save standing. *Id.*

16

at 796 ("Nominal damages will not alleviate the harm caused by the denial of the application—the prohibition of the billboard.").

*Coastal Outdoor*'s principle controls here. The City's overlay ordinance is exactly the kind of unchallenged independent restriction that defeats redressability. An injunction against DOJ's enforcement of § 856 would not let Safehouse open a supervised-consumption facility in Philadelphia; without a variance (which Safehouse does not aver it is seeking), the City would block any such facility by enforcing the overlay ordinance "already on the books." *Coastal Outdoor*, 397 F. App'x at 795. And a declaration that § 856 does not apply to Safehouse—or that RFRA bars its enforcement—would not remove the independent zoning prohibition either. The relief that Safehouse seeks here cannot remedy its asserted injury.

Two possible responses do not change the analysis. First, Safehouse may argue that a ruling on § 856 would relieve some federal exposure even if it will not permit Safehouse's actual operation. But *Coastal Outdoor* forecloses that argument: nominal benefits cannot satisfy redressability where the relief sought does not allow the conduct that the plaintiff actually wants to perform. 397 F. App'x at 796; *cf. United States v. Juvenile Male*, 564 U.S. 932, 937 (2011) (per curiam) (a judgment's "possible, indirect benefit in a future lawsuit" does not preserve standing). Second, Safehouse may argue that operation remains theoretically possible in the lone unaffected district. But the TAC neither identifies a site there nor alleges any concrete steps toward operating there. The same defect that defeats Safehouse's claim of injury-in-fact defeats that fallback.

17

### B.    Alternatively, the 2023 Zoning Ordinance Moots Safehouse's Counterclaims.

Alternatively, if the Court concludes that the relevant inquiry is whether Safehouse had Article III standing when it filed its original counterclaims in 2019, then the City's enactment of Bill No. 230410 on September 28, 2023, rendered Safehouse's counterclaims moot.

An "actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997). If intervening events leave a court unable to grant the prevailing party "any effectual relief whatever," the case becomes moot. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016). That principle applies here. Nothing this Court does in this case would provide Safehouse with relief from the City's zoning ordinance, rendering its counterclaims moot.

Safehouse may respond that a judgment in its favor here would facilitate some future challenge directed at the City's ordinance, or bolster a variance application. But Article III requires that the relief sought be connected to the injury asserted in the case. A judgment's "possible, indirect benefit in a future lawsuit" does not preserve standing. *Juvenile Male*, 564 U.S. at 937.

## II.    Safehouse's RFRA Claim Fails Because the CSA Does Not Impose a Substantial Burden on Safehouse and Safehouse Is Motivated by Socio-Political or Philosophical Beliefs, Not Religious Ones.

Safehouse asserts that "[t]he leaders and organizers of Safehouse are motivated by the Judeo-Christian beliefs ingrained in us from our religious schooling, our devout families and our practices of worship. At the core of our faith

18

is the principle that preservation of human life overrides any other considerations." ECF No. 247, ¶ 136. Safehouse does not contend that any of its board members' multiple faiths explicitly directs that they must organize to manage or operate supervised injection facilities (while other medical professionals actually *supervise* drug use). Instead, Safehouse asserts that "the board members believe that the provision of overdose prevention services *effectuates* their religious obligation to preserve life, provide shelter to our neighbors, and to do everything possible to care for the sick." *Id.* at ¶ 146 (emphasis added). Safehouse therefore seeks a declaration that any prohibition on its operation of a supervised injection facility would violate the RFRA rights of its board members.

RFRA prevents the federal government from "substantially burden[ing] a person's exercise of religion" unless it "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1(a), (b). To invoke RFRA, a claimant must make out a *prima facie* case that (1) it possesses a sincerely held belief that (2) is religious in nature, and (3) application of the challenged law would substantially burden the litigant's religious belief. *See United States v. Stimler*, 864 F.3d 253, 267-68 (3d Cir. 2017), *vacated on other grounds by United States v. Goldstein*, 902 F.3d 411 (3d Cir. 2018).

Safehouse asserts that § 856's application "burdens [it] by forcing it to choose between the exercise of its founders' and directors' religious beliefs" and conformity with the law. ECF No. 247, ¶ 147. Safehouse fails to state a claim as a matter of

19

law. Safehouse cannot show that application of § 856(a) substantially burdens its board members' religious exercise because Safehouse's board members have multiple legal alternatives for effectuating their religious beliefs that they must "preserve life, provide shelter to [their] neighbors, and [ ] do everything possible to care for the sick." *See, e.g.*, ECF No. 247, ¶ 146.

Furthermore, even accepting as true the well-pleaded allegations of the TAC, Safehouse continually asserts that its true motivation is socio-political, scientific, or philosophical in nature, not religious, and therefore not protected by RFRA.

### A.    Application of § 856(a) to Safehouse Does Not Substantially Burden Its Claimed Religious Belief.

Whether the government has imposed a "substantial burden" under RFRA is a question of law, not a question of fact. *Real Alts., Inc. v. Sec'y of HHS*, 867 F.3d 338, 356 (3d Cir. 2017) (internal citations omitted); *see also Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151, 1176 (10th Cir. 2015) ("[C]ourts—not plaintiffs—must determine if a law or policy substantially burdens religious exercise"). A court need not accept as true conclusory allegations of substantial burden. *Real Alts.*, 867 F.3d at 357; *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008) (not "accepting as true" the legal conclusion regarding substantial burden in reviewing a district court's dismissal of a RFRA claim). "To the contrary, [courts] have not hesitated to examine whether an alleged burden is sufficiently 'substantial' under RFRA." *Real Alts., Inc.*, 867 F.3d at 357.

Government action does not constitute a substantial burden if it "does not coerce the individuals to violate their religious beliefs or deny them the 'rights,

20

benefits, and privileges enjoyed by other citizens.'" *Geneva Coll. v. Sec'y U.S. HHS*, 778 F.3d 422, 442 (3d Cir. 2015) (quoting *Lyng v. NW Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988)). A substantial burden exists only if: "1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available . . . versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the Government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Real Alts., Inc.*, 867 F.3d at 356 (quoting *Mack v. Warden Loretto FCI*, 839 F.3d 286, 304 (3d Cir. 2016)) (emphasis in original).

The government's enforcement of § 856 does not coerce Safehouse's board members to act. There is no affirmative obligation on Safehouse's board members to take any action at all, or to act in a way that violates their religious beliefs. *See Lyng*, 485 U.S. at 450-51; *cf. Goodall by Goodall v. Stafford Cnty. Sch. Bd.*, 60 F.3d 168, 172-73 (4th Cir. 1995) (no substantial burden where plaintiffs were neither compelled to engage in conduct proscribed by their religious beliefs nor forced to abstain from any action which their religion mandates that they take).

Instead, Safehouse contends that enforcement of § 856 interferes with its board members' religious exercise by not permitting them to take a discrete action[5] that *effectuates* their general Judeo-Christian religious beliefs that they must "preserve life, provide shelter to [ ] neighbors, and do everything possible to care for

---

[5] Safehouse does not contend that its board members have or are maintaining a place to supervise use of illegal drugs. Instead, Safehouse asserts its desire to do so.

the sick." ECF No. 247, ¶ 146. Because there are myriad other methods by which Safehouse can effectuate its board members' broad religious beliefs, Safehouse has not alleged a substantial burden here on the exercise of its religion.

