IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAFEHOUSE, a Pennsylvania nonprofit corporation,<br><br>*Counterclaim Plaintiff*,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>*Counterclaim Defendant*,<br><br>and<br><br>U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Attorney General of the United States; and DAVID METCALF, in his official capacity as U.S. Attorney for the Eastern District of Pennsylvania,<br><br>*Third-Party Defendants*. | : | Case No. 19-cv-519 |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT**
**OF MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

ARGUMENT .......... 2

I. This Court Lacks Subject-Matter Jurisdiction Over Safehouse's Counterclaims. .......... 2

  A. Safehouse Must Establish Standing for Its Own Counterclaims, Measured as of April 13, 2026. .......... 3

  B. The TAC Pleads No Imminent Injury. .......... 7

  C. The TAC Pleads No Redressable Injury. .......... 10

  D. Alternatively, Safehouse's Counterclaims Are Moot. .......... 13

II. Safehouse Fails to State a Plausible Claim for Relief under RFRA. .......... 14

  A. RFRA's Substantial Burden Inquiry Includes Whether the Religious Obligation Can be Fulfilled through Alternative Legal Means. .......... 14

  B. RFRA Protects Only Religious Exercise, Not Political, Social, or Public-Health Policy Preferences. .......... 20

III. Safehouse Fails to Assert a Viable Free Exercise Claim. .......... 26

CONCLUSION .......... 38

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Africa v. Pennsylvania*,
662 F.2d 1025 (3d Cir. 1981) .......... 22

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) .......... 4, 5, 13

*Barker v. Conroy*,
282 F. Supp. 3d 346 (D.D.C. 2017), *aff'd*, 921 F.3d 1118 (D.C. Cir. 2019) .......... 18

*Blackwell v. Lehigh Valley Health Network*,
No. 22-cv-3360, 2023 WL 362392 (E.D. Pa. Jan. 23, 2023) .......... 24

*Carpenter v. United States*,
585 U.S. 296 (2018) .......... 14

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Review Comm'n*,
605 U.S. 238 (2025) .......... 24

*Chafin v. Chafin*,
568 U.S. 165 (2013) .......... 13

*Cheffer v. Reno*,
55 F.3d 1517 (11th Cir. 1995) .......... 18, 19

*Coastal Outdoor Advert. Grp., LLC v. Twp. of East Hanover*,
397 F. App'x 794 (3d Cir. 2010) .......... 10

*Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*,
836 F.2d 173 (3d Cir. 1988) .......... 11, 16

*Constitution Party of Pa. v. Aichele*,
757 F.3d 347 (3d Cir. 2014) .......... 11

*Cordance Corp. v. Amazon.com, Inc.*,
521 F. Supp. 2d 340 (D. Del. 2007) .......... 4

*Davis v. Wigen*,
82 F.4th 204 (3d Cir. 2023) .......... 21

*Doe v. Pine-Richland Sch. Dist.*,
No. 24-3348, 2026 WL 1103489 (3d Cir. Apr. 23, 2026) .......... 6, 9

*Employment Div. v. Smith*,
494 U.S. 872 (1990) .......... 26

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 13

*Ferguson v. Owen*,
No. 21-cv-2512, 2022 WL 2643539 (D.D.C. July 8, 2022), *aff'd*,
2024 WL 120099 (D.C. Cir. Jan. 11, 2024) .......... 18, 20, 21

*Fraternal Order of Police v. City of Newark*,
170 F.3d 359 (3d Cir. 1999) .......... 27, 28

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) .......... 27, 29, 38

*Gatto v. Johnson & Johnson Servs.*,
No. 24-1992, 2025 U.S. App. LEXIS 5995 (3d Cir. Mar. 14, 2025) .......... 22

*Geerlings v. Tredyffrin/Easttown Sch. Dist.*,
No. 21-cv-4024, 2021 WL 4399672 (E.D. Pa. Sept. 27, 2021) .......... 25

*Harp Advert. Ill., Inc. v. Village of Chicago Ridge*,
9 F.3d 1290 (7th Cir. 1993) .......... 10

*Hasbajrami v. Blankenship*,
No. 22-cv-166, 2023 WL 5436163 (W.D. Pa. July 26, 2023), *R&R adopted*,
2023 WL 5432328 (W.D. Pa. Aug. 23, 2023) .......... 19

*Henderson v. Kennedy*,
253 F.3d 12 (D.C. Cir. 2001) .......... 14

*Holt v. Hobbs*,
574 U.S. 352 (2015) .......... 15

*Integrity Magnesia Corp. v. Mifflin, McCambridge Co.*,
28 F.R.D. 596 (E.D. Pa. 1961) .......... 4

*Kaemmerling v. Lappin*,
553 F.3d 669 (D.C. Cir. 2008) .......... 18

*Knight v. City of New York*,
164 F.4th 173 (2d Cir. 2026) .......... 8, 12

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 4, 8, 13

*Lutter v. JNESO*,
86 F.4th 111 (3d Cir. 2023) ........................................................................ 6

*Mack v. Yost*,
63 F.4th 211 (3d Cir. 2023) ........................................................................ 9

*McDowell v. Bayhealth Med. Ctr., Inc.*,
No. 24-1157, 2024 U.S. App. LEXIS 29065 (3d Cir. Nov. 15, 2024)...................... 21

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ........................................................................ 8

*Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey* ("*NSSF*"),
80 F.4th 215 (3d Cir. 2023) ........................................................ 7, 8, 9, 13

*Pevia v. Hogan*,
443 F. Supp. 3d 612 (D. Md. 2020) ................................................................ 19

*Planned Parenthood Ass'n v. Walton*,
949 F. Supp. 290 (E.D. Pa. 1996)................................................................... 18

*Rackovan v. Pa. State Univ.*,
No. 25-cv-603, 2026 U.S. Dist. LEXIS 44247 (M.D. Pa. Mar. 4, 2026) ................. 23

*Sherwin-Williams Co. v. Cnty. of Delaware*,
968 F.3d 264 (3d Cir. 2020)........................................................................ 7

*Smith v. City of Atlantic City*,
138 F.4th 759 (3d Cir. 2025) ................................................................ 26, 27, 29

*Spivack v. City of Philadelphia*,
109 F.4th 158 (3d Cir. 2024) ........................................................................ 29

*Steffel v. Thompson*,
415 U.S. 452 (1974) ........................................................................ 8

*Storino v. Borough of Point Pleasant Beach*,
322 F.3d 293 (3d Cir. 2003)........................................................................ 12

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ........................................................................ 7, 8

*Tillman v. Allen*,
187 F. Supp. 3d 664 (E.D. Va. 2016) ................................................................ 20

*Toll Bros., Inc. v. Twp. of Readington*,
555 F.3d 131 (3d Cir. 2009)................................................................ 10, 11

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 4

*Turner v. Safley*,
482 U.S. 78 (1987) .......... 15

*Tyco Fire Prods. LP v. Victaulic Co.*,
No. 10-cv-4645, 2012 WL 39956 (E.D. Pa. Jan. 6, 2012) .......... 4

*United States v. Armstrong*,
517 U.S. 456 (1996) .......... 30, 31

*United States v. Goldstein*,
902 F.3d 411 (3d Cir. 2018) .......... 14

*United States v. Goldstein*,
914 F.3d 200 (3d Cir. 2019) .......... 14

*United States v. Houck*,
No. 22-cr-323, 2023 WL 144117 (E.D. Pa. Jan. 10, 2023) .......... 32

*United States v. Khanu*,
664 F. Supp. 2d 28 (D.D.C. 2009) .......... 32, 33

*United States v. Lewis*,
517 F.3d 20 (1st Cir. 2008) .......... 32

*United States v. Malka*,
602 F. Supp. 3d 510 (S.D.N.Y. 2022) .......... 32

*United States v. Rashwan*,
No. 22-cr-118, 2023 WL 4471687 (E.D. Pa. July 11, 2023) .......... 32

*United States v. Safehouse (“Safehouse I”)*,
985 F.3d 225 (3d Cir. 2021) .......... *passim*