In conducting its analysis, it is important to bear in mind what § 856 does not limit. For example, it does not prevent Safehouse's board members from medically supervising illegal drug use occurring in a public space. Rather, § 856 prohibits Safehouse from "own[ing] or maintain[ing] a 'drug-involved premises': a place for using, sharing, or producing drugs." *Safehouse*, 985 F.3d at 230. Thus, enforcement of § 856 does not require Safehouse to abandon its founders' core tenets of preserving life, providing shelter to neighbors, or helping the sick. At most, it restricts "one of a multitude of means," which does not constitute a substantial burden. *Henderson v. Kennedy*, 253 F.3d 12, 15 (D.C. Cir. 2001); *see also Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011) (applying Henderson and multitude of means analysis); *Ferguson v. Owen*, Civ. No. 21-2512, 2024 WL 120099 (D.C. Cir. Jan. 11, 2024) (affirming district court's dismissal of RFRA claim and employing multitude of means test), *cert denied*, 144 S. Ct. 2527 (2024).

In determining whether any asserted burden is substantial, this Court can consider whether Safehouse's board members have acceptable alternative legal means to practice their religion that do not involve violating the CSA. *See Stimler*, 864 F.3d at 268; *Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir. 1995) (no substantial burden in law restricting access to abortion clinics where plaintiffs did not allege that their religion required them to physically obstruct clinic areas and the

plaintiffs otherwise had "ample avenues open" by which they could express their deeply held beliefs); *Planned Parenthood Ass'n v. Walton*, 949 F. Supp. 290, 296 (E.D. Pa. 1996) (same); *United States v. Kelly*, Crim. No. 18-0022, 2019 WL 5077546, at *25–26 (S.D. Ga. Apr. 26, 2019) (same).

Thus, in *Stimler*, the Third Circuit affirmed the denial of a motion to dismiss a criminal indictment against defendants who claimed that RFRA protected their conduct. The defendants were three rabbis charged with various kidnapping-related offenses in connection with their religiously inspired attempts to forcibly help women obtain religious divorces from their recalcitrant husbands. *Stimler*, 864 F.3d at 259. In weighing whether the criminal prosecution imposed a substantial burden, the district court considered that, when a husband refuses to consent to divorce, it is considered a religious commandment or a "mitzvah" in Orthodox Judaism to assist a woman in obtaining consent, and that Jewish law authorizes "certain forms of force" in providing such assistance. *United States v. Epstein*, 91 F. Supp. 3d 573, 580 (D.N.J. 2015).

While the district court accepted that helping a woman to obtain a religious divorce was authorized by Jewish law, and therefore part of the defendants' legitimate religious exercise, it held that "there is also no dispute that there are alternative means of coercion to perform this mitzvah," including secular legal methods. *Id.* at 582. The court held that "[t]hese alternative and meaningful means . . . do not violate the criminal laws of the United States, yet still permit Orthodox Jews to participate in the mitzvah[.]" *Id.* at 582. Because "acceptable alternative

23

means of religious practice . . . remained available to the defendants," the Third Circuit affirmed the district court's determination that indictment for kidnapping did not substantially burden the defendant's religious exercise. *Stimler*, 864 F.3d at 268, *affirming Epstein*, 91 F. Supp. 3d 573. *See also United States v. Thompson*, Crim. No. 25-0013, 2025 WL 1689390, at *3 (E.D. Pa. June 16, 2025) (applying *Stimler* and concluding that plaintiff had acceptable alternative means of religious practice in rejecting RFRA claim).

Similarly, in *Henderson v. Kennedy*, the D.C. Circuit considered a RFRA claim challenging a ban on t-shirt sales on the National Mall. 253 F.3d 12 (D.C. Cir. 2001). There, the claimants argued that, as Christians, they were obligated to preach the gospel "to the whole world . . . by all available means," including by offering religious t-shirts for sale. *Id.* at 15. The D.C. Circuit held the claimants could not show a substantial burden because they could not show that a ban on certain commercial activity on the National Mall either forced them to engage in conduct forbidden by their religion or prevented them from engaging in conduct their religion required. *Id.* at 16.

Furthermore, the claimants' broad religious conviction that they must spread the gospel by "all available means" was not substantially burdened by a restriction on the sale of t-shirts because the claimants had other means to satisfy their religious requirement, including distributing t-shirts for free or selling them in surrounding areas. *Id.* at 17; *cf. Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 333 (D.C. Cir. 2018) (Archdiocese not substantially burdened

24

by restrictions on religious advertising on public transit where it never alleged that its religion required displaying advertisements on WMATA property and had "many other ways to pursue its evangelization efforts: in newspapers, through social media, and even on D.C. bus shelters"); *Wilson v. James*, 139 F. Supp. 3d 410, 425 (D.D.C. 2015) (applying multitude of means test), *aff'd*, 2016 WL 3043746, at *1 (D.C. Cir. May 17, 2016)

*Henderson* established that when a plaintiff explains which of its religious beliefs are at issue, "the level of generality at which they describe those beliefs (and the associated conduct) matter," such that a highly general religious belief is not substantially burdened when the government forecloses only one available option of complying with that tenet. *See Yarbrough v. Chance Saltzman*, Civ. No. 25-3526, 2026 WL 913085, at *5 (D.D.C. Apr. 3, 2026) (discussing *Henderson*).

In *Yarbrough*, the court evaluated a plaintiff's claim that his religion required him to "speak truth." *Id.* at *2. The court determined that a letter admonishing the plaintiff for remarks he made at a military gathering while in uniform, in violation of military policy, did not substantially burden his religious exercise because he remained able to "speak truth" while complying with military regulations or while out of uniform. *Id.* at *3. Like the plaintiff in *Yarbrough*, Safehouse, too, describes its religious beliefs in broad and general terms. Safehouse asserts its board members' religious beliefs obligate them to "preserve life, provide shelter to our neighbors, and to do everything possible to care for the sick." ECF No. 247, ¶ 146.

25

Like the RFRA claimants in *Stimler*, *Henderson*, and *Yarbrough*, Safehouse also has multiple legal ways in which its board members may satisfy their broad religious beliefs that they must shelter their neighbors, care for the sick, and preserve life. In fact, Safehouse's TAC details many of them. Safehouse plans to offer services to assess the physical and behavioral health status of drug-addicted persons in Philadelphia, to provide sterile drug consumption equipment, drug testing strips, wound care, primary care services, on-site education and counseling, on-site medication-assisted treatment and recovery counseling, distribution of Naloxone, and access to social services such as housing, public benefits, and legal services. ECF No. 247, ¶ 38.

Assuming compliance with applicable statutory and regulatory requirements (*e.g.*, 21 U.S.C. §§ 822, 823(g), and 21 C.F.R. § 1301.12), none of these measures would run afoul of the CSA, and all align with the asserted religious beliefs of Safehouse's board members. The government does not seek to stop those lawful activities.

Accordingly, Safehouse's board members remain able to follow the precepts of their religions through methods other than maintaining a place for others to use and medical providers to supervise the use of illegal drugs. Given the many ways in which these board members can act within the bounds of the law, Safehouse cannot show that its board members' religious beliefs to "preserve life, provide shelter to [their] neighbors, and to do everything possible to care for the sick" is substantially

26

burdened by enforcement of the CSA's prohibition on maintaining a place for illegal drug use.