*United States v. Seeger*,
380 U.S. 163 (1965) .......... 22

*United States v. Stimler*,
864 F.3d 253 (3d Cir. 2017) .......... 14, 19

*United States v. Vazquez*,
145 F.3d 74 (2d Cir. 1998) .......... 4

*United States v. Washington*,
869 F.3d 193 (3d Cir. 2017) .......... 32

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) .......... 21, 22

## STATUTES

21 U.S.C. § 822(d) .......... 34

21 U.S.C. § 841 .......... 33

21 U.S.C. § 844 .......... 33

21 U.S.C. § 844(a) .......... 37

21 U.S.C. § 844a .......... 36, 37

21 U.S.C. § 856 .......... 26, 27, 28, 34

21 U.S.C. § 856(a) .......... 34, 35, 37

21 U.S.C. § 872(e) .......... 35

42 U.S.C. §§ 2000bb *et seq.* .......... 1

## REGULATIONS

21 C.F.R. § 1307.03 .......... 33, 34

21 C.F.R. § 1307.31 .......... 35, 36

## OTHER AUTHORITIES

132 Cong. Rec. 26,447 (1986) (statements of Sens. Chiles & Moynihan) .......... 33

Justice Manual § 9-27.001 .......... 30

Justice Manual § 9-27.300 .......... 30

Phila. Code § 14-539 .......... 11

*Registration Requirements for Narcotic Treatment Programs With Mobile Components*, 86 Fed. Reg. 33861 (June 28, 2021) .......... 34

As discussed in the government's opening brief, this Court lacks subject-matter jurisdiction to consider Safehouse's claims under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq*., and the Free Exercise Clause of the First Amendment. Safehouse merely alleges that it will seek to open a site somewhere in "the Philadelphia area," some day, once "legal barriers are removed," but alleges no concrete plans for actually doing so. Safehouse also pleads no redressable injury. Philadelphia bans supervised-injection sites in nine of its ten city-council districts, Safehouse does not challenge that ordinance, and no judgment that Safehouse can plausibly obtain from this Court would provide relief from that ordinance. And if the Court measures standing from 2019 instead, the 2023 ordinance moots Safehouse's counterclaims. Either way, dismissal follows.

The counterclaims fail as a matter of law as well. RFRA asks whether the government substantially burdens a religious obligation. Here, it does not because Safehouse's stated obligation—preserving life, sheltering neighbors, caring for the sick—has numerous lawful implementations, many of which Safehouse itself catalogs in its Third Amended Counterclaims, ECF No. 247 ("TAC"). A plaintiff does not plead a substantial religious burden by asserting that one particular method best serves its beliefs when it can still satisfy its asserted religious obligation in myriad other ways.

Nor is the belief at issue here religious. Safehouse calls supervised consumption a "medical and public health response to the opioid crisis," grounds it in harm-reduction theory and overdose data, and marshals endorsements from

medical associations and researchers. TAC ¶ 90. The Court should take Safehouse at its word. RFRA protects religious exercise, not public-health policy convictions—no matter how sincere or serious.

Safehouse's Free Exercise claim also fails. Section 856 is neutral, and Safehouse identifies no comparable exception that undermines the government's interest in § 856. Prosecutorial discretion is not an exemption mechanism. Neither are exemptions to other CSA provisions that § 856 does not implicate.

Safehouse's Third Amended Counterclaims should be dismissed with prejudice.

## ARGUMENT

### I. This Court Lacks Subject-Matter Jurisdiction Over Safehouse's Counterclaims.

Seven years ago, the United States needed to establish this Court's Article III jurisdiction. Today, Safehouse does. *Safehouse I* resolved the government's declaratory-judgment claim on the merits, so all that remains is Safehouse's own demand for relief—a declaration and an injunction against the United States. *See United States v. Safehouse* ("*Safehouse I*"), 985 F.3d 225 (3d Cir. 2021). Safehouse thus bears the burden that every plaintiff bears: to establish injury, traceability, and redressability for its counterclaims. And because Safehouse's TAC relies on post-suit events, standing is measured as of the date Safehouse filed it—April 13, 2026.

The TAC cannot carry Safehouse's burden. It pleads no imminent injury. A commitment to open a site somewhere in "the Philadelphia area," some day, "once

the legal barriers are removed"—with no site, lease, funding, or timeline—is the "some day" intent that Article III rejects. Nor does the TAC plead a redressable injury. Philadelphia's zoning ordinance bans supervised-injection sites in nine of ten council districts; Safehouse does not challenge the ordinance; and no judgment against the United States would affect the ordinance's operation. The TAC does not even mention the ordinance, let alone plead a path around it.[1] And traceability fails with redressability. To the extent Safehouse cannot open, the ordinance—not § 856—is the cause.

The result is the same if the Court measures standing from 2019. On that view, the 2023 ordinance is an intervening event that leaves no effectual relief to grant, meaning the counterclaims are moot. Either way, this Court should dismiss.

### A. Safehouse Must Establish Standing for Its Own Counterclaims, Measured as of April 13, 2026.

Safehouse's lead argument is that it needs no standing of its own because its counterclaims are part of the "same controversy" that the United States began in 2019. ECF No. 251 ("Opp.") at 8. That argument confuses this case's posture. The government's declaratory-judgment case is over; it was resolved on the merits five years ago in *Safehouse I*. 985 F.3d at 243; *see also* ECF No. 244 at 3 (Safehouse recognizing that an "adverse declaratory judgment [was] entered in *Safehouse I*"). What remains is not an affirmative defense to anything but Safehouse's

[1] That omission is telling. Rather than update its allegations to grapple with the current landscape, Safehouse continues to rely on stale allegations like support from the former mayor. *See* TAC ¶ 129; *see also* ECF No. 249 ("Gov't Opening Br.") at 13-14 & n.4 (noting current mayor's opposition).

freestanding demand for relief—a declaration of rights and an injunction against the United States. And the party invoking federal jurisdiction to obtain relief bears the burden of establishing jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "[S]tanding is not dispensed in gross" either—Safehouse "must demonstrate standing for each claim that [it] presses and for each form of relief that [it] seeks." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). An actual controversy "must be extant at all stages of review, not merely at the time the complaint is filed." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks and citation omitted).

Safehouse's cited cases do not hold otherwise. In each, jurisdiction over the counterclaim rested on a live, unresolved affirmative claim. *See United States v. Vazquez*, 145 F.3d 74, 80-81 (2d Cir. 1998) (counterclaimant had standing "[i]n light of the pendency of the government's suit against" her, which made her "the object of a government action"); *Tyco Fire Prods. LP v. Victaulic Co.*, No. 10-cv-4645, 2012 WL 39956, at *4-6 (E.D. Pa. Jan. 6, 2012) (counterclaim survived because the plaintiff's own live allegations sustained a controversy, while the parallel counterclaim was dismissed once a clear covenant not to sue "extinguish[ed]" it); *Cordance Corp. v. Amazon.com, Inc.*, 521 F. Supp. 2d 340, 344-45 (D. Del. 2007) (declaratory counterclaim was justiciable during the plaintiff's pending infringement suit because the counterclaim defendant "presently engage[d] in conduct or ha[d] taken concrete steps" toward the accused activity); *Integrity Magnesia Corp. v. Mifflin, McCambridge Co.*, 28 F.R.D. 596, 596 (E.D. Pa. 1961)

(counterclaim to cancel asserted trademark was "merely another aspect of th[e] controversy" created by plaintiff's pending infringement action). None holds that a counterclaimant may litigate for years after the plaintiff's claim is decided without ever establishing its own injury.

The *Already* decision shows what happens when the affirmative claim drops out. There, Nike sued Already for trademark infringement and Already counterclaimed to invalidate the mark. At that point both sides had standing—"Already had standing to file its counterclaim because Nike was allegedly pressing an invalid trademark to halt Already's legitimate business activity." *Already*, 568 U.S. at 91-92. Then Nike dismissed its claim and covenanted not to sue. The counterclaim did not carry on as one aspect of a continuing controversy. Once the covenant reached everything that Already was doing, it became "incumbent on Already to indicate that it engages in or has sufficiently concrete plans to engage in activities not covered by the covenant." *Id.* at 94. Already offered an affidavit "saying little more than that Already currently has plans to introduce new shoe lines." *Id.* at 95. But that was not enough. Already's "only legally cognizable injury—the fact that Nike took steps to enforce its trademark—[wa]s now gone," the Court concluded, and there was "no other basis on which to find a live controversy." *Id.* at 100.