In response to prior briefing, Safehouse suggested that *Stimler* "did not consider . . . subsequent Supreme Court precedent in *Holt*." ECF No. 48, at 53. But *Holt v. Hobbs*, 574 U.S. 352 (2015) was decided two years before *Stimler*, and the Third Circuit panel was clearly aware of *Holt*, as evidenced by its citation to that decision. *See Stimler*, 864 F.3d at 268 n.61. Nevertheless, the court still held that, "[w]hile the government's decision to prosecute the defendants undoubtedly constituted a burden on their sincerely held religious beliefs, *the District Court properly analyzed whether the burden was 'substantial' by looking to acceptable alternative means of religious practice that remained available to the defendants*." 864 F.3d at 268 (emphasis added) (citing *Washington v. Klem*, 497 F.3d 272, 282-83 (3d Cir. 2007), in support of the alternative means analysis).

In any event, *Holt* is readily distinguishable. In that case, the district court held that a prison did not substantially burden a prisoner's religious exercise by refusing to let him grow a religiously required beard because the prison facilitated other ways in which the prisoner could observed his Muslim faith, including by providing a prayer rug, allowing him to follow a religious diet, and permitting his observance of religious holidays. *See Holt*, 574 U.S. at 360. The Supreme Court rejected this analysis, stating that "whether [a claimant] is able to engage in other forms of religious exercise" is not a consideration under the substantial burden test. *Id*. at 361-62.

27

The alternative means analysis employed by the Third Circuit in *Stimler* does not conflict with *Holt* because it involves a narrower question. Rather than consider whether the defendants could engage in other, separate forms of religious exercise, the *Stimler* court considered whether the *specific religious exercise* in which the defendants sought to engage, specifically, helping women obtain divorces from recalcitrant husbands, could be satisfied through other means. *See Stimler*, 864 F.3d at 268. In other words, the court did not suggest that the defendants ignore what they viewed as a religious obligation, as the district court erroneously did in *Holt*; rather, it looked to whether there were alternative ways the same obligation could be fulfilled without violating the law.

Similarly, the government does not here contend that the religious exercise of Safehouse's board members is not substantially burdened merely because the board members may still engage in other acts of faith, such as attending church or synagogue, keeping Kosher, reading holy texts, or praying. Instead, the government argues—and Safehouse acknowledges in its counterclaim—that there are other means by which its board members can effectuate their specific professed religious obligations to preserve life, provide shelter, and care for the sick, including the myriad additional ways they have proposed on their website and in their pleadings. Those board members can travel to areas of the City where drug use is prevalent,

28

remaining in close proximity while drug users inject heroin and fentanyl, and offering care and medical assistance in the event of an overdose.[6]

Because Safehouse cannot show a substantial burden on its board members' religious practice, this Court should hold that it has failed to make out a *prima facie* case under RFRA. *See Stimler*, 864 F.3d at 268; *Cheffer*, 55 F.3d at 1522-23 (where there is no substantial burden on religion, the court need not reach the question of whether the challenged act was the least restrictive means to further a compelling state interest); *see also Adams v. Comm'r*, 170 F.3d 173, 176 (3d Cir. 1999) (before the government must prove that enforcement of a law is the least restrictive means of advancing a compelling interest, a plaintiff first must "demonstrate a substantial burden on [its] exercise of [ ] religious beliefs"). As Safehouse has not pleaded a *prima facie* RFRA violation, this Court should dismiss its RFRA counterclaim. *See* Fed. R. Civ. P. 12(b)(6).

## B.    Safehouse Acknowledges that It Seeks to Engage in Activity that Is Motivated by Socio-Political, Scientific, or Philosophical Beliefs, not Religious Ones.

Repeated allegations in its pleading reveal that Safehouse additionally cannot meet the second requirement of a *prima facie* RFRA claim: that the asserted

---

[6] Additionally, as discussed above, the existence of Phila. Code § 14-539 and the Narcotics Injection Sites Overlay District further demonstrates that the federal government is not imposing a substantial burden on Safehouse's religious exercise. The federal government cannot be putting "substantial pressure on [Safehouse] to substantially modify [its] behavior and to violate [its] beliefs" under the *Real Alternatives* framework when its behavior is not otherwise permitted under local regulations. 867 F.3d at 356.

belief motivating the proposed conduct is religious in nature. *See Stimler*, 864 F.3d at 267-68.

Although courts may not question the *bona fides* of an asserted belief, Third Circuit and Supreme Court precedent require courts to identify with particularity the belief motivating a RFRA claimant's activity and to assess whether the belief is religious or secular in nature. *See Sutton v. Rasheed*, 323 F.3d 236, 250-51 (3d Cir. 2003) (evaluating whether a proffered viewpoint was religious or secular in nature); *Africa v. Pa.*, 662 F.2d 1025, 1030 (3d Cir. 1981); *cf. Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (in a case under Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), inquiry into the truth of an asserted belief is impermissible, but inquiry into the religiosity of a belief is not).

Not all sincerely held beliefs are religious in nature and therefore eligible for constitutional protection. *See Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972) (noting that "[a] way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation [ ] if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief"); *see also United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996) (government action must substantially burden "a religious belief rather than a philosophy or way of life"). Thus, a court can evaluate whether a plaintiff's beliefs are religious as opposed to being "essentially political, sociological, or philosophical views or a merely personal moral code." *United States v. Seeger*, 380 U.S. 163, 165 (1965) (internal quotation marks omitted); *Fallon v. Mercy Catholic*

*Med. Ctr., 877 F.3d* 487, 490 (3d Cir. 2017) (quoting Seeger). *See also McDowell v. Bayhealth Med. Ctr., Inc.*, Nos. 24-1157, *et al.*, 2024 WL 4799870, at *1 (3d Cir. Nov. 15, 2024) (not precedential) ("In religious objection cases, courts must examine whether a belief is a religious one, as opposed to a personal belief cloaked in religion"), *cert denied*, 145 S. Ct. 2848 (2025).

Safehouse asserts that its board members believe they must provide a place where other individuals can supervise drug use as an exercise of the board members' various faiths. This Court can evaluate whether this specific asserted belief is religious or secular. *See Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51 (2d Cir. 1988) (conducting threshold inquiry into whether belief is religious or based on secular or scientific principles);[7] *cf. Caviezel v. Great Neck Pub. Sch.*, 701 F. Supp. 2d 414, 430 (E.D.N.Y. 2010) (construing the applicability of a New York state law exemption to vaccination, and finding that plaintiff's "reluctance to have her daughter vaccinated did not arise from a religious belief, but from a personal, moral, or cultural feeling against vaccination"); *Check ex rel. MC v. N. Y. City Dep't of Educ.*, Civ. No. 13-0791, 2013 WL 2181045, at *3 (E.D.N.Y. 2013) (finding the plaintiff's "aversion to immunization" was based on a secular conviction, not a religious belief); *Geerlings v. Tredyffrin/Easttown Sch. Dist.*, Civ. No. 21-4024, 2021 WL 4399672, at *6 (E.D. Pa. Sept. 27, 2021) (interpreting First Amendment religious freedom claim and concluding that, while each plaintiff had "a passionate

---

[7] *But see Wiggins v. Sargent*, 753 F.2d 663, 666-67 (8th Cir. 1985) (belief that is both religious and secular can qualify for constitutional protection); *see also Callahan v. Woods*, 658 F.2d 679, 687 (9th Cir. 1981).

objection" to wearing masks, none of these beliefs were religious in nature so as to warrant First Amendment protection); *Gatto v. Johnson & Johnson Servs., Inc.*, No. 24-1992, 2025 WL 816732, at *3 (3d Cir. Mar. 14, 2025) ("[T]o conclude that [plaintiff] states a claim by invoking broad religious objections to nasal testing and related 'mandates,' would impermissibly 'cloak[] with religious significance' her fundamentally secular objections to testing, and thereby create a 'blanket privilege' whenever an employee invokes scripture[.]").