So too here. With the government's claim resolved, Safehouse—like Already—must show its own "sufficiently concrete plans." It has not. Already's showing failed even though it was an operating business attesting to future product

lines. Safehouse has never operated and pleads no definite plans. However the affirmative claim is resolved—by covenant or by judgment—the counterclaim must then stand on its own footing. These counterclaims do not.

The next question is when standing is measured. The answer is April 13, 2026, when Safehouse filed the operative counterclaims. A pleading that rests on allegations "based on events that occurred after the initiation of the lawsuit" is a supplemental pleading, whatever its caption. *Lutter v. JNESO*, 86 F.4th 111, 125 (3d Cir. 2023). For "the claims and requested relief substantively affected by the alleged post-suit developments," standing is assessed as of the supplemental filing. *Id.* at 125-26. Indeed, the Third Circuit recently applied that rule to a complaint labeled "amended." *Doe v. Pine-Richland Sch. Dist.*, No. 24-3348, 2026 WL 1103489, at *2 (3d Cir. Apr. 23, 2026).

The counterclaims in this case are governed by *Lutter*'s rule. As alleged in the TAC, Safehouse's board adopted its religious mission statement and amended its bylaws in January 2026—seven years into this litigation. TAC ¶¶ 151-53. Those allegations are not decorative. They bolster the religious-exercise claims that Safehouse now presses: Safehouse's opposition invokes its board's 2026 resolution and amended bylaws to establish its corporate religious purpose. Opp. at 23. Safehouse cannot rely on those acts to prove its religiosity while dismissing them as mere "confirm[ation]" to try to fix standing as of 2019. Opp. at 12. Standing is thus properly measured as of April 13, 2026.

**B. The TAC Pleads No Imminent Injury.**

Pre-enforcement standing starts with what the plaintiff intends to do. A plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," plus a credible threat of prosecution. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citation omitted). An "allegation that certain conduct has (or will have) a chilling effect" on protected activity "must claim a '. . . threat of specific future harm,'" and "generalized allegations" do not suffice. *Sherwin-Williams Co. v. Cnty. of Delaware*, 968 F.3d 264, 269-70 (3d Cir. 2020) (citation omitted). Applying *Sherwin-Williams*, the court in *National Shooting Sports Foundation v. Attorney General of New Jersey* ("*NSSF*") could infer that the plaintiff's members "plan to make, market, and sell guns." 80 F.4th 215, 220 (3d Cir. 2023). "But that is all." *Id.* That generalized intent "might alone suffice to torpedo standing." *Id.* Safehouse distinguishes *NSSF* on the basis that New Jersey disavowed enforcement. Opp. at 15. But the intent holding is a separate section of the opinion (and it comes first). Yet Safehouse never engages with that holding.

The TAC fails to plausibly allege an intention to act. Safehouse alleges a commitment to open an overdose-prevention site somewhere in "the Philadelphia area," at some time, "as soon as feasible once the legal barriers are removed." TAC ¶¶ 10, 138. No site. No district. No lease, no funding plan, no permit application, no timeline. Opening may not even be feasible regardless of any legal barriers. True, Safehouse is a single organization rather than a trade association, so the Court knows who intends to act. But knowing the actor is not knowing the act. Article III

asks what, where, and when—and on those questions the TAC says less than the *NSSF* record said about the gun-maker plaintiffs there. An abstract intention to act "once the legal barriers are removed" is no different than the "some day" intent that *Lujan* held insufficient. 504 U.S. at 564.

Safehouse's own authorities show what concrete intent looks like. MedImmune kept paying royalties under a live contract it disputed. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 121-22 (2007). Steffel was handbilling on specific premises, was twice warned to stop, and watched his companion get prosecuted. *Steffel v. Thompson*, 415 U.S. 452, 454-56 (1974). The SBA List had made specific statements and pleaded its intent to repeat them. 573 U.S. at 161. And Knight—Safehouse's centerpiece—had "taken several concrete steps," including "obtaining a federal firearms license and consulting with federal and local agencies regarding his contemplated business." *Knight v. City of New York*, 164 F.4th 173, 179 (2d Cir. 2026). In addition, *Knight* affirmed dismissal of Knight's ninety-day-rule challenge because he alleged no customer, actual or imminent, whom the rule affected. *Id.* at 178. Courts that permit pre-enforcement suits still police concreteness.

To be clear about what the United States does not argue: Safehouse need not open a site and invite prosecution. The pre-enforcement doctrine excuses the violation. It does not excuse the preparation. Every step short of operating the supervised-injection component of Safehouse's proposed plan—leasing space, securing funds, selecting a location—is lawful today, and § 856 does not chill any of

it. (Indeed, as discussed below, nothing prevents Safehouse from opening a facility like Prevention Point and offering all of its contemplated services except for the supervised-injection component.) Safehouse's refusal to plead a single such step is not coerced abstention; it is the absence of the concrete intent that Article III requires.

*Mack v. Yost* is not to the contrary. *Mack* was a damages suit over a past injury—guards drove an inmate to stop praying at work—and the court never addressed standing. 63 F.4th 211, 218-19 (3d Cir. 2023). Its reasoning also presupposes a religious practice that had begun and was then interrupted. *Id.* at 231. Safehouse has begun nothing.

That leaves the government's admission that it would enforce against Safehouse "if Safehouse actually operate[d] an injection site." Gov't Opening Br. at 13. Although Safehouse invokes that line three times, it proves the opposite of what Safehouse needs. The threat is conditional, and the condition—actual operation—is the very conduct that the TAC fails to allege is imminent. A party becomes the object of § 856 enforcement by operating a location, just as a parent is the object of a school policy only while her child attends the school. *Cf. Pine-Richland*, 2026 WL 1103489, at *3 (parent who withdrew her child was "no longer the object" of the challenged policy and lacked standing for prospective relief). A threat contingent on non-imminent conduct is by definition not an imminent injury. It is a forecast, and "[f]ederal courts are not forecasters." *NSSF*, 80 F.4th at 217.

Finally, imminence fails on the TAC's own terms. Safehouse commits to pursuing opening "once the legal barriers are removed." TAC ¶¶ 10, 138, 141. One legal barrier is Philadelphia's zoning ordinance—a barrier that no judgment against the United States can remove. Even total victory here leaves Safehouse's stated condition unsatisfied. That defect is also a redressability problem, which is where Safehouse's opposition spends most of its energy—and where it fails next.

**C. The TAC Pleads No Redressable Injury.**

Redressability requires "a substantial likelihood that the requested relief will remedy the alleged injury in fact." *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 143 (3d Cir. 2009) (citation omitted). Philadelphia's ordinance defeats that showing either way. If it bars an overdose-prevention site everywhere the TAC would put one, then an unchallenged local law—not § 856—blocks Safehouse's mission, and no relief against the United States removes it. If it leaves an opening, the TAC pleads nothing about pursuing it. Either way, dismissal follows.

Take the first path. Where a plaintiff's proposed conduct would violate an independent, unchallenged law, relief against the challenged restriction redresses nothing: the government "could block the [conduct] simply by enforcing another, valid, ordinance already on the books." *Harp Advert. Ill., Inc. v. Village of Chicago Ridge*, 9 F.3d 1290, 1292 (7th Cir. 1993). The Third Circuit applied that rule in *Coastal Outdoor*: unchallenged restrictions would still have prevented the billboard, so striking the challenged ban would not have let the plaintiff build. *Coastal Outdoor Advert. Grp., LLC v. Twp. of East Hanover*, 397 F. App'x 794, 795-96 (3d Cir. 2010). *Toll Brothers* marks the other side of the line: the developer had

standing because a favorable decision was "substantially likely to result in construction of Toll Brothers' planned developments." 555 F.3d at 143. Toll Brothers had planned developments. Safehouse has a phrase—"the Philadelphia area," TAC ¶¶ 10, 138—yet Philadelphia prohibits supervised-injection sites in nine of ten council districts. Phila. Code § 14-539. Safehouse does not challenge the ordinance, does not name the City, and does not allege that the ordinance is invalid. And a judgment against the United States leaves it fully enforceable.