"Religious adherents often profess that faith inspires much of their secular lives, but those activities are still secular." *Geerlings*, 2021 WL 4399672, at *7 (Goldberg, J.) (quoting *Yoder*, 406 U.S. at 215-16). Secular activity inspired by an individual moral imperative or a philosophical disagreement with the law is not protected by RFRA. *See Real Alts., Inc.*, 867 F.3d at 350 (noting the country's "vast history of legislative protections that single out and safeguard religious freedom but not moral philosophy").

The government does not challenge the sincerity of Safehouse's board members' asserted religious beliefs in the value of human life, which Safehouse contends arises from the teachings and scriptures of Christianity and Judaism and the religious upbringings of its founders and board members. *See* ECF No. 247, ¶¶ 140-145. But where Safehouse seeks to open a supervised injection facility based on secular concerns about the current state of the opioid crisis in Philadelphia, as it repeatedly states throughout its pleading, it asserts a social or moral philosophy grounded in secular views about the best methods of reducing harm for drug users.

32

*Geerlings* is particularly instructive on this point. The court in that case evaluated a claim that the plaintiffs' religious beliefs prevented them from sending their children to school wearing masks, as required by a school district during the COVID-19 pandemic. After taking testimony about each plaintiff's religious beliefs,[8] the Court denied all claims. With respect to one plaintiff, the court explained:

> [S]he has not demonstrated that she practices keeping her face uncovered the way followers of Catholicism practice communion or those of Jewish faith practice eating unleavened bread on Passover. Her decision to eschew masks corresponds to no teaching of her community, upbringing, or other 'comprehensive . . . belief-system,' nor does she practice it through 'formal and external signs' such as holidays, ceremonies, or clergy. *Africa* [*v. Pennsylvania*, 662 F.2d 1025, 2032 (3d Cir. 1981)]. It is, rather, an "isolated moral teaching" that reflects the circumstances of the ongoing pandemic and seems to be more associated with health restrictions.

2021 WL 4399672, at *7. As in *Geerlings*, this Court can identify with particularity the beliefs actually motivating Safehouse's plans to operate a supervised injection site and determine that they are secular in nature. *See Yoder*, 406 U.S. at 216 (noting that "to have the protection of the Religion Clauses, the claims must be rooted in religious belief," rather than being "based on purely secular considerations").

Safehouse's Third Amended Counterclaims are replete with allegations demonstrating that the driving rationale for its proposal to maintain a site for the supervised use of drugs is socio-political, medical, and philosophical. Safehouse

---

[8] The *Geerlings* court ruled after an evidentiary hearing. Here, this Court has sufficient factual information from Safehouse's pleading to rule on this motion to dismiss.

contends that it seeks to engage in a "harm reduction strategy" with the purpose of "reduc[ing] harm for individuals 'who, for whatever reason, may not be ready, willing, or able to pursue full abstinence as a goal.'" ECF No. 247, ¶¶ 30, 36. Safehouse asserts that "[h]arm reduction strategies are an essential aspect of public health initiatives," and can include "reducing the frequency of substance use, preventing diseases caused by substance use (such as HIV and Hepatitis C), providing syringe exchange, and offering medication-assisted treatments, overdose prevention, and wound care." *Id.* at ¶ 36. Safehouse further posits that "[h]arm reduction strategies are necessary in light of the psychology of addiction and substance use disorder[.]" *Id.* None of these beliefs are religious in nature.

Safehouse categorizes its proposed action as a "modest extension of already-endorsed harm reduction measures" and states that supervised injection has been endorsed by authorities in the medical community. *Id.* at ¶¶ 77, 100. Safehouse contends that "compassionate and conscientious medical providers"[9] should be permitted to operate a location for the medically supervised use of drugs, and that this is supported by "medical facts recognized by Congress, the CDC, and federal health policy." *Id.* at ¶¶ 75-76.

Safehouse's view consists of individual, medical, and public health-based judgments, informed by an admittedly ongoing and serious public health crisis, but it is not a religious belief. *See Fallon*, 877 F.3d at 492 (plaintiff's underlying belief

---

[9] Notably, Safehouse does not claim that the medical providers who would staff its proposed supervised injection facility would also be acting in exercise of their individual religious beliefs.

that the flu vaccine may do more harm than good was a medical belief, not a religious one); *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458, 465-66 (M.D. Pa. 2022) (finding the plaintiff's belief that she has a "'God given right to make [her] own choices'" is "fungible enough to cover anything that [she] trains it on" and would therefore amount to "a blanket privilege" and a "limitless excuse for avoiding all unwanted . . . obligations" (internal marks and citation omitted))[10]; *Blackwell v. Lehigh Valley Health Network*, Civ. No. 22-3360, 2023 WL 362392, at *7 (E.D. Pa. Jan. 23, 2023) (rejecting claim for religious exemption from nasal swab COVID testing, noting that, while the plaintiff was religious and her belief against "the insertion of unwanted foreign objects into her body" was sincerely held, this belief was not religious where evidence showed that she "challenge[d] the factual and scientific basis" for the testing requirement).

Several courts have dismissed religious claims on Rule 12 motions. *See, e.g., McDowell*, 2024 WL 4799870, at *3 (affirming dismissal of Title VII religious discrimination claim, concluding that a "general moral commandment drawn from religion cannot transform a medical [belief] into a religious one" (internal marks and citation omitted)); *Gatto*, 2025 WL 816732 (affirming dismissal of religious discrimination claims, finding plaintiff's allegations gave rise to, at most, the "mere possibility" that her religious beliefs informed her objections to testing); *Ulrich v. Lancaster Gen. Health*, Civ. No. 22-4945, 2023 WL 2939585, at *5 (E.D. Pa. Apr. 13,

---

[10] *Finkbeiner* was affirmed in part and vacated in part, on other grounds. *See Federoff v. Geisinger Clinic*, No. 24-2844, 2026 WL 195416 (3d Cir. Jan. 26, 2026) (not precedential).

2023) (granting Rule 12 motion and dismissing complaint with prejudice after rejecting Christian plaintiff's concerns about COVID testing as "medical concerns which she attempts to cloak with religious significance" (internal mark and citation omitted)); *Detwiler v. Mid-Columbia Med. Ctr.*, Civ. No. 22-1306, 2022 WL 19977290, at *4 n.4 (D. Or. Dec. 20, 2022) (recommending granting Rule 12 motion and dismissing Title VII religious discrimination claim after Christian plaintiff failed to establish that her opposition to COVID testing was religious: "[a]lthough she couches it in religious terms, the complaint makes clear that plaintiff's request for alternate accommodation stems from her belief that nasal swab testing contains hazardous materials," a secular belief); *report and recommendation adopted*, 2023 WL 3687406 (May 26, 2023); *aff'd,* 156 F.4th 886 (9th Cir. 2025).[11]

Here, Safehouse believes that maintaining a supervised injection site for unlawful users of heroin, fentanyl, and other opioids would, in essence, do more *good* than *harm*. As Safehouse has emphasized throughout its pleading, this conclusion is not religious, but is a judgment based on Safehouse's opinions about social circumstances and medical policy. Safehouse's board members have asserted a general religious belief and desire to "preserve life, provide shelter to our neighbors, and to do everything possible to care for the sick." ECF 247, ¶ 146.