Safehouse's answers arrive by brief, not by pleading. It says the Third District remains open; that the suburbs may be an option; that a variance "could authorize Safehouse's use"; and that the ordinance may be invalid anyway. Opp. at 20. But the TAC alleges none of this—it never mentions the ordinance at all. On a facial jurisdictional challenge, the Court's review is confined to the pleading, *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014), and "the complaint may not be amended by the briefs in opposition to a motion to dismiss," *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (citation omitted). That rule bars Safehouse's unpleaded plans, not the ordinance. The ordinance is law, subject to judicial notice, while Safehouse's site preferences are facts, which must be plead.

Nor can Safehouse squeeze the missing allegations out of "the Philadelphia area" itself on the theory that the phrase includes the one exempt district. An inference needs an allegation beneath it. Reading those words to mean an unpleaded district, on an unidentified parcel, that Safehouse has never said it

would accept is not an inference from the TAC—it is speculation layered on speculation. Standing cannot rest on an injury that "one cannot describe . . . without beginning the explanation with the word 'if.'" *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 297-98 (3d Cir. 2003). And *Storino* rejected just this move: the plaintiffs' theory of future injury appeared in their briefs, not their complaint, and the court refused to consider it. *Id.* at 297. If Safehouse in fact plans to open in the exempt district, or in the suburbs, then Article III required it to say so—with the specificity that injury-in-fact demands.

Safehouse's partial-redress cases do not close the gap, because each presupposes a plaintiff whose concrete, present injury a court can partially relieve. Knight established his injury first—the license, the consultations, the personal threat—and only then did the court ask whether reducing his "aggregate criminal exposure" sufficed. *Knight*, 164 F.4th at 179-80. Injury first, partial redress second. Relief must "provide meaningful redress for an injury"—an injury that the plaintiff has actually established. *Id.* at 179. Safehouse skips the first step: it pleads no site whose zoning status could be assessed and no operation whose criminal exposure a judgment would reduce. And Knight, unlike Safehouse, consistently maintained that the unchallenged zoning laws did not bar his business at all. *Id.* at 180. Safehouse pleads no position on the ordinance whatsoever.

Safehouse's zoning-variance theory fails independently. A variance is a discretionary act of the City's zoning board—an "independent actor[] not before the

court[].” *Lujan*, 504 U.S. at 562 (citation omitted). And redress that depends on the unfettered choices of an absent third party is not “likely.” It is speculative.

Safehouse’s third-party chilling theory—that landlords, funders, and clinicians are holding back because § 856 looms—also fails on its own terms. A plaintiff “must do more than assert subjective chill,” *NSSF*, 80 F.4th at 220 (citation omitted), and the Supreme Court has rejected precisely this move: affidavits that investors would hold back until the legal cloud lifted described “conjectural or hypothetical” speculation, not the “concrete” and “actual” injury Article III demands. *Already*, 568 U.S. at 96-97. Third parties’ hesitancy cannot substitute for the counterclaimant’s own concrete plans.

Traceability fails for the same reasons. Causation and redressability “are often flip sides of the same coin.” *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citation omitted). To the extent Safehouse cannot open in Philadelphia, the ordinance—not the United States—is the cause, and a judgment here is not the cure.

**D. Alternatively, Safehouse’s Counterclaims Are Moot.**

If the Court instead measures standing as of 2019, the proper result is the same: dismissal, just for mootness. A case becomes moot when intervening events make it impossible to grant “any effectual relief whatever.” *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted). The United States acknowledges that this bar is high and that it has the burden to establish mootness. But the 2023 ordinance is an intervening event that establishes mootness: it independently prohibits the only proposed operation Safehouse describes in its TAC, in the only

venue identified in the TAC. And a declaration against the United States that leaves Safehouse unable to open is not effectual relief.

## II. Safehouse Fails to State a Plausible Claim for Relief under RFRA.

### A. RFRA's Substantial Burden Inquiry Includes Whether the Religious Obligation Can be Fulfilled through Alternative Legal Means.

There is no substantial burden on Safehouse's religious exercise when alternative means exist for its board members to satisfy their religious obligations to "preserve life, provide shelter to [their] neighbors, and to do everything possible to care for the sick." TAC ¶ 146. Because Safehouse's board members may effectuate these religious beliefs through many methods, the government's enforcement of the CSA does not substantially burden their religious exercise. *United States v. Stimler*, 864 F.3d 253, 268 (3d Cir. 2017) (district court properly weighed whether a burden on religious exercise was "substantial" by considering acceptable alternative means of religious practice that remained available);[2] *see also Henderson v. Kennedy*, 253 F.3d 12, 15 (D.C. Cir. 2001).

*Stimler* squarely supports the position that availability of alternatives is relevant to a substantial burden analysis, and nothing in subsequent Third Circuit

---

[2] *Stimler* resolved a trio of consolidated appeals. The Third Circuit later granted panel rehearing in one of them—*Goldstein*, No. 15-4094—based on intervening Fourth Amendment precedent, and vacated the opinion as to that appeal alone. *See United States v. Goldstein*, 902 F.3d 411 (3d Cir. 2018). That vacatur left *Stimler*'s RFRA holdings undisturbed. As the panel explained on rehearing, *Carpenter v. United States*, 585 U.S. 296 (2018), "does not affect our other holdings in *Stimler*," which "remain as written." *United States v. Goldstein*, 914 F.3d 200, 201 n.3 (3d Cir. 2019).

decisions has displaced that rule. Moreover, the *Stimler* opinion and the government's argument here are consistent with *Holt v. Hobbs*, 574 U.S. 352 (2015).

Under *Holt*, in evaluating substantial burden, it is improper to consider whether a religious claimant can engage in other aspects of their faith (such as by rejecting a Jewish claimant's argument that he must keep Kosher by asserting he may still read the Torah, for example). In *Holt*, the Supreme Court noted that a line of cases involving a prisoner's First Amendment rights improperly incorporated the question of whether a claimant could engage in other aspects of religion (*e.g.*, whether refusal to provide a religious diet could be excused by providing the prisoner opportunities for prayer). 574 U.S. at 361-62 (citing, *e.g.*, *Turner v. Safley*, 482 U.S. 78, 90 (1987)). *Holt* disavowed that analysis, noting that RLUIPA provides greater protection than the Free Exercise Clause in the prison context. *Id.*

But, consistent with *Stimler*, it remains appropriate to evaluate whether the *specific religious exercise* in which a party seeks to engage (here charitable acts, lifesaving measures, and providing care and shelter) can be met through alternative means. In *Stimler*, the Third Circuit did not consider whether the RFRA claimants had other ways of exercising their Jewish faith, but evaluated whether other means existed by which they could engage in the specific religious exercise they asserted (*i.e.*, that they must help women get divorces from recalcitrant husbands).

Thus, contrary to Safehouse's position, *Holt* did not invalidate *Stimler*'s "same obligation/alternative-means" framework. Moreover, the *Holt* holding is context-specific, arising in a prison grooming dispute, and its prohibition was

directed against reliance on "other ways of practicing religion," apart from growing a beard. *Holt* did not examine—as this Court may do here—whether the same obligation could be satisfied through different means.

The government properly relies on *Stimler* because Safehouse's asserted religious obligation—preserving life, providing shelter, and caring for the sick—has lawful implementations that do not require hosting supervised drug consumption. The question is not whether Safehouse can engage in other forms of religious exercise, but whether its stated religious mandates can be fulfilled by alternative, lawful means, such as outreach, emergency response, or providing shelter that does not facilitate unlawful drug use. The answer is yes.