---

[11] *But see Leeck v. Lehigh Valley Health Network*, Civ. No. 22-4634, 2022 WL 4147223 (E.D. Pa. June 23, 2023) (holding, in a Title VII case, that plaintiff pleaded enough about her religious beliefs about vaccination, even where mixed with secular beliefs, to survive a motion to dismiss).

But, as Safehouse implicitly acknowledges, the application of these religious beliefs to its plan to maintain a supervised injection facility is driven by its concerns about the current opioid crisis and its review of literature supporting harm reduction efforts. Safehouse's admissions in this regard should guide this Court's determination about the secular nature of its proposal; Safehouse has secular beliefs that it seeks to cloak with religious significance, by way of the broad and sweeping claim that its board members' religious beliefs contain the "principle that preservation of human life overrides any other considerations." *Id.* at ¶ 152. RFRA does not protect such beliefs. Because Safehouse's secular motivation is evident from the pleading, this Court should rule, as a matter of law, that Safehouse's board members' beliefs that they should operate a supervised injection facility is a secular belief not entitled to protection under RFRA.[12]

### C.    Safehouse's Corporate Organization Further Demonstrates that Its Beliefs Are Not Religious.

Though the Third Circuit held that Safehouse is a "person" under RFRA, *Safehouse*, 146 F.4th at 320-21, Safehouse's corporate organization nonetheless additionally demonstrates that Safehouse's belief that it should provide supervised injection is not religious.

This was undoubtedly true prior to 2026. Its Articles of Incorporation did not set forth any religious mission or activity. *United States v. Safehouse*, 729 F. Supp. 3d 451, 455 (E.D. Pa. 2024). Its website's "description of its activities does not set

---

[12] This argument applies with equal force to Safehouse's claim under the First Amendment's Free Exercise Clause.

37

forth any apparent religious practices or behavior." *Id*. Its Form 1023 application for tax-exempt status from the Internal Revenue Service also did not "set forth any religious activity or purpose and makes no reference to religion." *Id*. at 455. Finally, as a non-profit corporation organized under Pennsylvania law, Safehouse has no individual owners. *Id*. This is significant, as this Court explained, because the "actions of a non-profit are governed by its stated purpose, not the preferences of individual owners." *Id*. Together, these considerations buttress the discussion above: that Safehouse's belief that it should operate a supervised injection facility is secular and not religious. Safehouse was, at best, a secular, public health organization whose founders and board members were inspired by religion.

Perhaps seeking to cure this legal defect, in January 2026, Safehouse made two changes: (1) its Board issued an "official mission statement of Safehouse," stating that its "leaders and organizers . . . are motivated by []Judeo-Christian beliefs and [a]t the core of our faith is the principle that preservation of human life overrides any other considerations," ECF No. 247, ¶ 152; and (2) it amended its bylaws to provide that it "acts for charitable and religious purposes, as reflected in the mission statement that has been adopted by the Board," *id*. at ¶ 153.

These changes do not transform Safehouse's belief that it should operate a supervised injection facility into a religious one. If Safehouse, prior to 2026, was a public-health organization inspired by religion, these changes now make it, at best, a public-health organization that now states in its bylaws that it is inspired by religion. The mission statement and changes to the bylaws do nothing to satisfy

38

several criteria for assessing whether corporate belief/activity is religious: whether the corporation produces a secular product; whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue; whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees; whether the entity holds itself out to the public as secular or sectarian; whether the entity regularly includes prayer or other forms of worship in its activities; whether it includes religious instruction in its curriculum, to the extent it is an educational institution; and whether its membership is made up by coreligionists. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007).

Safehouse does not satisfy these criteria:

- Its proposed conduct remains the same and secular: medical observation, harm reduction, overdose prevention, counseling, and referrals.

- It is not owned, affiliated with, or financially supported by a religious entity or that any religious entity participates in its management. *See EEOC v. Kamehameha Sch.*, 990 F.2d 458, 460-64 (9th Cir. 1993) (weighing all significant religious and secular characteristics to determine whether the corporation's purpose and character are primarily religious). *See, e.g., Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (RFRA); *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171 (2012) (Free Exercise); *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993).

- A formally religious entity does not participate in its management.

- It does not hold itself out as religious, but rather acknowledges that it "is not itself a religious entity or organization[.]" ECF No. 247, ¶ 143.

- Its proposed activities do not include prayer or other forms of worship.

- While it proposes to provide onsite education and counseling. *id*. at ¶ 38, it will not provide religious education.

39

- And, its membership is not made up by coreligionists, but rather members of multiple faiths.

As the absence of these markers demonstrates, the mission statement and amended bylaws are largely conclusory relabeling rather than a transformation of a secular belief that it should provide supervised injection into a religious one. In short, its corporate structure lacks the hallmarks associated with corporate religious belief/activity and the proposed conduct itself lacks religious content—all consistent with Safehouse's acknowledgement that it "is not itself a religious entity or organization[.]"*Id.* at ¶ 143.[13]

III.    **Because § 856 Does Not Contain a Mechanism for Individualized Exemptions and Does Not Authorize Comparable Secular Conduct in the Manner Proscribed by *Fulton*, Its Enforcement Would Not Violate the Free Exercise Rights of Safehouse's Board Members.**

Safehouse has also failed to plead a claim for relief under the Free Exercise Clause of the First Amendment.

In its TAC, Safehouse seizes upon language in *Fulton v. City of Philadelphia, Pa.*, 593 U.S. 522 (2021), to support its Free Exercise claim, arguing that § 856 contains "exemptions from a law for those engaged in *non-religious* activity" in a manner that requires this Court to apply strict scrutiny to the application of the statute to Safehouse. ECF No. 247, at ¶ 200 (emphasis in original).

---

[13] If the Court determines that § 856 substantially burdens Safehouse's religious exercise, the government reserves all defenses, including that it has a compelling interest and that § 856 is the least restrictive means of furthering it.

But measured against *Fulton*'s standard, § 856 is generally applicable, and Safehouse's argument that strict scrutiny applies should be rejected. Unlike the provision at issue in *Fulton*, § 856 does not contain a mechanism for individualized exemptions that invites the government to consider the *reasons* for the otherwise prohibited conduct. Indeed, by its terms, § 856 contains no exemptions at all. Nor has Safehouse identified any other exception in the CSA that would undermine the government's interest in minimizing the harm to public health posed by concentrated illegal drug use. While it does identify five exemptions found in unrelated portions of the broader statutory scheme, none of them relates to the use of specific facilities for illegal drug activity, and thus none calls that interest into question. Accordingly, the enforcement of § 856 against Safehouse need only be rationally related to a legitimate government interest. And because the Third Circuit has already found that it is, Safehouse's Free Exercise claim should be dismissed.

### A. Safehouse Has Not Demonstrated a Burden that Warrants Strict Scrutiny

Similar to RFRA's threshold inquiry into whether the plaintiff's religious exercise has been substantially burdened, so too must a plaintiff in the First Amendment context demonstrate burden to warrant strict scrutiny. *Fulton*, 593 U.S. at 533 (finding "[a]s an initial matter" that Catholic Social Services' exercise of religion has been "burdened" because the City of Philadelphia "put[ ] it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs"); *Lukumi*, 508 U.S. at 546 ("A law burdening religious practice that is not neutral or

41

not of general application must undergo the most rigorous of scrutiny"). Just as Safehouse cannot demonstrate RFRA's required substantial burden, neither can it meet the First Amendment's threshold burden test.