Safehouse attempts to avoid the application of the alternative-means test by more narrowly defining its board members' religious beliefs in its opposition. But Safehouse is bound by its pleadings and the way it has described its religious beliefs for the seven years of this litigation. *See Zimmerman*, 836 F.2d at 181 ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). Safehouse's TAC does not allege that each of Safehouse's board members sincerely believes that there is no activity short of serving on the board of a supervised-injection facility that can satisfy their religious beliefs. *See generally* TAC. Instead, Safehouse alleges that "the provision of overdose prevention services" "effectuates" a religious belief—namely, its board members' "religious obligation to preserve life, provide shelter to [their] neighbors, and to do everything possible to care for the sick." *Id.* ¶ 146. And the paragraphs of its TAC that Safehouse cites as

reflective of its religious beliefs further broaden, rather than narrow, the board members' asserted beliefs. In particular, in paragraph 137, Safehouse contends:

> The Board believes, based on their deeply held religious convictions, that they have a duty to do everything possible to keep people who use drugs alive, even for one more day, and their beliefs include a call to give shelter to the vulnerable and to treat them with dignity and humanity.

In paragraph 146, Safehouse alleges:

> The board members' religious beliefs obligate them to take action to save lives in the current overdose crisis, and thus to establish and run Safehouse in accordance with these tenets. Specifically, the board members believe that the provision of overdose prevention services effectuates their religious obligation to preserve life, provide shelter to our neighbors, and to do everything possible to care for the sick.

*See also id.* ¶ 148 (claiming Safehouse's board members "have been unable to fulfill their deeply held religious obligation to do everything possible to provide them with critical lifesaving care").

DOJ does not question the sincerity of Safehouse's stated belief that it must "do everything possible to care for the sick." TAC ¶ 146. But that expansive belief can be exercised in a multitude of ways. Safehouse cannot use its broadly framed belief to evade the alternative-means inquiry by shifting its description of the practices necessary to "effectuate" it. The TAC itself identifies numerous lawful ways to fulfill the asserted obligation, and framing the obligation as doing "everything possible" does not eliminate those alternatives. A RFRA claimant does not allege a substantial burden merely by asserting that one particular activity best serves its religious beliefs where other alternatives would also serve those beliefs.

*See Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir. 1995) (no substantial burden in act restricting access to abortion clinics where plaintiffs did not allege that their religion required them to physically obstruct clinic areas and they had "ample avenues open" by which they could express their deeply held beliefs); *Planned Parenthood Ass'n v. Walton*, 949 F. Supp. 290, 296 (E.D. Pa. 1996) (same).

Furthermore, this Court can resolve the alternative-means argument on a motion to dismiss, even assuming all facts pleaded in the TAC are true. *See Ferguson v. Owen*, No. 21-cv-2512, 2022 WL 2643539, at *7-8 (D.D.C. July 8, 2022) (dismissing RFRA case for failure to state a claim where plaintiff did not plead a substantial burden given availability of alternative means), *aff'd*, 2024 WL 120099 (D.C. Cir. Jan. 11, 2024) (affirming district court's dismissal of RFRA claim and employing alternative means test); *Barker v. Conroy*, 282 F. Supp. 3d 346 (D.D.C. 2017) (dismissing RFRA claim for failure to state a substantial burden), *aff'd*, 921 F.3d 1118 (D.C. Cir. 2019); *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008) (affirming dismissal for failure to state a claim where plaintiff failed to plead a substantial burden under RFRA).

Discovery is not required to understand the innumerable ways in which a person or entity can take actions to preserve life, care for the sick, and provide shelter, short of maintaining a supervised-consumption facility. Safehouse describes many of these ways by outlining the scope of its planned services. *See* TAC ¶ 38. As Safehouse notes, its "overdose prevention services [also] include the assessment of an individual's physical and behavioral health status, provision of sterile

consumption equipment, provision of drug testing (*i.e.*, fentanyl test strips), . . . wound care and other primary care services, on-site education and counseling, on-site MAT and recovery counseling, distribution of Naloxone, and access to wraparound services such as housing, public benefits, and legal services." *Id.* This description illuminates that there are numerous specific activities that would further Safehouse's religious beliefs that it must provide care, shelter, and treatment to a vulnerable population. (And its failure to take concrete steps to effectuate any of these legal activities is telling as to the subject-matter jurisdiction issues raised above.)

The Court must accept these allegations as true. And, because Safehouse's proposed services to Philadelphians struggling with opioid use have many counterparts, as pleaded in the TAC, this Court can readily identify alternatives that Safehouse's board members may use to satisfy their religious obligations, and determine that no substantial burden exists here. *See, e.g.*, *Stimler*, 864 F.3d at 268; *Cheffer*, 55 F.3d at 1522; *Hasbajrami v. Blankenship*, No. 22-cv-166, 2023 WL 5436163, at *4-5 (W.D. Pa. July 26, 2023) (granting Rule 12(b)(6) motion for failure to plead substantial burden where prisoner was able to satisfy his specific religious practice through other means), *R&R adopted*, 2023 WL 5432328 (W.D. Pa. Aug. 23, 2023); *Pevia v. Hogan*, 443 F. Supp. 3d 612, 638 (D. Md. 2020) ("[C]ourts properly consider whether the inmate retains other means for engaging in *the particular religious activity* . . . in assessing whether a denial of the inmate's preferred method for engaging [in] that religious exercise imposes a substantial burden." (quoting

*Tillman v. Allen*, 187 F. Supp. 3d 664, 673 (E.D. Va. 2016) (emphasis added))); *Ferguson*, 2022 WL 2643539, at *10 (restriction of one among several means of fulfilling a religious belief does not impose substantial burden).

Because Safehouse's religious objective can plausibly be met through lawful alternative means, Safehouse has not adequately pleaded a substantial burden.

### B. RFRA Protects Only Religious Exercise, Not Political, Social, or Public-Health Policy Preferences.

RFRA applies only where a claimant's conduct is grounded in *religious* belief. The statute does not safeguard political philosophy, social activism, or public-health policy preferences—even if sincerely held. Where a claimant's motivation is secular in substance—rooted in science, health policy, or social welfare—the claim falls outside RFRA's protections.

Safehouse's TAC provides a host of secular health and policy reasons for its proposed supervised-injection facility, described as a "medical and public health response to the opioid crisis." TAC ¶ 90. This Court should take Safehouse at its word that it believes its proposed supervised-consumption room is a "medical and public health measure," with endorsements from medical and public health associations and addiction researchers. *Id.*; *see also id.* ¶¶ 97, 106 (describing Safehouse's "medical and public health mission"); *id.* ¶ 100 (noting that overdose prevention services are a "legitimate medical and public health measure"); *id.* ¶ 101 (supervised consumption is a "medical and public-health intervention"). On this basis, the Court should rule that Safehouse has failed to plausibly plead that it

seeks to operate a supervised-injection facility for religious, rather than secular, reasons.

Safehouse's reliance on *Davis* here is misplaced. *Davis* held that sincerity challenges cannot be resolved at the pleading stage when the allegations facially assert a religious belief. *Davis v. Wigen*, 82 F.4th 204, 213 (3d Cir. 2023). Here, DOJ does not dispute Safehouse's sincerity; it disputes religiosity. Moreover, *Davis* did not consider the line between political, social-policy, or public-health objections and religious beliefs. Rather, the Court considered whether non-mandatory religious conduct is protected under RFRA. *Id.* at 210. The Court held that the plaintiffs had adequately pleaded a religious right to marry, because they averred that marriage had "profound religious significance for them" and that they "viewed their marriage as an expression" of their Christian faith. *Id.* at 212. Unlike in *Davis*, Safehouse's own description of its activities is secular, as outlined above. *See also* TAC ¶ 36 (describing harm-reduction strategy, including overdose prevention, as "necessary in light of the psychology of addiction and substance use disorder").

"In religious objection cases, courts must examine whether a belief is a religious one, as opposed to a personal belief cloaked in religion." *McDowell v. Bayhealth Med. Ctr., Inc.*, No. 24-1157, 2024 U.S. App. LEXIS 29065, at *3 (3d Cir. Nov. 15, 2024) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972)). While RFRA provides broad protection for the exercise of religion, it does not stand for the principle that all a claimant must do is assert that particular conduct is religiously motivated to claim RFRA's protection for any activity. *Id.* at *5. As *McDowell*

described, "concluding that Plaintiffs state a claim by broadly invoking an overarching religious belief without directly connecting that religious belief to the objected-to employment term would impermissibly 'cloak[] with religious significance' a fundamentally secular objection to an employment term, and thereby create a 'blanket privilege' whenever an employee invokes scripture." *Id.* (citing *Africa v. Pennsylvania*, 662 F.2d 1025, 1031, 1035 (3d Cir. 1981)); *see also United States v. Seeger*, 380 U.S. 163, 165 (1965).