It is well-established, moreover, that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton*, 593 U.S. at 533 (citing *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 878-82 (1990)). In *Fulton*, the Supreme Court clarified that "[a] law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," or "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interest in a similar way." *Id.* at 533-34.

**B.     By Its Terms, Section 856 Is Generally Applicable and Does Not Contain Mechanisms for Individual Exemptions.**

At the outset, Safehouse is wrong when it posits that § 856 provides for "a mechanism for individualized exemptions" in the manner contemplated by *Fulton*. 593 U.S. at 534. As this Court is aware, § 856 prohibits making available a place "for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance." 21 U.S.C. § 856(a)(2). The Third Circuit explicitly held that § 856(a)(2) applies to Safehouse's proposed activities. *United States v. Safehouse*, 985 F.3d 225 (2021).

42

Key to *Fulton*, and the cases it relied upon, *Sherbert v. Verner*, 374 U.S. 398 (1968), and *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993), was the existence of the type of "mechanism for individualized exemptions" that defeats general applicability because it "invites the government to consider the particular reasons for a person's conduct." *Fulton*, 593 U.S. at 534 (quoting *Smith*, 494 U.S. at 884); *see also id.* (noting that a law is not generally applicable if the government could "grant exemptions based on the circumstances underlying each application" (citing *Smith*, 494 U.S. at 884)).

In *Fulton*, the plaintiffs challenged a specific provision of a foster care contract that limited the rejection of a foster child or foster parents based on their sexual orientation "unless an exemption is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion." 593 U.S. at 535. In *Sherbert*, the challenged law "prohibited eligibility to [unemployment] claimants who had failed, without good cause . . . to accept suitable work." *Id.* at 533-34 (citing *Sherbert*, 374 U.S. at 401). And in *Lukumi*, the Court struck down "ordinances prohibiting animal sacrifices," which did "not regulate hunters' disposal of their kills or improper garbage disposed by restaurants, both of which posed a similar hazard." *Id.* (citing *Lukumi*, 508 U.S. at 544-45). Such provisions, the Court held in *Lukumi* and reemphasized in *Fulton*, would "prohibit religious conduct while permitting secular interests in a similar way." *Id.* (citing *Lukumi*, 508 U.S. at 545-46).

Central to *Fulton*, *Sherbert*, and *Lukumi* were the existence of specific provisions empowering government actors to grant or deny exemptions in a manner that could constitute "religious practice . . . being singled out for discriminatory treatment." *Lukumi*, 508 U.S. at 538. And in those cases, a government actor had nearly unfettered discretion to grant exemptions in a way that could discriminate against religious practice.

Section 856 resembles none of these provisions. It provides no statutory exemption, nor does it vest discretion in a government actor to make a place available for illegal conduct for secular (but not religious) purposes. Section 856 does not care about the underlying motivation for making a place available "for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance." 21 U.S.C. § 856(a)(2). Regardless of motive, the conduct is prohibited without a provision for discretionary exemption. *See Safehouse*, 985 F.3d at 232 ("The text of the statute focuses on the third party's purpose, not the defendant's"). Under such circumstances, this provision is classically generally applicable, and therefore not subject to strict scrutiny.

### C.    The CSA Does Not Otherwise Authorize Secular Conduct in a Manner Comparable to the Conduct Prohibited by Section 856.

Perhaps recognizing that the text of § 856 itself is neutral and generally applicable, Safehouse looks more broadly to other provisions of the CSA. *See* 21 U.S.C. § 856(a)(2) (stating that "[e]xcept as authorized by this subchapter, it shall be unlawful to" maintain drug-involved premises). But none of the five exemptions it identifies either creates the kind of broad discretion to make exemptions that can

44

constitute a "mechanism for individualized exemptions" or provides an exemption from the requirements of § 856, much less an exemption that would be comparable to the exemption Safehouse requests.

As a threshold matter, Safehouse's proposed activities are markedly different than those authorized under other provisions of the CSA. Along with educational and counseling activities, "Safehouse will also feature a drug consumption room. Drug users may go there to inject themselves with illegal drugs, including heroin and fentanyl." *Safehouse*, 985 F.3d at 231. Safehouse will "not provide, dispense, or administer any controlled drugs"; rather, "[t]he drugs [the user] consumes will be his own," *id.* at 237, and "Safehouse itself has a significant purpose that its visitors use heroin, fentanyl, and the like," *id.* at 238. Thus, by design, Safehouse seeks to create a site to allow third parties to use illegal drugs in an unregulated environment. Such activities find no analogy in existing exemptions under the CSA, much less those that "undermine[ ] the government's asserted interest" in discouraging the establishment of facilities where illegal drugs are consumed. *See Fulton*, 593 U.S. at 534.

None of the five provisions that Safehouse identifies meets the Supreme Court's standard of providing "a mechanism for individualized exemptions" *for the behavior regulated by § 856* or otherwise "permitting secular conduct that undermines the government's asserted interest [*i.e.*, the basis of § 856] in a similar way." *Fulton*, 593 U.S. at 534. None of the exemptions would authorize the actions Safehouse seeks to undertake (*i.e.*, making available a place for the use of illegal

45

drugs). And none of the exemptions calls into question the government's interest in preventing facilities that permit unregulated drug use and distribution.

### 1.    The Research Exemption—21 U.S.C. § 872(e)

The first exemption Safehouse identifies is the research exemption, which provides that the Attorney General "may authorize the possession, distribution, and dispensing of controlled substances for persons engaged in research." 21 U.S.C. § 872(e); *see also* 21 C.F.R. § 1316.24 (implementing regulations). (*See* ECF No. 247, at ¶ 165). But Safehouse does not propose to possess, distribute, or dispense controlled substances—in fact, it expressly denies that it will—and, in any event, the research exemption is in no way comparable to the religious exemption to § 856 that Safehouse seeks.

Insofar as Safehouse suggests the narrow research exemption "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," *Fulton*, 593 U.S. at 534, its argument fails. The Attorney General's interest in carrying out "educational and research programs directly related to enforcement of the laws under his jurisdiction concerning drugs"[14] is not the interest furthered by § 856, which concerns preventing sites where users congregate for illegal drug activity.

---

[14] Examples of these exempted research programs make clear that the research exemption is designed to *aid* the government in its law enforcement efforts under the CSA. *See* 21 U.S.C. § 872(a)(1)-(6) (discussing examples, including "educational and training programs on drug use and controlled substances" for law enforcement; studies "designed to compare the deterrent effects of various enforcement strategies on drug use and abuse"; "assess[ing] and detect[ing] accurately the presence in the human body of drugs or other [controlled substances]"; or "develop[ing] more

The research exemption balances that "[t]here is a legitimate need for conducting research with controlled substances" with the fact that "the diversion and abuse of pharmaceutical controlled substances remains a public health concern in the United States." *See* https://www.deadiversion.usdoj.gov/GDP/DEA-DC-057)(EO-DEA217)_Researchers_Manual_Final_signed.pdf (hereinafter, "DEA Researcher's Manual"), at 7. It is therefore heavily regulated, unlike the conduct proposed by Safehouse.

Any applicant for a research exemption must comply with significant regulatory requirements and reviews, including a detailed review by the Secretary of the Department of Health and Human Services on the merits of the research protocol, the qualifications and competencies of the applicant, and whether there are "effective procedures to safeguard adequately against diversion of such controlled substances from legitimate medical or scientific use." 21 C.F.R. § 1301.32(a).