While Safehouse contends its proposed supervised-injection facility is religiously motivated, Safehouse repeatedly frames its incentives and motivations to pursue *this particular type* of care and shelter in terms of harm-reduction theory, medical research, and overdose-prevention strategies. These are classic public-health and scientific rationales, not religious doctrine.

Courts have routinely held that claims resting on medical disagreement, scientific skepticism, or secular morality are not religious—precisely the problem that defeated COVID-era RFRA and Title VII claims where plaintiffs objected to vaccines or testing based on health concerns rather than religious doctrine, even though they positioned their objections within the framework of religious belief. *See, e.g., McDowell*, 2024 U.S. App. LEXIS 29065, at *6 n.5 (noting that vaccine objections were "rooted in personal, secular, scientific or medical views about the vaccine and its impact on their bodies in ways that are unconnected to their overarching religious beliefs"); *Gatto v. Johnson & Johnson Servs.*, No. 24-1992, 2025 U.S. App. LEXIS 5995, at *5, 7-8 (3d Cir. Mar. 14, 2025) (district court

correctly dismissed Title VII complaint upon finding that plaintiff's views about COVID testing were based on her "personal and medical preference, not religion" and that her allegations gave rise to, "at most, the 'mere possibility' that her religious beliefs informed her objections to testing"); *Rackovan v. Pa. State Univ.*, No. 25-cv-603, 2026 U.S. Dist. LEXIS 44247, at *8 (M.D. Pa. Mar. 4, 2026) (noting overly broad "religious" objection to "avoid coming into contact with evil" was "akin to a 'divinely granted right to pick and choose' what qualifies as evil and what does not").

Safehouse's repeated assertions throughout its counterclaims reveal that its belief that it must exercise *this specific practice*—maintaining a place for supervised injection—is informed by secular viewpoints. *See* TAC ¶¶ 36, 43-47, 49, 79 (explaining "harm reduction" principles and describing supervised injection as a "modest extension of already-endorsed harm reduction measures" that has the approval of various authorities within the medical community). The same principle that governed the disposition of the COVID-era cases applies here: Safehouse's reliance on overdose data, pharmacological effects of fentanyl, and public-health models indicates that its beliefs arise from scientific and policy analysis, even where Safehouse's desire to take action is motivated by its general, overarching religious belief.

Safehouse argues that the medical and philosophical rationale it pleads in its counterclaims should not affect this Court's analysis because courts have afforded protection to a belief that shares both religious and philosophical components.

However, as a necessary limiting corollary, it is not the case that once a person asserts a sincere religious belief that *anything* they deem to further that religious belief is necessarily protected activity. This would amount to "a blanket privilege" and a "limitless excuse for avoiding all unwanted . . . obligations." *Blackwell v. Lehigh Valley Health Network*, No. 22-cv-3360, 2023 WL 362392, at *7 (E.D. Pa. Jan. 23, 2023) (internal marks and citation omitted). This Court still must parse whether Safehouse's proposed activity is religious exercise. Moreover, mixed motives do not salvage a RFRA claim when the dominant motivation is secular.

Safehouse relies on *Catholic Charities*, but that case was decided on different grounds, inapplicable here. *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Review Comm'n*, 605 U.S. 238 (2025). There, the Supreme Court invalidated a state-based tax exemption scheme because it required religious entities to engage in proselytization or only serve members of their same religion to qualify for the exemption. *Id.* at 242. The Court held it was inappropriate to define religious activity to require proselytizing or limiting services to coreligionists because it amounted to discrimination or favoritism between religious denominations. *Id.* at 248-49, 254. The Court did not consider the question here: whether a religious organization can broadly state its religious beliefs and then use those beliefs to cloak all manner of secular activity within the realm of religious practice.

Safehouse's averment that operating a supervised-injection facility would further its broad religious belief does not shield it from this inquiry at the pleadings stage. Although RFRA protects religious conduct, that protection does not extend to

every action a person attributes to faith: "Religious adherents often profess that faith inspires much of their secular lives, but those activities are still secular." *Geerlings v. Tredyffrin/Easttown Sch. Dist.*, No. 21-cv-4024, 2021 WL 4399672, at *7 (E.D. Pa. Sept. 27, 2021) (Goldberg, J.). Here, Safehouse's mission—providing supervised-consumption services—is derived from public-health evidence, epidemiological research, and scientific consensus regarding overdose prevention. These rationales overwhelmingly indicate a secular foundation reflecting Safehouse's conclusion that supervised injection is the most efficacious way to prevent overdose for a person who is using drugs. That judgment, as Safehouse phrases it, does not convert a fundamentally secular activity into religious exercise.

Examining Safehouse's example of a religious hospital is instructive for this principle. Safehouse contends that the mere fact that a religious hospital's medical care is rooted in public health and medical science does not mean that the hospital lacks religious conviction or that its provision of medical care is not religious exercise. Opp. at 28. But if Safehouse's argument were adopted, then *every element* of the hospital's provision of medical care would necessarily be considered the exercise of religion, including every kind of medication, surgery, and other treatments, all of which are governed by secular and generally applicable medical standards. Safehouse's view of what counts as religious activity under RFRA is fatally overbroad and would wholly eradicate the distinction the Supreme Court and this Court have recognized between religious and inherently secular activity. *See* Gov't Opening Br. at 29-33. Some of a religious hospital's acts are plainly

religious exercise—declining to perform abortions, for instance. But that is because the religious conviction attaches to a specific act. Safehouse's theory has no such connection—and no limiting principle.

RFRA does not protect political, scientific, or public-health motivations, even when morally serious or compassion-driven. Because Safehouse's asserted motivations are secular on their face—anchored in overdose-prevention science and harm-reduction policy rather than religious command—its RFRA claim fails as a matter of law.

## III. Safehouse Fails to Assert a Viable Free Exercise Claim.

Safehouse also fails to plead a plausible claim for relief under the Free Exercise Clause of the First Amendment. Because § 856 is a neutral law of general applicability, without any comparable exceptions, Safehouse's Free Exercise claim should be dismissed.

As Safehouse observes, the Third Circuit's decision in *Smith v. City of Atlantic City*, 138 F.4th 759 (3d Cir. 2025), "supplies the governing . . . framework" for the Free Exercise analysis. Opp. at 38. As the *Smith* Court observed, "the right of free exercise does not relieve an individual of the obligation to comply with a . . . neutral law of general applicability." 138 F.4th at 770 (quoting *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990)) (internal marks omitted). Such a law "do[es] not contravene the Free Exercise Clause and [is] subject to rational basis review." *Id.*

Because Safehouse appears to concede that the law in question here—21 U.S.C. § 856—is neutral, this Court need only decide whether the statute is generally applicable. A statute "will fail general applicability, and thus fall within

the Free Exercise Clause, if it invite[s] the government to consider the particular reasons for a person's conduct." *Id.* (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)) (internal marks and citation omitted). As the *Smith* Court explained, "[t]his can happen through one of three means":

> First, the government action enumerates an exception to the challenged policy. Second, the government creates . . . a formal mechanism for granting exceptions . . . regardless of whether any exceptions have been given. Third, the government does not provide enumerated or formal exceptions to the challenged act but grants them as a matter of practice.