The research must also have the "[a]pproval of a Human Research Committee for human studies," 21 C.F.R. § 1301.18(a)(3)(ii), and the requisite "state authority to handle controlled substances for the state of the researcher's registered business/office address." DEA Researcher's Manual, at 15. The applicant must identify "the risks posed to the research subjects by the research procedures and what protection will be afforded to the research subjects," as well as the "risks posed

---

effective methods to prevent diversion of controlled substances into illegal channels").

47

to society in general by the research procedures and what measures will be taken to protect the interests of society" from those risks. 21 C.F.R. § 1316.24(b)(6), (7). The applicant must also maintain numerous records to "provide accountability of all controlled substances to help reduce the potential for diversion." DEA Researcher's Manual, at 15; 21 C.F.R. § 1304.21(a). And, finally, the research exemption is explicitly time-bound; it expires upon "completion of the research project or until the registration of the researcher is either revoked or suspended or his renewal of registration is denied." *Id*. at § 1316.24(d)(6).

In short, the research exemption recognizes a need for research, but also that it must be tempered by extensive scientific and regulatory controls to prevent harm to third parties. These purposes are entirely consistent with the general ban on facilities that would allow—indeed, that are designed to promote—the *unregulated* use of illegal drugs without proper scientific or medical guardrails.

Moreover, the research exemption would not authorize the conduct that Safehouse intends. The exemption provides that the Attorney General "may authorize the possession, distribution, and dispensing of controlled substances *by persons engaged in research*." 21 U.S.C § 872(e) (emphasis added); *see also id*. ("Persons who obtain this authorization shall be exempt from State or Federal prosecution for possession, distribution, and dispensing of controlled substances to the extent authorized by the Attorney General"). The entire premise of Safehouse's proposed operation is that Safehouse will *not* possess, distribute, or dispense such substances—third parties will. *See Safehouse*, 985 F.3d at 231. The research

48

exemption does not apply under those circumstances. It is not a categorical exemption from all provisions of the CSA; it applies to specific actions that Safehouse does *not* propose to do. Therefore, it reflects neither a "mechanism for individualized exemptions" from § 856 nor an exception that is comparable to the broad exception Safehouse requests.

Safehouse's proposal to operate a site where illegal drugs would be used by third parties would accord with none of the regulatory controls that apply to the research exemption. Safehouse would not be required to secure approval of a Human Research Committee, to satisfy state legal requirements, or be subject to regulatory review of the adequacy of its protocols or the competency of its employees. Nor would it be required to maintain records or otherwise design its processes to limit third party harms. The limited, highly regulated processes authorized by the research exemption are fundamentally different than authorizing supervised injection sites that are unbound in time, unlimited by any requirement to mediate, or even identify, risks to third parties, and divorced from a specific research purpose.

### 2.   The Registration Exemption—21 U.S.C. § 822(d)

As Safehouse further observes, federal law requires that "every person who manufactures or distributes any controlled substance" must obtain a registration from the Attorney General, 21 U.S.C. § 822(a)(1), but that "[t]he Attorney General may, by regulation, waive the requirement for registration of certain manufacturers, distributors, or dispensers if he finds it consistent with public

49

health and safety," *id.* at § 822(d); *see also* 21 C.F.R. § 1307.03 (providing a process for applying "for an extension of any provision of this chapter"). ECF No. 247, at ¶ 163.

But, as with the research exemption, the registration exemption limits only the requirement *to register*, or waives certain registration restrictions, and thus, by extension, to *legally* manufacture, distribute, or dispense a controlled substance. *See* 21 U.S.C. § 822(b).[15] Safehouse does not seek to manufacture, distribute, or dispense controlled substances. Thus, its proposed activities fall outside the scope of the registration exemption.

Nor does allowing waiver of particular registration requirements in certain circumstances undermine the purpose of § 856. The registration exemption ensures that the federal government is aware of, and can regulate, those involved in the manufacturing, distributing, and dispensing of controlled substances. *See* 21 U.S.C. § 822. It also provides a pathway to determine whether the applicant is taking actions that are "inconsistent with the public interest." 21 U.S.C. § 823(b). And it

---

[15] For example, DEA regulations require a practitioner to obtain a separate DEA registration in each state in which he or she dispenses a controlled substance. This requirement was recently waived under 21 C.F.R. § 1307.03 in response to the exigencies of the COVID-19 pandemic; consequently, many states permitted practitioners to dispense drugs in both their home states and states with which their home states had reciprocity. *See* DEA067, Letter to Registrants from Assistant Administrator of Diversion Control Division William T. McDermott, March 25, 2020, available at https://www.deadiversion.usdoj.gov/GDP/(DEA-DC-018)(DEA067)%20DEA%20state%20reciprocity%20(final)(Signed).pdf. Significantly, this exception still required practitioners to be registered in their home state, thus retaining a robust regulatory scheme for those who manufacture, distribute, or dispense controlled substances.

imposes strict rules on those who distribute or dispense those substances, *id*. at § 823(d), and permits waiver only where "consistent with the public health and safety," *id*. at § 822(d).

In short, the registration exemption ensures federal oversight over the activities of those authorized to distribute or dispense controlled substances to ensure that the interests of public health and safety are served. But § 856 serves a different purpose: that of preventing facilities where illegal drugs are distributed or used *without* any such authorization or regulation, and where "[illegal] drug activities are likely to flourish." *Safehouse*, 985 F.3d at 241. Regulating the legal distribution of controlled substances in a manner that serves public health, and with close supervision to prevent third-party externalities, is fundamentally different than permitting a place that allows use of illegal street drugs without any such supervision.

### 3.    The Peyote Exemption—21 C.F.R. § 1307.31

Safehouse also invokes the peyote exemption, found at 21 C.F.R. § 1307.31, which provides that "[t]he listing of peyote as a controlled substance in Schedule I does not apply to the nondrug use of peyote in bona fide religious ceremonies of the Native American Church, and members of the Native American Church so using peyote are exempt from registration." ECF No. 247, at ¶ 167. But this exemption, which is not "secular" in nature, is also different in kind from the exemption Safehouse seeks. Thus, it too reflects neither a mechanism for individualized

51

exemptions nor a comparable secular exemption to the broad religious exemption Safehouse demands.

The peyote exemption applies to a specific type of controlled substance (peyote), used in a specific way ("nondrug use"), in a specific context ("bona fide religious ceremonies of the Native American Church"), and by specific persons ("members of the Native American Church"). 21 C.F.R. § 1307.31. None of these limitations apply to Safehouse, which does not seek to exempt the non-drug use of a specific type of controlled substance, but rather to permit the use of *any* controlled substance. Making a place available for the purpose of illegal drug use is fundamentally different in kind from permitting the religious use of one drug solely for use in a controlled religious setting.

Safehouse does not propose allowing controlled substances to be used in its facility for "nondrug use." Rather, as the Third Circuit observed, Safehouse specifically recognizes that its "visitors will have a significant purpose of drug activity." *Safehouse*, 985 F.3d at 237; *see also id.* at 238 ("One of Safehouse's significant purposes is to allow drug use"). Moreover, Safehouse does not itself seek to use controlled substances in specific religious ways. Instead, it seeks to operate a facility, purportedly motivated by its *board members*' religious beliefs, where *other* people will use drugs. (*See* ECF No. 247, at ¶¶ 147-50). And Safehouse does not propose limiting the class of persons who would use substances to those who are *themselves* motivated by religious purposes, nor does it even purport to serve such a class.