138 F.4th at 770 (internal citations omitted).

Critically, however, "[n]ot just any exception will do." *Id.* Rather, "[g]eneral applicability also requires a relevant comparator; that is, a real or hypothetical application of an existing government exception that would 'undermine the [government's] interest.'" *Id.* (quoting *Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999)). In *Fraternal Order of Police*, for example, the Newark Police Department permitting undercover officers to grow beards was an exception to the city's general policy of beardless police officers, but it did not run afoul of the Free Exercise Clause because that exception did not undermine the city's interest in the policy—maintaining an "*esprit de corps*" among officers—as undercover officers "obviously [were] not held out to the public as law enforcement person[nel]." *Id.* (quoting *Fraternal Order*, 170 F.3d at 366). But Newark's exception permitting officers to wear beards for medical reasons did fail general applicability because that exception undermined the policy's justification for a secular reason. Thus, when two officers asserting a sincerely held religious reason for wearing

beards did not receive an exemption, the government impermissibly made "a value judgment in favor of secular motivations [*i.e.*, beards for medical reasons], but not religious motivations [*i.e.*, beards for religious reasons]," and was therefore subject to strict scrutiny. *Fraternal Order*, 170 F.3d at 366.

Applying that framework here, this Court must first identify the government's interest in § 856—that is, the harm the statute was designed to prevent. That question was conclusively answered by the Third Circuit in *Safehouse I*. As the Court explained:

> At first, the [Controlled Substances] Act said nothing about people who opened their property for drug activity. Then, the 1980s saw the rise of crack houses: apartments or houses (often abandoned) where people got together to buy, sell, use, or even cook drugs. These very dirty and unkempt houses blighted their neighborhoods, attracting a stream of unsavory characters at all hours. But it was hard to shut crack houses down. To go after owners, police and prosecutors tried to cobble together conspiracy and distribution charges. But no law targeted the owner or maintainer of the premises.
>
> To plug this gap, Congress added a new crime: 21 U.S.C. § 856. This law banned running a place for the purpose of manufacturing, selling, or using drugs. Congress later extended this crime to reach even temporary drug premises and retitled it from "Establishment of manufacturing operations" to "Maintaining drug-involved premises." After all, the statute covers much more than manufacturing drugs.

*Safehouse I*, 985 F.3d at 230-31. The same Court held that "[b]ecause Safehouse knows and intends that its visitors will come with a significant purpose of doing drugs, its safe-injection site will break the law." *Id.* at 229.

Having identified the underlying purpose of § 856—preventing a slew of negative externalities associated with "maintaining drug-involved premises"—the analysis turns to whether Safehouse can show any of the "three means" by which general applicability may be undermined—(1) an exception to the law in question, (2) a mechanism for granting exceptions, or (3) an informal practice of making exceptions—bearing in mind that exceptions must be comparable, meaning they must undermine the government's interest in the statute. *Smith*, 138 F.4th at 770.

Safehouse nominates several candidates. First, it cites its TAC, which in turn cites a 2023 news article in which the federal government purportedly announced "a *policy* of selectively enforcing Section 856(a) against providers of supervised consumption services on a 'district-by-district' basis." TAC ¶¶ 93, 171 (citing Sharon Otterman, *Federal Officials May Shut Down Overdose Prevention Centers in Manhattan*, N.Y. Times (Aug. 8, 2023) ("NYT Article")) (emphasis added). In Safehouse's view, this "policy" is a "formal mechanism for granting exceptions," which "invites the government to decide which reasons for not complying with the policy are worthy of solicitude." Opp. at 39 (quoting *Fulton*, 593 U.S. at 537; *Smith*, 138 F.4th at 769-70; *Spivack v. City of Philadelphia*, 109 F.4th 158, 172 (3d Cir. 2024)).

In so arguing, Safehouse improperly attempts to convert the government's general law-enforcement discretion into a system of individualized exceptions. But the government does not announce "policy" through newspapers, and the NYT Article does not discuss a "district-by-district authorization" of § 856 enforcement,

Opp. at 39; rather, it states that sites were, at that time, "being evaluated on a district by district basis." NYT Article. Such evaluation is entirely consistent with DOJ policy, as set forth in the Justice Manual, that all prosecutorial decisions must be made on a case-by-case basis, considering individualized needs and individualized circumstances. *See* Justice Manual § 9-27.001 ("A determination to prosecute represents a policy judgment that the fundamental interests of society require the application of federal law to a particular set of circumstances."); *id.* § 9-27.300 (providing that charging "decisions should be informed by an individualized assessment of all the facts and circumstances of each particular case"); *see also United States v. Armstrong*, 517 U.S. 456, 465 (1996) ("The Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws."). And Safehouse's view of the law cannot support its own weight. Every charging decision rests on an individualized assessment of the particular facts—yet under Safehouse's view, any federal prosecution would be subject to strict scrutiny as soon as a defendant alleged that his conduct was religiously motivated. That is not the law.

Moreover, even if there were such a policy, it would not constitute an exception to the general prohibition on maintaining drug-involved premises set forth in § 856. Variations in law-enforcement priorities across jurisdictions do not constitute an exception to the law, and the government's interest in the law is not undermined by prosecutorial discretion, resource allocation, or litigation posture. The comparators in this circumstance are merely enforcement choices, not

exemptions. Under *Armstrong*, variation in enforcement priorities does not give rise to a Free Exercise claim, nor, under *Smith* or *Fulton*, does it override the fundamental distinction between exceptions to a policy and the exercise of prosecutorial discretion.

Safehouse's argument that this case "does not present garden-variety prosecutorial discretion," because "the government has never enforced the statute against any entity based solely on simple use," Opp. at 39, ignores that Safehouse, by its own admission, is the first of its kind. Safehouse's entire proposition is that it "wants to open America's first safe-injection site in Philadelphia." *Safehouse I*, 985 F.3d at 229; *see also id*. at 231 ("The parties have stipulated to the key facts: Safehouse wants to try a new approach to combat the opioid crisis. It plans to open the country's first safe-injection site."). Endeavoring to do something that has never been done before, Safehouse cannot then credibly claim that there are "similar circumstances" to its novel activity that could support a selective enforcement claim.

As the government explained in its opening brief, Safehouse's attempt to apply Free Exercise Clause strict scrutiny to prosecutorial discretion fails in the face of the Supreme Court's decision in *Armstrong*, 517 U.S. at 465. In a selective-prosecution case, the Supreme Court instructed that "a prosecutor's discretion is 'subject to constitutional constraints,'" including "that the decision whether to prosecute may not be based on an 'unjustifiable standard such as race, religion, or other arbitrary classification.'" *Armstrong*, 517 U.S. at 465 (citations omitted).

"Courts evaluate substantive claims for selective prosecution and enforcement under the same standard: a defendant bears the burden of 'provid[ing] clear evidence of discriminatory effect and discriminatory intent or purpose.'" *United States v. Rashwan*, No. 22-cr-118, 2023 WL 4471687, at *3 (E.D. Pa. July 11, 2023) (quoting *United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017)). *Armstrong*'s standard applies to claims alleging prosecutions based on religious discrimination. *See, e.g.*, *United States v. Lewis*, 517 F.3d 20, 25 (1st Cir. 2008); *United States v. Malka*, 602 F. Supp. 3d 510, 543-44 (S.D.N.Y. 2022); *United States v. Khanu*, 664 F. Supp. 2d 28, 33-34 (D.D.C. 2009).

Safehouse cannot satisfy *Armstrong*'s selective-prosecution standard. It has not established discriminatory effect, and it certainly has not pleaded facts meeting the high standard of showing discriminatory intent. This Court should reject its efforts to claim that a generally applicable, neutral law such as this violates *Fulton*. *See United States v. Houck*, No. 22-cr-323, 2023 WL 144117, at *5 (E.D. Pa. Jan. 10, 2023) (rejecting argument that application of neutrally applicable law violates *Fulton* and concluding instead that such an argument was a "restating of [defendant's] selective prosecution claim").

Next, Safehouse alleges that DOJ "permits and tolerates a range of secular conduct that implicates [its interest in § 856] in the same or greater way, while threatening Safehouse alone for religiously motivated conduct." Opp. at 42. It cites as examples that "DOJ has conceded in this very litigation that § 856, by its terms, would *not* prohibit a supervised consumption mobile van parked outside Safehouse's

facility" and "would not reach parents who allow a drug-addicted adult child to use narcotics in their home under parental supervision." *Id.* at 43. Again, however, these are not exceptions to § 856; rather, they are examples of conduct that falls outside the ambit of the statute. Other criminal prohibitions, such as those applicable to distributing illegal drugs (21 U.S.C. § 841) or possessing illegal drugs (21 U.S.C. § 844), would certainly apply. And those hypothetical scenarios are categorically distinguishable from Safehouse's proposal to operate a facility where it invites anyone to come in and consume illegal drugs. *See, e.g.*, 132 Cong. Rec. 26,447 (1986) (statements of Sens. Chiles & Moynihan) (voicing particular concern about permitting public drug use).