52

Ultimately, the peyote exemption is not analogous to § 856. Safehouse proposes to allow third parties, not the founders themselves, to engage in drug use, not "nondrug use" as permitted by the peyote exemption, for any purpose, not a religious purpose. This does not satisfy *Fulton*'s standard.

Nor does the peyote exemption undermine the purpose of § 856. Again, that provision limits *places* where illegal drugs can be consumed. The limited allowance of the use of one type of drug for *non-drug* purposes in the context of a specific religious ceremony does not demonstrate the type of "underinclusiveness" that the Supreme Court has held suspect. *See Lukumi*, 508 U.S. at 538.

### 4.    The Civil Penalty Exemption—21 U.S.C. § 844a

Next, Safehouse identifies an "exemption" under § 844a by which, as to possession offenses, the "Attorney General [may] decide in his discretion to 'compromise, modify, or remit, with or without conditions, any civil penalty' imposed for simple possession." *See* ECF No. 247, at ¶ 170 (citing 21 U.S.C. § 844a). This provision does not create an exemption for illegal possession. Stated more broadly, nearly any enforcement scheme includes penalties, and it cannot be the case that anytime the government forebears a penalty, in some context, for some reason, it is thereby prohibited from taking enforcement action in a different context, for a different reason.

### 5.    The Regulatory Exemption—21 C.F.R. § 1307.03

Finally, in its search for a "mechanism[ ] for individualized exemptions" from § 856(a)'s prohibitions, Safehouse turns to 21 C.F.R. § 1307.03. ECF No. 247, at

¶ 166. This provision states that "[a]ny person may apply for an exception to the application of any provision of this chapter," *i.e.*, Chapter II of Title 21 of the Code of Federal Regulations. 21 C.F.R. § 1307.03. Under this provision, any person may apply for an exception to particular CSA regulations (as opposed to compliance with the CSA writ large). It does not, however, provide substantive authority for granting an exemption to § 856, which is a statute, nor does Safehouse identify any provision of Chapter II of Title 21 that covers the "unlawful acts" of "[m]aintaining drug-involved premises," 21 U.S.C. § 856, which the statute prohibits.

> **D.   Section 856 Is Generally Applicable on Its Face, and Safehouse's Efforts to Challenge the Federal Government's Discretionary Prosecutorial Determinations Is a Back-Door Selective Prosecution Claim.**

Furthermore, Safehouse wrongly argues that Free Exercise Clause strict scrutiny applies here merely because the federal government has discretion to determine whether to prosecute under the CSA, including § 856. *See* ECF No. 247, at ¶ 171. Prosecutorial decisions of the Attorney General and United States attorneys are entitled to a "presumption of regularity." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)). Accordingly, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Id.*

That rule applies to constitutional challenges, *see Armstrong*, 517 U.S. at 464-65, including equal protection challenges, *see id.*, which closely resemble a claim that the government is unconstitutionally targeting religion for adverse treatment. *See Lukumi*, 508 U.S. at 540 (nothing that "[i]n determining whether the

54

object of a law is a neutral one under the Free Exercise Clause, we can also find guidance in our equal protection cases"); *see also United States v. Christie*, 825 F.3d 1048, 1060 (9th Cir. 2016) (noting that "[i]t is not wise for us to decide whether prosecuting the Christies represents the best exercise of prosecutorial discretion, or the wisest allocation of the Executive's finite resources"); *United States v. Friday*, 525 F.3d 938, 959 (10th Cir. 2008) (deferring to the government's decision to prosecute illegal taking of eagle feathers by Native American tribe for religious purposes "in light of the executive's vested and exclusive authority over criminal prosecution") (citing, *e.g.*, *Morrison v. Olson*, 487 U.S. 654, 692-96 (1988)). Here, Safehouse has failed to identify any evidence, much less the "clear" evidence *Armstrong* requires, that the United States has in any way unconstitutionally targeted religion in exercising prosecutorial discretion in Controlled Substances Act matters.

Citing a 2023 *New York Times* article, Safehouse suggests the government has implemented "a policy of selectively enforcing Section 856(a) against providers of supervised consumption services on a 'district-by-district' basis" in a way that discriminates against religion. ECF No. 247, ¶¶ 93, 171. However, the article cited by Safehouse does not discuss a "district-by-district authorization of Section 856"; rather, it reports that supervised injection sites were, at that time, "being evaluated on a district by district basis." *See* NYT Article. Such evaluation is consistent with DOJ policy that all prosecutorial decisions must be made on a case-by-case basis, considering individualized needs in individualized circumstances. *See* Department

55

of Justice Manual § 9-27.001 ("A determination to prosecute represents a policy judgment that the fundamental interests of society require the application of federal law to a particular set of circumstances"); *id*. § 9-27.300 (charging "decisions should be informed by an individualized assessment of all the facts and circumstances of each particular case"); *see also Armstrong*, 517 U.S. at 465 ("The Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws").

Moreover, this is not the current policy of the federal government. An Executive Order issued on July 24, 2025, directs the Secretary of Health and Human Services to ensure that discretionary federal grants "do not fund programs that fail to achieve adequate outcomes, including so-called 'harm reduction' or 'safe consumption' efforts that only facilitate illegal drug use and its attendant harm"; directs the HUD Secretary to discontinue "Federal housing and homelessness assistance" to recipients who "operate[s] drug injection sites or 'safe consumption sites" or otherwise "permit[s] the use or distribution of illicit drugs on property under their control"; and directs the Attorney General to "review whether such recipients are in violation of Federal law, including 21 U.S.C. [§] 856, and bring civil and criminal actions in appropriate cases[.]" Ending Crime and Disorder on America's Streets, Exec. Order No. 14,321, 90 Fed. Reg. 14,391 (July 24, 2025).

Safehouse's selective enforcement argument attempts to transform prosecutorial discretion—which is given the widest latitude, *Armstrong*, 518 U.S. at 465—into something constrained by strict scrutiny, which imposes the most

56

restrictive constraints. But there is no basis in the pleadings or the case law for such a conclusion.

In sum, § 856 does not contain a mechanism for individualized exemptions and is a neutral law of general applicability under *Fulton*. The CSA exemptions cited by Safehouse are not secular activities comparable to the conduct that Safehouse proposes. Thus, strict scrutiny does not apply,[16] and because enforcement of § 856 against Safehouse is rationally related to a legitimate government interest, Safehouse's Free Exercise claim should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the United States requests that its motion be granted, and that Safehouse's Third Amended Counterclaims be dismissed with prejudice.

Dated: May 29, 2026

Respectfully submitted,

DAVID METCALF
United States Attorney

/s/ *Gregory B. David*
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

/s/ *Bryan C. Hughes*
BRYAN C. HUGHES
ERIN E. LINDGREN
GREGORY B. in den BERKEN
Assistant United States Attorneys

---

[16] If the Court determines that strict scrutiny review is appropriate here, the government reserves all defenses, including that it has a compelling interest, that § 856 is the least restrictive means of furthering that compelling government interest, and that the statute otherwise satisfies strict scrutiny.

57

Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476

*Counsel for the United States*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, I caused a true and correct copy of the foregoing Motion to Dismiss, which was filed electronically and is available for viewing and download from the court's CM/ECF system, to be served upon all counsel of record.

*/s/Bryan C. Hughes*
BRYAN C. HUGHES
Assistant United States Attorney

Dated: May 29, 2026