Safehouse also continues to argue (at 44-45) that other sections of the CSA provide mechanisms for individualized exemptions that subject § 856 to strict scrutiny. But none of the scattered provisions Safehouse identifies constitutes a mechanism for an individualized exemption from § 856.

In its search for a "mechanism[] for individualized exemptions" from § 856(a)'s prohibitions, Safehouse turns to 21 C.F.R. § 1307.03. Opp. at 44. That provision states that "[a]ny person may apply for an exception to the application of any provision of this chapter;" *i.e.*, Chapter II of Title 21 of the Code of Federal Regulations. 21 C.F.R. § 1307.03. Under this regulation, any person may apply for an exception to particular CSA regulations (as opposed to compliance with the CSA writ large). It does not, however, provide substantive authority for granting an exemption to § 856, which is a statute. Safehouse cites examples of exemptions

provided under 21 C.F.R. § 1307.03, but the exceptions granted under this provision are to regulations, not statutory proscriptions. *See, e.g.*, *Registration Requirements for Narcotic Treatment Programs With Mobile Components*, 86 Fed. Reg. 33,861, 33,867 (June 28, 2021) (providing for a "waiver *of the regulation*" under certain circumstances (emphasis added)). Nor does Safehouse identify any provision of Chapter II of Title 21 that covers the "unlawful acts" of "[m]aintaining drug-involved premises," 21 U.S.C. § 856, which the statute prohibits.

Safehouse's arguments that §§ 822(d) or 856(a) provide an applicable exemption also fail. Starting with § 822(d), Safehouse does not appear to dispute that 21 U.S.C. § 822(d) applies only to the "requirement for registration of certain manufacturers, distributors, or dispensers," and Safehouse does not contend that it would be a manufacturer, distributor, or dispenser. TAC ¶ 124; *see also* Gov't Opening Br. at 49-50 (explaining that 21 U.S.C. § 822(d) does not apply to 21 U.S.C. § 856(a)). Safehouse does not qualify for a § 822(d) exception because it is not a manufacturer, distributor, or dispenser subject to the registration requirement.

Moreover, "possession" is *not* one of the activities that the Attorney General may waive under § 822(d); rather, that provision applies only to *registration* requirements that are not at issue here. *See* 21 U.S.C. § 822(d). Furthermore, there is no illogic in the government's interpretation: the government can waive certain requirements, under certain circumstances, but not *every* requirement, given the plain limitations of the applicable statutory and regulatory text. Nor is the government's construction inconsistent with the purposes of the law: the

registration exemption ensures that the federal government is aware of, and can regulate, those involved in the manufacturing, distributing, and dispensing of controlled substances. Section 856 regulates entirely different conduct and serves the different purpose of preventing facilities where illegal drugs are used and/or distributed without such regulation, and where "[illegal] drug activities are likely to flourish," *Safehouse I*, 985 F.3d at 241.

Finally, Safehouse points to the fact that § 856(a) states that its requirements would apply "[e]xcept as authorized by this subchapter." Opp. at 41 (citing 21 U.S.C. § 856(a)). To be sure, § 856(a) does not apply if another subchapter affirmatively authorizes the relevant activity; however, Safehouse does not identify any such provision.

Safehouse next attempts to rely on the CSA's research exemption, 21 U.S.C. § 872(e). It does not dispute that § 872(e) sets out extensive scientific and regulatory controls that are altogether separate from authorizing the unregulated use of illegal drugs without proper scientific or medical guardrails. Safehouse must plead that it either qualifies for a research exemption or that the exemption it seeks is comparable to the research exemption in all relevant respects. It makes no attempt to show either. The fundamental differences between the research exemption scheme and the activities in which Safehouse seeks to engage make *Fulton* inapplicable.

In its opening brief, the government acknowledged the existence of the peyote exemption, 21 C.F.R. § 1307.31, which exempts from registration requirements one

drug (*i.e.*, peyote), in limited circumstances (*i.e.*, "nondrug use of peyote in bona fide religious ceremonies of the Native American Church"), by specific persons (*i.e.*, "members of the Native American Church"). Gov't Opening Br. at 52 (citing 21 C.F.R. § 1307.31). The government further explained that this provision does not constitute an individualized exemption for behavior covered *by § 856(a)*, nor does it call into question the interests articulated by the exemption. *Id.*

Safehouse contests none of these points in its opposition. It makes no attempt to plead that this exemption satisfies either of *Fulton*'s two prongs. Nor are the claims it does put forward meritorious. Safehouse states that "[t]he CSA's longstanding religious exemption for peyote use by the Native American Church . . . confirms that the government already 'recognize[s] exceptions' to the CSA on religious grounds[.]" Opp. at 45. Safehouse assumes that the government has the authority to provide it with an exemption, just like the peyote exemption, but identifies no such location for that authority. Moreover, as discussed, § 856(a) does not implicate the registration requirement at issue with the peyote exemption. Nor does Safehouse identify another source of "authority." Rather, its premise seems to be that the ability to provide exemptions to some legal requirements necessitates the ability to provide exemptions to *all* legal requirements. That is not the law.

Safehouse states that the civil penalty provision found at 21 U.S.C. § 844a, which authorizes the Attorney General to "compromise, modify, or remit, with or without conditions, any civil penalty" for simple possession is "the kind of standardless, individualized assessment[] that defeat[s] general applicability under

*Fulton*" because it "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions[.]" Opp. at 44. This conclusion does not follow.

It is true that § 844(a) provides that "[i]t shall be unlawful for any person knowingly or intentionally to possess a controlled substance," and that "[a]ny person who violates this subsection may be sentenced to a term of imprisonment of not more than 1 year." 21 U.S.C. § 844(a). It is also true that under certain circumstances a violation of that provision for personal use may be punished with a civil penalty, and that the Attorney General may "compromise, modify, or remit" that penalty. *Id.* § 844a(a), (f). But § 844a does *not* give the Attorney General the authority to compromise a violation of § 856(a), rather it only applies to a violation of § 844. This provision is simply inapplicable. Nor is the possession of a controlled substance for personal use by a single person comparable to operating a place "for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance." *Id.* § 856(a)(2). Section 856(a) liability is not predicated on simple possession of drugs, and the Attorney General's ability to settle a claim under § 844 does not extend to § 856.

In sum, § 856(a) is neutral and generally applicable on its face. Safehouse has not shown that it contains "a mechanism for individualized exemptions" *for the conduct prohibited by § 856(a)*, nor does Safehouse make any effort to show in its opposition that the reasons for exemptions to *other* provisions of the CSA

"undermine the government's asserted interest in a similar way." *Fulton*, 593 U.S. at 534. Accordingly, its First Amendment claim must be dismissed.

## CONCLUSION

For the foregoing reasons, the United States requests that its motion be granted and that Safehouse's Third Amended Counterclaims be dismissed with prejudice.

Dated: September 3, 2026

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Gregory B. David*
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

*/s/ Gregory B. in den Berken*
GREGORY B. IN DEN BERKEN
BRYAN C. HUGHES
ERIN E. LINDGREN
Assistant United States Attorneys
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476
Phone: (215) 861-8200
Email: gregory.indenberken@usdoj.gov
bryan.hughes@usdoj.gov
erin.lindgren@usdoj.gov

*Counsel for the United States of America, United States Department of Justice, Attorney General of the United States Todd Blanche, and United States Attorney for the Eastern District of Pennsylvania David Metcalf*

**CERTIFICATE OF SERVICE**

I certify that on September 3, 2026, I filed this Reply Memorandum of Law in Further Support of Motion to Dismiss using the Court's CM/ECF system and thus served a copy on all counsel of record via CM/ECF.

*/s/ Gregory B. in den Berken*
GREGORY B. IN DEN BERKEN